No. 2:09cv00327-TJW

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

———————————————————————————————

ROBERT L. ROBERSON, III,

*Petitioner,*

v.

RICK THALER,
Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

———————————————————————————————

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
87th District Court of Anderson County, Texas

———————————————————————————————

## PETITION FOR WRIT OF HABEAS CORPUS

———————————————————————————————

**JAMES W. VOLBERDING**
SBN: 00786313

Plaza Tower
110 North College Avenue
Suite 1850
Tyler, Texas 75702

(903) 597-6622 (Office)
(903) 597-5522 (fax)
*e-mail:*
*jamesvolberding@gmail.com*

**JOHN E. WRIGHT**
SBN: 20048500

Law Office of John E. Wright, P. C.
P. O. Box 6547
Huntsville, Texas 77342-6547

(936) 291-2211 (Office)
(832) 201-0463 (fax)

*e-mail: wright49@swbell.net*

Court-Appointed Attorneys for the Petitioner

No. 2:09cv00327-TJW

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

———————————————————————————————

ROBERT L. ROBERSON, III

*Petitioner,*

v.

RICK THALER,
Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

———————————————————————————————

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
87th District Court of Anderson County, Texas

———————————————————————————————

## PETITION FOR WRIT OF HABEAS CORPUS

———————————————————————————————

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, ROBERT L. ROBERSON, III, the Petitioner, and respectfully submits his

Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the

Institutional Division of the Texas Department of Criminal Justice. This application follows his

conviction and death sentence in the 87th District Court of Anderson County, Texas, cause number

26,162, styled *State v. Robert L. Roberson, III.*

## SUMMARY OF FACTS AND ARGUMENTS

Mr. Roberson is a dim-witted, mentally ill, drug abusing petty criminal with a long family history of serious mental health issues. His federal habeas counsel assume that Roberson probably did contribute to the death of his two-year-old daughter. Just not knowingly or intentionally. Roberson is not the worst of the worst. Not even close. But he is on Texas' death row anyway.

Roberson made an easy target for a small-town prosecutor who did not mind seeking execution of a mentally deficient man in an ordinary shaking baby case who would not be able to defend himself well. In the pages that follow, counsel for Mr. Roberson will tell the story of how a newly minted prosecutor, a trial judge and a state appellate court bent and broke the rules established by our constitution to achieve Roberson's death sentence. Sadly, there was also more, much more, that Roberson's trial defense team could have, but did not do for him at his trial. The details follow.

The prosecutor abused his office by claiming that Roberson sexually assaulted his child when he knew he did not have satisfactory evidence of that. Barely enough to avoid a bar grievance, if that.

The trial judge badly abused his discretion when he refused to sever the sexual assault theory from the status crime theory. This allowed the prosecutor to talk to the jury about a sexual assault of a two-year-old child that he knew he could never prove. The trial judge also excluded relevant mental health evidence that cast serious doubt about whether Roberson harbored the culpable mental state to support a murder conviction. The prosecutor committed misconduct by arguing to the jury that the sexual assault of the child actually did occur even though that issue was belatedly taken from the jury just prior to the time the trial judge charged the jury.

At the punishment phase of the trial, the prosecutor offered, and the trial judge admitted highly unreliable "junk science" so-called expert opinion that tended to show that Roberson would be a continuing threat to society. The prosecutor's ethical lapses combined with the trial judge's errors in judgment produced a trial that was fundamentally unfair, and a murder conviction and death

sentence that should not have been imposed under our Due Process Clause and Cruel and Unusual Punishment Clause. The Texas appellate court has simply stood by and done nothing to right these wrongs.

Worse, Roberson's own lawyers failed to 1) properly defend him from the junk science that was used to produce his death sentence, 2)  to investigate and discover, present, explain and argue to the sentencing jury all aspects of Mr. Robersons' mitigating circumstances, especially his long and robust family history of serious mental illness, or 3) to make a timely and specific complaint about the instructions the trial judge submitted to the sentencing jury that returned the death verdict. Taken as a whole,  the punishment charge failed to provide an adequate vehicle for the sentencing  jury to fully consider all aspects of his mitigation case that the jury did hear about, and to give his mitigating evidence its full mitigating effect.

In sum, Mr. Roberson is far from the worst of the worst. He is a dysfunctional mental cripple that descends from a long line of such cripples. That is not Roberson's fault. None of us are allowed to choose our ancestors. In a fair trial,  he would have been convicted of manslaughter and sentenced to 20 years, but not murder, let alone capital murder.

In the pages that follow, Mr. Roberson will show that the decisions of the state courts that placed him on Texas' death row were objectively unreasonable in light of clearly established constitutional law.

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record for Petitioner, ROBERT L. ROBERSON, III, certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that this court may evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Petitioner* | | |
| Mr. Robert L. Roberson | Polunsky Unit | Petitioner |
| Mr. James W. Volberding | 110 North College Avenue Suite 1850, Plaza Tower Tyler, TX 75702 (903) 597-6622 | Appointed attorney for current federal habeas and state habeas |
| Mr. John E. Wright | P. O. Box 6547 Huntsville, Texas 77342-6547 (936) 291-2211 | Appointed attorney for current federal habeas |
| Mr. Robin Norris | 2408 Fir Street El Paso, Texas 79925 (915) 590-4446 | Appointed attorney for petition for writ of *certiorari* |
| Mr. Steve Evans | 513 North Church Palestine, Texas 75801 903-723-3334 | Appointed attorney for trial and direct state appeal |
| Mr. John C. Vanmeter | 501 North Church Street Palestine, TX 75801-2962 Phone: (903) 723-2491 | Appointed attorney for trial |
| *Respondent* | | |
| The Hon. Mr. Greg Abbott | | Texas Attorney General |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Ms. Georgette P. Oden | Office of the Attorney General *Counsel for the State* Capital Litigation Division P.O. Box 12548, Capitol Station Austin, TX 78711-2548 (512) 936-1400 (voice) (512) 320-8132 (fax) | Asst. Attorney General |
| Mr. Doug Lowe | Anderson County Courthouse Palestine, Texas 75801 | |
| Mr. Mark Calhoon | Anderson County Courthouse Palestine, Texas 75801 | |
| Mrs. Sue Korioth | P.O. Box 600103 Dallas, TX 75360 (214) 384-3864 | Contract attorney hired by State. |
| Judges | | |
| Hon. Bascom W. Bentley, III | Anderson County Courthouse Palestine, Texas 75801 | Trial judge. |

# TABLE OF CONTENTS

*Note: To avoid confusion, the claims are numbered in the same manner they were presented in Roberson's state application for habeas relief. Some state claims have been dropped. Claims raised in direct appeal appear as claims number 31 to 39 here.*

SUMMARY OF FACTS AND ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

CERTIFICATE OF INTERESTED PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

INDEX OF PETITIONER'S RECORD EXCERPTS AND AFFIDAVITS . . . . . . . . . . . . . . xix

INDEX OF PETITIONER'S SUPPORTING PUBLICATIONS . . . . . . . . . . . . . . . . . . . . . xx

INDEX OF ADDITIONAL EVIDENCE
    SUPPORTING FEDERAL APPLICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxviii

DESIGNATION OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LIST OF PARTICIPANTS IN CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                Liability Phase of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
                The Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
                Roberson's Limited Intellectual Functioning . . . . . . . . . . . . . . . . . . . . . . 11
                Misuse of a Controversial Psychological Testing Device Known
                    as the Hare Psycopathy Checklist . . . . . . . . . . . . . . . . . . . . . . . . . 13
                The Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

DISCUSSION OF THE APPLICATION
    OF THE AEDPA TO ROBERSON'S CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ROBERSON IS ENTITLED TO AN EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . 24

ROBERSON HAS MET ALL PROCEDURAL REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . 25

ALL CLAIMS HAVE BEEN EXHAUSTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

NO CLAIMS HAVE BEEN PROCEDURALLY DEFAULTED . . . . . . . . . . . . . . . . . 28

A.    Explanation of Default Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
B.    Application to Roberson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
C.    Presentation of a constitutional claim twice to the state court does not create federal
      procedural default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Claim Number 1: The Prosecutors Made Allegations of Sexual Assault of Which They
         Knew They Did Not Have Sufficient Evidence In Order to Prejudice the Jurors and
         Increase the Odds of a Death Sentence in What Otherwise Would be a Shaken Baby
         Case. Improper Allegations by the State for the Purpose of Prejudicing Jurors for
         Tactical Advantage Deprived Roberson of His Sixth Amendment Right to a Fair Jury
         Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Claim Number 2: The Prosecutors Made Allegations of Sexual Assault of Which They
         Knew They Did Not Have Sufficient Evidence In Order to Prejudice the Jurors and
         Increase the Odds of a Death Sentence in What Otherwise Would be a Shaken Baby
         Case. Improper Allegations by the State for the Purpose of Prejudicing Jurors for
         Tactical Advantage Deprived Roberson of His Fourteenth Amendment Right to Due
         Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Claim Number 3: The Prosecutors Made Allegations of Sexual Assault of Which They
         Knew They Did Not Have Sufficient Evidence In Order to Prejudice the Jurors and
         Increase the Odds of a Death Sentence in What Otherwise Would be a Shaken Baby
         Case. Improper Allegations by the State for the Purpose of Prejudicing Jurors for
         Tactical Advantage Deprived Roberson of His Eighth Amendment Right to Be Free
         From Cruel and Unusual Punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Claim Number 4: The Absence of a State Procedure to Permit Severance of Theories of
         Criminal Liability When Necessary to Provide a Fair Trial As Required by the Due
         Process Clause and Fair Jury Trial Clause and to Prevent Violation of the Cruel and
         Unusual Punishment Clause, Violates *Chambers v. Mississippi* and the Fifth, Sixth,
         Eighth and Fourteenth Amendments to the U.S. Constitution. . . . . . . . . . . . . . 36

         A.    The District Attorney Never Possessed Evidence that Roberson Molested
               Nikki. His Evidence Suggested That She Had Not Been
               Sexually Assaulted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B.      The District Attorney Used the Sexual Assault Allegations From the First Moment of Jury Selection to Taint the Entire Jury Selection Process. . . 40

C.      The Prosecutors Told Each Juror During Individual Questioning That They Believed Roberson Was a Child Molester, that He had Been Indicted as a Child Molester, and That They would Present Evidence that He Molested Nikki. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

D.      The State Used the Sexual Assault Allegations During the Liability Phase of Trial to Argue for Conviction on the Non-Sexual Assault Offense and Misrepresented Texas Law to Jurors. . . . . . . . . . . . . . . . . . . . . . . . . . 48

E.      Even the Judge Recognized That Allegation Could Have Been More Prejudicial Than Sexual Assault of a Child. . . . . . . . . . . . . . . . . . . . . . 52

F.      Evidence of the State's Improper Motive: The Prosecutors Eliminated One Potential Juror Who Would Have Recognized the Paucity of the State's Sexual Assault Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

G.      Evidence of the State's Improper Motive: The Infamous Surreptitious Search of Roberson's Cell During Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

        1.      The Prosecutor Searched Roberson's Cell to Find His Litigation File. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        2.      The Prosecutor Seized Privileged Litigation Documents From Roberson's Cell. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

        3.      The Search Was Discovered. . . . . . . . . . . . . . . . . . . . . . . . . . 57

        4.      The Trial Judge Believes Nothing Was Done Improperly. . . . . . 58

        5.      A Hearing Was Conducted on the Search and All Documents Were Banned From Trial and a Restraining Order Imposed on District Attorney. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        6.      What was the Real Reason for the Search of Roberson's Cell? Answer: To Find Evidence of Extraneous Sexual Assault Because Prosecutors Concluded That They Lacked Any Evidence of Sexual Assault. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

        7.      Did the Search of Roberson's Litigation File Provide Useful Information? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

H.      Federal Law Condemns Use of Extraneous Offenses in the Liability Phase of a Trial for Purposes of Destroying the Defendant's Character, or Inflaming Jurors With Prejudicial Unproven Misconduct. . . . . . . . . . . . . . . . . . . . . . 63

I.      How Does the Court Sever Theories of Liability in a Capital Murder Indictment?  Intro: *Chambers v. Mississippi.* . . . . . . . . . . . . . . . . . . . . . 64

J.      This Claim Was Fully Preserved and Has Not Been Procedurally Defaulted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

K.      The Findings and Conclusions by the State Court are unreasonable application of existing federal law and do not bar this Court from granting relief under the AEDPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Claim Number 5: Unreliable and Unscientific Testimony by The State's Psychologists That Roberson Was a Future Danger Lacked Scientific Reliability Required by *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, and *Kumho Tire Co., Ltd. v. Carmichael*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Claim Number 6: The State's Psychologists Who Testified That Roberson Was a Future Danger Lacked Sufficient Qualifications as Required by *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, and *Kumho Tire Co., Ltd. v. Carmichael*. . . . . . . . . . . . . 73

Claim Number 7:  Unreliable and Unscientific Testimony by the State's Psychologists That Roberson Was a Future Danger Lacked Scientific Reliability, and Thereby Violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Claim Number 8: Unreliable and Unscientific Testimony by the State's Psychologists That Roberson Was a Future Danger Lacked Scientific Reliability, and Thereby Violated the Fifth, Sixth and Eighth Amendments to the U.S. Constitution. . . . . . . . . . . . 74

Part I: The key to the State's death verdict was misuse of the Hare Psychopathy Checklist by Dr. Allen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

A.      A leading government proponent has recently repudiated use of the Hare Psychopathy Checklist as an appropriate instrument for predicting the future dangerousness of capital defendants  . . . . . 74

B.      Both case law and empirical research demonstrate that psychopathy evidence is unfairly prejudicial  . . . . . . . . . . . . . . . . . . . . . . . . . . 82

C. No useful predictive value among violence risk tools according to APA Journal Publication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

PART II: TESTIMONY BY PSYCHOLOGISTS WHO ATTEMPT TO PREDICT THE DEFENDANT'S FUTURE DANGEROUSNESS IS INHERENTLY UNRELIABLE . . 88

A. Dr. Self's and Dr. Allen's Method of Assessing Future Dangerousness of a Capital Defendant Is Not Supported by Current Psychological Body of Knowledge and Opinion in the Profession. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

B. The Forensic Psychology Profession Has Developed Standards of Conduct and Scientific Methodology for Conducting Risk Assessments of a Capital Defendant's Propensity for Future Serious Violence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

C. State Hired Forensic Psychologists Frequently Fail to Consider Recognized Influences on Future Dangerousness. . . . . . . . . . . . 93

    1. First Error of State Forensic Psychologists: Failing to Consider the Context of Prison When Assessing Future Risk of Violence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

    2. Second Error of State Forensic Psychologists: Failing to Consider the Base Rate Data of Actual Violence in Prison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

    3. Third Failure of State Forensic Psychologists: Recklessly Labeling the Capital Defendant as a "Psychopath." . . . . 95

    4. The Hare Psychopathy Checklist-Revised Is Not an Accurate Tool For Assessing Future Dangerousness in Prison. . . . 96

D. Current Forensic Psychology Standards Has Created a Methodology for Assessing Future Danger. . . . . . . . . . . . . . . . . . . . . . . . . . . 98

    1. Methodology Step One: Assessing the Defendant's Past Behavior in Similar Context. . . . . . . . . . . . . . . . . . . . . . . 99

    2. Methodology Step Two: Applying the Relevant Base Rates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

    3. Methodology Step Three: Adjusting The Final Risk Estimate

For Risk Management or Violence Prevention/Reduction Procedures That Could Be Applied. . . . . . . . . . . . . . . . 105

CRITIQUE OF THE METHODOLOGY OF DRS. SELF AND ALLEN . . . . . 106

E.      Summary of Dr. Allen's Opinions and Testimony. . . . . . . . . 106

F.      Summary of Dr. Self's Opinions and Testimony. . . . . . . . . . . 107

G.      Dr. Self and Dr. Allen Applied Their Own Self Created Ad Hoc Methodology for Assessing Roberson's Future Dangerousness, Not One Recognized by the Profession. . . . . . . . . . . . . . . . . . . . . . 108

H.      Dr. Allen's and Dr. Self's Assessments That Roberson Posed a Probability of Future Violence Is Not Substantiated Either by Their Own Ad Hoc Methodology or Current Professional Standards. 110

      1.      Dr. Self and Dr. Allen Reached Their Conclusions Without Waiting for or Considering All of the Available Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

      2.      Dr. Self and Dr. Allen Failed to Conduct any Objective Measurable Testing on Roberson. . . . . . . . . . . . . . . . . . 112

      3.      Dr. Allen Modified An Inappropriate and Unverified Psychological Test and Created His Own Ad Hoc Version Which He Used Roberson. . . . . . . . . . . . . . . . . . . . . . . . 112

      4.      Dr. Allen Twisted His Comparison of Affective Violence to Instrumental Violence to Suit His Need in This Case. . 117

      5.      Dr. Allen Provided Mutually Exclusive Opinions at Trial.123

      6.      Dr. Allen Did Not Rely on Appropriate Testing to Determine Whether Roberson Was Suffering Anti-Social Personality Disorder. . . . . . . . . . . . . . . . . . . . . . . . . . 125

      7.      Dr. Self and Dr. Allen Failed to Assess Properly the Context of Prison in Making Their Assessment of Roberson's Future Dangerousness. Dr. Allen Admitted That Roberson Posed Little or No Risk of Violence in Prison. . . . . . . . . . . . 125

8.    Drs. Self and Allen Ignored Objective Base Rate Data Research. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

9.    Drs. Self's and Allen's Individual Examination of Roberson Was Ridiculously Inadequate. . . . . . . . . . . . . . . . . . . . 133

10.   Dr. Allen Misused a Psychological Term of Art and Allowed the Prosecutor to Inflame Jurors by Labeling Roberson a Psychopath. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

11.   Dr. Allen Assumed That Roberson Was a Child Sex Offender Without Any Supporting Evidence that the Prosecutor's Allegations Were True. . . . . . . . . . . . . . . . . . . . . . . . . 135

12.   The Two Experts Failed to Conduct a Meaningful Assessment of Mitigating Circumstances, But Said There Were None.135

13.   Dr. Self's and Dr. Allen's Methodology Did Not Balance Individual Assessments With Objective Psychological Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

14.   Drs. Self and Allen Incorrectly Argued That Roberson Does Not Match the Reference Group in Some Fashion. . . . . 137

15.   Drs. Self and Allen Failed to Adjust Their Final Risk Estimate For Risk Management or Violence Prevention/Reduction Procedures That Could Be Applied.138

16.   Dr. Allen Improperly Compared Roberson to Heinous Criminals and Placed Him in the Same Category. . . . . . 138

17.   Both Experts Failed to Define Their Terms Properly. . . 138

18.   Drs. Allen and Self Lacked the Forensic Psychology Qualifications to Undertake a Risk Assessment of Roberson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

SCIENCE DOES NOT SUPPORT PREDICTIONS OF FUTURE DANGEROUSNESS . . . . . . . . . . . . . . . . . . . . . . . . . 139

I.    The Psychology Profession Does Not Recognize Predictions of Future Dangerousness in Capital Cases. . . . . . . . . . . . . . . . . . 140

J.       The Testimony of Dr. Allen and Dr. Self Violates the Requirement of Scientific Reliability Mandated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and *Kumho Tire v. Carmichael.* . . . . . . . 142

K.      The *Rock/Daubert* change in the law has Eighth Amendment implications as well. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

L.      The Glacier Cracks: Circuit Courts Are Beginning to Question State Use of Forensic Psychologists. . . . . . . . . . . . . . . . . . . . . . . . . . 148

Part III: The Findings and Conclusions by the State Court are Not Reasonable Application of Existing Federal Constitutional Law. Consequently, Relief is Not Barred by the AEDPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

Claim Number 9: Roberson Received Ineffective Assistance of Counsel In the Sentencing Phase of Trial in Violation of the Sixth Amendment and Fourteenth Amendment to the Federal Constitution, By Failing to Challenge Adequately State's Forensic Psychology Testimony That Roberson Would Constitute a Future Danger. . . . 159

A.      Failure to Show Jurors That Testimony of Dr. Allen and Dr. Self, State's Forensic Psychologists, Was Unsubstantiated by Science. . . . . . . . . . . 159

B.      Failure to Cross-Examine Dr. Allen Effectively. . . . . . . . . . . . . . . . . . . 162

C.      Failure to Confront Inaccurate Statements by Dr. Allen that His Opinions Were Supported by Research. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

D.      Failure to Differentiate Between Prediction of Future Serious Violence in Prison and Prediction of Future Dangerousness. . . . . . . . . . . . . . . . . . . 171

E.      Failure to Block Dr. Allen From Offering Testimony as to Mitigating Evidence, and Misunderstanding the Role of Mitigating Evidence. . . . 172

F.      Failure to Stop Dr. Allen From Volunteering Damaging Testimony with Non-Responsive Answers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

G.      Failure to Cross-Examine Dr. Self Effectively . . . . . . . . . . . . . . . . . . . 174

H.      Failure to Provide Effective Rebuttal Evidence to Dr. Self or Dr. Allen Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

I.      Defense Counsel Failed to Present to Jurors Objective Base Rate Data Which Demonstrated That the Incidence of Serious Violence Among Incarcerated Capital Murder Inmates is Low. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

J.      Failure to Present Available TDCJ-ID Statistics Showing Low Incidence of Violence in Prison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

K.      Failure to Object on Proper Basis and Possible Procedural Default of Constitutional Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

L.      Discussion of the Duties of Appointed Counsel in Capital Case . . . . . . 176

M.      Application of Strickland v. Washington Requirements. . . . . . . . . . . . 177

Analysis of the State Court's Findings of Fact and Conclusions of Law: The State Court's F&Cs Do Not Constitute Reasonable Application of Federal Law. Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 178

Claim Number 10: Roberson Received Ineffective Assistance of Counsel In the Sentencing Phase of Trial in Violation of the Sixth Amendment and Fourteenth Amendment to the Federal Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

A.      Waiver of all charge issues by failing to object to the jury charge in sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

B.      Waiver of all charge issues by failing to object to the jury charge in the liability phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

C.      Failure to Object to Improper Prosecutor Argument. . . . . . . . . . . . . . 182

D.      General Failure to Preserve Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

E.      General Failure to Brief Direct Appeal Adequately. . . . . . . . . . . . . . . . 183

Analysis of the State Court's Findings of Fact and Conclusions of Law: The State Court's F&Cs Do Not Constitute Reasonable Application of Federal Law. Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 184

Claim Number 12: Under a *Ring* and *Apprendi v. New Jersey* analysis, Texas Code Crim. P. Art. 37.071 § 2(b)(1) Operates As the Functional Equivalent of an Element of a Greater Offense.  Accordingly, Jury Determination of a Defendant's "Future Dangerousness" in Art. 37.071 § 2(b)(1), Which If Established is an Aggravating Circumstance or Element the Effect of Which Causes a Defendant's Execution, Must Be Proven Beyond a Reasonable Doubt, Rather Than by the Current Statutory Requirement of a "Probability" of Future Dangerousness Beyond a Reasonable Doubt, Which is a Much Lower Standard.  Accordingly, Texas Code Crim. P. Art. 37.071 §2(b)(1) is Unconstitutional.  As such, Roberson must not be executed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

Analysis of the State Court's Findings of Fact and Conclusions of Law: The State Court's F&Cs Do Not Constitute Reasonable Application of Federal Law. Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 190

Claim Number 13: Roberson's Fourteenth Amendment Due Process Rights as Interpreted in *Apprendi v. New Jersey* Were Violated Because the Statute under Which Applicant Was Sentenced to Death it Implicitly Put the Burden of Proving the Mitigation Special Issue on Applicant Rather than Requiring a Jury Finding Against Applicant on That Issue under the Beyond a Reasonable Doubt Standard and Because the Charging Instrument Did Not Give Applicant Notice of the Facts That the State Intended to Prove in Order to Establish Applicant's Statutory Qualification for the Death Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

A.      What *Apprendi* Decided . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

B.      The Texas Statute and its Interpretation  . . . . . . . . . . . . . . . . . . . . . . . . 196

Analysis of the State Court's Findings of Fact and Conclusions of Law: The State Court's F&Cs Do Not Constitute Reasonable Application of Federal Law. Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 198

Claim Number 14:  Applicant's Fourteenth Amendment Due Process Right to Be Free from a Wholly Arbitrary Deprivation of Liberty and Eighth Amendment Right to Be Free from the Arbitrary and Capricious Infliction of the Death Penalty Were Violated Because the Evidence Adduced at Trial Was Legally and Factually Insufficient to Support the Jury's Answer to the Future Dangerousness Special Issue. . . . . . . 201

A)      Legal Bases for Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

B)      Facts Supporting the Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

> Analysis of the State Court's Findings of Fact and Conclusions of Law: The State Court's F&Cs Do Not Constitute Reasonable Application of Federal Law. Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 203

Claim Number 15: Applicant's Fourteenth Amendment Due Process Right to Be Free from a Wholly Arbitrary Deprivation of Liberty and Eighth Amendment Right to Be Free from the Arbitrary and Capricious Infliction of the Death Penalty Were Violated Because the Evidence Adduced at Trial Was Legally and Factually Insufficient to Support the Conviction for Capital Murder. . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

> Analysis of the State Court's Findings of Fact and Conclusions of Law: The State Court's F&Cs Do Not Constitute Reasonable Application of Federal Law. Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 210

Claim Number 16: Applicant's Fourteenth Amendment Right to Due Process and Eighth Amendment Right to Be Free from the Arbitrary and Capricious Infliction of the Death Penalty Were Violated Because the Statute under Which Applicant Was Sentenced to Death Allows the Jury Too Much Discretion to Determine Who Should Live and Who Should Die and Because it Lacks the Minimal Standards and Guidance Necessary for the Jury to Avoid the Arbitrary and Capricious Imposition of the Death Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

> Analysis of the State Court's Findings of Fact and Conclusions of Law: The State Court's F&Cs Do Not Constitute Reasonable Application of Federal Law. Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 215

Claim Number 17: Applicant's Fourteenth Amendment Right to Due Process and Eighth Amendment Rights as Interpreted in Penry v. Johnson Were Violated Because the Mitigation Special Issue Set Forth in the Texas Death Penalty Statute Sends Mixed Signals to the Jury Thereby Rendering Any Verdict Reached in Response to That Special Issue Intolerably Unreliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

> Analysis of the State Court's Findings of Fact and Conclusions of Law: The State Court's F&Cs Do Not Constitute Reasonable Application of Federal Law. Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 220

Claim Number 18: The Special Sentencing Issue Asking Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Because It Does Not Provide a Means for Jurors to Give Effect to the Mitigating Circumstances Warranting a Life Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

Claim Number 19: The Special Sentencing Issue Asking Jurors to Weigh Mitigating

Circumstances Against Aggravating Circumstances Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution Because It Does Not Provide a Means for Jurors to Give Effect to the Mitigating Circumstances Warranting a Life Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

Claim Number 20: The Special Sentencing Issue Asking Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Because It Shifts the Burden of Proof to the Defendant to Prove that Sufficient Mitigating Circumstances Exist to Warrant a Life Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Claim Number 21: The Special Sentencing Issue Asking Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution Because It Shifts the Burden of Proof to the Defendant to Prove that Sufficient Mitigating Circumstances Exist to Warrant a Life Sentence. . . . . . . . . . . . . . . . . . . . . . . . 224

Claim Number 22: The Special Sentencing Issue Asking Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Because It Does Not Require Jurors to Consider Mitigating Circumstances Alone in Determining Whether a Life Sentence is Warranted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Claim Number 23: The Special Sentencing Issue Asking Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution Because It Does Not Require Jurors to Consider Mitigating Circumstances Alone in Determining Whether a Life Sentence is Warranted. . . . . . . . . . . . . . . . . . . . . . 224

Analysis of the State Court's Findings of Fact and Conclusions of Law: The State Court's F&Cs Do Not Constitute Reasonable Application of Federal Law. Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 229

Ground for Relief 24: The Trial Court Violated the Eighth and Fourteenth Amendments to the United States Constitution by Failing to Instruct the Jury That the a "No" Vote by a Single Jury Member Would Result in a Life Sentence Instead of Death Despite the Statutory Requirement of 10 Votes for a "No" Answer to Article 37.071 § 2(b)(1) or for a "Yes" Vote to Article 37.071 § 2(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

Ground for Relief 25: The Trial Court Violated Article I, §§ 10, 13, and 19 of the Texas Constitution by Failing to Instruct the Jury That the a "No" Vote by a Single Jury Member Would Result in a Life Sentence Instead of Death Despite the Statutory Requirement of 10 Votes for a "No" Answer to Article 37.071 § 2(b)(1) or for a "Yes" Vote to Article 37.071 § 2(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

    Analysis of the State Court's Findings of Fact and Conclusions of Law: The State Court's F&Cs Do Not Constitute Reasonable Application of Federal Law. Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 232

Ground for Relief 26: Article 37.071 § 2(e) Is Unconstitutional Under the Eighth and Fourteenth Amendments to the United States Constitution Because Appellate Review of the Second Special Issue Is Impossible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

    Analysis of the State Court's Findings of Fact and Conclusions of Law: The State Court's F&Cs Do Not Constitute Reasonable Application of Federal Law. Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 236

Claim for Relief 28: Science Evidence Demonstrates That the Jury Instructions Used in the Sentencing Phase Failed to Explain the Concept of Mitigating Evidence, Thereby Violating Roberson's Rights to a Fair Trial, Due Process, Equal Protection, and Not to Suffer Cruel and Unusual Punishment as Guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the Federal Constitution. . . . . . . . . . . . . . . . . 239

Claim for Relief 29: Social Science Evidence Demonstrates That the Jury Instructions Used in the Sentencing Phase Failed to Define Key Terms "Criminal Acts of Violence," "Probability," "Continuing Threat," "Society," Thereby Violating Roberson's Rights to a Fair Trial, Due Process, Equal Protection, and Not to Suffer Cruel and Unusual Punishment as Guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the Federal Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

Claim for Relief 30: Social Science Evidence Aside, The Jury Instructions Used in the Sentencing Phase Failed to Define Key Terms "Criminal Acts of Violence," "Probability," "Continuing Threat," "Society," "Mitigating Evidence," and "Culpability" Thereby Violating Roberson's Rights to a Fair Trial, Due Process, Equal Protection, and Not to Suffer Cruel and Unusual Punishment as Guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the Federal Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

    A.    Overview of Constitutional Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

    B.    Social Science Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

C.      Application to Roberson's Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Analysis of the State Court's Findings of Fact and Conclusions of Law: The State
        Court's F&Cs Do Not Constitute Reasonable Application of Federal Law.
        Therefore, the AEDPA is not a Bar to Relief By This Court. . . . . . . . . 249

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 252

Claim Number 31:  The Decision That the Evidence Was Sufficient to Support a Conviction
        for Capital Murder Was an Unreasonable Application of Clearly Established
        Constitutional Law. *Jackson v. Virginia*, 443 U.S. 307 (1979), overruling *Thompson
        v. City of Louisville*, 362 U.S. 199 (1960), citing *In re Winship* 397 U.S. 358
        (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Claim Number 32: the Application of the "Child under Six" Aggravator, Section 19.03(a)(8)
        of the Texas Penal Code Was an Unreasonable Application of Clearly Established
        Constitutional Law. ( Invalid Death Aggravator Eighth and 14th Amendments to the
        United States Constitution) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

CLAIMS THAT THE INSTRUCTIONS SUBMITTED TO ROBERSON'S SENTENCING JURY DID NOT
        AFFORD THE JURORS WITH AN ADEQUATE VEHICLE TO FULLY CONSIDER AND GIVE
        EFFECT TO HIS MITIGATING CIRCUMSTANCES . . . . . . . . . . . . . . . . . . . . . . . . . 258

Claim Number 33:  By refusing to instruct the  jury at either phase of the trial that, in order
        to impose death as a penalty, the state was required to establish beyond a reasonable
        doubt that Mr. Roberson acted deliberately, or even intentionally, in killing the
        victim, the decision of the Texas courts involved an unreasonable application of
        constitutional law clearly established in *Jurek v. Texas*, 428 U.S. 262 (1976).
        (Derived from Points of Error Nine and Ten on Direct Appeal to the Texas
        CCA.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

The Eighth Amendment Guidelines for Aggravating Factors . . . . . . . . . . . . . . 265

Mr. Roberson's arguments on his claims that the charge to the jury at the punishment
        phase was contrary to or involved an unreasonable application of clearly
        established constitutional law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268

Summary of Arguments Regarding the Charge to the Sentencing Jury . . . . . . . 268

The evolution of the Texas mitigation inquiry . . . . . . . . . . . . . . . . . . . . . . . . . 270

Claim Number 34: The statutory moral blameworthiness instruction and the trial court's improvised "personal culpability" instruction improperly limited the scope of the Texas mitigation inquiry. *Skipper v. South Carolina*, 476 U.S. 1 (1986) . . . . 272

Claim Number 35: The failure to assign any burden of roof or persuasion to any party in the mitigation inquiry offends our basic notions of due process of law that do apply at capital sentencing. The failure to assign to the state the burden of proof and persuasion of facts adverse to the capital defendant's mitigation case also offends the Due Process Clause. *In re Winship,* 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . 274

Claim Number 36: The failure to assign any burden of proof or persuasion at the mitigation inquiry is objectively unreasonable as it renders the decision to impose death incapable of meaningful appellate review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 277

Claim Number 37: The Texas 12-10 and secrecy rule offend the guided discretion guidelines set out by the Supreme Court followed by the Fifth circuit in *Nelson* . . . . . . . . 277

Claim Number 38: By failing to conduct an adequate investigation into Mr. Roberson's background, mental health record, family history and upbringing, and by failing to present the results of an adequate investigation to competent experts or to present and explain the results of his investigation to the sentencing jury, trial counsel performed deficiently and below the prevailing professional norms of the legal profession as they existed in 2003. This failure to investigate prejudiced Mr. Roberson's case for a lesser included offense and for a life sentence upon conviction for capital murder. *Wiggins v. Smith*, 539 U.S. 510 (2003*)*, *Williams v. Taylor*, 529 U.S. 362, 395-97 (2000*)*, *Strickland v. Washington,* . 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . 279

Claim Number 39: By Excluding the Testimony of Defense Witness Dr. Krusz Testimony Before the Jury During the Guilt and Innocence Phase of Trial, the Texas Courts Unreasonably Denied Mr. Roberson His Right to Present a Complete Defense, Contrary to the Guarantees of the Sixth, Eighth and Fourteenth Amendments. *Holmes v. South Carolina.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281

FINAL COMMENT ON STATE FINDINGS AND CONCLUSIONS . . . . . . . . . . . . . . . . . . 283

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 284

RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

## INDEX OF PETITIONER'S RECORD EXCERPTS AND AFFIDAVITS

The state writ application was accompanied by three volumes of excerpts from the trial record, extraneous documents, and research articles, and other supporting documents. These documents are too voluminous to file electronically with Roberson's federal application, but all of the documents are contained in the state record. All arguments, evidence, and citations contained in the documents and publications should be considered part of this application.

| Tab | Description | Comment |
|-----|-------------|---------|
| 1 | Final judgment of conviction and sentence of death | |
| 2 | Jury charge and verdict, liability phase | |
| 3 | Jury charge and verdict, punishment phase | |
| 4 | Testimony of Dr. Thomas Allen, State's expert, *State v. Robert L. Ladd* (another death penalty case) | |
| 5 | Testimony of Dr. Thomas Allen, April 27, 1994, *State v. Rickey Lynn Lewis.* | |
| 6 | Testimony of Dr. Thomas Allen, February 28, 1996, *State v. Charles D. Tuttle* | |
| 7 | Affidavit of James Volberding | |
| 8 | Affidavit of Robert Roberson | |
| 9 | Affidaviit of Joseph Willis, DA's Investigator, and Hearing on Search of Jail Cell | |
| 10 | Defendant's Pretrial Exhibit No. 2, Photograph of Roberson's cell. | |
| 11 | Defendant's Pretrial Exhibit No. 3, Cover of District Attorney's Folder Containing Documents Seized From Roberson's Cell | |
| 12 | Defendant's Pretrial Exhibit No. 3, Documents Seized From Roberson's Cell, Correspondence | |

| Tab | Description | Comment |
|-----|-------------|---------|
| 13 | Defendant's Pretrial Exhibit No. 4, Documents Seized From Roberson's Cell, Roberson's Litigation Notes. | |
| 14 | Affidavit of Rex Olson | |
| 15 | Affidavit of Steve Evans | |
| 16 | Affidavit of Judge Bascom Bentley, III. | |
| 17 | Letter From Inmate Offering Testimony Against Roberson, received in June 2002, but not disclosed until January 2003. | |
| 18 | Affidavit of Anderson County Jail Administrator, Ryan Tolliver | |
| 19 | Affidavit of Dr. Kelly Goodness, and report. | |
| 20 | Affidavit of TDC official, James Jones, Asst. Warden. | |
| 21 | Texas Public Defender, Deadly Speculation: Misleading Texas Capital Juries With False Predictions of Future Dangerousness (2004). | |

## INDEX OF PETITIONER'S SUPPORTING PUBLICATIONS

Roberson's state writ application was accompanied by the following published articles from the field of forensic psychology.  These articles are incorporated into this application by reference.  All arguments, evidence, and citations contained in the documents and publications should be considered part of this application.  These publications are too voluminous to file electronically, but they are contained in the state record.

| Tab | Publication | Comment |
|-----|-------------|---------|
| 22 | Not used. | |
| 23 | Cunningham, Mark D. and Alan M. Goldstein, *Sentencing Determinations in Death Penalty Cases*, Ch. 21, published in Goldstein, Alan M. and Irving B. Weiner, 11 Forensic Psychology, Handbook of Psychology, 407-32, 416-17 (John Wiley & Sons, Inc.) (hereinafter "Cunningham & Goldstein") | |

| Tab | Publication | Comment |
|---|---|---|
| 24 | Cunningham, Mark D. & Thomas J. Reidy, *Antisocial Personality Disorder and Psychopathy: Diagnostic Dilemmas in Classifying Patterns of Antisocial Behavior in Sentencing Evaluations*, 16 Behav. Sci. L. 333-51 (1998). | |
| 25 | Cunningham, Mark D. & Thomas J. Reidy, *Antisocial Personality Disorder Versus Psychopathy as Diagnostic Tools*. | |
| 26 | Article, Mark D. Cunningham and Thomas J. Reidy, *Integrating Base Rate Data in Violence Risk Assessments at Capital Sentencing,* 16 Behav. Sci. L. 71-95 (1998) | |
| 27 | Reidy, Thomas J. & Mark D. Cunningham, Jon R. Sorensen, *From Death to Life, Prison Behavior of Former Death Row Inmates in Indiana*, 28 Crim. Justice & Behavior 62 (2001). | |
| 28 | Article, Mark D. Cunningham and Thomas J. Reidy, *Don't Confuse Me With the Facts, Common Errors in Violence Risk Assessment at Capital Sentencing*, 26 Crim. Just. & Behav. 20-43 (Mar. 1999). | |
| 29 | Cunningham, Mark D. & Mark P. Vigen, *Death Row Inmate Characteristics, Adjustment, and Confinement: A Critical Review of the Literature,* 20 Behav. Sci. L. 191-210 (2002). | |
| 30 | Article, Mark D. Cunningham and Thomas J. Reidy, *Violence Risk Assessment at Federal Capital Sentencing: Individualization, Generalization, Relevance, and Scientific Standards*, to be published in Crim. Just. & Behav. 2003. | |
| 31 | Cunningham, Mark D. & Thomas J. Reidy, *A Matter of Life or Death: Special Considerations and Heightened Practice Standards in Capital Sentencing Evaluations*, 19 Behavioral Sciences L. 473-90 (2001) | |
| 32 | Affidavit of Mark Cunningham, from Danielle Simpson death penalty case. | |
| 33 | TDCJ-ID statistics of inmate assaults, 1998-2000 | |

| Tab | Publication | Comment |
|-----|-------------|---------|
| 34 | TDCJ-ID statistics of inmate actions, 1993-2002 | |
| 35 | Source book, Bureau of Justice Statistics, showing state by state levels of community violence | |
| 36 | U.S. Department of Justice, *Survey of State Prison Inmates, 1991* | |
| 37 | TDCJ-ID statistics of inmate actions, EAC Select Statistics for December 2002, attached to January 13, 2003 memo. | |
| 38 | U.S. Dept. of Justice, Jack Alexander and James Austin, Handbook for Evaluating Objective Prison Classification Systems (June 1992). | |
| 39 | Morris, Norval & Marc Miller, Predictions of Dangerousness 1-50 (Univ. of Chicago Press 1985). | |
| 40 | Masten, Ann & Norman Garmezy, *Risk, Vulnerability and Protective Factors in Developmental Psychopathology*, 8 Advances Clinical Child Psychology 1 (1985). | |
| 41 | Article, Jonathan R. Sorensen and Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed By Capital Murder Defendants*, 90 J. Crim. L. & Criminology 1251 (Summer 2000) | |
| 42 | Marquart, James W. & Jonathan R. Sorensen, *A National Study of the Furman Commuted Inmates: Assessing the Threat to Society From Capital Offenders*, 23 Loyola of Los Angeles L. Rev. 5 (1989). | |
| 43 | Marquart, James W., *et al.*, *Gazing Into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases*, 23 Law & Society Rev. 449 (1988). | |
| 44 | Article, Jon Sorensen and Robert D. Wrinkle, *No Hope For Parole: Disciplinary Infractions Among Death-Sentenced and Life-Without-Parole Inmates*, 23 Crim. J. & Behav. 542-552 (Dec. 1996). | |

| Tab | Publication | Comment |
|-----|-------------|---------|
| 45 | Marquart, James W., *et al.*, The Rope, The Chair, and the Needle: Capital Punishment in Texas (Univ. Texas Austin (1994). | |
| 46 | U.S. Dept. Justice, Guide for Implementing the Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders, Juvenile Justice Bull. June 1995. | |
| 47 | Widom, Cathy, Childhood Victimization, Nat'l Inst. Justice J. 1 (Jan. 2000). | |
| 48 | Akman, Dogan D., *et al.*, Homicides and Assaults in Canadian Penitentiaries, 8 Canadian J. Corrections 284 (1966). | |
| 49 | Gallemore, Johnnie L. & James H. Panton, *Inmate Responses to Lengthy Death Row Confinement*, 129 Amer. J. Psychia. 167 (1972). | |
| 50 | Ethical Principles of Psychologists and Code of Conduct, 47 American Psychologist 1597 (Dec. 1992). | |
| 51 | U.S. Dept. Justice, Jail Classification System Development: A Review of the Literature (Mar. 1992 Rev.). | |
| 52 | *Specialty Guidelines for Forensic Psychologists*, Committee on Ethical Guidelines for Forensic Psychologists, 15 L. Human Behav. 655 (1991). | |
| 53 | Edens, John F. *et al.*, *Psychopathy and the Death Penalty,* 29 J. Psychiatry Law 433 (2001). | |
| 54 | Bedau, Hugo A., *Death Sentences in New Jersey*, 1907-1960, 19 Rutgers L. Rev. 1 (1964). | |
| 55 | U.S. Dept. Justice, *Assaults on BOP Staff and Inmates* 2 Research Forum 1 (July 1992). | |
| 56 | Heilbrun, Kirk, *Prediction v Management Models Relevant to Risk Assessment* 21 L. Human Behav. 347 (1997). | |

| Tab | Publication | Comment |
|-----|-------------|---------|
| 57 | Rogers, Richard, *The Uncritical Acceptance of Risk Assessment in Forensic Practice*, 24 L. Human Behav. 595 (2000). | |
| 58 | Deitchman, Mary Ann, *et al., Self-Selection Factors*, 15 L. Human Behav. 287 (1991). | |
| 59 | Appelbaum, Paul S. *Hypotheticals, Psychiatric Testimony and the Death Sentence*, 12 Bull. Am. Acad. Psychiatry L. 169 (1984). | |
| 60 | Monahan, John, *Violence Prediction* 23 Crim. Justice and Behav. 107 (1996). | |
| 61 | Blake, Pamela, et al., Neurologic Abnormalities in Murderers, 45 Neurology 1641 (1995). | |
| 62 | Clements, Carl, Offender Classification 23 Crim. Justice and Behavior 121 (1996) | |
| 63 | Costanzo, Mark & Sally, Jury Decision Making in the Capital Penalty Phase, 16 L. Human Behav. 185 (1992). | |
| 64 | Craig, Robert J., MMPI-Based Psychological Assessment of Lethal Violence, Lethal Violence 506 (Pacific Institute for the Study of Conflict and Aggression 1996). | |
| 65 | Davis, Peggy C., The Texas Capital Sentencing Procedures, 69 J. Crim. L. & Crim. 300 (1978). | |
| 66 | Ewing, Charles, Dr. Death and the Case for an Ethical Ban on Psychiatric and Psychological Predictions of Dangerousness in Capital Sentencing Proceedings, 8 Am. J. L. Medicine 408 (1983). | |
| 67 | Geimer, William S. & Jonathan Amsterdam, *Why Jurors Vote Life or Death*, 15 Am. J. Crim. Law 1 (1988) | |
| 68 | Green, William, *Capital Punishment, Psychiatric Experts, and Predictions of Dangerousness*, 13 Capital Univ. L. Rev. 533 (1984). | |

| Tab | Publication | Comment |
|-----|-------------|---------|
| 69 | Kennedy, Thomas D., *Trends in Inmate Classification*, 13 Am. Assoc. Correctional Psych. 165 (June 1986). | |
| 70 | Langevin, Ron, *et al., Brain Damage, Diagnoisis, and Substance Abuse Among Violent Offenders*, 5 Behav. Sci. & L. 77 (1987). | |
| 71 | Simon, Robert I., *Psychiatry and the Death Penalty: The Past Decade*, 23 Psychiatric Annals 41 (Jan. 1993) | |
| 72 | Lewis, Dorothy O. *et al., Neuropsychiatric, Psychoeducational and Family Characteristics of 14 Juveniles Condemned to Death in the U.S.*, 145 Am. J. Psychiatry 584 (1988). | |
| 73 | Martell, Daniel A., *Estimating the Prevalence of Organic Brain Dysfunction in Maximum Security Forensic Psychiatric Patients,* 37 J. Forensic Sci. 878 (1992). | |
| 74 | Bluestone, Harvey & Carl L. McGahee, *Reaction to Extreme Stress: Impending Death by Execution*, 119 Am. J. Psychiatry 393 (1962). | |
| 75 | Monahan, John, Predicting Violent Behavior, Sage Library of Social Research (Sage Pub. 1981). | |
| 1 | Quay, Herbert C., Managing Adult Inmates, (Am. Correctional Assoc.) | |
| 2 | Serin, Ralph C. & Nancy L. Amos, *The Role of Psychopathy in the Assessment of Dangerousness*, 18 Int'l J. L. & Psychiatry 231 (1995). | |
| 3 | Shah, Saleem A., *Dangerousness: A Paradigm for Exploring Some Issues in Law and Psychology*, Am. Psychologist (Mar. 1978). | |
| 4 | Swanson, Jeffrey W. *et al., Violence and Psychiatric Disorder*, 41 Hospital & Community Psychiatry 761 (July 1990). | |

| Tab | Publication | Comment |
|-----|-------------|---------|
| 5 | Hawkins, J. David, *et al., Predictors of Youth Violence*, Juvenile Justice Bulletin (U.S. Dept. Justice, Office Justice Programs) (Apr. 2000). | |
| 6 | Widiger, Thomas A. & Elizabeth Corbitt, *Antisocial Personality Disorder*, DSM-IV p. 103 (Am. Psychiatric Assoc. 1995) | |
| 7 | Worrell, Claudia M., *Psychiatric Prediction of Dangerousness in Capital Sentencing*, 5 Behav. Sci. & L. 433 (1987). | |
| 8 | Zager, Lynne D., *The MMPI-Based Criminal Classification System*, 15 Crim. Justice & Behavior 39-57 (Mar. 1988). | |
| 9 | Freedman, Alfred & Abraham L. Halpern, *The Psychiatrist's Dilemma: A Conflict of Roles in Legal Executions*, 33 Australian & New Zealand J. Psychiatry 629 (1999). | |
| 10 | Yarvis, Richard M., *Axis I and Axis II Diagnostic Parameters of Homicide*, 18 Bull. Am. Academy Psychiatry L. 249 (1990). | |
| 11 | Kelley, Barbara T., Terence P. Thornberry & Carolyn A. Smith, *In the Wake of Childhood Maltreatment* Juvenile Justice Bulletin (U.S. Dept. Justice, Office Justice Programs) (Aug. 1997). | |
| 12 | Leong, Gregory, *et al., Survey of Forensic Psychiatrists on Evaluation and Treatment of Prisoners on Death Row*, 28 J. Am. Acad. Psychiatry L. 427 (2000). | |
| 13 | Ferris, Rob, *Psychiatry and the Death Penalty*, 21 Psychiatric Bulletin 746 (1997). | |
| 14 | Dekleva, Kenneth B., *Psychiatric Expertise in the Sentencing Phase of Capital Murder Cases,* 29 J. Am. Acad. Psychiatry L. 58 (2001) | |
| 15 | ABA Criminal Justice Mental Health Standards (1984). | |

| Tab | Publication | Comment |
|-----|-------------|---------|
| 16 | Appelbaum, Paul, *Psychiatrist's Role in the Death Penalty*, 32 Hospital & Community Psychiatry 761 (1981). | |
| 17 | Beck, James C., *Psychiatry and the Death Penalty*, 4 Harvard Rev. Psychiatry 225 (1996). | |
| 18 | Liebert, Douglas S. & David V. Foster, *The Mental Health Evaluation in Capital Cases: The Standards of Practice* 15 Am. J. Forensic Psychology 43 (1994). | |
| 19 | Freedman, David & David Hemenway, *Precursors of Lethal Violence: A Death Row Sample*, 50 Social Sci. & Med. 1757 (2000). | |
| 20 | Melton, Gary B. *et al.* Psychological Evaluations for the Courts (Guilford Press 2nd ed. 1997). | |
| 21 | Showalter, C. Robert, *Psychiatric Participation in Capital Sentencing Procedures: Ethical Considerations* 13 Int'l J. L. Psychiatry 261 (1990). | |
| 22 | Haney, Craig, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation*, 35 Santa Clara L. Rev. 547 (1995). | |
| 23 | Report of the Task Force on the Role of Psychiatry in the Sentencing Process, Am. Psychiatric Assoc. (1984). | |
| 24 | Frierson, Richard, *et al., Capital v. Noncapital Murders*, 26 J. Am. Acad. Psychiatry L. 403 (1998). | |
| 25 | Smith, Charles E. & Richard R. Felix, *Beyond Deterrence: A Study of Defenses on Death Row*, Federal Probation 55 (1986). | |
| 26 | Panton, James H., *Personality Characteristics of Death-Row Inmates,* 32 J. Clinical Psychology, 306 (1976). | |
| 27 | Article, Scott E. Sunby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109 (1997) | |

| Tab | Publication | Comment |
|---|---|---|
| 28 | Cunningham, Sorensen & Reidy, *Revisiting Future Dangerousness, Revisited: Response to DeLisi and Munoz,* 15 Crim. Justice Policy Rev. 365 (2004). | |
| 29 | Affidavit of Dr. Bethany K. Dumas | |
| 30 | Affidavit of Dr. Carolyn R. Miller | |
| 31 | Affidavit of Dr. James Luginbuhl | |
| 32 | Affidavit of Dr. Ronald R. Butters | |
| 33 | Affidavit of Dr. Barbara B. Levenbook | |
| 34 | Affidavit of Dr. John N. Wall, Jr. | |

## INDEX OF ADDITIONAL EVIDENCE
## SUPPORTING FEDERAL APPLICATION

The following additional exhibits are filed electronically with this federal petitition.

| Exhibit | Description | Comment |
|---|---|---|
| 1 | 2003 Declaration of Dr. Thomas Ryan | |
| 2 | 2003 Declaration of Dr. John F. Edens | |
| 3 | 2000 Declarations of Dr. Steven D. Hart, Dr. Kirk Heilbrun, Dr. Norman Poythress, Dr. John F. Edens, Dr. Donald N. Bersoff. | |
| 4 | 2010 Affidavit of Deborah Wright | |
| 5 | Freedman, David, Premature Reliance on Psycophathy Checklist-Revised (In Press: Journal of Threat Assessment 2002). | |
| 6 | Edens, John F., Inter-Rater Reliability of the PCL-R Total and Factor Scores among Psychopathic Sex Offenders, 28 Behavior Sci. Law 106-119 (2010). | |

## DESIGNATION OF ABBREVIATIONS

"Petitioner's Supporting Documents" are abbreviated "P.S.D." References to the court reporter's record are abbreviated "R.R." References to the clerk's record are abbreviated "C.R."

The Clerk's Record from the 2003 trial consists of 5 volumes. The Reporter's Record from the trial consists of 49 volumes of testimony and 3 volumes of exhibits for a total of 52 volumes.

The Clerk's Record from the state habeas application added a number of additional volumes, comprised of the state habeas application and exhibits, largely publications.

## STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments five (due process clause), eight (cruel and unusual punishment clause), and fourteen (due process and equal protection clauses), of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

## PROCEDURAL HISTORY

**A.**     ***Procedural History in State Court.***

Mr. Robert L. Roberson, III was indicted April 25, 2002 for the January 30, 2002 murder of his daughter, Nikki Curtis, 2. He plead not guilty. (R.R. vol. 41 at 42.) The indictment, cause number 26,162, alleged the following crimes:

| Indictment | | |
|---|---|---|
| *Offense* | *Penal Code* | *Disposition* |
| Intentionally and knowingly murdering child under age 6 by blunt force trauma (R.R. vol. 41 at 41.) | C.R. vol. 1 at 2. | Convicted by jury; death sentence. *State v. Robert L. Roberson, III*, No. 26,162, in the 87th District Court, Anderson County, Texas |

| Indictment | | |
|---|---|---|
| *Offense* | *Penal Code* | *Disposition* |
| Intentionally murdering a person during a sexual assault | C.R. vol. 1 at 2. | Dismissed by State at close of State's case-in-chief |
| Intentionally or knowingly causing injury to a child under age 14 | C.R. vol. 1 at 2. | Unknown. |

The following summarizes the events in the case:

| Key Dates | | |
|---|---|---|
| *Event* | *Date* | *Reference* |
| Child brought to hospital | January 30, 2002 | |
| Death of child | February 1, 2002 | |
| Arrest of Mr. Roberson | February 1, 2002 | |
| Indictment | April 25, 2002 | C.R. vol. 1 at 2. *State v. Robert L. Roberson, III*, No. 26,162, in the 87th District Court, Anderson County, Texas. |
| Pre-trial hearing | June 20, 2002 | |
| Pre-trial hearing | July 19, 2002 | |
| Pre-trial hearing | July 31, 2002 | |
| Pre-trial hearing | August 22, 2002 | |
| Initial panel jury selection | September 4, 2002 | 750 jurors summoned; approximately 300 appeared. |
| Commencement of individual voir dire | September 11, 2002 | |
| Jury strikes and final selection of petit jury | December 18, 2002 | |
| First day of trial | February 3, 2003 | |

| Key Dates | | |
|---|---|---|
| *Event* | *Date* | *Reference* |
| Conviction jury verdict returned | February 11, 2003 | C.R. vol. 5 at 620. |
| Sentencing jury verdict returned | February 14, 2003 | C.R. vol. 5 at 642 |
| Judgment signed | February 19, 2003 | C.R. vol. 5 at 643. |
| Motion for New Trial (no ruling by court) | March 7, 2003 | C.R. vol. 5 at 707. |
| Roberson's opening direct appeal brief filed with the Court of Criminal Appeals | February 16, 2004 (on time; by mail) | *Roberson v. State,* No. 74,671 (Tex. Crim. App.) |
| State's direct appeal brief filed with the Court of Criminal Appeals | August 12, 2004 | |
| Oral arguments before Court of Criminal Appeals | November 17, 2004 | |
| Article 11.071 application for writ of habeas corpus filed in 87th District Court. | December 2004 | Trial court granted one-time 90-day extension of time permitted. |
| Decision by Court of Criminal Appeals on Direct Appeal | | *Roberson v. State*, No. 74,671, 2007 Tex. Crim. App. Unpub. LEXIS 1175 (Tex. Crim. App. June 20, 2007) |
| Denial of Motion for Rehearing by CCA | | *In re Roberson*, No. 74,671, 2007 Tex. Crim. App. LEXIS 1312 (Tex. Crim. App. Oct. 3, 2007) |
| State's answer to the article 11.071 habeas application | June 7, 2005 | CR vol. 17 at 2626. |
| Order by state district court denying evidentiary hearing. | June 20, 2005 | CR vol. 17 at 2743 |

| Key Dates | | |
|---|---|---|
| *Event* | *Date* | *Reference* |
| Findings of Fact and Conclusions of Law and denial of 11.071 application | Signed July 21, 2005, CR vol. 17 at 2744-2784. | Two days after filing (July 19, 2005, Tuesday), the trial judge signed (Thursday, July 21) a 41-page proposed F&Cs by the State without any changes or a hearing. |
| Petition for writ of *certiorari* filed with the U.S. Supreme Court | Uncertain, but appears timely filed September 2007 | |
| Petition for writ of *certiorari* denied by the Supreme Court | | *Roberson v. Texas*, No. 07-8536, 128 S. Ct. 1873, 170 L. Ed. 2d 752, 2008 U.S. LEXIS 3229 (U.S., 2008) |
| Denial of the 11.071 application by the Court of Criminal Appeals | | *Roberson v. Texas,* Nos. WR-63,081-01 & WR-63,081-02, 128 S. Ct. 1873, 170 L. Ed. 2d 752, 2008 U.S. LEXIS 3229 (U.S., 2008)<br><br>From this date, Roberson had 90 days to file a petition for writ of *certiorari*. Although he did not do so, this 90 days is added to the one-year AEDPA period. Therefore, the deadline for Roberson's federal habeas application is November 16, 2010. |

At the punishment phase of trial, jurors received two special issues:

### *Special Issue No. 1*

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, ROBERT LESLIE ROBERSON, III,

would commit criminal acts of violence that would constitute a continuing threat to society?

**Answer**

We the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "Yes."

*/s/ signature*

_____
Presiding Juror

**Special Issue No. 2**

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

**Answer**

We the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "No."

*/s/ signature*

_____
Presiding Juror

2003 Clerk Record vol. 5 at 642 (filed Feb. 14, 2003).

Roberson was sentenced to death accordingly. Since then, he has been confined in the Polunsky Unit, and previously the Ellis One Unit, by the Director of the Texas Department of Criminal Justice, and by the warden of the Polunsky Unit.

**B.      *Procedural History in Federal Court.***

When the CCA denied relief, lawyers for Roberson sought and received appointment in the Tyler Division of the Eastern District of Texas. The case was assigned to the Marshall Division.

Judge Ward granted the appointment of counsel. This application is timely filed within the AEDPA deadline.

## LIST OF PARTICIPANTS IN CASE

| Participants in the Case | |
|---|---|
| *Individual* | *Comments* |
| Nikki Curtis, 2, victim | Daughter of Robert Roberson, III and Gwendolyn Bowman |
| Robert L. Roberson, III, defendant, 40 | Marginally employed, Robert was Nikki's father. He had custody of Nikki for only a few months before her death. Appointed attorneys: Steve Evans, Palestine John Van Meter, Palestine |
| Gwendolyn Bowman | Former girlfriend of Roberson and mother of Nikki. She lost custody of Nikki immediately after birth. Gwen was a drug user, drifter, and prostitute. She was not involved in the case and did not testify. |
| Carolyn Roberson, about 58 | Robert's mother. She was found in contempt at trial for violating the rule of exclusion by talking to a reporter. She did not testify at trial. |
| R.L. Roberson, II | Robert's father. He did not testify at trial and did not figure in events. |
| Teddie Cox, 28 | A key State witness at trial, she was Roberson's live-in girlfriend, with her own daughter, Rachel, 11. Teddie was unstable in all respects. She gave several versions of events. |
| Sheila Granger | Mother of Teddie Cox. She did not testify and did not figure in the case. |
| Rachel Cox, 11 | Daughter of Teddie Cox. She testified at trial that Roberson was an angry man who sometimes yelled and shook Nikki. |
| Courtney Berryhill, 11 | Niece of Teddie Cox who stayed with Teddie and Robert periodically. She testified similarly as Rachel. |

| Participants in the Case | |
|---|---|
| **Individual** | **Comments** |
| Larry and Verna Bowman | A good couple and the parents of Gwendolyn Bowman. They raised two of Gwendolyn's other children and had custody of Nikki until wrested by Carolyn Roberson, Robert's mother. Mrs. Bowman became ill one evening and called Robert to take Nikki for a couple of days until she recovered. Nikki was harmed during the night with Roberson. |
| Victoria, 15 | Daughter of Robert Roberson and Lucretia Gray. Raised by grandparents in Palestine, R.L. and Carolyn Roberson. She did not testify and did not play a role in the case. |
| Robert Roberson, IV, 14 | Son of Robert Roberson and Lucretia Gray. Raised by grandparents in Palestine, R.L. and Carolyn Roberson. He did not testify and did not play a role in the case. |
| Lucretia Gray | Former wife of Mr. Roberson. She lives in Alabama. She testified that Robert beat her frequently during their marriage. |
| John Roberson | Brother of Robert L. Roberson. He did not testify and did not play a role in the case. |

## STATEMENT OF FACTS

### A.    *Liability Phase of Trial*

***The Plan.***    The newly elected Anderson County District Attorney, Doug Lowe, had a problem. As he pored over the a table covered with reports and records with his assistant prosecutor, he realized that it would be hard to convince a jury that this case was any more than a reckless shaking baby case by a semi-conscious drug user, not a capital murder warranting a death sentence. The death of a lovely two-year-old girl had grabbed headlines in the small East Texas town of Palestine and Lowe was under pressure for results.

As he studied the records, he noticed one obscure report by a nurse at the hospital where the little girl, unconscious, had been taken by Roberson and the child's mother, Heather. The nurse,

*Andrea Sims*, R.R. vol. 41 at 101, wrote a report of her physical exam of Nikki. (St. Exhs. 2, 3 (medical records); exhs. 4, 6-14, 16-23 (photos); R.R. vol. 41 at 125-29.) She found some fresh superficial tears to Nikki's anal area. R.R. vol. 41 at 127, 133-34, 142.) She examined the rate of dilation of the anal canal and found that the dilation was faster than usual, suggesting theoretical sexual penetration. (R.R. vol. 41 at 129-30.) Although she never saw it, Mrs. Sims reported that Nikki had a torn frenulum. A frenulum of tongue is a fold of mucus membrane connecting the floor of the mouth to the underside of the tongue in midline. Mosby's Medical Dictionary (6th ed. 2002) (R.R. vol. 41 at 136-37.) Mrs. Sims could not inspect Nikki's mouth because it was obstructed by breathing tubes, but she found references in the medical examination of a torn frenulum. (R.R. vol. 41 at 136-38.) In a child, a torn frenulum may be caused by insertion of a large penis, and is therefore a possible indicator of sexual assault. (R.R. vol. 41 at 137-38.)

As Lowe studied Nurse Sim's report, he wondered whether he had found a solution. If he could accuse Roberson of raping the child, his chances of getting a death sentence rose considerable. There were problems, however. Sim's report made clear that she did not find clear evidence of sexual assault, merely small suggestions of the possibility, and her observations were routine in such examinations. Moreover, none of the witnesses interviewed suggested that Roberson had sexually abused the child, or any other child. Worse, Lowe's testifying medical physician, *Dr. Janet Squires*, a Dallas pediatrician and director of general pediatrics at the University of Texas Southwestern Medical Center, R.R. vol. 42 at 90-91, did not find evidence that the child had been raped. He studied Dr. Squires's report. She had examined Nikki's medical records. (R.R. vol. 42 at 94; St. Exh. 45, 46.) She also had driven to the Texas Children's Hospital and examined Nikki, R.R. vol.

42 at 95, who was on life support.  (R.R. vol. 42 at 95.)  Nikki had obvious signs of shaking baby syndrome.

But the child's body did not reveal evidence of previous child abuse.  She had no bone fractures.  (R.R. vol. 42 at 105, 123.)  She had no past fractures which had healed, no bruises to her legs or arms, and no scar tissue.  (R.R. vol. 42 at 123-24.)  Nikki's injuries indicated that she had suffered a powerful blow to the head.  (R.R. vol. 42 at 103.)  Dr. Squires reported that Nikki had suffered *shaken impact syndrome*, or what is commonly known as shaking baby syndrome.  (R.R. vol. 42 at 105-06, 113-14, 119-20.)  She explained that an adult can readily cause severe and irreversible trauma to a baby by shaking it.  (R.R. vol. 42 at 106-07.)  She believed that Nikki had suffered non-accidental child abuse, but she would not go so far as to say intentional.  (R.R. vol. 42 at 113, 125-26.)  These type injuries were caused by "an out of control, angry, violent adult."  (R.R. vol. 42 at 126, 128.)  This, DA Lowe realized as he studied the Dr. Squires's report, would not get him to the deliberate and intentional findings necessary to win a death sentence.

Lowe continued reading Dr. Squires's report.  She had examined Nikki's anus to determine whether she had been sexually assaulted.  (R.R. vol. 42 at 96-97.)  She saw a tiny laceration.  (R.R. vol. 42 at 97, 100-01.)  She did not observe major trauma of the anus.  (R.R. vol. 42 at 97.)  She did not see signs of bruising.  (R.R. vol. 42 at 98.)  She collected samples.  (R.R. vol. 42 at 97.)  She found insufficient evidence to conclude that Nikki had been sexually assaulted, nor could she rule it out.  (R.R. vol. 42 at 99-100.)  She indicated that there are instances when a child has been sexually assaulted in the anus without leaving visual evidence around the anus.  (R.R. vol. 42 at 99-100.)  Dr. Squires explained the anal canal contraction which concerned the Palestine nurse, Mrs. Sims.  She said that when a child is comatose the anal muscle commonly becomes lax.  (R.R. vol.

42 at 99, 118.) This is because the nervous system is shutting down because of brain injury. (R.R. vol. 42 at 118.) Dr. Squires said that dilation of the anal canal, which led Mrs. Sims to write in her report the possibility that Nikki had been sexually assaulted, did not indicate one way or the other whether sexual abuse had occurred. (R.R. vol. 42 at 99-100, 118, 119.) Her final report stated that child sexual assault could not be substantiated. (R.R. vol. 42 at 119.)

Lowe thought hard about Dr. Squire's report and his conversations with her. She could not substantiate any allegation that Roberson raped the child. She, in fact, discredited Nurse Sims's tentative sexual assault indicators. So what could he do? If he went to a jury on a shaking baby case, jurors Roberson faced a maximum 20 years incarceration on a second degree felony manslaughter based on reckless intent. He would be criticized as soft on crime. Somehow, Lowe thought, he needed to get death penalty findings that Roberson had killed the child intentionally, was a future danger to society, even in prison, without any mitigating circumstances.

Suddenly, Lowe realized that the solution was there in front of him. He did not need evidence that Roberson had raped the child. He merely need *to accuse* Roberson of having done so. He could easily convince the piable grand jury to approve an additional count in the indictment alleging that Roberson had killed the child while raping her. He could visualize jury selection. Sonorously, he could impressively tell hundreds of gaping jurors on the opening day of selection at the local civic center that Roberson was charged by the grand jury with raping a two-year-old child before killing her. He would not have to explain any evidence. Jurors would begin then and there to hate Roberson. Then, as each juror was questioned individually, Lowe could quiz their feelings about men who rape children, thereby dialing up the juror's emotions and pointed their anger toward the man across the table. Then, at the conclusion of his case-in-chief, he could forestall the

anticipated motion for directed verdict by the defense by simply voluntarily dismissing the murder during the sexual assault count, and proceed solely on the capital murder theory of death of a child under six. Angry jurors by this point would not care or notice the difference, and they could be counted on to convict Roberson easily and, outraged at his rape of the child, whether proved or not, make the findings for death.

The plan worked perfectly. Lowe typed and presented the indictment which the grand jury approved. Later, at the civic center, he could see the anger and distaste develop on the room full of jurors's faces as he explained how Roberson was charged with raping the child before killing her. And when time came, he dismissed the allegation, enjoying the vehement protests of Roberson's defense lawyer. The jury voted for death. Lowe received congratulations from everyone.

### *Roberson's Limited Intellectual Functioning.*

Although Roberson is not mentally retarded, he suffers from diminished mental capacity and is the product of a rural family with a long history of mental illness and disorders. During Roberson's sentencing, his lawyers called **_Dr. John C. Krusz, M.D._**, a Dallas neurologist. (R.R. vol. 47 at 81.) He is board certified in neurology and psychiatry. (R.R. vol. 47 at 82, 108.) He examined Robert. He offered several opinions:

- Roberson suffers from a post-concussional type syndrome. (R.R. vol. 47 at 87.)

- He has a history of multiple traumatic brain injuries. (R.R. vol. 47 at 87, 93.)

- His IQ was 85. (R.R. vol. 47 at 89.)

- His EEG (test which measures electrical brain impulses) showed abnormal brain functioning. (R.R. vol. 47 at 89-90, 94.)

- Roberson's brain damage has affected him by causing him to be less able to stop his behavior in response to heightened stress. (R.R. vol. 47 at 100-01.)

- His brain damage probably contributed to his harm of Nikki. (R.R. vol. 47 at 110.)

- He needed certain types of medication and a controlled environment. (R.R. vol. 47 at 103-05.)

Roberson's attorney also called **Dr. Bill Burleson, M.D.**, a psychologist with TDCJ-ID. (R.R. vol. 47 at 135-36.) He interviewed Roberson and reviewed documents. (R.R. vol. 47 at 137.) His opinions were:

- Roberson would not be a danger in prison. (R.R. vol. 47 at 138.)

- Aspects of Roberson's trips through TDC suggest that he would perform well there. (R.R. vol. 47 at 138-39, 143.)

Roberson also called **Dr. Kelly R. Goodness,** Ph.D., a Dallas psychologist experienced in capital litigation. (R.R. vol. 48 at 9-10; Defendant. Exhs. 16, 17, 18).) She examined Roberson, conducted a battery of tests, interviewed people who knew him, and studied his case file and medical records. (R.R. vol. 48 at 21-22.) She explained to jurors:

- Robert had give several explanations of what had occurred, the first being that he did not remember, the latter being that he had lost control when Nikki cried and that he had shaken her. (R.R. vol. 48 at 24.)

- His full scale IQ tested at 89, and she explained several administration factors which might account for the elevated score. (R.R. vol. 48 at 26-27, 35.)

- Robert's upbringing was dysfunctional, but it was difficult to learn the details from him or his family. (R.R. vol. 48 at 27-30.)

- Robert's brain is damaged either as a result of injury or genetic traits. (R.R. vol. 48 at 31, 35-36.)

- Robert is mentally ill, including antisocial personality disorder, substance dependence, and depression. (R.R. vol. 48 at 31-32, 35-36.)

- Robert is impulsive, has problems with long term memory, and is often depressed, and possesses traces of paranoia. (R.R. vol. 48 at 36-37.)

- His ability to modify or retrain his behavior is impaired, particularly when under stress. (R.R. vol. 48 at 38-39, 42.)

- One problem in Robert's life is his dysfunctional and domineering mother, Carolyn Roberson, who for instance in this case, pressured Robert to take custody of Nikki, which he otherwise would not have sought, even though Carolyn knew that Robert was not a fit parent. (R.R. vol. 48 at 39-41.)

- He likely killed Nikki during a loss of control which led to rage which he could not stop. (R.R. vol. 48 at 42-44.)

Dr. Goodness assessed Robert's future dangerousness.

- During his time in prison, Robert had no difficulty complying with rules, with one fight in the prison kitchen when he was first incarcerated. (R.R. vol. 48 at 32-33, 48-49.) He was always held in minimum security. (R.R. vol. 48 at 48-49.) All factors indicated that he would perform well in prison. (R.R. vol. 48 at 49-51, 51-56.)

- Robert had never been involved with a weapon. (R.R. vol. 48 at 33.)

- Robert had never acted aggressively against any jail or prison staff. (R.R. vol. 48 at 34.)

- "Robert is too lazy to be a predator." (R.R. vol. 48 at 51.)

### *Misuse of a Controversial Psychological Testing Device Known as the Hare Psycophathy Checklist.*

In rebuttal, the State called **Dr. Thomas Allen, Ph.D.**, a Tyler psychologist. (R.R. vol. 48 at 108-16 (*Daubert* hearing), 116.) He talked with Robert at the jail the day before he testified for 2.5 hours. (R.R. vol. 48 at 120.) To assess Roberson quantitatively, Dr. Allen *ad hoc* modified a controversial psychological test known as Hare Psychopathy Checklist–Revised, developed by a Dr. Hare. As discussed in detail below, the Hare Psychopathy Checklist is controversial because it was never designed or evaluated to measure the future dangerousness of capital murder defendants. Worse, Allen created his own scoring system and ranked Roberson so high that he deemed Roberson

to be a dangerous psychopath, which gave the district attorney the emotional leverage he needed to seal Roberson's fate.  Predictably, Allen told jurors:

- Roberson would probably commit future acts of violence, even in prison.  (R.R. vol. 48 at 141, 142-43.)

- Roberson was a psychopath.  (R.R. vol. 48 at 141.)

- "His violence tends to be more impulsive and rage based than predatory."  (R.R. vol. 48 at 141.)

- His risk level in prison was "minimum."  (R.R. vol. 48 at 142.)

Use of the Hare Psychopathy Checklist has been condemned as unethical by psychology professional associations for its improper use in capital cases and misleading predictions by the psychologists who use it to portray capital murder defendants as future dangers.

***The Offense.***  As tragic as this case is, it never should have been prosecuted for a death sentence.  The problem with this case is that this is a shaken-baby case successfully miscast into a death penalty case.  Moreover, the prosecutor, knowing that he did not have the evidence, improperly accused Roberson of sexually assaulting the child so that he could inflame jurors.  When the prosecutor dismissed the sexual assault allegations for lack of evidence at the close of his case, the trial judge declined to dismiss the indictment entirely.  The jurors promptly convicted Roberson of capital murder and voted for death.

Robert Roberson was charged with the murder of his daughter, Nikki Curtis, 2.  On the one night when Robert had possession of Nikki alone, she suffered acute trauma so severe that she entered a coma.  Robert, high on drugs, left her in bed, assuming that she would eventually awaken, and delayed taking her to the hospital for five or six hours.  When he finally delivered her to the

hospital, it was too late. All of her vital signs were flat. She was disconnected from life support two days later.

## DISCUSSION OF THE APPLICATION
## OF THE AEDPA TO ROBERSON'S CASE

In this section, Roberson discusses the application of the AEDPA. The AEDPA, 28 U.S.C. §2254(d), creates this structure for habeas 2254 review:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Approaching this statute, the Respondent has developed predicable arguments, and will likely make them here, which Roberson respectfully contends does not reflect current Supreme Court analysis.

First, the Respondent will argue that the first and only question is whether the state court decision was objectively unreasonable based on the record before it. Consequently, the federal court inquiry is merely whether the state judges made any sort of competent decision. If so, it was reasonable.

Second, the Respondent's fall back argument will be that there is no clearly established federal law which controls the outcome of this case. The Respondent will argue that Roberson must

lose unless he can point to a Supreme Court decision with identical facts, issues and favorable outcome.

Third, the Respondent will argue that the AEDPA establishes an extremely deferential standard of review. Consequently, if the state court decided the issue, that essentially ends the federal court inquiry.

The Supreme Court has issued conflicting decisions regarding the AEDPA analytical process. A recent case favoring the Respondent's position is *Renico v. Lett*, 130 S. Ct. 1855 (2010). In *Renico* the Court held, "The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no trial court abuse of discretion was "an unreasonable application of . . . clearly established Federal law.'" *Id*. at 1862 (quoting section 2254(d)(1). The court continued:

> We have explained that "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.*, at 411, 120 S. Ct. 1495, 146 L. Ed. 2d 389. Rather, that application must be "objectively unreasonable." *Id.*, at 409, 120 S. Ct. 1495, 146 L. Ed. 2d 389. This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam).

*Renico*, 130 S. Ct. at 1862.

Analyzing the decision of the Michigan Supreme Court --- which held that the state trial judge had discretion to declare a deadlock although jurors had not said so, permitting Lett's retrial

– the Supreme Court held that the decision "while not necessarily correct – was not objectively unreasonable." *Id.* at 1865. The AEDPA "prevents the federal courts from using federal habeas corpus review as a vehicle to second guess the reasonable decisions of state courts." *Id.* at 1866.

But in *Berghuis v. Thompkins*, 130 S. Ct. 2250 (U.S. 2010), the petitioner raised Miranda and IAC claims, and the Court addressed the merits of both *de novo* before turning to the question whether §2254(d) prevented a grant of relief. And similarly, in *Porter v. McCollum*, 130 S. Ct. 447 (2009) (*per curiam*), the Court first addressed the merits of Porter's IAC claim and determined that the failure to present mitigating evidence regarding brain damage, abuse and military service was prejudicial and that it was "unreasonable to conclude otherwise."

What these conflicting decisions mean is that proper framework AEDPA analysis is this. First, the reviewing habeas federal court should decide whether there was a constitutional violation in the petitioner's case. This is appropriate because of the text of the statute itself. Section 2254(a) comes before section 2254(d) and was not amended by the AEDPA. Moreover, section 2254(d) is a limitation on relief, not a limitation on rights. Section 2254(d), which decides whether relief is available, comes into play only if the court determines that the petitioner has suffered a federal constitutional violation.

Supreme Court decisions support this framework. In many, if not most, Supreme Court decisions, the Court has first determined whether the underlying claim has merit, and only then asked whether the state court decision was contrary to or an unreasonable application of clearly established federal law. *See, e.g., Rompilla v. Beard,* 545 U.S. 374 (2005), *Wiggins v. Smith,* 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). Even in *Renico*, there is some subtle recognition, as the Court implies that its emphasis on the section 2254(d) bar to relief is limited to *Renico*,

writing, "the standard applied by the Michigan Supreme Court -- whether the judge exercised sound discretion -- is a general one, to which there is no "plainly correct or incorrect" answer in *this* case." *Renico*, 130 S. Ct. at 1865 (emphasis).

The AEDPA does not require the court to begin its analysis with section 2254(d)'s bar to relief. The statute itself makes this clear. To establish entitlement to relief, the petitioner must prove:

Step 1: that he is in custody in violation of the Constitution (section 2254(a)) (*i.e.*, he has proven a constitutional violation), and

Step 2: the state court decision rejecting his claim on the merits:

> (a)     was contrary to or involved unreasonable application of clearly established federal law (section 2254(d)(1)); or
> (b)     was based on an unreasonable determination of the facts (section 2254(d)(2)).

Section 2254(d) looks to the state court's handling of the petitioner's claim in light of binding federal law and the available record. The required analysis cannot be performed in the absence of some articulation of the state court's reasoning. This is especially true when the underlying constitutional claim has multiple prongs (such as IAC), because the state court could have rejected the claim on one of the prongs (as the state courts are usually expressly invited to do by the State) and not have addressed the other prongs at all.

The statute does not permit assumptions. The language of the statute does not permit a court to assume that the state court: (a) identified the correct legal principles; (b) correctly applied those principles to the facts of the case; and ( c ) appropriately determined which facts were proved or relevant. Indulging in such assumptions would effectively read "contrary to" clause out of the statute. Moreover, doing so would render the past participles "involved" [(d)(1)], and "was based

on" [(d)(2)] meaningless. And finally, applying §2254(d) to summary state court orders/adjudications --- commonly issued by the Court of Criminal Appeals --- would also create a perverse incentive structure under which the measure of "deference" given to a state court would be inversely proportional to the amount of reasoning that court discloses in support of its decision. The statute, at times, does permit "informed deferential results," but it never permits "blind deferential review."

"Clearly established federal law" does <u>not</u> mean a Supreme Court decision applying an established constitutional rule to facts similar to those in the case at hand. *See Carey v. Musladin,* 549 U.S. 70 (2006) (Kennedy, J., concurring). The search for a case with similar facts may be relevant in the "contrary to" analysis, but it is not part of the "unreasonable application" or "clearly established federal law" analysis.

There is tension between section 2254(d)(2) and section 2254(e)(1). Section 2254(e)(1) provides:

> [A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Section §2254(d)(2) provides that the writ:

> shall not be granted . . . unless the [state court's] adjudication of the claim – resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

One immediate question is this: When a habeas petitioner challenges a factual determination underlying a state court's denial of relief, must he –

> -- Show it was "unreasonable … in light of the evidence presented in the state court proceeding," (d)(2);

--      Rebut it by "clear and convincing evidence," (e)(1);

--      Or both?

This is an open question. *Wood v. Allen*, 130 S. Ct. 841, 849 (2010), noted, "[W]e have explicitly left open the question whether §2254(e)(1) applies in every case presenting a challenge under §2254(d)(2)." What we can say for certain is that both section 2254(e)(1) and 2254(d)(2) do not apply at the same time. *See Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) ("It was incorrect for the Court of Appeals … to merge the independent requirements of §§ 2254(d)(2) and (e)(1). AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence."). There is no real consensus among lower courts. The Ninth Circuit has adopted fairly sensible approach. *See Taylor v. Maddox*, ___ F.3d ____ (9th Cir. 2004) (intrinsic and extrinsic review). The Third Circuit has created a somewhat confusing approach. *See Lambert v. Blackwell*, ___ F.3d ___ (3d Cir. 2004) ("decision"-level and "subsidiary"-level facts). Other circuits have dodged the issue for years, often relying on boilerplate suggesting both apply but not explaining how or why.

So why does understanding the relationship between 2254(e)(1) and 2254(d)(2) matter? In general, the idea that both have a role in every case artificially doubles the "deference" to state courts. Moreover, not knowing how a court will approach this aspect of the AEDPA means more work and less predictability.

The relationship between 2254(e)(1) and 2254(d)(2) is simply this. Section 2254 (d)(2) and (e)(1) could not have been intended to overlap, therefore, they must accomplish different tasks. Section (d)(2) occupies the field for challenges to what the state court did with the evidentiary record before it (see "… in light of the evidence presented in the State court proceeding"), which leaves no

room for interference by (e)(1). Meanwhile, section (e)(1) sets the standard of proof petitioner must meet when trying to rebut state court's factual finding through: (1) presentation of evidence at a federal hearing, or (2) expansion of the record in federal court, which leaves no room for interference by (d)(2) because it is expressly limited to the state court record.

The Supreme Court recently granted *certiorari* on a case which will address the relationship between subsections (d) and (e) of 2254. In *Cullen v. Pinholster,* No. 09-1088 (U.S., cert. granted 6/14/10), the Court granted *certiorari* to decide:

1. "Whether a federal court may reject a state-court adjudication of a petitioner's claim as "unreasonable" under 28 U.S.C. § 2254, and thus grant habeas corpus relief, based on a factual predicate for the claim that the petitioner could have presented to the state court but did not."

2. "Whether a federal court may grant relief under 28 U.S.C. § 2254 on a claim that trial counsel in a capital case ineffectively failed to produce mitigating evidence of organic brain damage and a difficult childhood because counsel, who consulted with a psychiatrist who disclaimed any such diagnosis, as well as with petitioner and his mother, did not seek out a different psychiatrist and different family members."

The California Attorney General's position in *Pinholster* is that if the state court denied the claim "on the merits," a federal hearing cannot be *considered* (let alone *granted*) unless the prisoner first establishes that the state court decision was "unreasonable" under §2254(d)(1) – regardless of whether state court allowed fact development, or based its decision on a sufficient record; and regardless of whether the proposed evidence would challenge the basis of the state court's decision. In other words, *no inmate can receive a federal hearing unless petitioner proves he can win under (d)(1) without one*.

This argument is attractively simple, but wrong, and the Court has already suggested this is the wrong approach. *Wellons v. Hall*, 130 S. Ct. 727, 730 n.3 (2010), held: "[I]t would be bizarre

21

if a federal court had to defer to state-court factual findings, made without any evidentiary record, in order to decide whether it could create an evidentiary record to decide whether the factual findings were erroneous. If that were the case, then almost no habeas petitioner could ever get an evidentiary hearing: So long as the state court found a fact that the petitioner was trying to disprove through the presentation of evidence, then there could be no hearing. AEDPA does not require such a crabbed and illogical approach to habeas procedures . . . ."

In *Landrigan*, the Supreme Court reaffirmed *Townsend*'s "facts, if true, would require relief" standard. *Schriro v. Landrigan*, 550 U.S. ___ (2007). The Court, however, modernized the *Townsend* standard by adding: "if the <u>record</u> <u>refutes</u> the applicant's factual allegations <u>or otherwise</u> <u>precludes habeas relief</u>, a district court is not required to hold an evidentiary hearing." *Landrigan,* 550 U.S. at ___ (emphasis added).

What this means is that the inmate can win habeas relief is his allegations are correct, but recognizes that winning requires more now than it used to. *Landrigan* accounts for this through "or otherwise precludes habeas relief," which brings the relief-preventing effect of §2254(d) into play for any bases of the state court decision *not implicated by* the petitioner's proposed new evidence.

Therefore, a post-*Landrigan* analysis of a request for fact development should look like this. To meet the "if true, would require relief" standard, the inmate's allegations must account for every leg on which the state court adjudication stands:

- Where the petitioner proposes to rebut state court factual determinations with evidence, plausible allegations about that evidence are enough;

- For any portions of the state court decision *not* affected by the petitioner's proposed new evidence, the petitioner must offer a plausible §2254(d) theory.

Here is an example. Suppose a state court denies a mitigation IAC claim finding: (1) that the trial lawyer's four-hour, single-witness investigation was adequate; and (2) there was no prejudice because the additional ten witnesses described in the petitioner's allegations probably would not have been credible. Now, the petitioner seeks a federal evidentiary hearing to rebut state court's prejudice-prong findings. To get a hearing, he must:

1. Allege facts inconsistent with those findings (*e.g.*, the witnesses are credible, have personal knowledge, corroborate each other, etc.); and,

2. Assert that the state court's performance-prong determination was defective under §2254(d), such that it will not preclude relief (the *Townsend/Landrigan* touchstone) if petitioner's prejudice allegations turn out to be true.

Whether and to what extent sections (d) and/or (e)(1) will apply after federal fact development depends on how that fact development affects the version of the claim previously adjudicated by the state court. Elements/components of the claim not impacted by the new evidence (*e.g.*, the deficient performance prong in the IAC example) remain subject to §2254(d) because the state court adjudicated the *same version* being considered by the federal court. Elements/components materially impacted by the new evidence (*e.g.*, the prejudice prong in the IAC example) should *not* be analyzed under §2254(d) because the "merits" are different. They are subject to the (e)(1) "clear and convincing evidence" requirement to the extent that the state court actually made findings on the same factual issues.

There is solid recent support for this view. *Wilson v. Workman*, 577 F.3d 1284, 1290-91 (10th Cir. 2009) (*en banc*), held: "We hold that when the state court makes … findings on an incomplete record, it has not made an adjudication on the merits to which we owe any deference. … If the state court fails to consider the very evidence that the claim is based upon, then the state court

has not adjudicated the merits of the claim." *Winston v. Kelly,* 592 F.3d 535, 556 (4th Cir. 2010), held: "If the record evidence after the hearing is substantially the same as the evidence presented to the state court, [§2254(d)(2) can apply] ¶ When, however, the petitioner offers … new, material evidence that the state court could have considered had it permitted further development of the facts, an assessment under § 2254(d) may be inappropriate. ... If the [state court] record ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d)."

## ROBERSON IS ENTITLED TO AN EVIDENTIARY HEARING

With these rules in mind, Roberson is entitled to an evidentiary hearing. First, throughout his petition he has alleged facts inconsistent with the state findings. Second, he asserts that the state court's legal analysis was defective under §2254(d), such that it will not preclude relief (the *Townsend/Landrigan* touchstone) if Roberson's allegations turn out to be true.

With regard to Roberson's claims involving misconduct by the local state prosecutor, Roberson requests a hearing so that the following witnesses can testify:

- Doug Lowe, state district attorney;
- Mark Calhoun, former state assistant DA;
- Steve Evans, Roberson's attorney;
- Joe Willis, DA's former investigator.

With regard to claims involving improper use of the Hare Psychopathy Checklist, Roberson requests a hearing so that the following witnesses can testify:

- Dr. Mark Cunningham, forensic psychologist in Lewisville, Texas. He is one of the most experienced experts in methods and qualitative and quantitative measurements for determining inmate future dangerousness.

- Dr. Stephen David Hart, Associate Professor of Psychology at Simon Fraser University in Burnaby, British Columbia, Canada. He teaches, researches, and

supervise graduate students in the areas of clinical and forensic psychology, with a particular focus on the assessment of psychopathy and risk for violence.

- Dr. Kirk Heilbrun, Professor and Chair of the Department of Clinical and Health Psychology at MCP Hahnemann University. Since 1981, he has presented more than 80 lectures and workshops, primarily on risk assessment and risk management, to mental health and legal professionals. He has published extensively in the leading journals in my field on risk assessment and criminal behavior.

- Dr. Norman Poythress, professor in the Department of Mental Health Law and Policy at the University of South Florida. He teaches forensic assessment (psychological evaluations for legal contexts) and conducts research on a variety of law-and-psychology issues.

- Dr. John F. Edens, a licensed clinical psychologist in the state of Texas and a faculty member in the Department of Psychology at Sam Houston State University (SHSU). He has conducted research on the area of risk assessment since 1997 and has published a professional manual, two book chapters, and eleven professional journal articles related to forensic assessment generally, and five articles specifically related to psychopathy.

- Dr. Donald N. Bersoff, a tenured full professor, Department of Clinical and Health Psychology, Medical College of Pennsylvania-Hahnemann University, and a tenured full professor, Villanova Law School.

Note: Roberson's attorneys have not contacted these experts, and instead rely on their declarations, attached as exhibits. Roberson will ask this Court for funding for these experts to testify.

## ROBERSON HAS MET ALL PROCEDURAL REQUIREMENTS

## ALL CLAIMS HAVE BEEN EXHAUSTED

There are procedural hurdles which must be crossed before a petitioner may ask a federal court to review a claim entitling him to federal habeas relief. *See generally Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999).

A petitioner seeking a writ of habeas corpus in federal court must show that he has exhausted all avenues of relief in state court. A federal district court may decline to address the merits of a claim that was inexcusably "defaulted" by the petitioner in state court proceedings.

A federal "default" question generally involves an evaluation of whether and how a claim for relief was presented to and considered by a state court. A default question arises in several ways. First, a default question can arise if a claim in a habeas corpus petition was not presented, or not fully presented, to the state court. Presenting a claim to the state courts is called "exhausting" the claim. *See Keeney v. Tamayo-Reyes*, 112 S. Ct. 1715, 1720 (1992) (the exhaustion requirement is grounded in "comity concerns." "The purpose of exhaustion is . . . [to] afford the State a full and fair opportunity to address and resolve the [federal] claim on the merits.")

"In order for a claim to have been 'fairly presented' to a state court to fulfill the exhaustion requirement, the applicant 'need not spell out each syllable of the claim before the state court.' Instead, a federal claim must only be the 'substantial equivalent' of one presented to the state courts." *Fisher*, 169 F.3d at 303 (citations omitted).

Second, a default question may arise if the claim was presented to the state court, but not in the manner that the state court normally and regularly requires that it be presented, such as when the claim is presented untimely, and the state court invoked its state rule to bar consideration of the inmate's claim. This is called a "procedural default." *See Wainwright v. Sykes*, 433 U.S. 72 (1977). This is discussed below.

***Demonstrating Cause and Prejudice.*** A federal district court is required to give considerable analysis and receive evidence when called upon to determine whether there has been a default, and if so, whether the default will be excused so that the federal court can reach the

constitutional merits of a claim. Whether there exists an independent and adequate state court basis for barring a claim is decided by the district court, and "[w]hether a petitioner's actions have created a state law procedural bar is a mixed question of law and fact." *Hansbrough v. Latta*, 11 F.3d 143, 145 (11th Cir. 1994). Even when a state court decides there has been default, the federal district court must make an independent inquiry. *Macklin v. Singletary*, 24 F.3d 1307 (11th Cir. 1994), *cert. denied*, 513 U.S. 1160 (1995).

Even if there has been an enforceable default, the federal district court may still proceed to the merit's of the petitioner's claim if the petitioner can demonstrate "cause" for and "prejudice" from the default. Cause and prejudice are federal questions requiring *de novo* review by the federal district court. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) ("cause and prejudice" is a mixed question of law and fact which the federal court must decide). If the state alleges and the federal court finds that a procedural default is applicable, a petitioner is entitled to an evidentiary hearing on the matter of cause and prejudice. *See Tamayo-Reyes*, 112 S. Ct. at 1721 ("a remand to the District Court is appropriate in order to afford respondent the opportunity to bring forward evidence establishing cause and prejudice"); *Wainwright v. Sykes*, 433 U.S. 72, 80 (1977); *Murray v. Carrier*, 477 U.S. 478, 487 (1986); *Walker v. Davis*, 840 F.2d 834, 839 (11th Cir. 1988); *Harich v. Dugger*, 813 F.2d 1082 (11th Cir. 1987).

Examples of cases applying these principles include: *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994) (new factual allegations supporting claim in federal court do not render a claim unexhausted unless they fundamentally alter the legal claim already considered by the state courts); *Beauchamp v. Murphy*, 37 F.3d 700, 704 (1st Cir. 1994) (discussing the fair presentation doctrine,

recognizing here that state court would not have viewed the claim differently had the word "federal" appeared in the heading to the issue), *cert. denied*, 115 S. Ct. 1365 (1995).

*Scarpa v. DuBouis*, 38 F.3d 1, 6 (1st Cir. 1994), *cert. denied*, 115 S. Ct. 940 (1995), includes a good discussion of the fair presentation doctrine, discussing ways in which a petitioner can fairly present claims to state courts. These include citing a specific provision of the Constitution, alerting the state court to the claim's federal nature through the substance of the claim, relying on federal constitutional precedents, claiming a particular right guaranteed by the Constitution, and asserting a state law claim that is "functionally identical" to a federal claim.

Other examples include *Laswell v. Frey*, 45 F.3d 1011, 1013-14 (6th Cir.) (Court held that petitioner's pre-state-court trial double jeopardy claim was exhausted), *cert. denied*, 116 S. Ct. 199 (1995); *Williams v. Washington*, 59 F.3d 673, 677-78 (7th Cir. 1995) (Petitioner fairly presented her ineffective assistance of counsel claim; in applying this rule courts should "avoid hypertechnicality"), *cert. denied*, 516 U.S. 1179 (1996).

## NO CLAIMS HAVE BEEN PROCEDURALLY DEFAULTED

### A.     *Explanation of Default Principles*

As mentioned, a requirement of a state death row petitioner seeking a federal writ of habeas corpus is to show that she has not procedurally defaulted any of the grounds for relief presented. In order for a claim to have been procedurally defaulted, the state court's ruling must *not* be based upon the federal constitution. In other words, the state ruling must be on grounds independent of the federal constitution. In addition, the state court's ruling *must be* based upon an adequate state ground. *See Ford v. Georgia*, 498 U.S. 411, 423 (1991) (discussing what is meant by "adequate" state ground).

For example, *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995), held that ineffective assistance at guilt phase issue was adequately presented to state courts. Even though the issue was not "precisely articulated" in state post-conviction proceedings, the "necessary arguable factual commonality" existed between claims presented in state court and in the federal petition.

*Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995), held that a petitioner's claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds."

In *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998), the court held that a petitioner's failure to object at trial to the admission of a snitch's out-of-court statements did not prevent the federal habeas court from considering the petitioner's confrontation clause claim where the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review.

"A federal court reviewing a state prisoner's habeas claim must respect a state court's determination that the claim is procedurally barred under state law." *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977). "The rule is quite simple: 'a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'"

*Williams*, 125 F.3d at 275 (*quoting Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989) (internal quotation marks and citation omitted)).

"In *Coleman v. Thompson,* 501 U.S. 722, 739, 111 S. Ct. 2546, 2559, 115 L.Ed.2d 640 (1991), the Court explained that the 'clear and express' statement requirement applies to cases where the state court's judgment fairly appears to rest primarily upon federal law, or to be interwoven with federal law, and not to cases where there is no reason to question whether the decision was based upon independent and adequate state law grounds." *Williams*, 125 F.3d at 275 n.3.

Of course, if there has been no adjudication on the merits in state court, and the claim is exhausted, then the statute by its terms requires no deference to the state decision. In that situation, the general rule that federal courts review questions of law *de novo* would apply. See *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (Where the state appellate court erroneously applied a state procedural default rule to bar review, there was no adjudication on the merits and § 2254(d) did not apply.)

If procedural default is established, an applicant can only avoid default by demonstrating one of two exceptions: the "cause and prejudice" exception or the "miscarriage of justice" exception.[1]

The "cause and prejudice" test requires that the applicant show cause for and prejudice resulting from the default. Generally, cause exists if an objective factor external to the defense excuses counsel's failure to comply with the state procedural rule. Examples of cause include the existence of novel constitutional claims that were not reasonably available to counsel; the

---

[1] This section is quoted from a chapter by Prof. Penny White, Federal Habeas Corpus, Presiding Over a Capital Case, section 10.14.

discovery of factual predicates that were unknown and undiscoverable by the use of due diligence; the presence of circumstances in which the procedural context in which default occurred made it difficult for counsel to perceive the need to raise the claim, or in which official interference made compliance with the procedural rule impractical; and the presence of circumstances in which counsel rendered ineffective assistance by failing to comply with the

procedural rule.

To demonstrate prejudice, the applicant must show that the constitutional violation "worked to his [or her] actual and substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions." To establish prejudice, the applicant will have to establish that but for the error, the outcome would have likely been different. The second exception to procedural default, the "miscarriage of justice" exception, requires a court to excuse default if the failure to consider the claims will result in a fundamental miscarriage of justice.

*See Coleman v. Thompson,* 501 U.S. 722 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 77 (1987); Engle v. Isaac, 456 U.S. 107, 135 (1982); *Murray v. Carrier,* 477 U.S. 478, 495-96 (1986); *Reed v. Ross,* 468 U.S. 1, 16 (1984); *Amadeo v. Zant,* 486 U.S. 214, 223-24 (1988); *Wainwright v. Sykes,* 433 U.S. 72, 95-96 (1997) (Stevens, J., concurring); *Brown v. Allen,* 344 U.S. 443, 486 (1953); *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *U.S. v. Frady*, 456 U.S. 152, 170 (1982); *Brecht v. Abrahamson,* 507 U.S. 619, 622 (1993) (defining *habeas* standard for relief as requiring a showing of a "substantial and injurious effect or influence in determining the jury's verdict"); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11 (1992) ("A *habeas* petitioner's failure to develop a claim in state court proceedings will be excused and a hearing mandated if he can show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing.").

**B.      Application to Roberson.**

Each of the claims presented by Roberson in this application have been exhausted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an

32

adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi,* 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky,* 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen,* 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

- if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

### C.    Presentation of a constitutional claim twice to the state court does not create federal procedural default.

It may be that the state F&Cs rubber-stamped by the state court contained assertions that some of Roberson's claims were procedurally defaulted because they were presented both in his

direct appeal brief and in his state habeas petition, and therefore presented twice to the state courts. The State sometimes takes the position that when a death row inmate presents a claim *twice* to the state courts he procedurally defaults that claim. This position is illogical and contradicted by federal law.

What has occurred is that Texas prosecutors have adopted a tactic of asking state court judges to sign decisions finding *federal* procedural default has occurred, then asking federal judges to defer to state court findings that an inmate's federal claim was defaulted. This is not permitted by federal law. Procedural default is a federal concept, not a state one. It is not appropriate for state courts to declare whether an inmate's federal claim has been procedurally defaulted for federal court purposes.

Issues need only be presented once to the state courts. It is not required that an issue presented to the state courts on direct appeal, and later again in the state habeas action. Moreover, presenting a federal claim *twice* to a state court does not create federal procedural default. A federal claim previously denied by a state court might be moot when submitted a second time, but subsequent submission of a previously preserve claim does not trigger federal procedural default.

In *Cone v. Bell*, 556 U.S. ___, slip op. at 1 (2009), Tennessee similarly argued that federal courts could not review Cone's *Brady* claim because it was presented twice to state courts, and was thus procedurally defaulted. *Id.* at 16-17. *Cone* held that state court procedural rules cannot automatically deny federal review of federal claims. It is the prerogative of federal court to decide whether a federal claim was appropriately presented to state courts. *Cone*, 556 U.S. ___ at slip op. 16. "When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review." *Cone*, 556 U.S. ___ at slip op. 17. "When a state court refuses to readjudicate a claim on the ground that it has been previously

determined, the court's decision does not indicate that the claim has been procedurally defaulted. To the contrary, it provide strong evidence that the claim has already been given full consideration by the state courts and is thus *ripe* for federal adjudication." *Cone*, 556 U.S. ___ at slip op. 17-18. "A claim is procedurally barred when it has not been fairly presented to the state courts for their initial consideration – not when the claim has been presented more than once." *Id.* at 18.

Consequently, any finding by the state court that a claim by Roberson is procedurally default because it was presented twice to the state courts is untenable.

## ARGUMENT AND AUTHORITIES

*Claim Number 1: The Prosecutors Made Allegations of Sexual Assault of Which They Knew They Did Not Have Sufficient Evidence In Order to Prejudice the Jurors and Increase the Odds of a Death Sentence in What Otherwise Would be a Shaken Baby Case. Improper Allegations by the State for the Purpose of Prejudicing Jurors for Tactical Advantage Deprived Roberson of His Sixth Amendment Right to a Fair Jury Trial.*

*Claim Number 2: The Prosecutors Made Allegations of Sexual Assault of Which They Knew They Did Not Have Sufficient Evidence In Order to Prejudice the Jurors and Increase the Odds of a Death Sentence in What Otherwise Would be a Shaken Baby Case. Improper Allegations by the State for the Purpose of Prejudicing Jurors for Tactical Advantage Deprived Roberson of His Fourteenth Amendment Right to Due Process.*

*Claim Number 3: The Prosecutors Made Allegations of Sexual Assault of Which They Knew They Did Not Have Sufficient Evidence In Order to Prejudice the Jurors and Increase the Odds of a Death Sentence in What Otherwise Would be a Shaken Baby Case. Improper Allegations by the State for the Purpose of Prejudicing Jurors for Tactical Advantage Deprived Roberson of His Eighth Amendment Right to Be Free From Cruel and Unusual Punishment.*

*Claim Number 4: The Absence of a State Procedure to Permit Severance of Theories of Criminal Liability When Necessary to Provide a Fair Trial As Required by the Due Process Clause and Fair Jury Trial Clause and to Prevent Violation of the Cruel and Unusual Punishment Clause, Violates* **Chambers v. Mississippi** *and ithe Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.*

The State obtained an indictment against Roberson which alleged that he sexually assaulted the child. The State never possessed evidence that Roberson sexually assaulted the child. The District Attorney inserted this allegation into the indictment merely for the benefits that a sexual assault allegation would have in creating and fostering juror hostility toward Roberson. There are two initial questions for the Court: first, did this occur, and if so, second, do such actions violate the Constitution? Once decided, the Court will have to decide whether the denial by the state courts was reasonable under the AEDPA.

A.    *The District Attorney Never Possessed Evidence that Roberson Molested Nikki. His Evidence Suggested That She Had Not Been Sexually Assaulted.*

The sole source of the sexual assault allegation was the note in the emergency room records by a nurse that she saw a tear in the girl's anus which, based on her child sexual abuse training, she thought *might* indicate sexual abuse.

That witness was Andrea Sims, a nurse at the local hospital in Palestine. (R.R. vol. 41 at 101.) She testified that when she first saw the child, Nikki was unconscious, lifeless and blue. (R.R. vol. 41 at 111-12.) The child had severe head bruising which Mrs. Sims believed was intentional. (R.R. vol. 41 at 115-20, 124, 141.)

Mrs. Sims interviewed Robert who did not appear as distraught as she would have expected, but he began to cry when police arrived. (R.R. vol. 41 at 121-22.) Robert told her that Nikki had fallen from her bed. (R.R. vol. 41 at 124-25.) He denied any sexual contact with Nikki. (R.R. vol. 41 at 125.)

Mrs. Sims conducted a sexual assault examination of Nikki. (St. Exhs. 2, 3 (medical records); exhs. 4, 6-14, 16-23 (photos); R.R. vol. 41 at 125-29.) She found some fresh superficial

tears to Nikki's anal area. (R.R. vol. 41 at 127, 133-34, 142.) She examined the rate of dilation of the anal canal and found that the dilation was faster than usual, suggesting sexual penetration. (R.R. vol. 41 at 129-30.) Although she never saw it, Mrs. Sims reported that Nikki had a torn frenulum. (A frenulum of tongue is a fold of mucus membrane connecting the floor of the mouth to the underside of the tongue in midline.) Mosby's Medical Dictionary (6th ed. 2002); R.R. vol. 41 at 136-37. Mrs. Sims could not inspect Nikki's mouth because it was obstructed by breathing tubes, but she found references in the medical examination of a torn frenulum. (R.R. vol. 41 at 136-38.) Mrs. Sims testified that in a child, a torn frenulum may be caused by insertion of a large penis, and is therefore a possible indicator of sexual assault. (R.R. vol. 41 at 137-38.) (Dr. Squires later correct this, pointing out that frenulum can tear as a result of accident, falling, the forcing of some object in the child's mouth causing trauma. R.R. vol. 42 at 111-12.) Mrs. Sims wrote a report which concluded that Nikki probably suffered sexual assault. (R.R. vol. 41 at 131.)

This testimony by Mrs. Sims is the sum total of all evidence that Roberson sexually assaulted his daughter. Mrs. Sims' medical report and her testimony were known by the prosecutor before he sought an indictment. In addition, before the indictment, the prosecutor also had in hand the report of one of North Texas' leading child abuse specialists, Dr. Janet Squires.

Knowing what she would say, the prosecutor called Dr. Squires at trial. Dr. Squires is a Dallas pediatrician and director of general pediatrics at the University of Texas Southwestern Medical Center. (R.R. vol. 42 at 90-91.) Much of her career has been devoted to researching and addressing child abuse. She examined Nikki's medical records. (R.R. vol. 42 at 94; St. Exh. 45, 46.) She also went to Texas Children's Hospital and examined Nikki. (R.R. vol. 42 at 95.) She was solely on life support by that point. (R.R. vol. 42 at 95.)

38

Nikki's injuries indicated that she had suffered a powerful blow to the head. (R.R. vol. 42 at 103.) Dr. Squires reported that Nikki had suffered *shaken impact syndrome*, or what is commonly known as shaking baby syndrome. (R.R. vol. 42 at 105-06, 113-14, 119-20.) She explained that an adult can readily cause severe and irreversible trauma to a baby by shaking it. (R.R. vol. 42 at 106-07.) She believed that Nikki had suffered non-accidental child abuse, but she would not go so far as to say intentional. (R.R. vol. 42 at 113, 125-26.) These type injuries were caused by "an out of control, angry, violent adult." (R.R. vol. 42 at 126, 128.)

Dr. Squires examined Nikki's anus to determine whether she had been sexually assaulted. (R.R. vol. 42 at 96-97.) She saw a tiny laceration. (R.R. vol. 42 at 97, 100-01.) She did not observe major trauma of the anus. (R.R. vol. 42 at 97.) She did not see signs of bruising. (R.R. vol. 42 at 98.) She collected samples. (R.R. vol. 42 at 97.) **She found insufficient evidence to conclude that Nikki had been sexually assaulted, nor could she rule it out.** (R.R. vol. 42 at 99-100.) She indicated that there are instances when a child has been sexually assaulted in the anus without leaving visual evidence around the anus. (R.R. vol. 42 at 99-100.)

Dr. Squires explained the anal canal contraction which concerned the Palestine nurse, Mrs. Sims. She said that when a child is comatose the anal muscle commonly becomes lax. (R.R. vol. 42 at 99, 118.) This is because the nervous system is shutting down because of brain injury. (R.R. vol. 42 at 118.) Dr. Squires said that dilation of the anal canal, which led Mrs. Sims to believe Nikki had been sexually assaulted, did not indicate one way or the other whether sexual abuse had occurred. (R.R. vol. 42 at 99-100, 118, 119.) Her final report stated that child sexual assault could not be substantiated. (R.R. vol. 42 at 119.)

There was no marking of her vagina to suggest sexual assault. (R.R. vol. 41 at 128.) There was no deformity of the little girl's anal canal. (R.R. vol. 41 at 142.) She took tissue swabbing and cultures to test for semen and sexually transmitted bacteria. (R.R. vol. 41 at 144, 148.) The results were negative. (R.R. vol. 41 at 150.)

With this evidence in hand, the prosecutor went to grand jurors and requested an indictment of Roberson for capital murder on a sexual assault theory. The prosecutor must have known that this evidence would not pass muster, either with the trial judge or this Court. He must have realized that if this evidence played out as it appears in the medical reports, he would be forced to abandon the sexual assault allegations or see them dismissed on directed verdict or on appeal. Yet he proceeded anyway, concluding that the gains of sexual assault allegations outweighed other concerns. Here is how he used the allegations.

### B. The District Attorney Used the Sexual Assault Allegations From the First Moment of Jury Selection to Taint the Entire Jury Selection Process.

The prosecutor used the sexual assault allegations throughout the trial for maximum effect. He used him in group voir dire, individual voir dire, opening statements, trial presentation, and in sentencing. At every moment, the prosecutor drove home the allegations that Roberson was a child molester. No parent could be unmoved.

Jurors were told on the first day of jury selection that Roberson was charged with sexual assault of a six-year-old. (R.R. vol. 6 at 107-08.) There were 208 jurors remaining after initial qualifications on the first day of jury selection. (R.R. vol. 6 at 92.)

The prejudicial effect of the sexual assault allegation was immediately manifested during the first group interview of prospective jurors. After the court explained to jurors that Roberson was

charged with sexual assault and murder of a two-year-old, 29 jurors asked to be excused, either because of the outrageous nature allegations, in some cases combined with personal contact because they knew someone involved in the case or had heard some information.  (R.R. vol. 6 at 113 (Mrs. Evans; excused), 113-14 (Mrs. Castellano; excused), 120-21 (Mrs. Reece; she overheard ER workers; not excused); 123 (Mrs. Bubb; excused), 127-28 (Mrs. Cummings; excused), 128-29 (Mrs. Thomas, crying; excused),133 (Mr. Sims, teacher of Roberson's children; excused), 134-35 (Mr. McKinley; excused), 135-37 (Mrs. Douhitt; excused), 140-41 (Mrs. Kelso; not excused), 141-42 (Mrs. Helms; excused), 144-45 (Mrs. Briley; excused), 146-47 (Mrs. Guerrero; not excused), 148-49 (Mrs. Jacob; not excused), 154-55 (Mrs. Liles; excused), 155 (Mrs. Gatewood; excused), 156 (Mrs. Hoffman; excused), 157 (Mr. Tooman; excused), 158-59 (Mrs. Vance, knew victim's family; not excused), 160-61 (Mr. Bowman, knew victim's family; excused), 161 (Mrs. Jones; excused), 161-62 (Mrs. Palos), 164-65 (Mrs. Boger, knew victim; excused); 166 (Mr. Pettiette, knew victim's family; excused), 166-67 (Mrs. Pell; excused), 172-73 (Mrs. Giddens; excused), 173-74 (Mr. Tuschoff; excused), 174-75 (Mrs. Huddleston; excused), 175-76 (Mrs. Wolfe).

There were 184 jurors remaining after second review on the first day of jury selection.  (R.R. vol. 6 at 179.)  More jurors were dismissed because the allegations involving violence or sexual assault of a child made it difficult or impossible for their jury service.  *See* R.R. vol. 7 at 151-53 (Mrs. Skidmore); R.R. vol. 8 at 45-46 (Mrs. Boyles); R.R. vol. 8 at 46-47 (Mrs. Luna); R.R. vol. 9 at 156-59 (Bertha Williams); R.R. vol. 10 at 2 (Tessa Conrad).

> **C.**     ***The Prosecutors Told Each Juror During Individual Questioning That They Believed Roberson Was a Child Molester, that He had Been Indicted as a Child Molester, and That They would Present Evidence that He Molested Nikki.***

As the District Attorney questioned each prospective juror individually, he made certain that each one understood that in addition to killing a child, Roberson was charged with sexually assaulting her. *See* R.R. vol. 12 at 77 ("We've also in this case have alleged that Mr. Roberson caused the death of an individual, intentional or knowingly, during the course or commission or attempt to commit sexual assault of a child. Okay. We've alleged that Mr. Roberson, during the sexual assault of a child committed murder."); R.R. vol. 12 at 94 ("And in this case we're alleging . . . that the murder was committed in the course of an aggravated sexual assault".); R.R. vol. 12 at 143 ("We've alleged that Mr. Roberson has caused the death of a person while he was committing or attempting to commit the offense of sexual assault of a child."); R.R. vol. 13 at 21, 64, 65; R.R. vol. 14 at 28, 72, 77; R.R. vol. 15 at 27 (juror not caused off), vol. 15 at 89, 92, 111.); R.R. vol. 16 at 34, 72-73, 97 (by Van Meter), 124; R.R. vol. 19 at 22 (Richard Lynn Sommer); R.R. vol. 19 at 58 ("We're saying that he was either sexually assaulting a child or trying to and he killed somebody. You follow that?"); R.R. vol. 19 at 58 ("And the legislature has said because of the nature of it, one felony being sexual assault of a child and then a murder resulting also, is serious enough to warrant consideration of the death penalty. How does that sit with you?"); R.R. vol. 19 at 58 ("Capital murder is an additional factor and we talked about it; a child under 6 or during the course of committing sexual assault of a child."); R.R. vol. 19 at 68 ("You believe that he killed either a child under the age of 6 or that during the course of committing sexual assault of a child or trying to, he killed somebody."); R.R. vol. 19 at 122 ("And it's capital murder in this case because we allege that she was a child under 6, okay, or that it was a murder that was committed in the course of an aggravated sexual assault. That's what makes it-- Those are the allegations against Mr. Roberson that makes this a capital murder trial. Okay?"); R.R. vol. 19 at 134 ("If this case showed that there

42

was a death of a child under 6 or that there was a death of a child when somebody's committing an act of sexual molestation is that one of the cases you would consider the death penalty would be the right punishment for?"); R.R. vol. 19 at 135 ("Two of them [aggravating factors] are a child under 6 years old that got killed or if they were being sexually molested and got killed."); R.R. vol. 20 at 28 ("We've also alleged that Mr. Roberson intentionally or knowingly killed somebody while attempting to or committing sexual assault of a child."); R.R. vol. 21 at 29; 91; R.R. vol. 21 at 127, 135 (Mr. Burgess) ("we've alleged he's committed capital murder because he killed somebody while he was either attempting to or actually committing sexual assault of a child."); R.R. vol. 22 at 24 ("The other way we've alleged Mr. Roberson has committed capital murder is that during his attempt to commit sexual assault of a child, he killed somebody."); R.R. vol. 23 at 44 ("In the alternative, we've alleged that as Mr. Roberson was either attempting to or was committing sexual assault of a child, he committed murder."); R.R. vol. 23 at 46-47 ("Now, that was murder and then we've already talked about what capital murder would be; child under the age 6 or committing murder while sexual assault of a child. Okay. That's what we've alleged. Let's say that you're a juror in this case and you found Mr. Roberson guilty under one of those two theories then we go to the punishment phase that we talked about."); R.R. vol. 23 at 86 ("And what makes it capital murder is she was a child under the age of 6 or the murder was committed in the course aggravated sexual assault. And that's what makes it capital murder."); R.R. vol. 25 at 29 ("The second way is that he's intentionally or knowingly killed someone during the course of committing sexual assault of a child or trying to sexually assault a child.") (Mr. Murphy; excused); R.R. vol. 25 at 60 ("In the alternative we've alleged that he's killed somebody while he was sexual assaulting a child or attempt to sexually assault a child.") (Mr. Bateman); R.R. vol. 25 at 117 ("And in this case it's Nikki Curtis. And what

makes it capital murder is it's a child under the age of 6 or murder was committed in the course of an aggravated sexual assault, alternatively."); R.R. vol. 25 at 158 (Mr. Day) ("[W]e have an allegation that he killed somebody during the course of committing sexual assault of a child or trying to sexually assault a child."); R.R. vol. 26 at 29 ("The second way is we've alleged that Mr. Roberson's committed capital murder because he caused the death of an individual during the course of committing sexual assault of a child or trying to sexually assault a child.  All right?"); R.R. vol. 26 at 68 ("And what makes it capital murder is that she was under 6 years old or the murder was committed in the course of aggravating sexual assault.  See that? . . . Do you think it's fair to protect a child under 6 that way?"); R.R. vol. 27 at 12 ("You know one of the allegations in this case, when the Judge read the indictment, is that this little girl's murder was committed in the course of a sexual assault.") (Juror and her brothers and sisters had been sexually assaulted by father.); R.R. vol. 27 at 25 ("And what makes it capital murder is that it was murder of a child under 6 or it was murder committed in the course of an aggravated sexual assault."); R.R. vol. 32 at 22 ("[A]nd what's makes it capital murder is that it's alleged the child was under 6 and that it was murder committed in the course of an aggravated sexual assault."); R.R. vol. 32 at 71 ("The other way we've alleged that Mr. Roberson committed capital murder is that he first intentionally or knowingly killed somebody while he was committing sexual assault of a child or trying to commit sexual assault of a child.  Okay. And the legislature has said, 'Because, one, he killed somebody, he murdered, and then, two, he was sexually assaulting a child during it, it's more serious.'"); R.R. vol. 32 at 72 ("And it's capital murder because during the murder he was either sexually assaulting a child or trying to."); R.R. vol. 32 at 126 ("[I]it was a murder that was committed in the course of aggravated sexual assault and that's what makes it capital murder."); R.R. vol. 33 at 34 ("The second way we've alleged is that Mr.

Roberson committed capital murder because he intentionally or knowingly killed someone during the course of committing sexual assault of a child or trying to sexually assault a child."); R.R. vol. 33 at 37 ("Now, I remind you to get to this first question you would have found that either Mr. Roberson killed a child under the age of 6 or killed somebody while committing sexual assault of a child or trying to."); R.R. vol. 34 at 63 ("The second way is we've alleged that Mr. Roberson committed capital murder because he murdered someone during the course of committing sexual assault of a child or attempting to sexually assault a child."); R.R. vol. 34 at 134-35 ("The second way is we've alleged that he's committed murder first, intentionally or knowingly killed somebody, and he did it during the course of sexual assault of a child or trying to sexually assault a child."); R.R. vol. 34 at 138 ("And then we'll talk about the two capital murder scenarios; be a child under 6 or during the course of committing sexual assault of a child."); R.R. vol. 35 at 22-23 ("The other way we've alleged is that Mr. Roberson has committed capital murder because he intentionally or knowingly killed someone while sexually assaulting a child or trying to sexually assault a child."); R.R. vol. 36 at 20 ("The second theory is that he is guilty of capital murder because he committed murder meaning that he intentionally killed someone while he was sexually assaulting a child or trying to sexually assault a child."); R.R. vol. 36 at 70 ("The second way we've alleged Mr. Roberson committed capital murder is that he murdered someone during the course of sexually assaulting a child or trying to sexually assault a child."); R.R. vol. 36 at 72 ("Child under the age of 6 or a murder during course of commission of sexual assault of a child."); R.R. vol. 36 at 97 ("The other theory that we've alleged Mr. Roberson committed capital murder is in that he murdered someone in the course of committing sexual assault of a child or trying to sexually assault a child."); R.R. vol. 36 at 97 ("Even if a child was sexually assaulted and killed?") (asking juror whether he could assign

45

life sentence if required); R.R. vol. 36 at 105 ("And let's also say that it was during the course of sexual assaulting that child."); R.R. vol. 36 at 106 ("That's the theory that we've alleged that he was sexually assaulting a child and a murder took place."); R.R. vol. 36 at 111 ("And that would be murder and then you would listen to that additional element, whether or not that person that was murdered was a child or whether or not the person was murdered during the course of sexual assault of a child. Okay?"); R.R. vol. 36 at 115 ("Mr. Herod, again, if you found him guilty of killing a child under the age of 6, murdering a child under the age of 6 or while sexually assaulting a child, the death penalty is not automatic.") (with this one juror, whose wife just had a child, ADA emphasized sexual assault allegation 6 times); R.R. vol. 38 at 23 ("The other way that we've alleged that Mr. Roberson's committed capital murder is that he's murdered somebody during the course of committing sexual assault of a child or attempting to sexually assault a child. All right. But I'll caution you that even if you were a juror in this case and you found that he murdered a child and he was sexually assaulting that child, death is not automatic."); R.R. vol. 38 at 29 ("Or you'd look if it was murder caused during a sexual assault of a child or the attempt to sexually assault a child. Okay?"); R.R. vol. 38 at 36 ("To show you how this works, let's say that you found, whatever it may be, you said to yourself, 'Well, he did kill a child under the age of 6. He was sexually assaulting that child. But because of these things out here, I believe he's more deserving of a life sentence.'"); R.R. vol. 38 at 66 ("We've also charged him with capital murder in that he's murdered somebody during the course of committing sexual assault of a child or attempting to sexually assault a child. All right?"); R.R. vol. 38 at 72 ("Again, if you were a juror you would like for the additional facts, was it a child under the age of 6 or was it murder during the commission of sexual assault of a child or the attempt to commit sexual assault of a child. Okay. Let's say that you're a juror in this case and

you found Mr. Roberson guilty of capital murder."); R.R. vol. 38 at 72 ("In other words, just because you found that he might have killed a child under the age of 6 and was also sexually assaulting that child, punishment is still not automatic."); R.R. vol. 38 at 106 ("We've also charged him with murder and murder during the course of committing sexual assault of a child. So it could be that you sat as a juror in this case and you found that Mr. Roberson not only killed a child under 6 but he was sexually assaulting them. All right?"); R.R. vol. 38 at 109 ("The second way that we've alleged that he could have committed capital murder is that he murdered somebody during the course of sexually assault a child. Okay."); R.R. vol. 38 at 110 ("That's the theory of the sexual assault of a child and a murder. All right. So let's say that you find him guilty of capital murder on one of those two theories."); R.R. vol. 38 at 131 ("The other way we've alleged he's committed capital murder is in that he's murdered someone while committing sexual assault of a child or trying to sexually assault a child. All right?"); R.R. vol. 38 at 132 ("Now the legislature has said if you murder somebody during the course of committing another felony, and the example here would be sexual assault of a child, it enhances the punishment where you could possibly get the death penalty. All right?"); R.R. vol. 38 at 132 ("Let's just say that you found him guilty that not only did he kill a child under the age of 6, but he also sexually assaulted that child, you'd be asked that first question. Is he a future danger? All right."); R.R. vol. 38 at 132-33 ("So you'd be telling yourself, 'All right. He's murdered a child under the age of 6 and he might have even sexually assaulted that child, but is there evidence out there that leads me to believe he's deserving of a life sentence instead of the death penalty?' Okay?"); R.R. vol. 38 at 152 ("What if not only a child was murdered but he was also sexually assaulted?"); R.R. vol. 38 at153-54 ("The second theory is that he's committed capital murder because he's murdered someone during the course of committing sexual assault of a child or trying

to sexually assault a child."); R.R. vol. 38 at 154 ("Let's say, for example, that you just found that he not only sexually assaulted a child under the age of 6, but he also murdered them."); R.R. vol. 38 at 157 ("So things that would lead you to say to yourself, 'Look. I found him guilty. I know that he murdered a child under 6 while he was sexually assaulting them.")

Some jurors said that they could put aside these allegations. Other prospective jurors said that they could not. Other jurors were excused, although it was sometimes difficult to determine whether their bias was the result of the sexual assault allegations or some other aspect. *(See* R.R. vol. 16 at 3-4 (Billie Jo Wiggins, her mind was made up); R.R. vol. 18 at 24 (juror excused); see R.R. vol. 16 at 3-4 (Billie Jo Wiggins, her mind was made up. She was excused on the defense challenge for cause, and rightfully so. She did not give a reason for her views, but she evidently is opposed to the legal system); Jerry Carter, R.R. vol. 17 at 8 (compared child molesters to whale feces in his questionnaire. Asked about sexual assault allegation by DA, vol. 17 at 13, 30, 33. He survived and was qualified. Defense objected; R.R. vol. 18 at 24 (not selected); Qualified jurors with reference to sexual assault (R.R. vol. 18 at 86); Reference to sexual assault with another juror (R.R. vol. 19 at 22).

All twelve of the jurors who decided Roberson's case were told by the District Attorney that he was also charged with sexual assault. (*See, e.g.,* Jerry Carter, R.R. vol. 17 at 8, 13, 30, 33 (compared child molesters to whale feces in his questionnaire); R.R. vol. 18 at 86; R.R. vol. 19 at 22.)

**D.**     ***The State Used the Sexual Assault Allegations During the Liability Phase of Trial to Argue for Conviction on the Non-Sexual Assault Offense and Misrepresented Texas Law to Jurors.***

During the liability phase of trial, the State used every opportunity through witnesses and jury argument to convince jurors that Roberson had molested Nikki.

*During Arraignment:* The State dramatically read the sexual assault indictment to the jury. (R.R. vol. 41 at 41-42.)

*During Opening Statements:* The prosecutor told jurors during opening statement that Roberson, "sexually assaulted and killed his own 2 year-old little girl." (R.R. vol. 41 at 43.) The prosecutor told jurors that a nurse named Andrea Sims "found that he probably sexually assaulted her." (R.R. vol. 41 at 54.) The girl's injuries to her anus were consistent with sexual assault, according to the prosecutor. (R.R. vol. 41 at 50.)

*During Closing Arguments:* Having dismissed the sexual assault allegations, the prosecutor did not concede defeat. He did not tell jurors that there was insufficient evidence of sexual assault. He did not point out to jurors that the sexual assault theory had been removed from the jury charge, a procedure of course the jurors would not know. Instead, the prosecutor *still* told jurors:

> [Prosecutor]: You heard from Andrea Sims that there was a probable sexual assault. Not only was she the Sexual Assault Examination Nurse, but she was also a registered nurse that was working in the emergency room that day. She saw evidence of three small anal tears. You heard her conclusion, probably sexual assault. You also heard that the defendant wasn't concerned when she talked to him.

> (R.R. vol. 46 at 21.)

> Then, in a low slow tone, he added this ominous indirect allusion to sexual assault:

> [Prosecutor]: He's upset. He's mad. And he sure snatches Nikki up. And you heard testimony from Mrs. Bowman about how they had to drag poor little Nikki out, kicking and screaming that she didn't want to go with Robert. ***Now, ask yourself why that is.***

> (R.R. vol. 46 at 24) (emphasis added).

49

Then again, the prosecutor told jurors that Roberson in fact sexually assaulted the child:

> [Prosecutor]: Let me talk with you about the evidence. You heard from the nurse, Kelly Gurganus, that she saw this anal tear. You heard from Andrea Sims who is the only one in this county, she's the SANE examiner, sexual assault nurse. She's the one who examines these kids. We have her cases all the time; Andrea Sims. She's the one and she looks and she performs that special examination to determine whether or not sexual assault took place and her conclusion was that more probably than not, it did. Probable sexual assault. That's in her findings. She talked about three anal tears. There's evidence there that Mr. Roberson sexually assaulted his daughter. (R.R. vol. 46 at 59.)

The prosecutor continued to drive home the sexual assault allegations by arguing that the absence of evidence constitutes evidence:

> [Prosecutor]: Dr. Squires [leading Dallas pediatrician], and I think her testimony was mischaracterized, she did mention that she also saw the tears. Now, she also mentioned the possibility that they could be healing over time from when Andrea Sims saw the injuries to the time that she saw them.
>
> You also heard Dr. Urban [pathologist]. I think her testimony was mischaracterized. She didn't see any anal tears. That's a given. But when we also asked the question, 'Doctor, just because you don't find any physical evidence does that necessarily – does that rule out completely that the child's been sexually assaulted?' 'No. In fact, often times there's no evidence of physical trauma when a child has been sexually assaulted.'
>
> Mr. Evans talked about how there was no semen found. Well, he only had five hours to clean it up before he decided to shimmy on down to the hospital. He had five hours. Is he going to leave that evidence laying around?
>
> (R.R. vol. 46 at 59-60.)

The prosecutor then went on at length about the child sleeping with Robert and concluded by misrepresenting to the jurors the requirements of Texas law:

> [Prosecutor]: Mr. VanMeter talked a lot about us abandoning the sexual assault of a child allegation. ***What he didn't tell you is that the law requires us to choose one or the other.*** You'll recall in voir dire we indicted under alternative theories of capital murder. The law says at the end of the State's case in chief we've got to pick, and we did, and now he wants to hold it against us.

50

(R.R. vol. 46 at 53-54) (emphasis added.)

[Prosecutor]: Next, ask yourself why it is that he made her sleep with him. And you can read and refer to his statement. I think it gives some insight. You heard the testimony that she hated sleeping with him, that she screamed and cried, screamed bloody murder whenever Mr. Roberson tried to pick her up. And he wants you to believe that he nestled her gently in his arms as they watched movies. You heard the evidence. His statement, 'Last night Nikki at first wanted to sleep in her own room. I told her, no, you don't want to sleep back there by yourself, and told her to come sleep with me. At first I was going to make her a pallet, but then decided to have her sleep in my bed.' Why would he have Nikki sleep in his bed at night? So he could get a good night's sleep? No. You heard about her screaming. You heard of the incident where he made her, through Teddie, you heard Teddie say about the time where he made her sleep with him. And grabbed her and physically put her on his side of the bed and she's screaming and he's saying, 'I'll beat your ass if you don't shut up. I'll kill you if you don't shut up.' And he takes the blanket and he smothers it over her head so he doesn't have to hear her cry. But now he wants you to believe that they just gently watched TV together. Why did he make her sleep with him? And then coincidentally enough we have evidence of anal tears after that. There's evidence of sexual assault here. ***The fact of the matter is we had to choose. Now they want to hold that against us.***

(R.R. vol. 60-61) (emphasis added).

The prosecutor in this statement misrepresented Texas law. He told jurors that Texas law required him to choose whether to obtain a capital murder conviction for sexual assault or killing a child under age 6. There is no such requirement. Texas law has long permitted alternative theories of liability to be presented to jurors in the disjunctive for a general verdict of guilt. *Kitchens v. State*, 823 S.W.2d 256 (Tex. Crim. App. 1991); *Hathorn v. State,* 848 S.W.2d 101, 113 (Tex. Crim. App. 1992); *Fitts v. State*, 982 S.W.2d 175 (Tex. App.--Houston [1st Dist.] 1998, pet. ref'd.) The prosecutor here relied on *Graham v. State,* 19 S.W.3d 851, 854 (Tex. Crim. App. 2000), arguing that he was entitled to charge Roberson with one capital murder with two alternative theories. *Graham* contains no requirement that he abandon one before charging the jury.

51

His misrepresentation is evidence of the prosecutor's improper use of the sexual assault allegation to prejudice the jury and assure that an angry jury decided Roberson's fate.

### E. Even the Judge Recognized That Allegation Could Have Been More Prejudicial Than Sexual Assault of a Child.

The trial court itself explained that prejudicial effect of an allegation involving harm to a child. "Any time you saw the word child in anything, people tend to head for the doors. I may be wrong, but it''s been my experience by the nature of this case (sic), will cause probably and extraordinarily large number of people to disqualify themselves." *See* R.R. vol. 3 at 22.

### F. Evidence of the State's Improper Motive: The Prosecutors Eliminated One Potential Juror Who Would Have Recognized the Paucity of the State's Sexual Assault Evidence.

One prospective juror was Gary Lively. *See* R.R. vol. 22 at 64-107. Mr. Lively alarmed the prosecutors because he had worked in TDCJ-ID at the Beto Unit with sexual offenders. He was unquestionably fair. The district attorney tried to trap Mr. Lively into disqualifying himself. When that failed, the prosecutor ask for him to be struck for cause. When that failed, the State exercised a peremptory challenge against Mr. Lively.

The elimination of this qualified juror indicates that the prosecutors feared a juror who might recognize the paucity of their claims that Roberson sexually assaulted a child. Mr. Lively would have concluded that Roberson possessed none of the sex offender criteria, and would have deduced that the prosecutors had overstated their case in order to scare jurors into a conviction.

### G. Evidence of the State's Improper Motive: The Infamous Surreptitious Search of Roberson's Cell During Trial.

Could there be circumstances where a prosecutor misused his evidence to obtain an indictment and seek a death sentence which he knew he could not support with evidence? If so, how

would a court possibly judge the motives of a prosecutor and segregate those circumstances where a prosecutor's witnesses simply did not testify as expected and the prosecutor in good faith must dismiss an allegation of an indictment, from other circumstances where a prosecutor knew in advance of trial that his evidence would not support an allegation as serious as capital murder while raping a child, but proceeds with the allegations anyway to obtain their collateral benefits?

One means is to look for evidence that the prosecutor may be misusing the system in other respects. In Roberson's case there was a strange event before trial which suggests the prosecutor's motives. This involved the surreptitious search of Roberson's cell to obtain his trial litigation file on December 18, 2002 while Roberson and his lawyers were in court exercising their jury strikes, and the prosecutor's response when confronted.

> ### 1. *The Prosecutor Searched Roberson's Cell to Find His Litigation File.*

Attempting to find incriminating evidence, Mr. Lowe, the district attorney, selected a day when Roberson would be in court and ordered a surreptitious jail cell search of Roberson's personal trial file, including privileged attorney client communication and work product. There is also evidence that Mr. Lowe presented improper testimony at a hearing on the matter, and failed to correct inaccurate statements to the court by his investigator.

The Anderson County District Attorney has an investigator on staff named Joseph E. Willis. (R.R. vol. 40 at 6-7.) Mr. Willis is a former Anderson County sheriff deputy and investigator. He was hired by Mr. Lowe in 1998 or 1999 when Mr. Lowe was elected. (R.R. vol. 40 at 7.)

On December 18, 2002, as jury selection was nearing completion, Mr. Willis went to the Anderson County jail. He contacted the jail administrator, Larry Ward. (R.R. vol. 40 at 11.) Mr.

Willis explained that he wanted to search Roberson's jail cell. Mr. Ward referred him to Mr. Choate, the assistant chief jailer. (R.R. vol. 40 at 12.) Mr. Willis again explained his objective. To his own credit, Mr. Choate told Mr. Willis that he would not conduct or assist the search, suggesting that Mr. Choate at least recognized its impropriety. (R.R. vol. 40 at 12.)

Mr. Willis found a jailer named Dep. Tolliver. Together, Mr. Willis and Dep. Tolliver went to Roberson's cell. (R.R. vol. 40 at 15.) Roberson at the time was in the courtroom where Mr. Lowe and Mr. Evans were exercising their respective strikes to create the jury which would hear the case. Mr. Willis admitted that he selected this day for his search because it was the last day of jury selection, and moreover, he was concerned that the discovery period was about to expire. (R.R. vol. 40 at 35.) Mr. Tolliver sent the other inmates in Roberson's cell to recreation yard. (R.R. vol. 40 at 21.)

Willis admitted that he went to Roberson's cell to "[s]earch his written material for trial preparation." (R.R. vol. 40 at 8.) He denied that he was searching for communication between Roberson and his lawyers. (R.R. vol. 40 at 9, 39-40.) He said instead that he wanted communication between Roberson and any friends or family which might incriminate him. (R.R. vol. 40 at 9.)

Willis entered the cell and dug under Roberson's bunk for his trial file. (R.R. vol. 40 at 17.) He rifled through the legal file searching for information which might be useful to Roberson's prosecution. Willis took some letters which he thought might be useful. (R.R. vol. 40 at 18-19, 20-21.) He also took one of Roberson's litigation notebooks containing writing by Roberson. (R.R. vol. 40 at 18, 21-22.) He also took Roberson's litigation notes which he had taken during the five-week jury selection process. (R.R. vol. 40 at 19-20.)

At the hearing, Willis produced some of the material he had taken. He did not, however, produce the litigation notebook. He could not explain why the notebook had disappeared. He said that he seized it, but could not, or would not, explain why it had disappeared. (R.R. vol. 40 at 22, 23.) *To this day, Roberson's litigation notebook has not been returned or its disappearance explained.*

Willis said that he left the cell and arranged Roberson's bunk the way he found it. (R.R. vol. 40 at 20.) He took the documents and placed them in the trial file at the office for Lowe. (R.R. vol. 40 at 27, 31.)

**2.    *The Prosecutor Seized Privileged Litigation Documents From Roberson's Cell.***

Roberson attached to his state habeas application copies of the documents seized by Willis from Roberson's cell. *Attachment 11* to Roberson's state habeas petition is a copy of Defense Exhibit 3, the manila folder in which Willis had placed some of the documents seized. This manila folder did not belong to Roberson. It appears to be a scrap folder from another prosecution which Willis used to collect the documents seized from Roberson. The notations at the top of the folder appear to be notes written by Willis or someone else in the District Attorney's Office.

*Attachment 12* contains copies of some of the documents seized by Mr. Willis. The documents under *Attachment 12* constitute the remainder of Defense Exhibit 3. The documents are copies of letters of encouragement from friends and family of Roberson. These documents identified for Mr. Lowe possible character witnesses to be called by Roberson, and allowed time to develop impeachment information or use the letters for cross examination.

Also attached to Roberson's state habeas application is a copy of Defense Exhibit 4. These documents are copies of legal notes and correspondence by Roberson. They include:

- A draft of instructions by Roberson to someone, probably a family member, to help him find another attorney to represent him. The instructions revealed to Mr. Lowe that Roberson was dissatisfied with his lawyers, which in turn, suggested that Roberson was not cooperating fully with his attorneys.

- Legal notes by Roberson to his attorneys listing specific complaints which he had with his attorneys and instructions to them to work harder in his behalf.

- Legal notes by Roberson to his attorneys expressing complaints about the mitigation expert hired by the attorneys, Dr. Kelly Goodness.

- Legal correspondence by Roberson to his lead attorney listing criticisms of the lead State witness, Teddie Cox, his former girlfriend. Roberson's legal correspondence posed questions pertaining to his defense, and provided instructions to his attorney to find certain witnesses who could rebut her testimony.

- Legal correspondence by Roberson to his attorney listing inmate witnesses who could support his defense. These witnesses were likely witnesses which he had identified to counter the allegations of another inmate from the jail who had informed Mr. Lowe's office that Roberson had confessed to him.

- Legal correspondence by Roberson to his attorney listing means of attacking another pair of State witnesses, Mr. and Mrs. Bowman, Nikki's maternal grandparents, and identifying witnesses who could counter their testimony.

Some of these documents Willis later copied and returned to Roberson's cell before anyone found out. (R.R. vol. 40 at 30, 32.) Willis claimed not to know why he returned some of the documents. (R.R. vol. 40 at 32.)

Neither Mr. Willis nor Mr. Lowe asked Mr. Evans for permission to search Roberson's legal file. Neither Mr. Willis nor Mr. Lowe notified Mr. Evans or Roberson that they intended to search Roberson's cell or his legal file. (R.R. vol. 40 at 12.) Neither of them notified Mr. Evans after searching the legal files. Mr. Willis admitted that there was no suspicion that Roberson was hiding

contraband in his cell which would have justified a search.  Mr. Willis made no effort to obtain a warrant.  (R.R. vol. 40 at 13.)

### 3.	*The Search Was Discovered.*

When Roberson returned to his cell, he realized that someone had searched his litigation files and notes, but he did not know who.  A day or so later, Rex Olson, Mr. Evan's investigator, visited Roberson at the jail to discuss progress on a list of witnesses that the two men were developing. Roberson told him that Roberson could not provide the list of witnesses because his personal property in the cell had been searched and his files were in disarray.  (*See Affidavit of Rex Olson*, *Attachment 13*.)

Sensing something odd, Mr. Olson discussed Roberson's comments that evening with the defense attorney, Mr. Evans.  The next day the two met with Roberson who told them that several pages of his legal work were missing, including Roberson's witness list.  (*See Affidavit of Rex Olson*, *Attachment 13*.)  None of the three men could fathom what had occurred.

About two week later, Mr. Lowe sent a copy of some of the documents he had seized to Mr. Evans as discovery.   (R.R. vol. 40 at 44-45.)  This was the first indication to Roberson or his attorneys that the District Attorney's office was responsible for the search.  Mr. Evans, Roberson's attorney, responded with a motion to suppress the documents.  (C.R. vol. 4 at 525.)

The trial court conducted a hearing on the motion on January 22, 2003.  (R.R. vol. 40 at 4.) The court determined that there was no evidence found by Mr. Lowe which would help the State prosecute Roberson.  The trial court found that some of the documents seized revealed Roberson's mental processes and thoughts.  (R.R. vol. 40 at 49; Defendant. Exhs. 3, 4.)  The court did not find any material defense evidence had been compromised.  (R.R. vol. 40 at 54.)  However, Mr. Lowe,

on January 29, 2003, six days following the January 23 exclusion hearing, formally designated the

documents which he had seized as evidence that he intended to introduce against Roberson at trial:

> The State of Texas' Tenth Supplemental Response to Discovery Order
>     3) The State offers the inspection to Defendant's counsel of the following
> items, if any, at the office of the Anderson County Criminal Defense Attorney,
> Anderson County Courthouse, Palestine, Texas.
>         . . .
>             c) All physical objects to be introduced as part of the State's case:
>                 . . .
>             Letters to District Attorney from Ryan Lodygowski[2]
>             Miscellaneous correspondence[3]
>             Jail records
>             REACH Clinic records                          (C.R. vol. 4 at 564-65.)

Mr. Lowe was making clear that he planned to use the documents if he found a way.

The trial court declined to disqualify Mr. Lowe or his office from the case. (R.R. vol. 40 at

49; C.R. vol. 4 at 525.) The court instead issued a stipulated protective order against the State to

prevent it from further searches of Roberson's trial material, and prohibited the prosecutors from

using any material seized from Roberson's cell. (R.R. vol. 40 at 49-54; C.R. vol. 4 at 559.)

### 4.        The Trial Judge Believes Nothing Was Done Improperly.

As an aside, the trial judge has provided an affidavit stating that he does not believe that Mr.

Lowe acted improperly. The judge also indicates that he does not believe that Roberson was harmed.

The judge's affidavit is attached. *See Attachment 15.* It should be pointed out that the judge cut the

two trial lawyers fees during the trial by about 10%. The judge did not provide a reason. Copies of

the invoices and payments are included in volumes 2 -5 of the direct appeal clerk's record.

---

[2]This letter was designated in the previous disclosure for first time on January 13, 2003,
C.R. vol. 4 at 543, although they received the letter six months earlier.

[3]These and the jail records on the next line are the documents seized from Roberson's
cell.

**5.** ***A Hearing Was Conducted on the Search and All Documents Were Banned From Trial and a Restraining Order Imposed on District Attorney.***

It is apparent that Mr. Willis searched Roberson's legal file on the instruction of Mr. Lowe. It appears that it was Mr. Lowe who made the decision not to seek Mr. Evans' permission or alert him in advance. It also appears that Mr. Lowe and Mr. Willis hoped that Roberson would not learn that his file had been searched, unless they found valuable incriminating communication.

Mr. Willis' explanation that he was merely searching Roberson's legal file for incriminating communication with people other than his attorneys is untrue. As Mr. Willis knew from having been an Anderson County sheriff investigator, all correspondence to or from inmates is regularly read by jailers and copied, with the exception of legal correspondence. (R.R. vol. 40 at 9-10.) In fact, as Mr. Willis was forced to admit, even in Roberson's case the jail was already copying Roberson's correspondence and sending it to the District Attorney's office. (R.R. vo. 40 at 10.) Finally, Mr. Willis confessed that this was the first time in his career he had ever searched an inmate's legal file for incriminating evidence during the defendant's trial. (R.R. vol. 40 at 36-37.)

At the hearing, Mr. Willis claimed that he was ignorant of the attorney-inmate correspondence procedures and that this is why he needed the help of the jail administrator. (R.R. vol. 40 at 11.) This is untrue. Mr. Willis was previously an Anderson County deputy and investigator for several years. As a deputy and investigator, he had frequent contact with jail personnel and along with inmates whom he interviewed. He was well aware of the procedures for attorney-inmate correspondence and the need to preserve confidentiality.

Over Mr. Lowe's objection, Mr. Willis was forced to admit that he had discussed the search with Mr. Lowe who told him that no search warrant was needed to search Roberson's cell. (R.R. vol. 40 at 14, 35.)

Mr. Willis went to some length to conceal his search. He selected a day for the search when he knew Roberson would be in court. (R.R. vol. 40 at 35.) Dep. Tolliver, the jailer, opened Roberson's cell and ordered the other inmates to the recreation yard, probably at Mr. Willis' request. (R.R. vol. 40 at 21.) This assured that no inmates would tell Roberson. Mr. Willis put Roberson's bunk back the way he found it. (R.R. vol. 40 at 20.) He did not make a report of the search, which is usually done after any law enforcement search, particularly in a capital case. (R.R. vol. 40 at 15.) Nor did he make a list of documents seized, which he typically would do in an investigation. (R.R. vol. 40 at 21, 23.) In early January, he was directed by Mr. Lowe to disclose copies of the some of the seized documents to the defense as part of the discovery process. He only provided some of the seized documents, not all of them. (R.R. vol. 40 at 47.) He did not reveal all of the documents until the day of the hearing, evidently only because he received a subpoena to do so. Even at this point, he did not turn over the litigation notebook he had taken.

Mr. Willis was caught lying during the testimony. When asked whether he had previously returned all of the documents he had seized, Mr. Willis confirmed that he had. (R.R. vol. 40 at 24.) When the attorney confronted him with a letter from Roberson which Mr. Willis still had, Mr. Willis claimed that he misunderstood the question. (R.R. vol. 40 at 24.)

> **6.** **What was the Real Reason for the Search of Roberson's Cell? Answer: To Find Evidence of Extraneous Sexual Assault Because Prosecutors Concluded That They Lacked Any Evidence of Sexual Assault.**

The real reason Lowe ordered a search of Roberson's legal file was because he was searching for evidence to support his allegation that Roberson sexually assaulted his daughter before killing her.

As mentioned, the evidence that Roberson sexually assaulted his daughter never existed. Lowe knew this long before he sought a sexual assault indictment. Mr. Lowe's expert witnesses told that there was insufficient evidence of sexual assault. As the date for trial approached, it appears that Mr. Lowe became concerned that he did not have sufficient evidence of a sexual assault. This posed a problem because jury selection had been underway for months and was nearing completion. If he could not find evidence of sexual assault, then he might have to inform the court, which might in turn require dismissal of the sexual assault portion of the indictment and a retrial so that jurors could be selected without informing them of any sexual assault allegations.

Mr. Lowe wanted to search Roberson's legal file to see if he had written incriminating statements to his lawyers or to his family or friends. If so, then the letters in Roberson's handwriting would prove to be valuable evidence of guilt. Moreover, Mr. Lowe would be able to subpoena the family members or friends to see if they received additional incriminating letters.

In addition, probably the chief reason Mr. Lowe ordered this search was to find an address or phone number of a witness named Rosie Boyer. Mrs. Boyer was the common law wife of Roberson's brother, John Roberson.

Mr. Lowe wanted to find Mrs. Boyer because he thought that she might be able to testify that Roberson had sexually assaulted her. If she testified during the punishment phase of Roberson's trial that he had sexually assaulted her, this would significantly increase the chances that the jury could assign a death sentence. Some time before Nikki's death, Mrs. Boyer filed a complaint with police

against Roberson. The evidence, however, was weak and a grand jury no billed the allegation, probably at Mr. Lowe's recommendation. Searching for evidence of sexual assault to bolster his capital case against Roberson, Mr. Lowe apparently changed his mind and determined to find Mrs. Boyer. She had moved out of state and could not be found, however. Mr. Lowe evidently thought that Roberson's trial preparation file might contain her address or phone number in letters to his lawyer or lists of possible witnesses.

### 7. Did the Search of Roberson's Litigation File Provide Useful Information?

Although their search of Roberson's litigation files did not reveal evidence to support their sexual assault claim or an address for Mrs. Boyers, Mr. Lowe's and Mr. Willis' search of Roberson's trial file provided them with useful information:

- They learned that Roberson was sharply critical of his two lawyers. (R.R. vol. 40 at 29.) Knowing that there is tension between a defendant and his lawyers can sometimes prove useful to an opponent because it suggests to an opponent that the client may not be telling all. Moreover, knowing which issues which cause tension between a client and his lawyers provides the opportunity for the opposing lawyer to direct evidence and questions to precisely those issues to further division.

- They obtained documents which Mr. Lowe admitted he planned to use to impeach any witnesses who said differently at trial. (R.R. vol. 40 at 50-51, 55.) The documents affected probably a dozen witnesses identified by Roberson.

- They discovered inmate witnesses who might be called at trial.

- They discovered other witnesses who might be called in rebuttal testimony against several key State witnesses, allowing time to prepare a response.

Mr. Lowe attempted to explain what had occurred. He said that he did not believe that "the fact that he rants and raves about how crummy his lawyers are," was not a privileged matter, and implied that he should be free to introduce this at trial. (R.R. vol. 40 at 51.)

Mr. Lowe also claimed at the hearing that he had learned that Roberson had confessed his guilt to another inmate named Ryan Lodygowski. (R.R. vol. 40 at 41.) Mr. Willis, however, gave no indication that this was the reason. Mr. Lowe cited other instances where he had found incriminating letters in the cells of defendants, suggesting that his conduct in this case may reflect a pattern. (R.R. vol. 40 at 44.)

### H. Federal Law Condemns Use of Extraneous Offenses in the Liability Phase of a Trial for Purposes of Destroying the Defendant's Character, or Inflaming Jurors With Prejudicial Unproven Misconduct.

Character-conformity evidence is judged inadmissible as a matter of law in Texas because it is categorically deemed to be more prejudicial than probative. *Montgomery v. State*, 810 S.W.2d 372, at 387 (Tex. Crim. App. 1991) (opinion on rehearing on Court's own motion).

Under such circumstances, "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, at 825 (1991), citing *Darden v. Wainwright*, 477 U.S. 168, 179-183 (1986).

In *Corwin v. State*, 870 S.W.2d 23, at 27-28 (Tex. Crim. App. 1993), the Texas Court of Criminal Appeals observed that in promulgating former Section 19.03 (a) (6) (B) of the Penal Code, now Section 19.03 (a) (7) (B):

> "Undoubtedly the Legislature intended a limiting principle in the phrase 'same scheme or course of conduct.' * * * [I]t is clear that the Legislature did not intend that every different-transaction multiple killing comprise a capital murder."

The Court of Criminal Appeals accomplished the intended limitation by construing the statute to require a showing that the different-transaction multiple murders occurred according to "a regular mode or pattern of . . . behavior." *Id.*, at 29.

The insertion of irrelevant extraneous misconduct during the course of a criminal trial, whether by evidence erroneously admitted, or by improper prosecutorial comment, may under the circumstances of a particular case be so prejudicial as to deny the defendant a fundamentally fair trial, in violation of the Due Process Clause of the Fourteenth Amendment, justifying a grant of relief in habeas corpus proceedings. *E.g.*, *Houston v. Estelle*, 569 F.2d 372 (5th Cir. 1978); *Bryson v. Alabama*, 634 F.2d 862 (5th Cir. 1981); *Menzies v. Procunier*, 743 F.2d 281 (5th Cir. 1984). In order to rise to the level of a constitutional violation, the erroneous insertion of extraneous misconduct into the case must be prejudicial, meaning that it must be "'material in the sense of a crucial, critical, highly significant factor,' in the context of the entire trial." *Menzies v. Procunier*, supra, at 288, quoting *Porter v. Estelle*, 709 F.2d 944, at 957 (5th Cir. 1983).

The rape allegations infected the entire trial from start to finish and have resulted in a fundamental miscarriage of justice.

**I.** **How Does the Court Sever Theories of Liability in a Capital Murder Indictment? Intro: Chambers v. Mississippi.**

Texas does not have an explicit procedure for severing theories of liability. It does, however, have a procedure through which counts or indictments may be severed in Texas Penal Code 3.04.

The Fourteenth Amendment due process clause guarantees that a criminal defendant shall have the meaningful opportunity to present a complete defense. *See Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Crane v. Kentucky*, 476 U.S.683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

The actions in this case conflict with the above cases on the due process issue, as well as with the decisions in *Mattox v. United States*, 156 U.S. 237, 242-243, 15 S.Ct. 337, 339-340, 39 L.Ed. 409 (1895); *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965); *Mancuse v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972) and *Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969).

*Chambers v. Mississippi, supra*, was grounded in the due process guarantee of the Fourteenth Amendment. That right, the Court said is, in essence, the right to a fair opportunity to defend against the State's accusations. This essential right has been preserved as a critical component of the criminal justice system, so that, while the right is not absolute, and may in appropriate cases bow to accommodate other legitimate interests in the trial process, <u>it is to be treated with special care</u>. If the right to present a defense is denied or <u>diminished</u>, the ultimate integrity of the fact-finding process is called into question, so that the competing interests are to be examined carefully when the defendant's proffered evidence has been excluded. *See Chambers v. Mississippi, supra,* 440 U.S. at 295, 93 S.Ct. at 1045-46 (citing *Mattox v. United States*, 156 U.S. 237, 242-243, 15 S.Ct. 337, 339-340, 39 L.Ed. 409 (1895); *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965); *Mancuse v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969).

In *United States v. McClure*, 546 F.2d 670 (5th Cir. 1977), the defendant in a drug delivery case sought to prove his duress defense (that he made the delivery because he was afraid of one Carroll, a D.E.A. informant) by calling three other individuals to testify that Carroll had coerced them into selling heroin and had carried a gun in the time shortly after McClure, the defendant, had

made the sales. The trial court had excluded McClure's evidence of those events, finding they were not relevant because they had happened after the sales.

The Fifth Circuit found the evidence relevant. It had some tendency, as evidence of a "systematic campaign of threats and intimidation" to support a defense of duress. <u>The Court did not consider whether the defense testimony was credible, nor did it say to what degree it was probative. Its tendency to support the defense</u> made it relevant <u>and admissible.</u> Its <u>ultimate weight was for the jury to decide</u>. The defendant's "right to present a <u>vigorous</u> defense <u>required</u> the admission of the proffered testimony," the Fifth Circuit held. "A jury could not properly convict (McClure) absent the opportunity to hear the proffered testimony <u>bearing upon</u> the theory of defense and <u>weigh its credibility</u> along with the other evidence in the case." *United States v. McClure, supra*, 546 F.2d at 673.

Fundamentally, a defendant has a right to present a defense. When a defendant lays claim to *Chambers* it is usually to claim that he was denied the admission of evidence which would have provided his defense. Roberson's case is identical in principle, with a slight difference which does not alter the standing principle. He is laying claim to *Chambers* and related cases to show that he was fundamentally denied a fair trial because he was denied *exclusion* of outrageously prejudicial evidence which the State knew was either false or too weak to be worthy of credulity.

What the trial court should have done when it received a motion challenging the State's lack of evidence and a serious argument that there was no credible evidence of sexual assault was to conduct a suppression hearing. The basis for a suppression hearing under Texas Code of Criminal Procedure article 38.32 is to afford an opportunity to challenge evidence the State intends to present for which there is no legitimate basis in law for doing so. More commonly, suppression hearings

are used for evidence seized in violation of the Fourth Amendment, but there is nothing to prevent a suppression hearing when necessary to determine whether the State intends to violate the federal constitution by introducing unsubstantiated evidence designed to deprive the defendant of a fair trial and then insulate its actions by dismissing the allegations at mid-trial.

A suppression hearing would have forced the State to show its medical reports and if necessary call the nurse, Mrs. Sims, to explain her opinions. The defense could have called Dr. Squires. The judge could have then (1) excluded the evidence as legally or factually insufficient, or (2) excluded the evidence as insufficiently probative to justify inclusion in the first trial, and ordered the sexual assault allegations to be relegated to a second one. Either of these decisions would have guaranteed protection of Roberson's constitutional rights and allowed for appellate review.

### J.     This Claim Was Fully Preserved and Has Not Been Procedurally Defaulted.

At every juncture, the trial counsel tried to sever the sexual assault allegations. He suggested this during pre-trial. (R.R. vol. 5 at 23; C.R. vol. 3 at 290; denied C.R. vol. 3 at 345.) He sought a gag order to prevent the DA from publically discussing the sexual assault allegation. (C.R. vol. 1 at 18, 20.) The defense sought a severance again at R.R. vol. 41 at 6-8 when the State abandoned just before trial all paragraphs except the first three. *See* R.R. vol. 41 at 6 ("MR. LOWE: Just for clarification, Judge, we're going forward with capital, paragraph A, paragraph B, count 2 paragraph A.") Defense objected and sought mistrial, and this was denied. (R.R. vol. 41 at 8.) Court denied the defense's motion in limine on the sexual assault allegations. R.R. vol. 41 at 18-19. At the close of the State's case-in-chief, the State abandoned the sexual assault allegations without prompting, tacitly acknowledging its lack of evidence. (R.R. vol. 44 at 2-3.) The court denied the defense

motion for mistrial. (R.R. vol. 44 at 3-4; C.R. vol. 5 at 593.) The issue was raised in claim 5 of the direct appeal. It was raised again in claims 1 - 4 of Roberson's state habeas application.

**K.** ***The Findings and Conclusions by the State Court are unreasonable application of existing federal law and do not bar this Court from granting relief under the AEDPA.***

In the findings and conclusions, written by the State and signed without change by the state trial judge, the state court made the following findings and conclusions, C.R. vol. 17 at 2644:

***Roberson properly stated constitutional claims.*** In paragraph 5, the state court concluded that Roberson failed to state a constitutional barrier to the state prosecutor proceeding upon a valid indictment to the jury. This is incorrect. Roberson has already explained the due process barriers which prevent a state prosecutor from alleging what he knows to be false evidence and arguments to the trial court and jury for the surreptitious objective of prejudicing the jury to obtain a death verdict. In *Napue v. Illinois*, 360 U.S. 264 (1959), for instance, the Supreme Court held that a conviction obtained through use of false testimony, known to be such by representatives of the State, is a denial of due process. The Court further ruled that there is also a denial of due process when the State, though not soliciting false evidence, allows it to go uncorrected when it appears. In *Miller v. Pate*, 386 U.S. 1 (1967), an Illinois death row inmate entitled to habeas relief where prosecution knowingly misrepresented paint-stained shorts as blood-stained, and failed to disclose the true nature of the stains.

***Roberson's claims were not procedurally defaulted under state law.*** In paragraph 6, the state court concluded that these claims were procedurally barred because they were not raised on direct appeal. The claims, however, were exhausted and none procedurally defaulted.

***Preserved at trial.*** Before trial Roberson filed a motion to sever and exclude the child sexual assault allegation, arguing among other things that, "Further evidence presented to the Defense, as shown on Exhibit C, clearly eliminates actual sexual assault. No other objective or direct evidence of actual or attempted sexual assault is known to the Defense or has been provided by the State." C.R. vol. 3 at 290, 291. Roberson correctly predicted that the State would drop the sexual assault allegation after prejudicing the jury for all it was worth. *Id.* Among the legal violations argued were Roberson's Sixth Amendment right to fair trial. *Id.* Although he did not cite the federal due process or eighth amendment guarantees, he was clearly complaining about the procedures used by the State and trial court to adjudicate guilt. (*See* "due. . . consideration" at p. 291).

Although he denied the motion, the trial judge recognized the danger of prejudice: "Any time you saw the word child in anything, people tend to head for the doors. I may be wrong, but it's been my experience by the nature of this case (sic), will cause probably and extraordinarily large number of people to disqualify themselves." (R.R. Vol. 3 pg. 22).

After evidence, Roberson filed a motion for directed verdict, alleging insufficient evidence of any sexual assault, albeit without assertion of constitutional violations. (C.R. vol. 5 at 593, denied at 595.)

Roberson objected, before the reading of the indictment, to trying the sexual assault paragraph and requesting again to sever it from the trial, re-urging his written motion, which contained constitutional objections. (R.R. vol. 41 at 6.) The court denied. (R.R. vol. 41 at 7, 8) (line 9, "All right.").

At trial, when the State abandoned the sexual assault allegation, the trial court denied Roberson's motion for directed verdict, albeit without constitutional objections. (R.R. vol. 44 at 3-6.)

**Preserved in motion for new trial.** After conviction, Roberson filed a timely motion for new trial, again asserting the prejudice caused by the unfounded sexual assault allegations. (C.R. vol. 5 at 707.) While he did not cite constitutional provisions, it is clear that he complained of the fundamental unfairness of the process of his trial and inability to obtain a fair minded jury. The trial court overruled the motion by allowing time for ruling to expire, which under Texas law constitutes denial.

**Preserved on direct appeal.** On appeal Roberson presented this issue:

Issue No. Five: the Trial Court Erred in Overruling the Defendant's Motion for Severance under Texas Penal Code Sec. 3.04, as to Alleged Capital Counts in the Indictment or Grant a Mistrial, Further Resulting in Violation of the Appellant's Sixth, Eighth and Fourteenth Amendment Rights under the U.S. Constitution.

*See* Roberson Direct Appeal Brf., *Roberson v. State,* (Tex. Crim. App. 2003).

In his direct appeal brief, Roberson relied upon *Llamas v. State*, 12 S.W.3d 469 (Tex. Crim. App. 2000), as authority that a severance is required to avoid substantial or injurious effect or influence on the jury's verdict. *Llamas*, in turn, predicated its ruling on *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946), which, while not resting its decision on the Sixth Amendment, developed the rule that the test for harmful error is whether it affected the "substantial rights" of the defendant, an important concept constitutional analysis.

In his direct appeal brief, Roberson complained of the corrupted trial process, a clear argument for a due process violation. He said, "The result in this trial was precisely the type of event

that prior court rulings contemplated and found violative of fairness in the trial process . . . ." *Roberson* Brf. Direct Appeal at 33. Moreover, he argued, "Without a serious review of the fairness of the joinder of criminal counts, the State could presume to be immune from appropriate scrutiny and insert issues that are designed to be inflammatory and prejudicial, without a good faith basis for prosecution, . . . ." *Id.* at 34. He explained the prosecutors' designed and complained, "Every juror had been individually voir dired on the issue of a sexual assault charge, reinforced by the announcement of the State during opening argument and then supported by a gossamer thin layer of evidentiary support. This tactic employed by the State accomplished its goal of antagonizing the jury to rush to conviction of the Appellant and the imposition of the ultimate sanction." *Id.*

Finally, Roberson explicitly explained the constitutional basis for his challenge, citing the Sixth, Eighth and Fourteenth Amendments, clearly bringing the federal claims to the CCA's attention:

> Appellant also asserted claims pursuant to the Sixth, Eighth and Fourteenth Amendments to the United States Constitution in regard to the issue of joinder of the two capital counts. In *Singh vs. United States*, 261 F3d 530 (5th Cir. 2001), no pet., the reviewing court specifically analyzed a situation involving presentation of multiple counts, and where bias and inappropriate prejudice is submitted by that action, the trial process is bereft of the guarantee provided by the sixth amendment. Thus, the circumstances presented by the inflammatory submission of a count with scant evidence for its support and with the jury ultimately considering only one count, mandate that this court vacate the conviction rendered by the trial court and compel a new trial as to all issues.

*Roberson* Brf. Direct Appeal at 34-35.

**Ruled on the merits by CCA.** The CCA denied Roberson's claim in the direct appeal on state law grounds, but also included a sentence recognizing and denying his federal claims.[4]

_____

[4]The CCA addressed Roberson's constitutional claims on the merits in its direct appeal opinion:

*Alternatively, default excused by IAC.*  Alternatively, Roberson asserts that if there was procedural default then it was excused by the cause and prejudice exception, here that his court appointed attorney, who represented him at trial and on direct appeal, failed to render effective assistance of counsel as required by the Sixth Amendment to the federal constitution.

*Alternatively, stay and abate requested.*  In the event, however, that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests.  First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence.  Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted.  The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court.  In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options.  They may withdraw

---

In his fifth point of error, the appellant claims that the trial court erred in denying his motion to sever under Section 3.04 of the Penal Code.
* * *
Here, the appellant argues that he was harmed by the trial court's decision in this case to "support the continued joinder of the two capital counts." The record, however, shows that no such thing happened. The indictment in this case did not allege two separate offenses, but rather one offense (capital murder) under two different theories ( the victim was under six years of age, and the murder was committed in the course of committing aggravated sexual assault). The trial court did not err by denying the appellant's motion to sever under Section 3.04.  *Nor did the trial court's ruling implicate, much less violate, any of the appellant's federal constitutional rights, as he claims.*  Point of error five is overruled.

*Roberson v. State*, No. 74,671, 2007 Tex. Crim. App. Unpub. LEXIS 1175 (Tex. Crim. App. June 20, 2007) (emphasis added).

a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

**Claim 4 was not state procedurally defaulted by double presentation.** In paragraph 7, the state court concluded that claim number 4 was procedurally defaulted because it was raised on direct appeal and denied.

**It is nonsense to claim that Roberson waived the claims.** In paragraphs 8 and 9, the state court concluded that Roberson waived complaint about the search of his cell by agreeing to the exclusion of the evidence obtained. This is nonsense. Unfortunately, candidly, it is at this point that Roberson has run out of briefing time in order to file this petition by the AEDPA statute of limitations. His counsel plan to file a supplemental brief addressing the default and waiver claims contained in the state court F&Cs.

**Claim Number 5: Unreliable and Unscientific Testimony by The State's Psychologists That Roberson Was a Future Danger Lacked Scientific Reliability Required by <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, and <u>Kumho Tire Co., Ltd. v. Carmichael</u>.**

**Claim Number 6: The State's Psychologists Who Testified That Roberson Was a Future Danger Lacked Sufficient Qualifications as Required by <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, and <u>Kumho Tire Co., Ltd. v. Carmichael</u>.**

**Claim Number 7: Unreliable and Unscientific Testimony by the State's Psychologists That Roberson Was a Future Danger Lacked Scientific Reliability, and Thereby Violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.**

***Claim Number 8: Unreliable and Unscientific Testimony by the State's Psychologists That Roberson Was a Future Danger Lacked Scientific Reliability, and Thereby Violated the Fifth, Sixth and Eighth Amendments to the U.S. Constitution.***

Roberson challenges the qualifications and testimony of Dr. Tom Allen and Dr. David Self, the State's psychologists, under *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999), and the U.S. Constitution. His rights to due process of law, equal protection of the laws, and a reliable sentence, trial by jury, and by an impartial sentencer, effective assistance of counsel, compulsory process, confrontation and cross-examination, proof of criminal offenses beyond a reasonable doubt and freedom from self-incrimination, were violated by the introduction of inaccurate, prejudicial and fundamentally flawed evidence of "future dangerousness" at the penalty phase.   U.S. Const. Amends. V, VI, VIII, XIV.

PART I: THE KEY TO THE STATE'S DEATH VERDICT WAS MISUSE OF THE HARE PSYCHOPATHY CHECKLIST BY DR. ALLEN.

In this section, Roberson musters the evidence and arguments to show that Dr. Allen's use of the Hare Psychopathy Checklist - Revised, central to the State's arguments and Roberson's death sentence, is classic junk science which demands re-sentencing.

A.       *A leading government proponent has recently repudiated use of the Hare Psychopathy Checklist as an appropriate instrument for predicting the future dangerousness of capital defendants.* [5]

Until recently, a psychologist named Dr. Thomas Ryan was one of the leading proponents of the use of the PCL-R in federal capital sentencing proceedings and a frequently retained

_____

[5]This section, Section A, and the supporting declarations, are taken from Movant's Motion to Alter and Amend Judgment Pursuant to Fed. R. Civ. P. 59(e), in *United States v. Daniel Lee*, No. 4:97-cr-00243 GTE, Doc. 1165 (E.D. Ark. Sept. 18, 2008).

government expert in capital cases. Recently, he has disavowed the use of the PCL-R in capital cases.

For a period of time between 1997 and 2000, the most lethal weapon in the federal government's death penalty arsenal was expert testimony and evidence about psychopathy and future dangerousness. The government had three experts whom it used in cases across the country, of which Dr. Ryan was one.[6] Dr. Ryan has had an extensive professional relationship with the government, having been retained in a number of federal capital cases to perform risk assessments of defendants using the PCL-R.

Dr. Ryan has since disavowed the use of the PCL-R in capital sentencing proceedings, and has specifically stated that the use of the PCL-R and the concept of psychopathy as a predictor of future dangerousness in prisons is inappropriate, as there is no scientific evidence to support such claims. *See Exhibit 1* to this petition. Dr. Ryan's reversal of his prior views on this matter came to light as part of the proceedings in another federal capital case, *United States v. Willis Haynes*, No. PJM-98-0520 (D. Md.), which was tried in the District of Maryland in May of 2000. We briefly recount Dr. Ryan's involvement in that case.

In *Haynes*, Dr. Ryan was retained by the government to perform a risk assessment of the capital defendant (Willis Haynes) using the PCL-R and give expert testimony regarding his potential psychopathy and future dangerousness. In May of 2000, after the written report of his evaluation was submitted to counsel, the defense filed a motion seeking to exclude Dr. Ryan's expert testimony

---

[6]The other two were Dr. Scott Duncan, whose expert testimony was discussed in (but not the reason for) the reversal in *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000), and Dr. Daniel A. Martell.

regarding the PCL-R and the diagnosis of psychopathy. The basis for the motion was that such evidence was unscientific and not probative of future dangerousness, and the motion was supported by five declarations from prominent clinical and forensic psychologists who variously attested that there was no scientific basis for claiming that a high PCL-R score supported a future dangerousness determination. (Those declarations are attached as *Exhibit 3*.)

After reviewing these declarations, Dr. Ryan reevaluated his position on this issue and voluntarily withdrew his expert report in the *Haynes* case. Nor did he testify regarding the PCL-R or psychopathy at the trial. As Dr. Ryan himself later explained:[7]

> The reasons why it is inappropriate to rely on the PCL-R for assessing the future dangerousness of a capital defendant became apparent to me in the Spring of 2000 when I was preparing to testify as an expert witness for the prosecution in the matter of *United States v. Willis Haynes*. In that case, after the written report of my evaluation was submitted, the defense filed a motion to preclude testimony about the PCL-R and psychopathy. The motion included opinions provided by a number of well-respected authorities on the PCL-R that the scientific literature did not establish a relationship between prison violence and a high PCL-R score that would support a future dangerousness determination. I reviewed those experts' opinions, re-evaluated the scientific literature and consulted with several other forensic psychologists. I then determined that I would withdraw my report.
>
> 5/12/03 Declaration of Thomas V. Ryan, Ph.D, ABPP at ¶5 (hereafter "Ryan Declaration," attached as *Exhibit 1*).
>
> As a result, no testimony about psychopathy or the PCL-R was introduced at that trial.
>
> Subsequent to the *Haynes* case, Dr. Ryan was contacted by Dr. Stephen David Hart and

---

[7]The following is excerpted from Dr. Ryan's sworn declaration filed in the capital § 2255 proceedings in *United States v. Richard Thomas Stitt*, No. 2:98-CR-47 (E. D. Va.). As will be explained in more detail *infra*, Dr. Ryan provided expert testimony at the *Stitt* trial in 1998 regarding the capital defendant's psychopathy and future dangerousness, but subsequently repudiated that testimony for the same reasons that he withdrew his testimony in the *Haynes* case.

Dr. Donald D. Bersoff, both of whom had filed affidavits in *Haynes*. *See Exhibit 2*. Dr. Hart had worked with Dr. Hare on the development and validation of the PCL-R, and in his expert opinion, he attested that there was "no direct scientific evidence that the PCL-R . . . [is] predictive of institutional violence in correctional offenders in the United States," and that the PCL-R is "not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in correctional offenders in the United States." *See* 5/19/00 Declaration of Dr. Stephen David Hart at ¶ 18 (hereafter "Hart Affidavit") (Exhibit 3 at p. 4). Dr. Bersoff is an elected fellow of the American Psychological Association (APA) and an expert in the standards and ethics of testifying as a psychological expert witness in legal proceedings. He attested that Dr. Ryan had "acted below the professional standards of those holding themselves out as forensic psychologists" in rendering the conclusion that the defendant was a "relatively high risk of engaging in violence recidivism," because there was a "dearth of data generally accepted in the relevant psychological community to support this opinion" and Dr. Ryan had made "misleading use of the extant studies" regarding the PCL-R in order to render his opinion. *See* 5/24/00 Affidavit of Dr. Donald D. Bersoff at ¶ 21 (hereafter "Bersoff Affidavit") (Exhibit 6 at p. 25).[8]

Dr. Hart and Dr. Bersoff contacted Dr. Ryan because they were aware that he had rendered a similarly unscientific and misleading expert opinion regarding psychopathy and future

---

[8]An ethical complaint was eventually filed against Dr. Ryan with the APA based on his misleading expert reports and/or testimony in three capital cases, including *Haynes*, on the issue of psychopathy and future dangerousness. *See* attached Exhibit ___. Additionally, a description of Dr. Ryan's conduct with respect to psychopathy and future dangerousness testimony in *Haynes* was published in a peer-reviewed journal for psychologists and described as "not only incompetent and factually misleading, but also highly unethical." Edens, J.F., *Misuses of the Hare Psychopathy Checklist-Revised in Court, Two Case Examples*, 16 Journal of Interpersonal Violence 1082-93 (2001).

dangerousness in another federal capital case that was tried prior to *Haynes – United States v. Richard Thomas Stitt*, No. 2:98-CR-47 (E. D. Va.), a federal capital trial which was tried in the Eastern District of Virginia in September and October of 1998. There, Dr. Ryan performed a risk assessment on the defendant (Richard Stitt) using the PCL-R and testified that based on the defendant's score on that instrument, the defendant presented a high risk of future violence even in the context of a maximum security federal prison, and that the defendant's psychopathy meant that he was not amenable to rehabilitation and would continue to be a future danger if sentenced to life without parole. The defendant was ultimately sentenced to death. Dr. Hart and Dr. Bersoff strongly encouraged Dr. Ryan to review his testimony in that case and write a letter to the court indicating that his testimony was inaccurate.[9]

Dr. Ryan ultimately provided a sworn declaration, which was filed with the court as part of the *Stitt* § 2255 proceedings. In that declaration, Dr. Ryan recanted his prior expert testimony made at trial and disavowed the notion that a capital defendant's potential psychopathy, as measured by the PCL-R, is predictive of his future dangerousness in prison:

> Based upon my current understanding of the literature and the obvious controversy about forensic clinicians' use of the PCL-R, I would choose not to use this instrument. Although I did not recognize it at the time, I am aware now that the PCL-R is not, and was not, appropriately relied upon to assess an individual's future dangerousness in federal prison. As an ethical and responsible clinician, I am informing all concerned that the statements about the defendant's future dangerousness that I made at trial were not grounded in current scientific literature and I do not stand by them now.
> . . .
> It was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on

---

[9] *See* Testimony of Thomas V. Ryan, Ph. D., 7/15/04 Transcript of § 2255 Proceedings in *United States v. Stitt*, No. 2:98cr47 (E.D. Va.) at 59.

relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.

Ryan Declaration (*Exhibit 1*).  *See also id.* at ¶ 10 ("Since withdrawing my report in the [*United States v. Willis*] *Haynes* case [in the Spring of 2000], I have been retained by the government in several other federal death penalty cases, and testified in those that went to trial.  In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies.  Indeed, to the best of my knowledge, the government has not introduced testimony about the PCL-R or psychopathy in any trial since *Haynes*.")

As Dr. Ryan explained in his declaration in the *Stitt* case, a comprehensive review of the scientific literature demonstrated that "the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerated is untenable[.]"  Ryan Declaration at ¶ 9 (internal citation omitted).

At the evidentiary hearing in the *Stitt* §2255 proceedings, Dr. Ryan was called as a witness and testified further regarding his current views on the PCL-R and psychopathy.  His testimony made unmistakably clear that predictions about future dangerousness in prison based on a defendant's PCL-R score and alleged psychopathy are not valid.  *See* Testimony of Thomas V. Ryan, Ph. D., 7/15/04 Transcript of § 2255 Proceedings in *United States v. Stitt*, No. 2:98cr47 (E.D. Va.) at 63 ("the Hare Psychopathy Checklist Revised is just not appropriate to be used in making predictive statements about adjustment within the prison system").  Dr. Ryan also made clear that as far back as the time of the *Stitt* trial in 1998, there was no scientific research supporting the use of the PCL-R to make risk assessments about an individual's future dangerousness in prison.  *Id.* at 78 ("Q. Was

there any study at the time you testified that established that [the PCL-R] was predictive of future dangerousness in prison? A. No."). Additionally, it should be noted that the district court in *Stitt*, although granting relief on different grounds, did find that Dr. Ryan's testimony at trial was based on unsupported scientific assumptions and erroneous:

> the Court is reasonably satisfied that Dr. Ryan's testimony was erroneous. Dr. Ryan's material testimony predicted Petitioner's future dangerousness based upon a scientific instrument that Dr. Ryan now believes he inaccurately applied. At the time of Petitioner's trial, Dr. Ryan did not realize that the PCL-R was not an accurate predictor of prison violence, as opposed to future dangerousness in the community at large. (Decl. Dr. Ryan PP3, 5, 8.) Dr. Ryan indicates that the scientific literature has come to reflect the view that the PCL-R is not a reliable predictor of future dangerousness of individuals confined in a federal prison, and the Government has not provided any evidence to refute this claim. (*Id.* at PP9-10.) The Court has not found any precedent providing guidance in a situation where an expert witness has discovered that the scientific basis for a test used to support a material fact was incorrect. However, if a DNA test indicated that an individual was guilty of a crime, and the Government's DNA expert later discovered that a change in DNA science indicated that the old test was inherently flawed, the Court cannot conceive that this would not be sufficient basis for the Court to at least consider such a petitioner's collateral attack. Therefore, the Court finds that Dr. Ryan's testimony was erroneous and has been recanted.

*Stitt v. United States*, 369 F. Supp. 2d 679, 699 (E.D. Va. 2005), *affirmed by, remanded by United v. Stitt*, 441 F.3d 297 (4th Cir.), *recalled by, vacated by, appeal dismissed by United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006).[10]

---

[10]After hearing argument, the Fourth Circuit initially published an opinion affirming the district court's judgment in all respects and remanding the case for resentencing. *See United v. Stitt*, 441 F.3d 297 (4th Cir. 2006). However, prior to issuance of the mandate, the Fourth Circuit discovered that, since the defendant had not yet been resentenced, it lacked jurisdiction over the appeal. *See United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006). In particular, the Circuit Court noted that under United States Supreme Court precedent, an order reversing a death in a § 2255 case sentence did not become final until resentencing had occurred. Additionally, the Circuit Court noted that it lacked jurisdiction over the district court's order denying the defendant relief as to his guilt phase claims, which also did not become final until resentencing. Accordingly, the Fourth Circuit vacated its previously issued decision, dismissed the appeal for lack of jurisdiction, and remanded the case for re-sentencing.

In short, there is absolutely no question that Dr. Ryan has rejected the use of the PCL-R as

an appropriate instrument for predicting the future dangerousness of capital defendants.

As Dr. Ryan's sworn declaration and testimony in *Stitt* – as well as the other affidavits

attached to this pleading – demonstrate, a diagnosis of psychopathy, as measured by the PCL-R, is

not – and never has been – probative of, or a valid predictor of, an individual's future dangerousness

in prison.[11]  This is a position that is fully supported by the forensic psychology community.  In

support of that claim, attached is the affidavit of Dr. John F. Edens, a licensed forensic clinical

psychologist with extensive forensic, clinical and research experience in the area of psychopathy and

the PCL-R.[12]  As Dr. Edens states, there is simply no scientific basis for the claim that a high PCL-R

score is predictive of an individual's future dangerousness:

> [T]he PCL-R has not been demonstrated to be a valid and reliable indicator of
> increased violence risk for all people in all circumstances. As such, blanket
> statements that persons who are more psychopathic are 'more dangerous' than non-
> psychopathic offenders are significant oversimplifications of what is known about
> the relationship between psychopathy and violence across various contexts.
>
> I am aware of four published studies (two of which were co-authored by me) and one
> unpublished doctoral dissertation that specifically have examined the relationship
> between psychopathy scores and violent behavior in male U.S. prison inmates.
> Although these studies have found some significant correlations between PCL-R

---

[11]Indeed, as is explained more fully *infra*, not only is such evidence of psychopathy
irrelevant to the issue of future dangerousness, but its injection into capital sentencing trials is
unfairly prejudicial because the label "psychopath" has an extremely powerful impact on jurors'
perceptions of the defendant, improperly skewing deliberations in favor of a death sentence
based on a perceived likelihood that the defendant will continue to commit violence unless he is
executed.

[12]This affidavit was also submitted in the *Stitt* case. The statements made by Dr. Edens
in this affidavit are not specific to the facts in *Stitt*, but rather address the PCL-R and its
inapplicability to future dangerousness assessments in prison settings. Dr. Edens' affidavit
provides a fair summary of the research regarding the PCL-R, and its uses and misuses in
performing risk assessments.

scores and various measures of institutional adjustment (e.g., non-compliance, hostility), *not one* has reported a statistically significant relationship between psychopathy and acts of physical violence. Moreover, it is important to note that one of these research projects (Walters, Duncan, & Geyer, 2003) specifically studied a large sample of prison inmates in the U.S. Federal Bureau of Prisons and failed to find a significant relationship between psychopathy and acts of physical aggression. Thus, the claim that a high PCL-R score indicates a high risk of future violence in a federal prison runs counter to existing evidence that does not support such an assertion. I do not believe that could ethically and responsibly make such an assertion in the face of the available research in this area.

11/24/03 Affidavit of John F. Edens, Ph.D, at ¶¶ 5-6 (hereafter "Edens Affidavit," attached as *Exhibit 2*).

As Dr. Eden notes, concerns about the scientific propriety of using the PCL-R to identify individuals as likely to commit act of violence in prison are not new, and date at least as far back as 1998 – in other words, prior to Roberson's trial. *See* Edens Affidavit at ¶ 7.

**B.    Both case law and empirical research demonstrate that psychopathy evidence is unfairly prejudicial.**

Numerous courts have warned of the unfairly prejudicial effect that psychopathy evidence can have on a capital jury's deliberations. In *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000), the government relied on the testimony of Dr. Scott Duncan, a psychologist who testified that based on the PCL-R, he concluded that the capital defendant (Aquilia Barnette) was a psychopath who felt no remorse or guilt, and that his score on the PCL-R was a predictor that he would be a future danger in prison. 211 F.3d at 811, 825. The Fourth Circuit reversed the death sentence on the grounds that the district judge erred in denying the defense request for surrebuttal to question the validity of Dr. Duncan's methods with their own expert witness. The Fourth Circuit rejected the government's claim that this was harmless error and specifically stated that "the testimony of Dr. Duncan was *as damning as it could be*," and that there was a reasonable possibility that his unrebutted expert

testimony regarding the PCL-R and the defendant's alleged psychopathy "contributed to the death sentence." 211 F.3d at 825 (emphasis added).

In the previously aforementioned *Stitt* case, the district court also found that the outcome of the sentencing proceeding might have been different but for Dr. Ryan's testimony regarding the PCL-R and psychopathy. As it noted in its memorandum and order:

> It is also possible the jury might have reached a different conclusion if Dr. Ryan's testimony had been different. The Court only has to find that "there is more than a faint possibility of a different jury verdict but something less than a probability." [*United States v.*] *Wallace*, 528 F.2d [863] at 866 n.3 [4th Cir. 1976)]. Given the nature of Dr. Ryan's testimony about the nature and consequences of Petitioner's psychopathy, the Court finds that it is clear that jury might have reached a different verdict.

*Stitt*, 369 F. Supp. 2d at 699-700.[13]

_____

[13]The district court in *Stitt* ultimately granted relief on different grounds, and did not grant relief based on Dr. Ryan's erroneous testimony. However, the basis for the district court's denial of the psychopathy claim in *Stitt* is not applicable here because the legal claim raised in *Stitt* is different from the one raised by Roberson. In *Stitt*, the § 2255 claim was not, as is the case here, that (1) the scientific evidence fails constitutional standards, and (2) trial counsel was ineffective for failing to fully challenge the psychopathy evidence. Rather, the *Stitt* motion alleged that a new sentencing proceeding should be held because Dr. Ryan had recanted his prior testimony. The district court, therefore, did not analyze the claim under *Strickland* or *Daubert,* but rather under *United States v. Wallace*, 528 F.2d 863 (4th Cir. 1976). Under *Wallace*, when a witness recants testimony, a new proceeding should be held when (1) the court is reasonably well satisfied as to the falsity of the testimony, (2) the jury might have reached a different conclusion, and (3) the party seeking the new proceeding did not know the testimony was false until after the original proceeding or was unable to respond to the testimony because that party was taken by surprise by the testimony. 528 F.2d at 866. Notably, the district court found that the first two prongs of *Wallace* had been met. It was on the third prong that the claim failed because trial counsel in *Stitt* "made a substantial effort to address the validity and effects" of Dr. Ryan's testimony, and had put on his own expert witness "to both attack the credibility of the PCL-R and to counter the findings of the PCL-R." 369 F. Supp. 2d at 700. The question raised by the third prong of *Wallace*, however, is not a component of the two-prong *Strickland* analysis. That said, the fact that the *Stitt* claim failed on the third prong of *Wallace* only strengthens Roberson's ineffective assistance of counsel claim here because it demonstrates that at the time of the *Stitt* trial, which was tried prior to Roberson's case, there was substantial evidence available to Roberson's trial counsel to fully object to the validity and credibility of the

In *United States v. Sampson*, 335 F. Supp. 2d 217 (D. Mass. 2004), a federal capital case tried in the District of Massachusetts, the district judge excluded expert evidence on future dangerousness because "its probative value would have been outweighed by the danger of creating unfair prejudice." 335 F. Supp. 2d at 220. Indeed, the district judge prohibited the government's mental health expert from using the word "psychopath" because it "would have entailed a high risk that, despite any limiting instruction, the jury would have considered [the expert] testimony as tending to show that [the defendant] would be dangerous in the future . . ." 335 F. Supp. 2d at 222 n.27. The district judge also noted that jurors may give great deference to "a supposed expert for purposes of determining future dangerousness," and that therefore, "there is good reason to fear that the testimony of a psychiatrist on the issue of future dangerousness will be given more weight than it deserves." *Id*. at 220. The district judge was particularly troubled by this given all the extant research which suggests that "it is not just difficult for jurors to predict reliably whether a murderer is likely to commit violent crimes again, but that it is impossible." *Id*. at 222.

The risk that a jury will erroneously determine that a capital defendant is a future danger is made exponentially greater with the introduction of demonstrably inaccurate psychological evidence disguised as cutting edge science. Indeed, this is why in *United States v. Taylor*, 320 F. Supp. 2d 790 (N.D. Ind. 2004), a federal capital case prosecuted in the Northern District of Indiana, the district judge prohibited the government's mental health expert from even using the PCL-R on the capital defendant in its pre-trial evaluation. In the district court's judgment, "the uncertainty of the validity and reliability of the PCL-R as it is used in capital sentencing hearings" would undermine the

_____

PCL-R on scientific grounds.

reliability of the defendant's sentencing proceedings if testimony about the defendant's PCL-R score was injected into the trial. 320 F. Supp. 2d at 794.

Moreover, empirical research confirms the demonstrably prejudicial nature of psychopathy evidence on jury deliberations.  As Dr. Edens attested in his affidavit submitted in the *Stitt* case:

> I have also written about and conducted research on the prejudicial impact that the label 'psychopath' and its associated traits may have on laypersons. In a recent article, my colleagues and I discussed the means by which testimony about psychopathy may bias jurors who are considering whether to impose a death sentence. For example, to the extent that an examiner's description of PCL-R data comports with and adds 'scientific' credibility to preconceived notions of violence potential and remorselessness, as well as bolsters the prosecution's description of the defendant as a 'cold-blooded' killer, it is difficult to imagine that such testimony would not have a significant effect on jurors.

> Based on these concerns, my colleagues and I have conducted several recent experiments that have examined the effects of labeling criminal defendants as exhibiting psychopathic traits. The typical format of these studies has been to present laypersons with case history information relevant to an offender's crime(s) and to then to manipulate whether he is described during testimony as psychopathic or as non-psychopathic (e.g., not mentally disordered or as suffering from some other form of mental illness such as schizophrenia).  Participants in these studies are then queried about their perceptions of the defendant and what sanctions they would support in his case. The general pattern of findings from these studies is that laypersons who hear a defendant being described as psychopathic subsequently expect him to be much more violent and dangerous in the future than do laypersons who are exposed to the same case information but hear the defendant described as being non-psychopathic. Moreover, when participants in these studies are asked whether a death sentence is appropriate given the facts of the case presented to them, it is not surprising that a much higher percentage of those who hear the defendant described as psychopathic believe the appropriate sentence for his crimes is death. For example, in one of these studies (Edens, Colwell, Desforges, & Fernandez, 2003), 38% of the study participants who were informed that the defendant was not mentally disordered supported death and 30% of those who were exposed to testimony that the defendant was schizophrenic supported death. In the condition in which the defendant was described as psychopathic, however, 60% supported a death sentence, even though all other facts of the case were held constant across the three types of testimony.  It is also noteworthy that these differing rates of support for the death penalty were obtained even when the prosecution expert acknowledged that the defendant was at 'low' risk for engaging in future acts of violence. Given these

findings, it seems very likely that the introduction of psychopathy testimony into actual trials could increase the probability that jurors would support capital punishment.

Edens Affidavit at ¶¶ 8 &9 (footnotes omitted).

Dr. Edens' empirical research confirms the judgment of the aforementioned courts which have found that the introduction of psychopathy evidence into capital sentencing proceedings is unfairly prejudicial.

C.     **No useful predictive value among violence risk tools according to APA Journal Publication.**

A groundbreaking recent meta-analytic study in the APA journal Psychological Bulletin by three academic researchers from the United Kingdom determined that no violent risk assessment tools warranted courtroom use, and had only marginal utility predicting a person's violence.  *See* Yang, M., Wong, S.C.P., & Coid, J., The efficacy of violence prediction: A metaanalytic comparison of nine risk assessment tools, *Psychological Bulletin*, 136, 740-767 (2010)[14]; Viljoen, J.L., MacDougall, E.A.M., Gagnon, N.C., & Douglas, K.S., Psychopathy evidence in legal proceedings involving adolescent offenders, *Psychology, Public Policy, and Law,* 16, 254-283 (2010).  Another article critical of the PCL-Revised is Edens, J.F., Misuses of the Hare Psychopathy Checklist 16 Journal of Interpersonal Violence 1082-93 (2001).

_____

[14]     Dr. Wong, former Research Director at the Regional Psychiatric Centre in Saskatoon, Saskatchewan, studied psychopathy and high-risk offenders for 25 years and developed the Violent Risk Scale and the Violence Risk Scale-sexual offender version before becoming a special professor at the Institute of Mental Health at the University of Nottingham. Dr. Yang is a professor of medical statistics with the Faculty of Medicine and Health Sciences at the University of Nottingham.  And Dr. Coid, Director of the Forensic Psychiatry Research Unit, is principal investigator of the UK Home Office's Prisoner Cohort Study and also studies the epidemiology of violent and criminal behavior at the population level.

The University of Nottingham researchers used sophisticated statistical tools to meta-analyze multiple studies on the accuracy of nine leading violence risk assessment tools. All nine turned out to have similarly moderate predictive accuracy, with none clearly leading the pack. And none -- the scholars warned -- were sufficiently accurate for courts to rely upon them as a primary basis for decision-making in forensic cases requiring "a high level of predictive accuracy, such as preventive detention."

Destroying the validity and credibility of forensic practitioners such as Dr. Allen, the researchers found that Factor 1 of the Psychopathy Checklist-Revised (PCL-R) does not predict violence. Factor 1 purports to measure the core constellation of a psychopathic personality (superficial charm, manipulativeness, lack of empathy, etc.). When introduced in court, evidence of psychopathy has an enormously prejudicial impact on criminal offenders, and unquestionably did in Roberson's trial.

But, the PCL-R's ability to predict certain types of violence owes only to the instrument's second factor, according to the meta-analysis by researchers Min Yang, Steve Wong, and Jeremy Coid. And that is no surprise. Factor 2 measures the criminogenic factors (criminality, irresponsibility, impulsivity, history of delinquency, etc.) that have always been admissible in Texas criminal trials -- capital and non-capital -- without psychology window dressing -- as bad signs for a future of law-abiding citizenship.

Researchers have been toiling for almost five decades to perfect risk prediction tools. Unfortunately, they keep running into an insurmountable obstacle: a large proportion of violence is situational. It is affected by environmental context, not just qualities internal to the individual. Moreover, it is always extremely hard to predict a rare event.

Based on their metaanalytic findings, the UK researchers suggest that it is time to stop searching for the holy grail. Violent behavior is the result of the individual interacting with the immediate environment. Although it may be possible to improve on our understanding and predicting what an individual may do in hypothetical situations, it will be much more difficult to predict the situation that an individual actually encounters in the open community. Even predicting violence within an institutional environment is difficult, where the assessor has much more information about that environment.

The studies included in the metaanalysis were from six countries: the United Kingdom (11), Canada (9), Sweden (3), the United States (3), Holland (2), and Germany (1). The instruments included the PCL-R, the PCL:SV, the HCR-20, the VRAG, the OGRS, the RM2000V, the LSI/LSI-R, the GSIR, and the VRS, as well as seven instrument ubscales: PCL-R Factor 1 and Factor 2, the 10-item Historical subscale, the five-item Clinical subscale, and the five-item Risk Management subscale of the HCR-20; and the Static and Dynamic scales of the VRS.

### PART II: TESTIMONY BY PSYCHOLOGISTS WHO ATTEMPT TO PREDICT THE DEFENDANT'S FUTURE DANGEROUSNESS IS INHERENTLY UNRELIABLE.

There are two groups of thought in the profession of psychology when it comes to future dangerousness assessments in capital cases. The first one, discussed below, is best represented by Dr. Cunningham and other authors, who believe that it is possible to make future risk assessments in capital cases, provided that the psychologist complies with accepted scientific methodology. Dr. Allen and Dr. Self woefully failed to apply any accepted methodology.

The second school of thought, represented by similarly well regarded psychologists, holds that it is <u>never</u> possible to make meaningful forecasts of future dangerousness under any conditions because such predictions have never been proven to be scientifically reliable.

This application presents both positions and contends that the assessments of Dr. Self and Dr. Allen should never have been admitted because their opinions were not based on any science at all. Secondly, Roberson argues that even if reliable science exists, these two psychologists failed to follow acceptable scientific methodology.

A.     *Dr. Self's and Dr. Allen's Method of Assessing Future Dangerousness of a Capital Defendant Is Not Supported by Current Psychological Body of Knowledge and Opinion in the Profession.*

In this series of challenges, Roberson challenges the constitutionality of using junk forensic psychology to predict that he will constitute a future danger of serious violence during his mandatory minimum 40 years in prison. The two psychologists hired by the State ignored the current and widely accepted psychological standards for making future dangerousness risk assessments. They also failed to apply a valid scientific methodology before reaching their conclusions that Roberson posed a future danger and ignored stunning evidence opposing their opinions. The testimony of these two psychologists is precisely the sort of junk science condemned by the Supreme Court which should have been excluded by the trial court during its gatekeeper function.

To understand these challenges, first Roberson must explain the proper standards and methodology recognized by the profession of forensic psychology. Second, Roberson must compare the methodology applied by the two State psychologists to show that they abjectly failed to comply with the acceptable professional standards and methodology and instead applied their own methodology which has been condemned as unscientific. Third, one must consider the standards for

scientific testimony imposed by the Supreme Court. Fourth, the court must then compare the Supreme Court's constitutional standards for reliable science against the testimony of the two State psychologists. When the court does so, it will find the testimony grossly violated the Supreme Court's requirements and conclude that a new sentencing hearing is required.

### B. The Forensic Psychology Profession Has Developed Standards of Conduct and Scientific Methodology for Conducting Risk Assessments of a Capital Defendant's Propensity for Future Serious Violence.

Justice Blackmun wrote that, Psychiatric predictions of future dangerousness are not accurate; wrote two times out of three," citing the scholarly work of Dr. John Monahan and the articles by Dr. Stephen Morse. "In a capital case, the specious testimony of a psychiatrist, colored in the eyes of an impressionable jury by the inevitable untouchability of a medical specialist's words, equates with death itself." *Barefoot v. Estelle*, 1983.

To begin, one must first consider what standards of conduct and scientific methodology have been developed for conducting risk assessments of a particular capital defendant's propensity to commit future acts of serious violence.

It is not considered *per se* unethical by the mental health profession for a psychologist to testify for the prosecution that a capital defendant constitutes a future danger to society. What is considered unethical is for a psychologist to offer opinions that a particular capital defendant is a future danger if the psychologist (1) lacks the experience or training, or (2) has not reviewed relevant objective base rate data for and against future dangerousness, or (3) has not undertaken relevant objective psychological testing of the defendant. Cunningham, Mark D. and Alan M. Goldstein, *Sentencing Determinations in Death Penalty Cases*, Ch. 21, published in Goldstein, Alan M. and Irving B. Weiner, 11 Forensic Psychology, Handbook of Psychology, 407-32, 416-17 (John Wiley

& Sons, Inc.) (hereinafter "Cunningham & Goldstein"); *Specialty Guidelines for Forensic Psychologists*, Committee on Ethical Guidelines for Forensic Psychologists, 1991.

Therefore, if Dr. Self and Dr. Allen possessed competent experience and training in the field of forensic psychology, then they may have been entitled to accept Roberson's case from the State and conduct a risk assessment on him. If they lacked competent experience or training on the other hand, then they are not entitled to accept the case and they violated the APA's cannon of ethics.

Similarly, the two psychologists must have obtained and reviewed relevant objective data against which to compare Roberson. They must also undertake appropriate objective testing of Roberson, which they claim to have done during the 2.5 hours they spent with him. Finally, they must accurately apply the unique factors of Roberson and his background against objective research data in order to reach a final risk assessment to justify their opinions. If the two psychologists failed in these steps, then they violated their profession's cannon of ethics.

The cannon of ethics imposed other requirements on Dr. Self and Dr. Allen. For instance, current cannons of ethics also require State-retained forensic psychologists to "verify that defense counsel is aware of the pending evaluation, the agreed-on parameters of any interview regarding the capital offense or unadjudicated conduct, and how the evaluation will be memorialized." Cunningham & Goldstein*, supra,* at 418. In addition, a State forensic psychologist should not use his skill to lull the defendant or his lawyer into feeling that the psychologist is on his side. "State-retained experts should take care in building rapport and using empathy in capital sentencing evaluations, as the combination of these techniques and the expert's professional identification as a psychologist may contribute to a misplaced anticipation of benevolence and a setting-aside of the initial interview warnings." Cunningham & Goldstein*, supra,* at 418 (citing Showalter, 1990).

The ethical standards recognize that there may be legitimate impediments which cause the State forensic psychologist to be restricted from receiving all of the relevant data or testing which would be useful to making a future dangerous assessment. In such situations, it is not an ethical violation for the psychologist to offer opinions at trial. What is an ethical violation, however, is to offer opinions beyond the objective data actually obtained. "Although some opinions may be presented with an 'incomplete data set,' ethical standards limit testimony to what is supported by the data, and further require that the trier of fact be informed regarding the limitations of opinions." Cunningham & Goldstein, *supra,* at 418.

There is significant portion of the psychiatric community which equates the entire effort to forecast a capital defendant's future dangerousness with voodoo. The psychiatric profession as a whole has repeatedly rejected such methods.[15] An American Psychiatric Association task force found such methods of practicing future dangerousness forensic psychiatry to be both unreliable and unprofessional.[16]

There is widespread belief among the psychiatric profession that future dangerousness cannot be reliably predicted, and to testify otherwise is simply unethical. Forensic psychiatrists as a profession oppose "recommending the death penalty specifically or expressing an opinion on a

[15] *See, e.g.,* Applebaum, Paul S., M.D., "Hypotheticals, Psychiatric Testimony, and the Death Sentence," *Bulletin of the American Academy of Psychiatry and the Law* 12.2 (1984): 169-77; Dix, George E., "The Death Penalty: 'Dangerousness,' Psychiatric Testimony and Professional Ethics." *American Journal of Criminal Law* May, 1977; Ewing, Charles P. "'Dr. Death' and the Case for an Ethical Ban on Psychiatric and Psychological

[16] American Psychiatric Association, "Clinical Aspects of the Violent Individual" (1974).

state's legal criteria virtually amounting to such a recommendation."[17]  The language of the Task Force on Clinical Aspects of the Violent Individual  underscores why Dr. Self's and Dr. Allen's claims are unsupported by their peers:

> Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or "dangerousness."  Neither has any special psychiatric "expertise" in this area been established.

> American Psychiatric Association, "Clinical Aspects of the Violent Individual"  (1974).

### C.      State Hired Forensic Psychologists Frequently Fail to Consider Recognized Influences on Future Dangerousness.

The profession of forensic psychology has considered testimony by psychologists in capital cases and has identified several fundamental mistakes often made by those testifying for the State that a particular capital defendant will be a future violent danger in prison.

- ● *First Error of State Forensic Psychologists: Failing to Consider the Context of Prison When Assessing Future Risk of Violence.*

The failure of mental health experts to "continue to neglect the dominance of context in their capital violence risk assessments, . . ." is one of the three most common failures of State forensic psychologists who attempt to predict future dangerousness.  Cunningham & Goldstein, *supra,* at 425.  State experts instead rely too heavily on "factors from community-based literature that are either pervasively present in an incarcerated population or have not been demonstrated to be predictive in a prison context."  Cunningham & Goldstein*, supra,* at 425.  In other words, it is one matter to say that someone is going to be violent in free society; it is quite another to say that someone is going to be violate in a maximum security prison.

---

[17]   Weinstock, Robert, "Perceptions of Ethical Problems by Forensic Psychiatrists," *Bulletin of the American Academy of Psychiatry and the Law,* Vol. 17, No. 2, p. 194 (1989).

The context of prison, however, is the single most important consideration, particularly since the inmate in Texas is going to serve a minimum 40-year sentence before his file is even picked up by the Parole Board, much less before parole may actually be granted.  Dr. Cunningham, a leading authority, has found that mental health experts, particularly those testifying as State experts, persist in the mistake of failing to consider the effects of prison on future violence, notwithstanding that psychology literature has emphasized the importance of prison context for years.[18]  See Hall, 1987, Monahan, 1981, Shah, 1978.  "[R]isk is always a function of context."  Cunningham & Goldstein, *supra,* at 425.

Compounding this error is that "factors that are associated with violence in the community do not demonstrate the same relationship with prison violence."  Cunningham & Goldstein, *supra,* at 425 Cunningham.  This recognition that the causes of free community violence are vastly different from the causes of prison violence likewise are not new and have been known in forensic science for years.  See Alexander & Austin, 1992, Cunningham & Reidy, 1998a, 1998b, 1999, in press; National Institute of Corrections, 1992, Reidy et al., 2001.

### 2.      *Second Error of State Forensic Psychologists: Failing to Consider the Base Rate Data of Actual Violence in Prison.*

The second significant error made by State mental health experts is that "many psychologists remain ignorant of or fail to rely on base rate data regarding the frequency of serious violence in prison in making violence risk assessment regarding particular defendants."  Cunningham & Goldstein, *supra,* at 425.  This is not a new concept.  In 1978, Dr. Shaw "described this problem over

---

[18]One of Roberson's jurors provided an affidavit after trial stating that many jurors misunderstood that the term "society" in the first special issue meant in context only prison.  See motion for new trial filed.

20 years ago, noting that even forensic clinicians tend to ignore base rates in the face of specific information or when confronted with a specific individuals." Cunningham & Goldstein, *supra,* at 425. The relevance of base rate data is discussed below and in the attached articles. Moreover, attached to this application are internal reports from TDC explaining the low actual rate of violence in prison.

> **3.** **Third Failure of State Forensic Psychologists: Recklessly Labeling the Capital Defendant as a "Psychopath."**

The third problem is that State forensic psychologists often overreact and inflame jurors by claiming that the defendant is a "psychopath" or some similar epitaph and attempt to show jurors that the defendant possesses an antisocial personality disorder. "[M]any mental health experts continue to attach unsubstantiated violence risk implications to antisocial personality disorder (APD) or related diagnostic formulations, concluding that such conditions create a high probability that the defendant will seriously assault or kill someone in prison." Cunningham & Goldstein, *supra,* at 425.

Although taking the stand and calling the defendant a psychopath is high drama in a tense courtroom, it is not good science. "Such assertions are not supported by empirical data – hardly surprising given the 49% to 80% prevalence rate of APD among American prison inmates." Cunningham & Goldstein, *supra,* at 425; See Cunningham & Reidy, 1998a, Meloy, 1988, Widiger & Corbitt, 1995. In other words, it is meaningless to say that a defendant possesses antisocial personality disorder because *most* inmates possesses antisocial personality disorder. In free society, such a condition is the exception. But in prison context, such a condition is the *norm,* not the exception. Therefore, telling jurors that a particular defendant possesses a greater likelihood of future violence because he is a "psychopath" or possesses antisocial personality disorder loses all

relevance in the courtroom for assessing future dangerousness with without question the inmate will spend a minimum of 40 years in prison.

Moreover, making an assessment of a capital defendant's antisocial personality disorder is less effective in a capital context than in a non-criminal diagnostic setting. "[T]he weaknesses of APD as a diagnostic construct are quite problematic in a life-or-death determination." Cunningham, Cunningham & Goldstein, *supra*, at 425. Quoted by Dr. Cunningham, the 1984 *Report of the Task Force on the Role of Psychiatry in the Sentencing Process* concluded, "Given our uncertainty about the implications of the finding, the diagnosis of sociopathy or antisocial personality disorder should not be used to justify or to support predictions of future conduct." Cunningham & Goldstein *supra*, at 425 (quoting Halleck, Applebaum, Rappeport & Dix 1984, P. 25.)

**4.      The Hare Psychopathy Checklist-Revised Is Not an Accurate Tool For Assessing Future Dangerousness in Prison.**

The next mistake commonly made by State hired forensic psychologists is to rely on testing instruments for predicting future serious prison violence. This is a grave error and reflects fundamental misunderstanding about the limitations of testing for predicting future prison violence with testing instruments which have not been proved reliable for that purpose. Particularly egregious is the practice of some State hired forensic psychologists to rely upon the Hare Psychopathy Checklist–Revised to label the defendant as a "psychopath." Since Alfred Hitchcock's riveting movie the worse epitaph which could be tagged to a capital defendant, or any defendant for that matter, is for a prosecutor to point to the defendant from across a silent courtroom and call the defendant a vicious psychopath. The Hare Psychopathy Checklist–Revised cloaks the label with the facade of science. Yet science it is not.

"[T]he Psychopathy Checklist–Revised have been used to identify the defendant as a 'psychopath,' again with an explanation that this condition is predictive of *serious prison violence*." Cunningham & Goldstein*, supra,* at 425 (emphasis in original). "Introduction of the profoundly pejorative label psychopath into a death penalty sentencing consideration may equate with a sentence of death." Cunningham & Goldstein *, supra,* at 425; *Barefoot v. Estelle*, at 916 (dissent); *United States v. Barnette*, 2000.

It is impossible to remove the harsh stain from the jury box once a psychologist throws the label "psychopath" at the defendant in a death penalty trial. It makes no difference how much cross-examination or how many concessions are extracted from the State expert, jurors will not forget that the defendant is a "psychopath" since it is a scary term and one of the few psychological terms of art which jurors can pronounce and remember. "Balancing the considerable potential of this label to confuse and mislead the court would seem to require a substantial body of empirical research demonstrating the predictive validity of psychopathy specific to the gender and ethnicity of the defendant, as well as the institutional context of American prisons. Such empirical support does not exist." Cunningham & Goldstein*, supra,* at 425-26.

"The PCL-R has *not* been demonstrated to reliably predict serious violence in American prisons, among minorities and women, and or on old-age parole." Cunningham & Goldstein *supra,* at 426. See also Cunningham & Reidy, 1998a, 1999, Edens 2001, Edens, Petrila & Buffington-Vollum, in press; Freedman, 2001, Reidy et al., 2001.[19] "[I]n the capital sentencing arena, there is a clear ethical imperative to bridle the enthusiasm of embracing the PCL-R (or other risk assessment

---

[19]The leading publication confirming this point is Walters, G.D., Duncan, S.A., & Gyer, M.D., *Predicting Disciplinary Adjustment in Inmates Undergoing Forensic Evaluation: A Direct Comparison of the PCL-R and the PAI*, 14 J. Forensic Psychiatry & Psychology 382-93 (2003).

instruments) with scrutiny of the empirical support for its application in a specific context with a particular population." Cunningham & Goldstein, *supra,* at 426.

"At this stage of capital violence risk assessment research, no interview-based personality variable, personality testing profile, or risk assessment instrument has been demonstrated to reliably predict serious prison violence." Cunningham & Goldstein *supra,* at 429, sic. In other words, there is no written test which can tell a psychologist whether a man on trial for murder will be violent in prison over 40 years. A simple illustration is that the common Wechsler Adult Intelligence Scale-III is frequently used to determine a defendant's IQ. Although the Wechsler test has good uses, predicting whether a person with a low IQ is going to be violent in prison is not one of them. There is no correlation between a person's IQ and their future violence in prison. "Thus, reliance on these methods is without empirical support and does not represent a meaningful method of grouping capital offenders for capital risk assessment purposes." Cunningham & Goldstein, *supra,* at 429. As discussed below, however, "there are consistent group data from both capital samples and general inmate populations that can be meaningfully brought to bear in estimating the probabilities of violence of varying severity for a particular capital inmate." Cunningham & Goldstein, *supra,* at 429.

### D. *Current Forensic Psychology Standards Has Created a Methodology for Assessing Future Danger*.

When a psychologist is hired by the State to conduct an assessment of a particular capital defendant like Roberson with an eye to testifying that the inmate is a future danger to society, the state appointed psychologist is required to comply with the profession's code of ethics by applying the accepted methodology for assessing the capital defendant's future risk of violence.

Consideration of the scientific methodology to be applied by a forensic psychologist in assessing a defendant's likelihood for future violent behavior is <u>extremely important</u> to meeting the Supreme Court's requirement that courts serve as the gatekeeper for scientific testimony. The influential opinions to be offered by a psychologist in a death penalty trial are only as valid as the methodology which led to them. After extensive internal discussion and external research, the psychology profession has crafted methodology considered as reliable as the profession can currently produce. There are three important components to this methodology.

Current research has shown "that long-range assessment of the probability of future serious violence is most reliable when:"

1. "The risk estimate relies on the past pattern of conduct displayed by the individual in a *similar* context." Morris & Miller, 1985. (emphasis in original). Cunningham & Goldstein, *supra,* at 426.

2. "The risk assessment is anchored to the base rate of violence for the group to which the individual most closely corresponds, and is then conservatively individualized." Hall, 1987, Monahan, 1981, Morris & Miller, 1985. Cunningham & Goldstein , *supra,* at 426.

3. "The final risk estimate is adjusted for risk management or violence preveation/reduction procedures that could be applied." Heilbrun, 1997, Serin & Amos, 1995. Cunningham & Goldstein, *supra,* at 426.

### 1. Methodology Step One: Assessing the Defendant's Past Behavior in Similar Context.

When evaluating a capital defendant's propensity for future violence, "[a] past pattern of behavior can be reliably predictive of future behavior, assuming that sufficient behavior has been exhibited to form a pattern and the context of prediction is sufficiently similar." Cunningham & Goldstein, *supra,* at 426, citing Morris and Miller, 1985.

"In a violence risk assessment at capital sentencing, then, detailed information regarding the defendant's history of serious violence during his pretrial confinement as well as past incarcerations can be quite important." Cunningham & Goldstein, *supra,* at 426. This means that the starting point for future violence risk assessment is to find out when the defendant was previously in jail or prison and review prison records to determine how the defendant behaved. In his assessment of prison behavior, the forensic psychologist should certainly consider the defendant's stretch of incarceration while awaiting his current capital trial. "The presence or absence of a record of serious violence during any past prison sentences is particularly relevant, as this context most closely approximates that of the pending capital life term." Cunningham & Goldstein, *supra,* at 426. "The circumstances and context of past institutional violence also may be illuminating." Cunningham & Goldstein, *supra,* at 426. The forensic psychologist cannot simply turn pages of the prison records and accept them at face value, but must think about each event in prison in context and proportion:

- Specific descriptions of prior confinements;
- Security level and celling arrangement;
- Disciplinary write-ups;
- Any prison gang affiliation;
- Out-of-cell activities;
- Involvement in work, academic, treatment, or religious programming;
- Visitation contacts; and
- Inmate and staff interactions.

Cunningham & Goldstein*, supra,* at 426.

Events like these "often provide additional perspectives regarding both the defendant's adjustment to confinement and the correctional staff's appraisal of whether the defendant was disproportionately at risk for serious violence." Cunningham & Goldstein*, supra,* at 426; see also Cunningham and Reidy, 1998b, 1999, 2001, Reidy, et al., 2001.

## 2. Methodology Step Two: Applying the Relevant Base Rates.

The second step in the methodology for assessing future violence is to consider what are called the "relevant base rates." "In the absence of a prior history of prison incarceration or serious violence in jail pretrial, the most reliable anchor for a violence risk assessment at capital sentencing involves the application of relevant base rates." Cunningham & Goldstein, *supra,* at 426. "Group statistical data have repeatedly been demonstrated to enhance the reliability of violence risk assessments[20], including the violence of capital offenders. Cunningham & Reidy, 1998b, 1999, 2001, Reidy 2001.

The leading forensic psychologists have "concluded that knowledge of the violence rate in the respective group is the single most important piece of information necessary to make an accurate risk assessment of a particular individual." Cunningham & Goldstein, *supra,* at 426.

Although it may seem counterintuitive, studies based upon prison records have shown that "the overwhelming majority of capital offenders do not have records of serious prison violence." Cunningham & Goldstein, *supra,* at 426. "This finding is broadly consistent – despite differences in the decade of follow-up, applicable capital statute, and/or geographical location." Cunningham & Goldstein, *supra,* at 426.

"For example, approximately two-thirds of former death row inmates were never confined in administrative segregation in samples from both Texas and Indiana." Cunningham & Goldstein *supra,* at 426-27 (citations omitted). Other studies tracked death row inmates who were transferred to general population after the 1993 *Furman* decision ended executions temporarily. "Similarly, just

---

[20]See Hall, 1987, Monahan, 1981, 1996, Morris and Miller, 1985, Serin & Amos, 1995.

over two-thirds of the nationwide sample of *Furman* commutees were never written up for assaultive conduct." Cunningham & Goldstein, *supra,* at 427.

Twenty-two percent of Texas death row inmates who were released to general population "had no disciplinary write-ups of any sort during follow-up in the general prison population" that averaged seven years. Cunningham & Goldstein, *supra,* at 427.

The odd fact is that overwhelming majority of death row inmates in Texas are non-violent. The reason for this is not because the inmates were shocked into good behavior by placement on death row for execution. It is simply that they now live in a structured environment. "The frequency of prison violence among capital offenders who were sentenced at trial to a life prison term is quite similar to that of former death row inmates." Cunningham & Goldstein, *supra,* at 427. Marquart, 1989, 1994. "Similarly, rates of prison violence among convicted murderers sentenced to death, life-without-parole, and life-with-parole have been found to be remarkably consistent." Cunningham & Goldstein, *supra,* at 427; Sorensen & Wrinkle, 1996.

Current research verifies previous findings. Two leading researchers "substantially augmented the statistical support for these base rate estimates in their report of the rate of serious prison violence among 6,390 murderers in the Texas prison system" over the ten-year period, January 1990 to March 1999. See Table 21.6, Cunningham & Goldstein *supra,* at 427. From this data, the researchers "extrapolated the probability of serious institutional violence across a 40-year prison term," the minimum period of incarceration in Texas for a non-death capital murder conviction. The purpose for this extrapolation was to determine the *actual* likelihood that a Texas capital defendant who is sentenced to a life sentence instead of death will display some serious violence in prison over the course of 40 years. *See* Sorensen, J.R. & R.L. Pilgrim, *An Actuarial Risk*

*Assessment of Violence Posed by Capital Murder Defendants*, 90 J. Crim. L. & Criminality 1262 (2000).

If the host of State appointed forensic psychologists who regularly testify for prosecutors in Texas death penalty cases are to be believed, this group of non-death capital inmates should be a violent group. One would expect that they would lead all categories for prison violence. In truth, their level of violence in prison is low. The researchers found a prevalence rate of only 16.4%. Cunningham & Goldstein*, supra,* at 427. Sorensen & Pilgrim,*supra*. This means that of 100 non-death capital inmates, over 40 years only 16.4% of them would be involved in a serious violent offense. Conversely, 83.6% of them would *not* be involved in serious violent offenses over their entire 40-year minimum period of incarceration.

Similarly, on a yearly basis, the non-death capital inmates were involved in serious violence at a rate of 8.4%. Sorensen & Pilgrim,*supra*. This means that annually 91.6% of non-death capital inmates were *not* involved in serious violence.

One of the advantages of the Sorensen & Pilgrim study of Texas non-death capital inmates was that the "extraordinary number of inmates followed in this study allowed for identification of a limited number of variables that served to raise or lower the risk of serious prison violence relative to the overall group risk." Cunningham & Goldstein, *supra,* at 428. In other words, one could break down the group of 6,390 inmates into risk pools. Some pools would reflect higher violence, some lower.

As mentioned, in order to perform the appropriate scientific methodology a State appointed forensic psychologist is required to apply the relevant base rates to a capital defendant. "Base rates of the incidence of institutional violence among capital offenders and murderers in the general

population of maximum-security prisons represent important anchoring points in performing a violence risk assessment of a capital defendant." Cunningham & Goldstein, *supra,* at 428. There are several other relevant base rates which the forensic psychologist must consider:

- "the frequency of serious violence in specific correctional settings;"
- "inmate and staff homicide nationally and in the particular department of correction;"
- "disciplinary infraction rates of long-term inmates;"
- "prison disciplinary infractions as a function of age of the inmate."

Cunningham & Goldstein, *supra,* at 428.

The relevant base rates allow the forensic psychologist to tailor his assessment of a particular capital defendant. Using the relevant base rates as a starting point, the forensic psychologist can adjust it for factors which are unique to the capital defendant on trial. "Conservative individualization of base rates examines various factors that might serve to modestly raise or lower the risk as compared to the relevant group anchor" such as:

- "the age of the inmate,"
- "continuing availability of community supports and visitation,"
- "history of employment in the community,"
- "prior responses to structured environments" such as prison,
- "psychological disorder."

Cunningham & Goldstein, *supra,* at 428.

Current psychology emphasizes "the need for mental health experts conducting fair and balanced risk assessments to describe both risk and protective factors, as well as mediator or moderator effects in a particular context." Cunningham & Goldstein, *supra,* at 428. Rogers 2000. Moreover, it is vital "that before identifying a particularizing factor as being operative," the forensic psychologist must consider "the incidence of that factor in the inmate group providing the anchoring base rate of violence risk." Cunningham & Goldstein, *supra,* at 428.

In other words, before latching on to one or more factors unique to the capital defendant on trial and claiming that these factors enhance his likelihood of committing future violent acts, the forensic psychologist must make certain that the factors are not ones which most inmates have. Otherwise, the forensic psychologist will be making generalizations of future violence which are not supported by the data which proves that the vast majority of capital inmates are not violent. "APD [Adaptive Personality Disorder] as well as a number of other factors that might be related to risk of violence in the community are so pervasively represented among prison inmates that they lose any predictive value in that setting." Cunningham & Goldstein, *supra,* at 428.

### 3. Methodology Step Three: Adjusting The Final Risk Estimate For Risk Management or Violence Prevention/Reduction Procedures That Could Be Applied.

Once the State forensic psychologist has examined past prison behavior and computed the relevant base rates, his next step in the methodology of future risk assessment is to return to the context of prison and adjust the final risk estimate for tools available in prison for reducing the odds of future violence.

"[C]onsideration of what modifications in context or risk management procedures might be brought to bear to reduce the likelihood of violence is a critically important step in violence risk assessments at capital sentencing." Cunningham & Goldstein, *supra,* at 428. Prisons have a host of tools available which may reduce likelihood of prison violence by the capital defendant:

- psychotropic medications;
- counseling or other treatment of psychological disorders;
- programming and psychoeducational services, such as anger management;
- academic/work activities;
- classification and celling procedures;
- modifications in confinement, including both psychiatric and supermaximum units.

Cunningham & Goldstein, *supra,* at 428.

"The availability of supermaximum confinement in virtually all prison systems is a particularly critical variable to consider in violence risk assessment at capital sentencing." In a supermaximum unit, which impose higher staffing, more control, in-cell meals, and rigorous shackling, reduce opportunities for violence. "Consequently, inmates who are viewed as being a disproportionate risk of serious violence toward staff or other inmates can be confined in a context that minimizes that risk." Cunningham & Goldstein, *supra,* at 428.

## CRITIQUE OF THE METHODOLOGY OF DRS. SELF AND ALLEN

The next step in this challenge is to examine what Dr. Self and Dr. Allen told jurors and determine whether their testimony was backed up by good science. The Court will conclude that their testimony was devastating to Roberson and that the two experts's opinions were unsupported by any legitimate science. This is junk science at its worst.

### E.     *Summary of Dr. Allen's Opinions and Testimony.*

Dr. Allen testified shortly after meeting Roberson that "he doesn't suffer from any severe mental disease or defect." (R.R. vol. 47 at 60; vol. 48 at 112-13.) Dr. Allen said that Roberson posed a "[m]oderate to high risk if the victim pool involves children or even females." (R.R. vol. 47 at 60.) "[H]e was moderate to high risk in the free world." (R.R. vol. 48 at 114.)

Dr. Allen placed considerable emphasis on the number of Roberson's arrests, which he said were 14 to 17 which meant "that the likelihood of future arrests even for a nonviolent offense is almost certain." (R.R. vol. 47 at 60-61.) He "probably is diagnostically an anti-social personality disorder." (R.R. vol. 47 at 61.) "There is some significant risk he would show some level of aggression toward female officers." (R.R. vol. 47 at 61.)

Dr. Allen labeled Roberson a dangerous psychopath who killed without remorse, empathy or conscience. (R.R. vol. 48 at 141.) He lumped Roberson with Saddam Hussein, Adolph Hitler, Henry Lee Lucas, and Ted Bundy, notorious mass murderers and serial killers. (R.R. vol. 48 at 127-28.)

Dr. Allen said that Roberson's assault of Nikki constituted *affectively based* violence as opposed to *instrumental* violence. Affectively based violence he described as an unpredictive emotional response to circumstances, which was more dangerous than instrumental violence, which Dr. Allen explained was the use of violence to accomplish a certain end, such as violence during a robbery. (R.R. vol. 48 at 134.) He offered no research to support his statements.

### F.    *Summary of Dr. Self's Opinions and Testimony.*

Likewise, minutes after interviewing Roberson for two hours the day after he was found guilty of capital murder, Dr. Self testified that Roberson was not suffering any significant mental illness. (R.R. vol. 47 at 59.) He said that Roberson meets the criteria for Anti-Social Personality Disorder according to the DSM-IV. (R.R. vol. 47 at 59.) He found that Roberson "has a long history of criminality," and "has shown a striking lack of remorse and empathy for others in his past criminal behavior." (R.R. vol. 47 at 59.) Dr. Self identified Roberson's "victim pool" to consist of "children and women and that he would be particularly dangerous if he had access to those persons." (R.R. vol. 47 at 60.) He said that in TDC "there are weak individuals and female employees." (R.R. vol. 47 at 60.)

Two days after the interview, before jurors, Dr. Self testified that he conducted no measurement testing of Roberson. (R.R. vol. 48 at 158-59.) Dr. Self told jurors that Roberson's actions were "cold-blooded," that Roberson had an "absolute lack of remorse," an "absolute lack of

empathy," and that he was "stone cold." (R.R. vol. 48 at 163.) He said that Roberson had poor impulse control. (R.R. vol. 48 at 163-64.) He explained to jurors that Roberson would be a target in prison by those who will seek to harm "these perverts." (R.R. vol. 48 at 165.) Dr. Self predicted that Roberson would try to make weapons in prison to protect himself. (R.R. vol. 48 at 165.) Dr. Self predicted that Roberson would be violent in prison. (R.R. vol. 48 at 166.) Roberson, he said, was "a drug seeker" a category who made "bogus complaints to get pain medicines." (R.R. vol. 48 at 171.)

These conclusions are unjustified by the two experts' own ad hoc methodology or good science.

### G. Dr. Self and Dr. Allen Applied Their Own Self Created Ad Hoc Methodology for Assessing Roberson's Future Dangerousness, Not One Recognized by the Profession.

Dr. Self and Dr. Allen could not explain any scientifically based methodology which permitted them to diagnose a defendant to determine whether he probably would create acts of serious violence in prison. Instead, the two men adopted an *ad hoc* approach which they evidently created themselves. This *ad hoc* methodology consists of the following steps:

A.     Meet with the prosecutor and receive an overview of the murder case;

B.     Receive from the prosecutor all documents deemed relevant by the prosecutor to the defendant's offense and past criminal history;

C.     Review the documents sent by the prosecutor;

D.     Gauge the damage caused to the victims to gain an understanding of the defendant's capacity for violence, R.R. vol. 48 at 121;

E.     Review the defendant's post conduct behavior, R.R. vol. 48 at 121;

F.     Review the defendant's criminal history;

108

G.     Decide whether the capital murder reflected instrumental violence or affective violence. If instrumental violence, he will testify that use of instrumental violence predicts future violence. If affective violence, he will testify that use of affective violence predicts future violence.

H.     If possible, meet with the defendant for a few minutes to assess his level of remorse, intelligence, and mental deficiencies. No objective medical or psychological testing is required. An individual interview is not required; if necessary two psychologists may interview the defendant simultaneously, during the lunch break immediately after a conviction.

I.     Look at all he has learned about the defendant in terms of risk factors;

J.     Administer and score the defendant on an ad hoc version of the Hare Psychopathy Checklist-Revised. Instead of applying the scoring criteria called for the writers of the Hare PCL-R, Dr. Allen appears to have created his own unverified ad hoc scoring criteria.

Missing from there *ad hoc* methodology are the following critical tasks:

•     Reconstructing the defendant's life;

•     Waiting to review the testimony or reports of other forensic psychologists who have examined the defendant;

•     Waiting for completion of neurological or medical examinations of the defendant;

•     Assuring capture and review of all educational, medical, and incarceration records;

•     Performing objective measurable psychological testing on the defendant with predictive value;

•     Obtaining and incorporating objective base rate data of the actual incidence of violence in prison by capital murderers.

Dr. Allen stated that he had completed "a risk assessment" of Roberson. (R.R. vol. 48 at 110.) Here is how he described his methodology:

Basically, what I do is I take a look at the instant offense, the capital crime that the person has been guilty of and get a good sense of the level of violence that was involved. I then look at the post conduct behavior, what happened after the conduct

charged. I take that and I put it in the context of relevant history, that is history relevant to assessing risk that might involve everything from educational records, arrest records, conduct records in school, conduct in prison or incarceration.

(R.R. vol. 48 at 110; *see also* p. 121.)

Dr. Allen stated that one of the aspects he considers is whether the defendant is responsible for instrumental violence or affective violence. (R.R. vol. 48 at 114.) Drs. Allen and Self's methodology are without support amongst forensic psychiatrists.

**H.** **Dr. Allen's and Dr. Self's Assessments That Roberson Posed a Probability of Future Violence Is Not Substantiated Either by Their Own Ad Hoc Methodology or Current Professional Standards.**

Having explained Drs. Allen's and Self's opinions and their methodology, one may now (1) grade whether their opinions are supported by their own methodology, or (2) grade whether their methodology is supported by their profession or science.

**1.** **Dr. Self and Dr. Allen Reached Their Conclusions Without Waiting for or Considering All of the Available Evidence.**

Although both men cast themselves as objective professionals, it is certain that they felt themselves partisan advocates for the death of Roberson. There are several telling circumstances which suggest that they had long decided to declare Roberson a future danger before the drove to Palestine for the trial.

First, they provided their complete opinions to the trial judge only minutes after meeting Roberson at the courthouse during a lunch break the day after he was found guilty of capital murder. They had conducted no objective testing on Roberson, compared their opinions with the three qualified experts hired by the defense, or reflected on whether additional information or testing was necessary as result of what Roberson told them.

Second, when they met privately with the trial judge to review their opinions, the two State experts had staked out unequivocal positions. At this point, it is not clear, but it appears that they had not heard the testimony of any of Roberson's three experts, Dr. Kelly Goodness, Dr. Bill Burleson, a psychologist with TDCJ-ID, or Dr. John C. Krusz, M.D., a Dallas neurologist, or at least Dr. Goodness' testimony. Each of Roberson's experts offered compelling testimony which at least should have had some impact on the opinions of Dr. Self and Dr. Allen. Their conviction that Roberson was a future danger was unshakable by any evidence that their three peers could offer.

Third, even when they finally heard the testimony of Dr. Goodness, Dr. Burleson, and Dr. Krusz, the two State experts made no effort to review their documents or files or take their data into consideration. Instead, they fought tenaciously to minimize the methodology and evidence collected by Dr. Goodness, Dr. Burleson, and Dr. Krusz. This was not a battle of science but a contest by two men on a mission to satisfy the State's request for future danger testimony.

Fourth, the two State experts were remarkably agreeable with each other's opinions. The judge asked them both:

> [Court]: You've heard each others's opinions. Is there anything, Dr. Self, that you disagree with on with Dr. Allen?
>
> [Dr. Self]: Not of the things that we've, you know, revealed just now, I don't, no sir.
>
> [Court]: Dr. Allen, do you see any points of disagreement between you and Dr. Self concerning the defendant?
>
> [Dr. Allen]: I have not heard any testimony from him today that I disagree with.
>
> (R.R. vol. 47 at 65.)

111

It seems striking that these two experts, who supposedly operated independently, had not one disagreement with the other over methodology, evidence, objective data, testing, or conclusions. One cannot help but suspect that they were parroting each other because they knew what was expected.

## 2. Dr. Self and Dr. Allen Failed to Conduct any Objective Measurable Testing on Roberson.

Dr. Allen stated, "We really didn't administer any tests, per se. We did a clinical examination of the client." (R.R. vol. 48 at 111.) Dr. Allen did not administer the Hare Psychopathy Checklist–Revised, but instead an ad hoc version he modified on his own.

He did not conduct an MMPI. (R.R. vol. 48 at 114.) He selected some questions from another checklist called the HCR20, but did not score them in any manner. (R.R. vol. 48 at 114-15.)

Similarly, Dr. Self did not administer any testing. He said instead that he conducted "a clinical interview," which merely means that he questioned Roberson. (R.R. vol. 48 at 172-73.) Even Dr. Self admitted "I could have used more time." (R.R. vol. 48 at 173.)

## 3. Dr. Allen Modified An Inappropriate and Unverified Psychological Test and Created His Own Ad Hoc Version Which He Used Roberson.

Dr. Allen stated that asked Roberson a series of questions from the Hare Psychopathy Checklist–Revised. As discussed above, page 96, the Hare Psychopathy Checklist–Revised is measurement test designed to detect the level of a person's psychopathy the risk that a person might act out antisocial behavior. The Hare PCL-R is limited in scope to conduct of individuals who will be in free society. It has never been verified for predictive use of inmates who will spend most of their remaining lives in a maximum security unit.

It is important to observe that Dr. Allen *did not properly administer* the Hare Psychopathy Checklist–Revised. He merely read some of the questions from it to Roberson for Roberson's answer. In other words, Dr. Allen used psychological test which has never been approved for capital murder risk assessments, and then modified portions of the test into his own version which he called "clinical examination." (R.R. vol. 48 at 111.) He had no scientific basis to justify his modifications or prove that his modified version had some predictive value when applied to capital murder inmates serving a 40-year minimum term.

Dr. Allen had never had even attended the training seminar for the Hare Psychopathy Checklist–Revised. (R.R. vol. 48 at 111.) He did not have certification or endorsement to apply the test. (R.R. vol. 48 at 111.)

By modifying the Hare Psychopathy Checklist–Revised and creating his own checklist, Dr. Allen committed serious professional and ethical blunders. "The PCL-R has *not* been demonstrated to reliably predict serious violence in American prisons, among minorities and women, and or on old-age parole." Cunningham & Goldstein*, supra,* at 426. See also Cunningham & Reidy, 1998a, 1999, Edens 2001, Edens, Petrila & Buffington-Vollum, in press; Freedman, 2001, Reidy et al., 2001. "[I]n the capital sentencing arena, there is a clear ethical imperative to bridle the enthusiasm of embracing the PCL-R (or other risk assessment instruments) with scrutiny of the empirical support for its application in a specific context with a particular population." Cunningham & Goldstein*, supra,* at 426. "At this stage of capital violence risk assessment research, no interview-based personality variable, personality testing profile, or risk assessment instrument has been demonstrated to reliably predict serious prison violence." Cunningham & Goldstein*, supra,* at 429, sic. In other

words, there is no written test which can tell a psychologist whether a man on trial for murder will be violent in prison over 40 years.

Moreover, Dr. Allen's ad hoc modification of the Hare Psychopathy Checklist–Revised has never been peer review tested in any manner. He has made no effort to publish his modifications, much less to conduct research into whether his ad hoc checklist has any predictive value.

Worse, Dr. Allen created his own scoring on his ad hoc modified Hare Psychopathy Checklist–Revised. He scored Roberson at a value of 34 and concluded that 30 was the cutoff value for Roberson's future dangerousness. (R.R. vol. 48 at 112.) Dr. Allen could offer no scientific justification for his 30 point cut off in the context of the first special issue. This is junk science at its worst. He created the illusion that Roberson had been subjective to valid scientific testing and found measurably dangerous.

Dr. Allen told jurors, however, that "I think it was important in our interview, as well as looking at the historical information, to determine whether or not the defendant scored very high on the Hare Psychopathy Check List." (R.R. vol. 48 at 122.) This statement by Dr. Allen was inaccurate. He did not administer the Hare Psychopathy Checklist–Revised. What he did was to select some of the personality characteristics from the Hare Psychopathy Checklist–Revised and create his own unverified ad hoc version, which he sidestepped before jurors. We are not certain, but it appears that Dr. Allen did not possess the scoring criteria written by Dr. Hare, a separate and vital component of the test necessary for accurate scoring.

Dr. Allen misled jurors about the predictive value of the Hare Psychopathy Checklist–Revised and gave jurors the false impression that he had used it. For several minutes in the sentencing trial, Dr. Allen explained to jurors the nature of the Hare Psychopathy

114

Checklist–Revised. Then he praised its predictive value, "And, in fact, subsequent research showed that, that it does have a high level of reliability. It's really handy and has pretty good predictive value." (R.R. vol. 48 at 122.)

Dr. Allen then misled jurors into believing that there is no disagreement among psychologists as to the predictive value of the Hare Psychopathy Checklist–Revised. Testifying in 2003, three years after the Cunningham articles, Dr. Allen told jurors:

> [Prosecutor]: Are you aware of any general controversy in the world of psychologists that Hare is not a reliable mechanism to evaluate somebody's risk for being a psychopath?
>
> Dr. Allen: Not really. I mean the Hare has become very widely used more and more. You know, the federal prison systems more and more use it. State prison systems use it. A lot of people involved in criminal psychology use it. There has been quite a bit of research dealing with its reliability and validity in terms of assessing risk for future criminal activity, assessing whether or not someone's likely to succeed on probation or parole and in violent recidivism.

(R.R. vol. 48 at 123-24.)

Dr. Allen misled jurors to believe that psychologists were united that the Hare Psychopathy Checklist–Revised could predict an inmate's propensity for violence. Dr. Allen failed to explain that the Hare Psychopathy Checklist–Revised has never been verified to have predictive value for (1) capital murder inmates, (2) sentenced to 40 years minimum, (3) in a maximum security prison, (4) where contact was limited to guards and male inmates, precisely where Roberson was destined when the jury found him guilty of capital murder two days earlier. More generally, the Hare Psychopathy Checklist–Revised has never been determined to have predictive value for future prison violence of inmates who would spend most of their lives in prison. The test is geared for predicting antisocial behavior in free society.

On cross-examination, Dr. Allen was forced to admit that he had never read the leading treatise in forensic psychology, Handbook of Psychology, by Dr. Alan Goldstein. (R.R. vol. 48 at 144-45.) This is the psychology equivalent of an English major admitting that he has not read Shakespeare.

Had he read Dr. Goldstein's treatise, Dr. Allen would have learned that there indeed is a sharp recommendation against Dr. Allen's practices, including misusing the Hare Psychopathy Checklist–Revised for purposes for which it was never designed nor verified.

Strangely, Dr. Allen also admitted that the error rate for the Hare Psychopathy Checklist–Revised was 3 points, R.R. vol. 48 at 146, which means that his 34 point scoring of Roberson on Allen's ad hoc version of the test could have been as low as 31 points, just above Allen's 30 point cutoff for dangerousness.

Dr. Allen violated the requirements Dr. Hare explained are necessary for proper use the Hare PCL-R and lacked the training required. Here is what Dr. Hare has said is necessary:

> In clinical settings, the PCL-R is used for psycho-diagnostic purposes. Because an individual's scores may have important consequences for his or her future, the absolute value is of critical importance. The potential for harm is considerable if the PCL-R is used incorrectly, or if the user is not familiar with the clinical and empirical literature pertaining to psychopathy. Clinicians should
>
>   * Possess an advanced degree in the social, medical, or behavioral sciences, such as a Ph.D., D.Ed. or M.D.
>   * Be registered with the local state or provincial registration body that regulates the assessment and diagnosis of mental disorder (e.g., psychological or psychiatric association);
>   * Have experience with forensic populations (as demonstrated by registration as a diploma in forensic psychology or psychiatry, completion of a practicum or

internship in a clinical-forensic setting,or at least two years of relevant work-related experience)[21]

    * Limit their use of the PCL-R to those populations in which it has been fully validated. The manual, published in 1991, stated that this meant only adult male forensic populations (e.g.,institutional or community correctional facilities, forensic psychiatric hospitals, and pre trial evaluation or detention facilities.) However, there now is enough empirical evidence to support its use with female and adolescent offenders, as well as with sex offenders.[22]

    * Insure that they have adequate training and experience in the use of the PCL-R(see below).[23] We further recommend that, wherever possible, the PCL-R scores of two independent raters should be averaged so as to increase the reliability of the assessment.[24]

Website for Dr. Hare: www. hare.org.  See Hare, R.D. (1998), *The PCL-R assessment of psychopathy: Some issues and concerns.* Legal and Criminological Psychology, 3, 101-122.

### 4.      Dr. Allen Twisted His Comparison of Affective Violence to Instrumental Violence to Suit His Need in This Case.

As mentioned, one aspect of Dr. Allen's purported methodology is to analyze the crime itself

for which the defendant is on trial to determine whether the defendant was motivated to commit

*instrumental violence* or *affective violence.*  In Roberson's trial he said that a pattern of affective

violence is more predictive of future violence because of its unpredictable and unstable nature.  He

---

[21]Dr. Allen and Dr. Self did not meet this requirement.  Neither of them indicated that they had ever been to death row or even maximum security units other than Rusk State Hospital. The relevant population was not TDC inmates in general, but capital murder defendants serving life and death sentences.

[22]Dr. Allen violated this point by testifying that the Hare PCL-R was one of his bases for concluding that Roberson was a sexual predator.  Moreover, Dr. Hare's use in correctional facilities means inmates who may be paroled to free society, not inmates serving their lives in a maximum security unit.

[23]Dr. Allen stated that he had no training on application of the Hare PCL-R.  At most he attended a seminar.

[24]Dr. Allen did not seek independent confirmation of his results.  His sidekick, Dr. Self, did not conduct the Hare PCL-R or attempt to revalidate Allen's results.  Even if he had, Self would not represent independent retesting.

said, "And in this case there appeared to be rage reactions that I would classify as affective violence."

(R.R. vol. 48 at 114.) This unpredictable rage would certainly lead to violence by Roberson in prison:

> [Defense Attorney]: So you're going to say that he probably will only pick on defenseless victims in prison? Could you agree with that?

> [Dr. Allen]: Yeah. I think there's a bullying quality to his rageful violence. I think he's going to explode, be explosive with people with whom he thinks he can get away with it.

> (R.R. vol. 48 at 154.)

Instrumental violence he defined as "when I use a gun and I stick it to your head to get your purse. The threatening you with a gun in an instrument. It's a tool I use to get my criminal goal, you know, your purse, your wallet." (R.R. vol. 48 at 133.) Affective violence he defined as,

> more emotionally based and it's where a person's got a short fuse and they explode, sometimes under highly specific circumstances, but it's usually not that specific. I mean a lot of things tend to set them off. You know, there's violence that occurs in certain specific situation. Like I break into your house and I really didn't intend to hurt you. I just wanted to get your money off your night stand, but you caught me and I got scared and I stabbed you. That's different in your assessment of risk. That's different than sneaking in your window, cutting your throat, and taking your wallet. It's different because it was more – It was a little closer to self-defense even though I was a criminal committing a crime. But affectively based violence more often has this explosive rage component to it. It's actually a little harder to predict, not always, but often than instrumental violence. The guy who's willing to use threat or the threat of violence or violence, you know, to knock over a 7-11 store or a bank or take a purse, that's a little easier to predict actually because they do it more often. The rage based violence is a little more unstable. It's a little harder to predict. If you know the circumstances and often that means knowing the victim pool then you can get a little closer."

> (R.R. vol. 48 at 133-34.)

First, there is no psychological literature *anywhere* to support this comparison as a legitimate basis for predicting future violence, particularly in prison context. When Dr. Allen was asked in

writing to provide citations to published research articles supporting his position, he declined to do so, at least at this writing.

Second, Dr. Allen appears to have a habit of flipping his methodology to suit his needs. In Roberson's case, he said that Roberson was acting out of emotional rage, which he said proved that he was more likely to be violent than someone who acted violently intentionally with tools, through what he called instrumental violence.

In 1994, Dr. Allen testified just the opposite. Testifying for the State in the capital trial of Rickey Lynn Lewis in Tyler, Dr. Allen told jurors that Lewis' *instrumental* violence showed that he was at enhanced risk for future violence. Here is what he told jurors:

> [Prosecutor]: Now, what is it about this particular crime itself that indicates to you a –
>
> [Dr. Allen]: When you look at this crime just in terms of clinical factors there are certain things that stand out. I didn't see any evidence in the records that there was any influence in a sense pulling him into the crime, that it was some sort of reaction to provocation, that there was some sort of baiting or something hypothetical like that that pulled him into the crime. . . .
>
> There were problems indicating future dangerousness with post-conduct charged behavior. For example, after fatally wounding one victim, another crime was committed immediately after which is an indicator of future dangerousness and again after killing one victim he was willing to have fun in a sense, to have sex with the victim's girlfriend, which is an indicator of future violence.
>
> (*State v. Rickey Lynn Lewis*, R.R. vol. 41 at 117-18, State Habeas P.S.D. at 5.)

Dr. Allen goes on in his Lewis testimony to explain that Lewis' intentional acts to kill a dog, reenter the crime scene, threaten a victim, rapes a victim, and then flees the scene, prove that Lewis will likely be violent in the future. (*State v. Rickey Lynn Lewis*, R.R. vol. 41 at 118-19, A.R.E. at 5.) Dr. Allen then points to robberies and kidnapings involving Lewis and compares those crimes

with Lewis' capital murder offense and explains that Lewis' intentional use of weapons (*i.e.,* "instrumental violence") in his previous crimes shows that he will likely commit future violence:

> [Dr. Allen]: Well, there were similarities in that they both involve the use of weapons. Both involve intimidation. The General Store – the General Dollar Store robbery, both those women were threatened and he said he was going to kill them. Abducted one. In that sense his willingness to intimidate Ms. Hilton in a fashion similar to the other.

> (*State v. Rickey Lynn Lewis*, R.R. vol. 41 at 119-20, A.R.E. at 5.)

What Dr. Allen told the jurors in Lewis' trial was that Lewis was likely to be dangerous in the future because he acted deliberately and intentionally in the capital murder. He said that the lack of any reactions by Lewis, or external influences on him, showed that Lewis would likely commit similar intentional violence, which he now terms "instrumental violence." On the other hand, Dr. Allen implies that had there been external influences, or had Lewis been acting in an emotional response to a provocation that pulled him into the crime, then he would be less likely to commit future violent acts, or what Allen now terms "affective violence."

Similarly, in his February 28, 1996 testimony for the State against Charles D. Tuttle in Tyler, Dr. Allen told jurors that instrumental violence was more predictive of future violence than affective violence. As he explained his methodology, he told Tuttle's jurors that it was important to assess the level of violence in the capital case for which the defendant was on trial to determine the defendants "threshold of violence," that is "the barrier [the] person is willing or has to get over to commit future of crime or violence." (*State v. Charles D. Tuttle*, R.R. vol. 41 at 74, A.R.E. at 6.) Directly contradicting what he told Roberson's jurors, Dr. Allen stated:

> [Dr. Allen]: If I hit someone one time in the head with a hammer and they die, and it was the result of a domestic squabble in which I exploded, then the likelihood of future violence in that situation tends to be lower, versus if it's intentional, it's not

120

the result of family violence, et cetera." (*State v. Charles D. Tuttle*, R.R. vol. 41 at 80-81, A.R.E. at 6.)

Dr. Allen elaborated for Tuttle's jurors:

> [Dr. Allen]: Right. The kind of intentionality, again, argues for a higher level of – or a higher likelihood of future violence. And still it's a clinical as opposed to a statistical predictor where the violence occurred in the course of a criminal act and it was instrumental in nature, that is, the violence was designed to get something.

> [Prosecutor]: Where you have violence that is instrumental in nature, in other words, it is done with a design to get someone's property, what does that instrumental type violence mean in terms of the risk of future dangerousness?

> [Dr. Allen]: It tends to be correlated with future acts of violence.

[Dr. Allen goes on to explain that Tuttle's crimes were even worse because he used more instrumental violence than necessary to get what he wanted].

> (*State v. Charles D. Tuttle*, R.R. vol. 41 at 80-81, State Habeas A.R.E. at 6.)

Likewise, when Dr. Allen testified for the State in the Tyler capital murder prosecution of Robert Ladd, he again told jurors that instrumental aggression is more predictive of future violence than emotional or rage based violence. Here is what he told Ladd's jurors:

> [Prosecutor]: Going back to the level of instrumental aggression, in terms of the violence that is beyond what is necessary to achieve the goal, what does that – how does that affect your opinion as to someone's probable future danger in terms of what you saw on the part of this Defendant in this offense?

> [Dr. Allen]: Well, of course, there was instrumental violence, but it was a level of instrumental violence that went way beyond what was required to obtain what he wanted. And that's where you get in unique situations of increasing the likelihood of future dangerousness, where someone is willing to go beyond what's necessary to obtain the goods he wants.

> (*State v. Robert Ladd*, R.R. vol. ___ at 149-50, State Habeas A.R.E. at 7.)

In Ladd's case, Dr. Allen made clear that instrumental violence is more predictive of future violence than emotional based violence, modified for this trial to mix both concepts to produce the most dangerous inmate, to his way of thinking:

> [Prosecutor]: What personal variables did you find in terms of a clinical assessment from the records that you had before you?
>
> [Dr. Allen]: You also want to look, in terms of understanding clinically what happened, at the nature of the violent acts. It's important to determine the level of what we call an angry, impulsive violence, [from] the level of instrumental violence that's present, which I looked at.
>
> [Prosecutor]: What is a – are those two separate terms?
>
> [Dr. Allen]: Yes, they're two separate terms. Sometimes they overlap in the style of criminal activity. A lot of murders are angry, impulsive violence, explosive. Some are instrumental.
>
> Instrumental violence is – the typical form of instrumental violence is where you use a certain level of threat to obtain what you want. I might threaten someone with a gun or harsh words, but it's instrumental. It's used to get what you want. And it's typically not as violent or as dangerously violent, necessarily, as the angry, impulsive violence.

(*State v. Robert Ladd*, R.R. vol. ___ at 149-50, State Habeas A.R.E. at 7.)

In Ladd's case, Dr. Allen modified his instrumental/emotional based violence dichotomy because doing so fit the case. Ladd was charged with both burglarizing and stealing property from a retarded woman, and then raping and murdering her, followed by burning her body.

Again, it bears repeating that Robert Roberson's case was never anything more than a shaken baby case. It was constructed by the Anderson County District Attorney into a capital case with the help of junk science experts like Dr. Allen who were perfectly willing to twist their own implausible methodology to suit the needs of the prosecutor's case. No proof of instrumental violence? No problem according to Dr. Allen. "I'll just switch to affective violence and say that because Roberson

acted out of uncontrolled rage, he is more likely to be violent in the future than someone who intentionally picks up a knife or gun or a rope, like Rickey Lewis or Charles Tuttle or Robert Ladd."

### 5. *Dr. Allen Provided Mutually Exclusive Opinions at Trial.*

At trial, Dr. Allen provided mutually exclusive opinions to jurors. On one hand, he said that Roberson would constitute a minimal risk of violence in prison. This was the right answer and one of the few true statements by Dr. Allen during trial. But then he flatly contradicted this statement by claiming that Roberson would commit serious future acts of violence, even in prison. These opinions are mutually exclusive and cannot be reconciled by good science.

Here are some of Dr. Allen's comments: "Well, basically what I told the Judge in chambers, I guess you'd call it, is I felt that he was moderate to high risk in the free world. He was a minimal risk in a prison environment." (R.R. vol. 48 at 114.)

Then Dr. Allen turned the table, claiming that Roberson would in fact commit serious acts of violence in prison. First, he prefaced his opinion by stating that Roberson would be violent in free society and children and women near him would be at risk:

> Clearly, in the free world, I mean there's a risk for this guy to be around, a significant level of risk for him to be around children. There's probably a significant level of risk to be around females and those two probably define the members of his victim pool the best. But I'm not convinced that they totally define it because he just seems to have a preference for someone who clearly, maybe not exclusively, but who clearly is a lot more vulnerable than him, you know, someone who he can bully. You know, he's not a small guy.

(R.R. vol. 48 at 134-35.)

Then Dr. Allen transferred these concepts to prison, arguing that even in a maximum security prison Roberson would have access to women and weak men and could be expected to assault them:

And obviously that victim pool is going to be somewhat different in prison. He's not going to have any children there. He is going to have female police officers and there will be males, too. That's his main pool in prison is going to be females. But, you know, a male that is, say, less than able to take care of himself might be a potential target, too.

(R.R. vol. 48 at 135.)

[Prosecutor]: And in the prison world what do you think his risk level is?

[Dr. Allen]: Minimum.

[Prosecutor]: All right. And yet you still believe that he's likely to commit [future] acts of violence?

[Dr. Allen]: Right.

[Prosecutor]: In the prison world?

[Dr. Allen]: Right.

[Prosecutor]: And why is that?

[Dr. Allen]: Probably a couple of reasons. First of all, you have this general criminality. I mean just because you're in prison doesn't mean you don't commit crimes. They have the same range of criminal activity in prison that they have in the free world. There's burglaries and assaults and drug abuse and alcohol abuse and all that stuff. And just because he's in prison, given his history *the likelihood that he's going to continue criminal activity is high.* He's in a high risk category in that regard, based on his psychopathy, based on his arrest history, and his general criminality and criminal versatility. I felt compelled to lower his risk because a good portion of his victim pool is just not present in prison and I feel like I had to weigh that in a systematic fashion. Still, he still is more likely, certainly than the average person on the street, he's at higher risk to commit criminal activity and certainly acts of violence. But I would acknowledge, too, I mean I've have seen more violent psychopaths in my business. But he's still in that risk category. Even though minimal, he's still a psychopath. I can't really reconcile that effectively.

(R.R. vol. 48 at 143) (emphasis added).

Dr. Allen's final statement that he "can't really reconcile that effectively" is certainly true. Nor can anyone qualified in forensic psychology. The reason is because Dr. Allen was arguing both sides of mutually inconsistent positions without any basis in science.

### 6. Dr. Allen Did Not Rely on Appropriate Testing to Determine Whether Roberson Was Suffering Anti-Social Personality Disorder.

Without any testing, Dr. Allen told jurors that, "It was pretty clear from the records that he was an antisocial personality disorder, but being a psychopath is a bit more than that." (R.R. vol. 48 at 122.) As discussed, Dr. Allen did not rely upon appropriate testing or documentation for this assessment.

### 7. Dr. Self and Dr. Allen Failed to Assess Properly the Context of Prison in Making Their Assessment of Roberson's Future Dangerousness. Dr. Allen Admitted That Roberson Posed Little or No Risk of Violence in Prison.

A review of the work performed by Dr. Self and Dr. Allen reveals that they did not comply with the profession's accepted methodology and therefore their opinions that Roberson was a future danger to society are unfounded and violate *Daubert* and related cases warning about the hazards of junk science.

Dr. Allen conceded that Roberson was unlikely to pose any risk of violence in prison, where of course he would be placed, not in free society. Dr. Allen stated, "I really could not say that he would pose a particular risk to those [younger more helpless] inmates." (R.R. vol. 47 at 62.) "I'm not convinced that he would engage in retaliatory acts or particularly prey – certainly would not prey on a male that could defend himself." (R.R. vol. 47 at 63.) "If there was a male who was physically weak enough that he more or less equated physically with a female, yes, he could be a target, but I

can't say that with much confidence."  (R.R. vol. 47 at 63.)  "He was a minimal risk in a prison environment."  (R.R. vol. 47 at 114.)

Dr. Allen told jurors that Roberson's risk level of violence in prison was "minimum."  (R.R. vol. 48 at 142.)  "I think that he will – that there is a minimal risk of violence."  (R.R. vol. 48 at 155.) Nevertheless, he believed Roberson would likely commit violent acts in prison because (1) crimes occur in prison, (2) Roberson is a criminal, (3) and he is a psychopath.  (R.R. vol. 48 at 143.)

When deciding that Roberson was a future danger, Dr. Allen did not take into consideration that TDC has violence prevention measures for reducing opportunities for violence.  (R.R. vol. 48 at 148-49.)  Dr. Allen did not even understand what these terms meant.  (R.R. vol. 48 at 148-19.)

Dr. Self similarly failed to consider the context of prison.  Although Dr. Self argued that Roberson possessed poor impulse control since his teens, Dr. Self refused to consider that Roberson spent eight years in TDC only a single disciplinary report, and no incident of any violence.  (R.R. vol. 48 at 169.)  Dr. Self implied that there were probably other assaults by Roberson in prison which were not reported.  (R.R. vol. 48 at 169.)

Moreover, Dr. Self refused to concede that maximum security units have stringent controls in place to regulate inmate behavior.  Instead, Dr. Self generalized across all prison units, from the mental illness ward at which he worked in Rusk to general population minimum security units. (R.R. vol. 48 at 170-71.)

Dr. Self speculated that, "my take on penitentiary is you can get just about what you want to get and methamphetamine is one of the easier things because it comes in little bitty packets.  I mean people come on visitor's day and can leave you two or three grams without a whole lot of trouble." (R.R. vol. 48 at 172.)  What Dr. Self failed to grasp is that this is not possible in a maximum security

126

unit because there are no contact visits. All visitors speak through glass. Dr. Self was making wild generalizations without any basis in science.

Dr. Allen's assessment was skewed in favor of prosecutors because he only spoke to their witnesses. He did not speak to any of Roberson's family members. (R.R. vol. 48 at 153-54.)

### 8. Drs. Self and Allen Ignored Objective Base Rate Data Research.

Dr. Allen ignored base rate data. Base rate data is important. Base rate data is the collection of statistics of *actual* violence in maximum security units. Dr. Allen ignored *actual* violence in favor of his own *guess* at levels of prison violence, which is bad science.

Tragically, Dr. Allen admitted on cross examination that he does not even *know* what the levels of actual violence are in maximum security units and does not know what base rate data are. (R.R. vol. 48 at 146.) He did not know the percentage of inmates with more severe Hare Psychopathy Checklist–Revised ratings than Roberson and guessed that 20% of the prison population are "psychopaths." (R.R. vol. 48 a t 146-47.)

Dr. Self made the same mistake. He misled jurors by telling them that, "I can tell you that by virtue of his characteristics that he belongs in a group of people with similar characteristics and that that group of people have some, relative to the general population, some increased incidents of violence, . . . But in a penitentiary setting I think his risk becomes moderate . . . ." (R.R. vol. 48 at 166.) Dr. Self also told jurors, "if we took a hundred of him, a hundred people with his general descriptors and followed them, we would probably find significant levels of violence above that of the general population in a penitentiary setting." (R.R. vol. 48 at 170.)

The problem for Dr. Self, and for Roberson, is that Dr. Self was making false statements to the jurors. Dr. Self *did not have any group data* against which he could compare Roberson. He told

127

jurors that he did, but in fact he did not because he never considered the actual base rate data, which he claimed existed. (R.R. vol. 48 at 166.) He offered jurors his opinions and feelings based on anecdotal information he had collected over time, but not objective scientifically collected data. This is an example of junk science.

The following is a summary of Dr. Mark Cunningham's expert analysis of the scientific unreliability of future dangerousness prediction, especially in the absence of an exam; it was part of a legal memorandum attacking the use of Dr. Edward Gripon by the State in a case in Hale County where defense counsel obtained a life sentence.

Properly conducted predictions of future dangerousness have a scientific basis. They are rooted in what are called "base rates." As explained in materials designed to prepare psychiatrists for the examinations required for board certification in forensic psychiatry., "[t]he base rate is defined as the statistical prevalence of violence behavior in a given group, i.e., the frequency with which violence is committed in a given period of time, usually one year." Smith, S.M., The Prediction of Dangerous Behavior, in P.J. Resnick (ed.), FORENSIC PSYCHIATRY REVIEW COURSE 539 (American Academy of Psychiatry and Law 1993) [hereafter referred to as "Smith"]. In a capital sentencing proceeding, assessments of future dangerousness must examine whether the defendant will be a future danger if he is sentenced to life rather than death. Thus, the "base rate" that is relevant for such assessments looks to the frequency of violent behavior in the population of people who have been sentenced to life instead of death in capital trials.

In the mental health professions, the base rate "is considered to be the single most important piece of data necessary in making an accurate risk estimate (Monahan, 1981; Webster, Harris, Rice, Cormier, & Quinsey, 1994)." Cunningham, M.D. & Reidy, T.J, Don't Confuse Me with the Facts:

Common Errors in Risk Assessment in Capital Sentencing, 26 CRIM. JUSTICE AND BEHAVIOR 20, 23 (1999) [hereafter referred to as, "Cunningham"]. *See also* Smith, at 540 ("[k]nowledge of the appropriate base rate is the most important single piece of information necessary to make an accurate prediction"). Base rates are so significant that "[w]ithout this anchor of a comparative reference point, individual risk estimates may be little more than speculation." Cunningham, at 23.

The use of base rates is especially important when the base rates for violence in a particular group are not what one would expect. Thus, while intuition suggests that murderers, especially those convicted of capital murder and sentenced to life, would be the most likely prisoners to engage in further violence, the base rates for such prisoners demonstrates otherwise. As Dr. Cunningham explained in examining the relevant studies, "base rates of serious institutional violence in capital commutees, murderers, long-term inmates, and federal high-security prisoners do not significantly exceed and in some studies are below inmates convicted of less serious offenses. Bedau, 1964; Cunningham & Reidy, 1998b; Flanagan, 1980; Harer, 1992; Marquart, Eckland-Olson, & Sorenson, 1989; Sorenson & Wrinkle, 1996)." Cunningham, at 23. When such prisoners are paroled, their base rates for violence continue to be lower than the base rates for violence of non-homicide parolees. Cunningham, at 24 (citing studies). "Base rates such as these demonstrate why multiple authors (Hall, 1987; Monahan, 1981; Morris & Miller, 1985; Serin & Amos. 1995) have asserted that base rates are essential to an accurate violence risk assessment." Cunningham, at 24-25.

The established and accepted method for estimating the risk of dangerousness of a particular capital convict, therefore, must begin with establishing the base rate of similar prisoners' and parolees' violence. Once that has been done, there is also an established method for individualizing the risk assessment of the individual. This involves examining prisoners within the cohort of

convicted murderers who <u>do</u> commit violence and "identifying particular characteristics of [these] research subjects who subsequently engaged in violent behavior." Grisso, T. & Appelbaum, P.S., <u>Is It Unethical to Offer Predictions of Future Violence?</u>, 16 LAW AND HUMAN BEHAVIOR 621, 628 (1992). With these characteristics identified, the characteristics of the person whose risk of dangerousness is being assessed can then be compared and an estimate made – taking this and the base rate into account – of the risk that this person will be dangerous in the future. *Id*.

Again, this aspect of the process may seem counter-intuitive to mental health professionals who are not expert in the field of violence risk assessment. Many untrained mental health professionals make assessments of future dangerousness on the basis of clinical "judgment" alone, *i.e.*, predicting the risk of dangerousness on the basis of the prior criminal behavior, personality characteristics, personality disorders, and/or symptoms of mental illness or brain damage observed in the defendant. Without comparing these characteristics and historical data to objective research concerning the relevant prisoner population and the individual characteristics of persons within that population that are correlated with incidents of subsequent violence, the mental health professional's clinical judgment is likely to be wrong. As Dr. Smith has explained,

> Systematic errors of observation have consistently been linked with the clinician's prior expectations about which characteristics imply dangerousness. The six most frequent responses elicited from psychiatrists as most characteristic of dangerous persons include, "often acts on impulse, has no conscience whatsoever, is addicted to heroin, is utterly irresponsible, fears that people are out to get him, and resents even the slightest criticism." Hartogs, (1970), has listed 48 alleged predictors of violence including "lack of family interest, love, support, or acceptance" and "conflict over basic identity." Such descriptions lack scientific validity and have been repeated so often that unfortunately, they have become part of accepted clinical practice.

> Smith, at 540. Even the factors most strongly thought to be predictive of future violence, on the basis of clinical judgment, are not:

Studies sponsored by the U.S. Justice Department (Alexander & Austin, 1992; National Institute of Corrections, 1992) have concluded:

1. Past community violence is not strongly or consistently associated with prison violence.

2. Current offense, prior convictions, and escape history are only weekly associated with prison misconduct.

3. Severity of offense is not a good predictor of prison adjustment.

Prison violence does not predictably follow from preconfinement violence or the capital offense of conviction.

Cunningham, at 27 (citing Alexander, Jack & Austin, James, HANDBOOK FOR EVALUATING OBJECTIVE PRISON CLASSIFICATION SYSTEMS, United States Department of Justice, National Institute of Corrections (June, 1992)).

Dr. Cunningham provides one telling example of the fatal flaw in a mental health professional's reliance on clinical judgment in predicting future dangerousness. He notes that many professional who rely on clinical judgment rather than empirical data find that a person is likely to be dangerous in the future because he has an antisocial personality disorder. As he explains, however,

Antisocial personality disorder [APD] is not in and of itself an indication of a particularly dangerous or incorrigible inmate. Again, base rates are instructive. The prevalence or base rate of APD in a prison population is about 75% (Meloy, 1988). Thus a diagnosis of APD alone describes little about prison behavior and recidivism outcome except that the individual is similar to other prison inmates.

Cunningham, at 30.

131

Because of the prevalence of the traits associated with antisocial personality disorder in the prison setting, these traits are "of little benefit in distinguishing those inmates likely to be a particular violence risk." Cunningham, at 29.

Notably, in the data that is available concerning the accuracy of predictions of future dangerousness which were based solely on clinical judgment, time has shown the predictions to be egregiously <u>inaccurate</u>. In an informal study of such persons sentenced to death in Dallas County, the District Attorney's office found that <u>10 out of 11</u> person sentenced to death prior to 1988, who were found to present a risk of future dangerousness, were not – in fact most had become model inmates without ever having had a disciplinary infraction. *See* Exhibit C. Similarly, in a study conducted of former death-sentenced Texas inmates, researchers found that the level of violence in prison or thereafter was generally <u>lower</u> than the level of violence for non-capital inmates.

Finally, the science of violence risk assessment requires that the expert making such an estimate take into account two variables in addition to those already discussed. First, such risk assessments must take into account the clearly established "[l]ower likelihood of criminal activity and violence with aging...." Cunningham, at 31. "Risk assessments that fail to address the reduced likelihood of violence with progressive aging are fundamentally flawed." Cunningham, at 32. Second, "Assessment of risk is not simply a static enterprise. It also involves consideration of what preventive measures can be undertaken that would modify or reduce the level of violence risk posed by a particular inmate." Cunningham, at 32. "Capital risk assessment, then, calls for consideration of how the probability of institutional violence would be affected by confinement of the defendant under special conditions of increased security, supervision, and isolation." Cunningham, at 33.

In sum, Clinicians who rely on traditional mental health evaluation sources of information in performing a capital risk assessment are woefully data deficient. Violence risk assessment at capital sentencing is a broadly data intensive task. These assessments require knowledge of multiple applicable base rates, various prison contexts, differing empirical correlates of violence risk factors in the community and within prison, parole recidivism risk correlates, institutional records of the defendant, patterns of criminal conduct, and situational and interpersonal variables. Cunningham, at 34.

The use of clinical evaluations or crime scene evidence as the basis for a prediction of future dangerousness has been completely and thoroughly repudiated by all experts in the field of psychology. It cannot be gainsaid that the State's expert's theories lack any acceptance in the requisite field whatsoever.

> **9.      Drs. Self's and Allen's Individual Examination of Roberson Was Ridiculously Inadequate.**

Both Dr. Self and Dr. Allen spoke to Roberson at the worst of possible occasions. They met him together on February 12, 2003. It is important to be aware that Dr. Self and Dr. Allen interviewed Roberson together, not separately. (RR. vol. 48 at 112.) There was no independent corroboration.

The previous day the jury had returned a guilt verdict of capital murder. (R.R. vol. 47 at 58.) The two experts spoke to Roberson during a short break in trial over the lunch hour between 11 a.m. and 2:25 a.m. on February 12. (R.R. vol. 47 at 58.) Within minutes of completing their interview of Roberson, they were ready to testify that there was a probability that he would commit future acts of violence in prison. (R.R. vol. 47 at 59-60.)

At the *Daubert* hearing the next day on February 13, Dr. Allen said that he had examined Roberson for 2.5 hours. (R.R. vol. 48 at 109.) They skipped lunch and met with him in one of the courthouse rooms from 11:35 a.m. to 2 p.m., in time for Dr. Allen to meet Judge Bentley who began his *in camera* meeting with Dr. Allen and Dr. Self at 2:20 p.m. (R.R. vol. 48 at 120, 158.)

By meeting with Roberson together, the two State experts lost the opportunity for independent assessments. Their interview was a ruse to assure that they spoke to jurors with one voice without any differences between themselves. Even Dr. Self admitted that "I could have used more time." (R.R. vol. 48 at 173.)

> ### 10. Dr. Allen Misused a Psychological Term of Art and Allowed the Prosecutor to Inflame Jurors by Labeling Roberson a Psychopath.

The holy grail of every prosecutor in a capital case is to label the defendant a "psychopath." It is an easy term for jurors to say and remember. It sounds like it might reflect real science. Best of all, the term carries scary connotations of Alfred Hitchcock's famous movie. The label allows prosecutors to point to the defendant in closing arguments and demand death for the dangerous remorseless psychopath.

Roberson's case was no different. Presenting Dr. Allen, the prosecutor quickly asked Dr. Allen to discuss the meaning of "psychopath." (R.R. vol. 48 at 125-26.) Dr. Allen obliged:

[Prosecutor]:   And then this word "psychopath," which is kind of a scarier sounding word to some folks.

Dr. Allen:   Well, it ought to be.

[Prosecutor]:   It ought to be? Why is that?

Dr. Allen:   Because they're scarier.

(R.R. vol. 48 at 126-27.)

134

For several minutes, Dr. Allen entertained jurors by illustrating famous psychopaths, such as mass murderers and serial killers, Adolph Hitler, Ted Bundy, Saddam Hussein, and Henry Lee Lucas, who killed without remorse, empathy or conscience. (R.R. vol. 48 at 127-29.)

### 11. Dr. Allen Assumed That Roberson Was a Child Sex Offender Without Any Supporting Evidence that the Prosecutor's Allegations Were True.

One of the most egregious aspects of this case is the prosecutors' allegation that Roberson sexually assaulted Nikki. As mentioned, the prosecutors abandoned this allegation at the close of their case in chief for lack of evidence. Nevertheless, they persisted in their allegations through Dr. Allen who had been provided with offense reports suggesting sexual assault cases which were never prosecuted for lack of evidence that any crime had actually occurred. Dr. Allen failed to remove the sexual assault allegations from his risk assessment and instead proceeded to assume that they were true. In addition, Dr. Allen relied upon an unsubstantiated and unprosecuted allegation from his brother's girlfriend that she had raped her. Roberson stated truthfully to Dr. Allen that he had not raped her at all but that they instead had had consensual sexual contact. The girlfriend asked that charges against Roberson be dismissed. Nevertheless, Dr. Allen felt that this incident proved sexual aggression. (R.R. vol. 48 at 135-36, 141.)

### 12. The Two Experts Failed to Conduct a Meaningful Assessment of Mitigating Circumstances, But Said There Were None.

Both experts testified that there were no mitigating circumstances to Roberson's offense. (R.R. vol. 47 at 64.) Neither of them, however, had explored Roberson's life, reviewed his medical records, or interviewed his family, or conducted any systematic assessment orientated to identifying mitigating circumstances. They misdefined mitigation in terms of mitigation of the offense. This is not the purpose of the special issue or the Supreme Court's requirement. Mitigation is defined in

135

terms of whether there are circumstances to reduce the defendant's moral culpability or moral blameworthiness, even though he committed capital murder.

### 13. Dr. Self's and Dr. Allen's Methodology Did Not Balance Individual Assessments With Objective Psychological Information.

The position of Dr. Self and Dr. Allen that group data does not accurately take into consideration the facets of a particular defendant is incorrect and not supported by forensic psychology literature or experts. Their contentions that objective data can be ignored or minimized reveals their profound ignorance of psychology and science. "[T]he distinction between individualized as opposed to group methods is a false dichotomy, reflecting a fundamental misunderstanding of the nature of risk assessment and, more broadly, of psychology as a science." Cunningham & Goldstein, *supra,* at 428.

"Simply stated, there is no *individualized* assessment of a particular person that does not rest on group data of one sort or another. . . .  Psychology exists as a science because it provides a database regarding the behavior of groups of individuals, that is systematically and reliability obtained using the scientific method." Cunningham & Goldstein , *supra,* at 428-29 (quoting Cunningham & Reidy, in press) (emphasis in original). In other words, in order to make *any* individualized assessment of a particular person, one first must compare that person to *some group* for comparison as to whether that person is likely to be more or less violent than the group. If a State forensic psychologist cannot explain what objective group data he is using for comparison, then it means that the psychologist is merely comparing the capital defendant to some generalized impression the psychologist has of some vague larger group. This is Voodoo, not science. "The question then is not whether individualized risk assessment will be based on group data, whether

136

applied by an uninformed jury or expert testimony.  Instead the issue is whether the grouping provides empirically sound group data regarding the likelihood of prison violence."  Cunningham & Goldstein*, supra,* at 429 (quoting Cunningham & Reidy, in press).

### 14. Drs. Self and Allen Incorrectly Argued That Roberson Does Not Match the Reference Group in Some Fashion.

A second excuse commonly made by State forensic psychologists is to contend that the capital defendant on trial does not match the larger reference group in some fashion.  This is an argument made by Drs. Self and Allen.  Such arguments carry little weight in forensic psychology circles.

There are always "the inevitable unique features of the individual case."  Cunningham & Goldstein*, supra,* at 429.  However, the "critical issue is not the presence of some *unique* features in the instant appraisal, rather whether there is sufficient *commonality* in the characteristic of interest for the general research to accurately generalize to the specific case."  Cunningham & Goldstein *, supra,* at 429 (quoting Cunningham & Reidy, in press) (emphases in original).  In other words, it is always true that each capital murder and each capital murder defendant is unique.  The issue is not whether the man on trial is unique, but whether he has something in common with those already in prison for capital murder who are known to be violent.   "All applications of scientific data involve this generalizing from the broader research to the specific case," so it is meaningless to say that a particular capital defendant is unique.  Cunningham & Goldstein *, supra,* at 429.  Instead, the current science in forensic psychology requires holding the defendant on trial up to the bright light  of objective group data.  "[G]roup data on the institutional violence frequencies of capital offenders generalize well to most capitally charged defendants."  Cunningham & Goldstein *, supra,* at 429.

"Base rates of violence among capital offenders in a general prison population have reflected remarkable consistency across varying correctional settings, capital statutes, and periods of the past century, . . . ."  Cunningham & Goldstein, *supra,* at 429.

> **15.** **Drs. Self and Allen Failed to Adjust Their Final Risk Estimate For Risk Management or Violence Prevention/Reduction Procedures That Could Be Applied.**

Next, the two experts failed to take into consideration the tools available to TDC to manage Roberson and reduce violence.  He would have been housed in a maximum security unit, with trained guards, including females, careful transporting, segregation, a system of rewards and punishments, and limited contact.

> **16.** **Dr. Allen Improperly Compared Roberson to Heinous Criminals and Placed Him in the Same Category.**

It is reprehensible that Allen found comparison of Roberson to Hitler, Saddam Hussein, and other serial or mass killers.  The effect was to deny Roberson individual sentencing required by the Supreme Court by lumping him with the worst of the worst.  It goes without much mention that Allen does not have any psychological studies on any of those to whom he compared Roberson.

> **17.** **Both Experts Failed to Define Their Terms Properly.**

Both experts were sloppy in their terminology.  A risk assessment in a capital case addresses one question only: is there a probability that the defendant will engage in material violence against another human in the future which will constitute a threat to prison society.  What the experts did was to redefine this question into a "future dangerousness" assessment.  The jury does not decide whether there is a probability that a defendant will be a future danger because the answer to this question is always yes.  There is always a risk that someone who has committed murder will be a

danger at sometime in the future. The question is most specific: will there be material violence in prison.

### 18. Drs. Allen and Self Lacked the Forensic Psychology Qualifications to Undertake a Risk Assessment of Roberson.

Dr. Allen's qualifications are mixed. He has never worked at with offenders on death row. His TDC experience consisted of working as a psychologist at the Rusk State Hospital in Rusk, Texas. (R.R. vol. 48 at 117.) He said that he participated in 800 to 1000 risk assessments at Rusk State Hospital. (R.R. vol. 48 at 117-18.) However, what he failed to discriminate is that there is a world of difference between assessing the risk of mentally ill inmates in an institutional setting and capital murderers in a maximum security setting. He has made his living in Tyler conducting inmate evaluations, mostly for the State, sometimes for the defense. He has been involved in interviews or testimony in 40 to 50 capital cases in Texas. (R.R. vol. 48 at 118.) He has never published any peer reviewed papers in forensic or general psychology.

The same is true for Dr. Self, who is a psychiatrist with the Rusk State Hospital in Rusk, Texas and has no relevant experience beyond that. (R.R. vol. 48 at 156.) Nothing in his experience or training involved assessing violence of murderers

---

## SCIENCE DOES NOT SUPPORT
## PREDICTIONS OF FUTURE DANGEROUSNESS

It is <u>never</u> possible to make meaningful forecasts of future dangerousness under any conditions because such predictions have never been proven to be scientifically reliable. What follows below are the arguments of this second school of thought. Roberson contends that the

assessments of Dr. Self and Dr. Allen should never have been admitted because their opinions were not based on any science at all.

## I. The Psychology Profession Does Not Recognize Predictions of Future Dangerousness in Capital Cases.

Drs. Self and Allen claimed that they were able to do what their profession as a whole recognizes cannot be done: reliably predict future dangerousness. The APA Task Force on the Role of Psychiatry in the Sentencing Process pointed out that "[c]onsiderable evidence has been accumulated by now that long-term prediction by psychiatrists of future violence is an extremely inaccurate process."[25] The APA Task Force on Clinical Aspects of the Violent Individual concluded "the ability of psychiatrists or any other professionals to reliably predict future violence is very unsatisfactory."[26] Yet, the two psychologists continue to assert the accuracy of their predictions.[27]

In an *amicus curiae* brief filed in *Barefoot v. Estelle*,[28] the American Psychiatric Association minced no words in arguing to the Supreme Court why testimony such as these psychologists should not be allowed in capital cases:

> Psychiatrists should not be permitted to offer a prediction concerning the long-term future dangerousness of a defendant in a capital case, at least in those circumstances where the psychiatrist purports to be testifying as a medical expert possessing predictive expertise in this area. Although psychiatric assessments may permit

---

[25]Task Force Report at p. 14.

[26] American Psychiatric Association, Task Force Report No. 8: "Clinical Aspects of the Violent Individual" (July 1974).

[27]Portions of these arguments were written by Richard Ellis, attorney, to whom counsel for Roberson expresses appreciation.

[28] *Barefoot v. Estelle,* 463 U.S. 880 (1983), *Amicus Curiae* Brief of the American Psychiatric Association. (Exhibit 93 herein).

short-term predictions of violent or assaultive behavior, medical knowledge has simply not advanced to the point where long-term predictions---the type of testimony at issue in this case--may be made with even reasonable accuracy. The large body of research in this area indicates that even under the best of conditions, **psychiatric predictions of long-term future dangerousness are wrong in at least two out of every three cases.**

Brief, at 8-9 (emphasis added).

Analyses not based on clinical exams are rejected by the APA. Despite the fact that literature in the mental health field requires a face-to-face examination and consistently recommends using a full battery of tests when diagnosing a patient, the two psychologists merely met with Roberson for 2.5 hours each, without an attorney. Although short interviews are better than no interviews, the scant examinations cannot be sufficient to conduct meaningful testing or risk assessment. This method has been rejected by the APA Task Force on Sentencing. The Task Force stated in its report, aimed at future dangerous assessments when *no* interviews take place:

> While the Supreme Court has ruled that such testimony may be admissible there is good reason for psychiatrists to shun such practices. The accuracy of such a report or testimony based on limited information and unsupported by the many clinical conferences that can be made by first-hand examination of the defendant is questionable. In situations in which such testimony is allowed, it is *imperative* that the psychiatrist fully acknowledge *all of the scientific limitations of opinions which are not based on clinical examination.* Report at 15 (emphasis added).

In its *amicus* brief in *Barefoot*, the APA judges such methods even more harshly:

> Even if psychiatrists under some circumstances are allowed to render an expert medical opinion on the question of future dangerousness, amicus submits that they should *never* be permitted to do so unless they have conducted a psychiatric examination of the defendant...a diagnosis simply cannot be made on the basis of a hypothetical question. Absent an in-depth psychiatric examination and evaluation, the psychiatrist cannot exclude alternative diagnoses...as a result, he is *unable to render a medical opinion with a reasonable degree of certainty.* Brief at 9.

The State of Texas will argue that Drs. Self and Allen did in fact conduct psychiatric examinations of Roberson which satisfy *Daubert*'s requirements. Although it is true that unlike some State forensic psychologists who are willing to make future dangerousness assessments without any examination of the defendant, it is true that Drs. Self and Allen at least met with Roberson, which is an improvement. Dr. Allen in the past has testified for the State predicting future dangerousness in capital trials in which he did not examine the defendant. Nonetheless, in Roberson's case, the paucity of the examinations of the two psychologists and their obvious bias in favor of reaching a predetermined opinion before they drove to Palestine for the trial, indicates that their examinations were perfunctory and cannot qualify as *Daubert* approved scientific methodology.

**J.    The Testimony of Dr. Allen and Dr. Self Violates the Requirement of Scientific Reliability Mandated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and *Kumho Tire v. Carmichael.***

In *Barefoot v. Estelle,* the Supreme Court ruled--over the protestations of the American Psychiatric Association--that admitting opinion testimony based on a hypothetical to predict future dangerousness did not violate due process. 463 U.S. 880, 904, 905 (1983). Essentially, it found that the jury was capable of independently evaluating the strength of such scientific testimony. *Id.* at 898, 899.

However, in *Daubert v. Merrill-Dow Pharmaceuticals, Inc.,* 113 S. Ct. 2786 (1993), the Supreme Court continued the trend it began in *Rock v. Arkansas,* 483 U.S. 449 (1987), rejecting the unfettered introduction of scientific testimony and acknowledging the need for the trial court's gatekeeping role missing from *Barefoot.*

In *Daubert,* the Supreme Court ruled that the "*Frye*"[29] requirement that such evidence be 'generally accepted" in the field to which it belongs must be superceded by the requirements of Federal Rule of Evidence 702. *Id.,* 113 S. Ct. at 2794. Rule 702, the Court concluded, does not make "general acceptance" an absolute prerequisite to admittance, for doing so would "be at odds with" the 'general approach of relaxing the traditional barriers to opinion testimony." *Id.,* 113 S. Ct. at 2794, citing *Beech Aircraft v. Rainey,* 488 U.S. 153, 169 (1988).

Thus, the Court replaced *Frye* by placing the onus on the trial judge to determine "whether the expert is proposing to testify to (1) 'scientific knowledge' that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert,* 113 S. Ct. at 2796. "Scientific" is defined as having "a grounding in the methods and procedures of science[,]"; "knowledge" as "more than a subjective belief or unsupported speculation." *Id.* at 2795.

To balance out this expansion of admissibility standards, the *Daubert* Court explicitly assigned to the trial judge the gate keeping task of making this initial assessment, and the task of monitoring its use if the court allows it to be heard. *Id.* at 2795-96. With regard to "gate keeping," the *Daubert* Court now requires the trial judge to make a preliminary assessment of the evidence *outside the presence of the jury* to see that it meets the two pre-requisites outlined above. *Id.*

If the evidence is admitted, the trial court's monitoring function begins. This monitoring should work to assure and encourage "[v]igorous cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof"---for those are "the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 2798.

---

[29] *See Frye v. United States,* 293 F. 1014 (D.C. 1923).

The monitoring process continues after the testimony is heard. If the trial judge concludes that the evidence, though already admitted, is nonetheless "insufficient to allow a reasonable juror to conclude that the position [taken] more likely than not is true, the court remains free to direct a judgment..." *Id.* at 2798. In other words, not even admissibility guarantees that this information can ultimately present a jury issue.

In *Jurek v. Texas*, the Supreme Court conditionally permitted a jury to make its own prediction of a capital defendant's future dangerousness upon its "hav[ing] before it all possible relevant information about the individual defendant whose fate it must determine." 428 U.S. 262, 274-76 (1976). Likewise, in *Barefoot v. Estelle,* the Court relied upon the "adversary system" to "uncover, recognize and take due account of [the evidence's] shortcomings"--thereby assuring due process. *See Barefoot,* 463 U.S. at 898-901.

Since then, however, the Court has deemed these methods inadequate in favor of a process that makes admissibility of scientific testimony contingent upon a showing of *reliability*--first in *Rock v. Arkansas*, 483 U.S. 44(1987), and more recently in *Daubert.* In *Rock*, the Supreme Court conditioned the admission of hypnotically-enhanced testimony (thereby conditioning recognition of hypnosis as a useful litigation tool) upon a showing of reliability. In that case, the reliability was found in the trial judge's ability to review and assess the method used by reviewing recordings of the hypnosis sessions--before the jury heard any of the testimony. *Daubert*, of course, prescribes similar gate-keeping measures. *See generally, supra.*

Based on the same principles set forth in *Rock* and *Daubert,* it has been suggested that the courts no longer give this testimony on future dangerousness such a free hand:

Although Dr. Grigson's[30] testimony is not incompetent *per se*, his testimony should not receive our judicial stamp of approval...[T]he trial judge is required to independently determine the admissibility of Dr. Grigson's testimony in each case.

*Fuller,* 829 S.W.2d at 214 (Baird, J., concurring and dissenting).

State courts across the country already have found that purported expert scientific opinions based on hypothetical scenarios fail the *Daubert* requirements.[31] Likewise, in applying the *Daubert* standards, Dr. Self's and Dr. Allen's testimony in Roberson's case fails the prerequisite test. His methodology does not have a known or potential error rate, is not accepted in the scientific community, has not withstood peer review, and cannot be fully tested. *See Daubert,* 113 S. Ct. At 2796-97.

### K.     The *Rock/Daubert* change in the law has Eighth Amendment implications as well.

---

[30]   Dr. Grigson, who gave testimony in many Texas cases was expelled from the American Psychiatric Association in 1995 for making predictions of future dangerousness without ever having personally examined the defendant. *See Flores v. Johnson,* 210 F.3d 456, 467 n. 16 (5th Cir. 2000)(*per curiam*)(Garza, J., concurring); Laura Beil, *Groups Expel Psychiatrist Known for Murder Cases, The Dallas Morning News*, July 26, 1995, at 21A; *Dr. Death Loses 2 Memberships Over Ethics Accusations, The Fort Worth Star-Telegram*, July 27, 1995, at A25.

[31]   For instance, the Supreme Court of New Hampshire looked to *Daubert* in rejecting a psychologist's conclusion about a child being the victim of sexual abuse based on the expert's "blind interpretation" of the child's drawings from the witness stand. *State v. Luce,* 628 A.2d 707, 709 (N.H. 1993). In particular, it grounded its *Daubert*-ian finding of unreliability on the fact that the expert "had not reviewed the drawings prior to trial, had no knowledge of the circumstances surrounding their creation, and had not interviewed the child who drew them. *Id.* (Conviction reversed). *See also People v. Johnson,* 19 Cal. App.4th 778, 788-91 (Cal. App. 1st Dist. [Div. 5] 1993)(citing *Daubert,* upholds trial court's preventing defense from presenting expert sociologist's testimony and other expert opinion testimony about the incredibility of prosecution witnesses on the grounds that these experts had not been shown to "research the particular inmates in question, or had made any scientific study of their credibility").

In the context of a capital criminal prosecution, the change in the law governing scientific evidence also has Eighth Amendment implications. At its core is the Eighth Amendment's demand for "heightened reliability" of capital sentencing determinations and the corresponding requirement that they be individualized.[32] In short, jurors must be able to assess fully and correctly "the character and record of the individual offender and the circumstances of the particular offense" in determining whether death is the appropriate punishment. *Woodson,* 428 U.S. at 304.

In *Penry,* the Supreme Court determined that without special instructions from the trial judge, the jury had no way to express its "reasoned moral response" to Penry's mitigating circumstances by imposing a sentence less than death. Thus, there was an unacceptable risk that Penry was sentenced to death in spite of factors that might have called for a less severe penalty. Under this analysis, the Eighth Amendment required resentencing. *Penry,* 492 U.S. at 328; *see Lockett v. Ohio,* 438 U.S. 586, 605 (1978). *Penry* made clear that the trial court has an affirmative responsibility in assuring that a truly individualized and reliable sentencing determination be made in capital cases.

The central problem with Dr. Allen's and Dr. Self's analyses is the lack of individualization of Roberson against objective standards. The two experts' risk assessments were predetermined before they met with Roberson, meaning that they decided he was dangerous from looking at the State's offense reports and witness statements. Their decision was predetermined. When they did meet briefly with Roberson, the State experts did not use measurement tools proven to predict violence in prison. Moreover, during their meeting with Roberson, there was nothing he could have

___

[32] *See Woodson v. North Carolina,* 428 U.S. 280, 305 (1976) ("Because of [the qualitative difference between a term of years and a death sentence], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio,* 438 U.S. 586 (1978).

said to the two men which would have convinced them that he was not a future danger. In broad strokes Dr. Allen classified Roberson as identical to Hitler, Saddam Hussein, Ted Bundy, and other mass murders or serial killers. All of these circumstances add up to a lack of individualization. In other words, the experts based their opinion that Roberson was a future danger chiefly on the offense itself, and did not incorporate (1) objective base rate data, (2) actual conditions of maximum security prison, (3) accurate testing of Roberson with predictive tools. Under *Barefoot*, this may have been acceptable, but *Barefoot's* allowance of such testimony can no longer be considered good law in light of *Daubert*. *See* Michael H. Gottesman, *From Barefoot to Daubert to Joiner: Triple Play or Double Error?,* 40 Ariz. L. Rev. 753, 755 (1998).

All the two State experts presented was unsupported speculation, cloaked in the false respectability of "expert testimony." The improper admission of this testimony improperly swayed the jury's evaluation of Roberson's propensity for future dangerousness and moral culpability. Consequently, he was denied his right to an individualized sentencing determination under the Eighth and Fourteenth Amendments to the United States Constitution.

A decade after *Barefoot*, in *Daubert v. Merrell-Dow Pharmaceuticals, Inc,* 509 U.S. 579, 113 S. Ct. 2786 (1993), the Supreme Court shifted course, declaring that "under the [Federal Rules of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. The Court in *Daubert* found this requirement implicit in Rule 702's description of expert scientific testimony as testimony about "scientific...knowledge." Fed. R. Evid. 702. As the Court stated:

> The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any

body of ideas inferred from such facts or accepted as truths on good grounds."... Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science...But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method...In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert,* 509 U.S. at 590.

Given this shift from the qualifications of the expert and relevance to the reliability of the evidence, *Barefoot* is no longer the sole authority regarding the specific question of the admissibility of predictions of dangerousness.

### L. The Glacier Cracks: Circuit Courts Are Beginning to Question State Use of Forensic Psychologists.

"[S]everal commentators have questioned the viability of the *Barefoot* majority's analysis post-*Daubert*." *Flores v. Johnson,* 210 F.3d 456, 465, n.11 (5th Cir. 2000) (*per curiam*) (Garza, J., concurring). Courts are beginning to question whether pseudo science in the guise of forensic psychology should be admitted to justify death sentences.

Even outside the sphere of *Daubert* and the Federal Rules of Evidence, the Supreme Court is raising the requirement of reliability in similar evidentiary matters. For example in *United States v. Scheffer,* 118 S. Ct. 1261 (1998), the Court held that polygraph evidence was not admissible for the defense in criminal trials. The Supreme Court noted that "the exclusion of unreliable evidence is a principal objective of many evidentiary rules." *Id.,* at 1265. The Supreme Court has affirmed in *Kumho Tire v. Carmichael,* 119 S. Ct. 1167 (1999) that the *Daubert* factors may apply to all expert testimony, scientific or otherwise. In *Kumho Tire,* the Court also observed that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

relevant field." *Kumho,* 119 S. Ct. at 1176, cited in *Flores,* 210 F.3d at 464 (Garza, J., concurring).

As Judge Garza's concurring opinion in *Flores* indicates, psychiatric predictions of future dangerousness are rarely reliable. When the jury in this case was called upon to make the determination whether Roberson would commit future acts of violence, the inherent unreliability of psychiatric predictions of violent behavior was so great that the jury was not assisted in any way by the use of such prognostications. *See also E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995) (approving *Daubert* and requiring proponent to show relevance and reliability of scientific expert testimony). Rather their predictions belong in the realm of what has become known to the courts as "junk science."[33]

While the use of psychiatric predictions of future dangerousness is not new, such predictions remain novel in the sense of being unusual in the realm of psychiatric practice. Scientific endeavors are not frozen in time: theories that in one era are widely approved may be later disproved, and the historical respect accorded them should not create an automatic presumption of admissibility.

---

[33] *See* Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom* (1991); *Brock v. Merrell Dow Pharmaceuticals*, 884 F.2d 167 (5th Cir. 1989); *Lust by and through Lust v. Merrell Dow Pharmaceuticals*, 89 F.3d 594 (9th Cir. 1996); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 554 (Tex. 1995) (discussing need to stem the flow of "junk science" and "kitchen chemistry" in our courts). *See also* Odom, J., quoted in George E. Dix, *The Death Penalty, "Dangerousness," Psychiatric Testimony, and Professional Ethics*, 4 Am. J. Crim. Law 151, 164: "I am unable to find that much of the testimony offered [regarding future dangerousness] was from this side of the twilight zone." Judge Garza commented on the reliability of such predictions as follows: "[o]ne commentator recently reviewed the psychological research on the issue post-*Barefoot* and concluded that "whereas first generation research suggested that perhaps one out of three people predicted to engage in some kind of violent behavior will actually go on to do so, more recent studies suggest that one out of every two people predicted to be violent would go on to engage in some kind of legally relevant, violent behavior." Randy Otto, On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature, 18 LAW. & PSYCHOL. REV. 43, 63 & n.63 (1994)." *Flores, supra,* 210 F.3d at 465, n. 11.

"[Science] is advanced by a broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance." *Daubert*, at 597.

In light of the acknowledgment in *Daubert* that scientific thinking can be called into question as the passage of time brings out its weaknesses, the precedential value of *Barefoot* can no longer be considered constitutionally valid. The trend toward exclusion of unreliable evidence, even evidence claimed to be scientific in basis, is a growing one, and one which tends to promote trustworthy fact-finding. *See United States v. Scheffer*, 118 S. Ct. 1261 (U.S. (1998) (exclusion of polygraph evidence promoted interest in reliability of trial process).

Predictions of future dangerousness are not the product of any legitimate scientific research, methodology or practice. They have no legitimate medical purpose. The error rate for such "scientific" predictions is far higher than if the jury chose to "predict" future dangerousness by flipping a coin.[34] *See Ohio Adult Parole Authority v. Woodard*, 118 S. Ct. 1244, 1254 (1998) (concurring opinion of O'Connor, J.) (it would be due process violation to make clemency decision on basis of a coin toss). In light of the considerably lesser due process rights that attach to clemency proceedings, there certainly would be a due process violation for a sentencing decision to be based on a prediction that has even less reliability than a coin toss. No professional literature accepts the practice of making predictions of future dangerousness based on hypothetical questions. In fact, the

---

[34] *See* American Psychiatric Association Task Force Report, Clinical Aspects of the Violent Individual 28 (1974) "90% error rate [u]nfortunately ... is the state of the art").

psychiatric community utterly rejects the practice.[35]  They are in fact the antithesis of the types of scientific evidence upon which the courts have traditionally chosen to rely:

> The scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness is, to put it bluntly, unreliable and unscientific.  It is as true today as it was in 1983 that "[n]either the Court nor the State of Texas has cited a single reputable scientific source contradicting the unanimous conclusion of professionals in this field that psychiatric predictions of long-term future violence are wrong more often than they are right."  *Id*. at 920, 103 S. Ct. at 3409 (Blackmun, J., dissenting) (citing studies). As those in the field have often noted, nothing within the training of a psychiatrist makes him or her particularly able to predict whether a particular individual will be a continuing threat to society...  In fact, not even the *Barefoot* majority could identify a "scientific" basis for predictions of future dangerousness;  its opinion expressly rests on the analysis that "even a lay person" could make such predictions.

> *Flores, supra,* 210 F.3d at 463-464 (Garza, J., concurring).

The inherent unreliability of these predictions is made still more prejudicial by the fact that juries may be influenced by the mere labeling of a witness as "expert," with the connotations of scientific impartiality and learned authority that appellation brings.  "[T]o the jury an expert is just an unbridled authority figure, and as such he or she is more believable."  Charles R. Richey, *Proposals to Eliminate the Prejudicial Effect of the Use of the Word "Expert" Under the Federal Rules of Evidence*, 154 F.R.D. 537, 544 (1994).  Although the traditional methods of attacking scientific evidence -- vigorous cross-examination or the presentation of rebuttal evidence -- remain available, some commentators contend that "ostensibly scientific testimony may sway a jury even

---

[35]American Psychiatric Association, *Draft Report on the Role of Psychiatry in the Sentencing Process*, 32-33: "Needless to say, responding to hypotheticals is just as fraught with the possibility of error as testifying in any other way about an individual whom one has not personally examined.  *Although the courts have not yet rejected the practice, psychiatrists should.*" (Emphasis added).

when as science it is palpably wrong." Black et al., *Science and the Law in the Wake of Daubert: A New Search for Scientific Knowledge*, 72 Tex. L. Rev. 715, 801 (1994).

The Supreme Court in *Daubert* outlined five non-exclusive factors to assist trial judges in determining the reliability, and hence admissibility of scientific evidence: Those factors are:

(1) whether the theory has been tested,
(2) whether the theory has been subjected to peer review and publication,
(3) the known or potential rate of error
(4) the existence of standards controlling the operation of the technique, and
(5) the degree to which the theory has been generally accepted by the scientific community.

*Daubert,* 509 U.S. at 593-94, 113 S. Ct. at 2796-97; *Flores,* 210 F.3d at 464.

As pointed out in Judge Garza's concurring opinion,

it appears that the use of psychiatric evidence to predict a murderer's "future dangerousness" fails all five *Daubert* factors. First, "testing" of these theories has never truly been done, as "such predictions often rest ... on psychiatric categories and intuitive clinical judgments not susceptible to cross- examination and rebuttal." *Barefoot*, 463 U.S. at 932, 103 S.Ct. at 3414-15 (Blackmun, J., dissenting)... *see also* APA Br. at 17 ("Because most psychiatrists do not believe that they possess the expertise to make long-term predictions of dangerousness, they cannot dispute the conclusions of the few who do."). Second, as is clear from a review of the literature in the field, peer review of individual predictions is rare, and peer review of making such predictions in general has been uniformly negative. *See, e.g.*, Grant Morris, *Defining Dangerousness: Risking a Dangerousness Definition*, 10 J. CONTEMP. LEGAL ISSUES 61, 85-86 (1999) (citing studies) ("More than twenty years ago, Alan Stone acknowledged that psychiatrists cannot predict whether a person will engage in dangerous behavior with a certainty, or beyond a reasonable doubt, or by clear and convincing evidence, or even by a preponderance of the evidence. As to clinically-based predictions of dangerousness, the passage of time has not altered the accuracy of Stone's judgment."). Third, the rate of error, at a minimum, is fifty percent, meaning such predictions are wrong at least half of the time... Fourth, standards controlling the operation of the technique are nonexistent. See APA Br. at 13 (noting that "the professional literature demonstrate[s] no reliable criteria for psychiatric predictions of long-term future behavior"). Overall, the theory that scientific reliability underlies predictions of future dangerousness has been uniformly rejected by the scientific community absent those individuals who routinely testify to, and profit from, predictions of dangerousness.

*Flores, supra,* 210 F.3d at 463-64 (Garza, J., concurring).

It is axiomatic that capital cases require a heightened degree of reliability in their resolution, because of the grave consequences of a flawed decision at the sentencing phase.[36]  As Judge Garza points out in his concurring opinion, although in federal courts the rules of evidence do not apply at a sentencing hearing,

> the cardinal concern of the rules of admissibility for expert testimony--reliability, *see Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794 ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.")-- is also the paramount concern in addressing the constitutionality of capital sentencing procedures.  This cannot be mere coincidence.

*Flores, supra,* 210 F.3d at 464, n.10 (Garza, J., concurring).

Widely recognized in the condemnation of such testimony is the danger that an unreliable opinion, when clothed in an unwarranted aura of legitimacy, actually misleads the jury:

> As some courts have indicated, the problem here (as with all expert testimony) is not the introduction of one man's opinion on another's future dangerousness, but the fact that the opinion is introduced by one whose title and education  (not to mention designation as an "expert") gives him significant credibility in the eyes of the jury as one whose opinion comes with the imprimatur of scientific fact.  As has been previously recognized, when a medical doctor testifies that "future dangerousness" is a scientific inquiry on which they have particular expertise, and testifies that a particular defendant would be a "continuing threat to society," juries are almost always persuaded.

*Flores, supra,* 210 F.3d at 465-66 (Garza, J., concurring).

---

[36] *See, e.g.,  Gardner v. Florida*, 430 U.S. 349, 359 (1977)("time invested in ascertaining the truth would surely be well spent if it makes the difference between life and death");  *Woodson v. North Carolina*, 428 U.S. 302, 305 (1976)(because of qualitative difference between death and life, there is correspondingly heightened need for reliability in determination that death is appropriate punishment); *Caldwell v. Mississippi*, 427 U.S. 325, 333 (1985) (intolerable danger presented when jurors tempted to minimize importance of their role, and to rely on authority of others to make sentencing decision).  *See also Dawson  v. Delaware,* 503 U.S. 159 (1992)(where state could not prove rational connection between evidence and aggravating circumstance, introduction of evidence was constitutional error).

Applying this analysis, Judge Garza outlines the unduly prejudicial effect the virtually exactly identical testimony had in that case:

> The testimony of Dr. Griffith, who has never met Flores, is particularly assailable. First, Griffith testified that Flores's "character and crime" made him a future danger without ever examining him. The practice of predicting future dangerousness without an individualized meeting with the subject is, while acceptable under Supreme Court precedent... condemned by most in the field as inherently unreliable and unscientific as well as unethical... In fact, one psychiatrist notorious for predicting dangerousness without examining the subject, Dr. James Grigson, has been evicted from the American Psychiatric Association for ignoring repeated warnings to stop the practice... In this case, not only did Griffith testify that he could accurately predict a defendant's future dangerousness from a hypothetical, but he also told the jury that actually examining the defendant is "a hindrance in comparison to a hypothetical question.

*Flores, supra,* 210 F.3d at 466-67 (Garza, J., concurring).

Judge Garza continued his analysis of the prejudicial effects of this testimony:

> Second, Griffith's deduction, with certainty, that Flores would be a "future danger," was based exclusively on the facts surrounding Flores's crime...The Court of Criminal Appeals noted that Griffith's conclusion that Flores was not remorseful was based on the fact that "[t]here was no evidence ... from which he could deduce any remorse or concern or the victim." *Flores,* 871 S.W.2d at 716. Given that Griffith never spoke to Flores, the fact that he failed to find "evidence" of any given personality trait is not surprising. Griffith's testimony to the extent that an individual with this "personality" would be dangerousness, moreover, was based on the "personality" of someone who would commit this unprovoked murder in general, not Flores's personality in particular.

> In fact, as noted by the dissent on direct appeal, Dr. Griffith's testimony on cross-examination revealed his feeling that he could predict an individual's future dangerousness merely by knowing their crime, and his belief that anyone who committed capital murder in general, or murder in the course of sexual assault in particular, would be a "future danger" simply for the fact that they committed that particular crime. *See Flores*, 871 S.W.2d at 724 (Clinton, J., dissenting).

*Flores v. Johnson,* 210 F.3d 456, 467-468.

In short, as the concurring opinion points out,

Dr. Griffith testified that Flores would be a "future danger," without examining Flores, because one with the "personality" to commit the crime Flores committed would be a "continuing threat to society." Based almost exclusively on this testimony, and irrespective of Flores's complete lack of a criminal record, family abuse, or truculent past, the jury answered "yes" to the second special issue. Accordingly, Flores was sentenced to death.

*Id.,* at 468.

This does not satisfy the Supreme Court's repeated insistence on

an individualized sentencing hearing, *see, e.g., Lockett v. Ohio,* 438 U.S. 586, 604 (1978), "[i]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. Only then can we be sure that the sentencer has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence." *Penry*, 492 U.S. at 319, 109 S.Ct. at 2947, 106 L.Ed.2d at 279 (emphasis added) (citations omitted); see also *Woodson*, 428 U.S. at 304, 96 S.Ct. at 2991 ("A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.").

*Id.* at 469.

As Judge Garza writes,

what separates the executioner from the murderer is the legal process by which the state ascertains and condemns those guilty of heinous crimes. If that process is flawed because it allows evidence without any scientific validity to push the jury toward condemning the accused, the legitimacy of our legal process is threatened. The Supreme Court has made clear that the constitutionality of a state's capital sentencing scheme is dependent on the individualized basis in which defendants are considered. I question whether that concern for individuality exists under a system which not only admits expert testimony deduced without examining the subject but also, as in this case, accepts the possibility that jurors will allow that evidence, rather than factors more personal to a defendant's crime and character, to effectively condemn that individual to death.

*Flores, supra,* at 469-470.

The gravity of the flawed sentencing decision in this capital case is such that Roberson must at least be granted a new sentencing phase, as *Barefoot* is no longer constitutionally valid in light of *Daubert* and *Kumho Tire*. "Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly ... Conjectures that are probably wrong are of little use ... in a quick, final and binding judgment -- often of great consequence -- about a particular set of events." *Daubert,* 509 U.S. at 597.

### PART III: THE FINDINGS AND CONCLUSIONS BY THE STATE COURT ARE NOT REASONABLE APPLICATION OF EXISTING FEDERAL CONSTITUTIONAL LAW. CONSEQUENTLY, RELIEF IS NOT BARRED BY THE AEDPA.

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally

defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more

of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi,* 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky,* 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen,* 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

- if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or

successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

### Conclusion.

Dr. Self's and Dr. Allen's examination of Robert was extremely limited and insufficient to support an opinion that he was a future danger to society. Their unfocused testimony cannot be supported by any acceptable scientific methodology and therefore Roberson's case must be returned for a new sentencing hearing.

### Claim Number 9: Roberson Received Ineffective Assistance of Counsel In the Sentencing Phase of Trial in Violation of the Sixth Amendment and Fourteenth Amendment to the Federal Constitution, By Failing to Challenge Adequately State's Forensic Psychology Testimony That Roberson Would Constitute a Future Danger.

Roberson received ineffective assistance of counsel in the sentencing phase of his trial. Consequently, there was a violation of the Sixth and Fourteenth Amendment right to counsel. If necessary to avoid procedural default, Roberson also argues that IAC by his trial and appellate attorney establishes causes and prejudice to avoid the default. Roberson was denied a hearing on his IAC claim in state court and requests a federal evidentiary hearing in which the attorneys may testify.

### A. Failure to Show Jurors That Testimony of Dr. Allen and Dr. Self, State's Forensic Psychologists, Was Unsubstantiated by Science.

Trial counsel did not effectively cross examine or rebut Dr. Allen and Dr. Self, although the fields for undermining their credibility were abundant. To consider this claim, one must consider first the challenges above to the paucity of science supporting the two experts' testimony that

Roberson would commit future acts of violence. Those arguments are incorporated here by reference. In addition, incorporated by reference, are stacks of peer reviewed forensic psychology articles which are attached to this application of which counsel should have been aware and used to cross-examine Allen and Self.

For more than 50 pages in this application, Roberson made several points. First, he argues that forensic psychology does not recognize or accept the practice of psychologists who claim the ability to review a capital case file and predict whether a defendant will be violent in the future. Second, he argues that even to the extent that the profession recognizes capital risk assessments, the profession has created a methodology for doing so. Third, Roberson argues that neither Dr. Self nor Dr. Allen followed the accepted methodology. Fourth, Roberson shows that Dr. Self and Dr. Allen made up their own methodology which has not be validated by any aspect of forensic psychology. And finally, fifth, Roberson explained that even their own ad hoc methodology did not support the two men's prediction that Roberson would be violent in prison.

All of these arguments were available to Roberson's trial counsel who did not make them. The research was available. Dr. Goodness is a fine psychologist and was certainly abreast of current research and means of attacking the opinions and methodology of Dr. Allen and Dr. Self. Trial counsel could have devoted most of a day to unmasking Dr. Allen with a bit of preparation and methodical cross-examination. There was ample advance notice that Dr. Allen and Dr. Self would testify for the State that Roberson would act violently in the future. They were first formally disclosed on August 21, 2002. (C.R. vol. 3 at 332.) It is not hard to obtain copies of transcripts of their testimony in other trials.

Given their damaging and intriguing testimony, there could not be a trial strategy for failing to challenge the experts' testimony at every step. One positive aspect of Dr. Allen's testimony was that he classified Roberson as a minimal risk of violence in prison, which is true. It may be that the trial counsel was willing to accept this verdict – pulled from the weeds as it was of Dr. Allen's other testimony and work. However, even this modest but useful concession cannot justify failing to challenge Dr. Allen on every other damaging point he made to jurors.

Here are examples of preparation work which was not performed:

1. Failure to serve Allen and Self pretrial with subpoenas duces tecum for the following:

    a. Their curricula vitae;

    b. All published articles or treatises which support the experts' claims. Allen and Self have testified many times and their statements are predicable. An attorney could have anticipated easily what they planned to say at Roberson's trial and planned accordingly:

        1. That there is an accepted methodology for predicting future prison violence by inmates;

        2. That there is a relationship between affective violence and instrumental violence for predicting future prison violence by inmates;

        3. That identify the risk factors useful for predicting future prison violence by inmates.

    c. The scoring sheets for Allen's scoring of Roberson on the Hare PCL-R.

    d. The Hare PCL-R manual used by Allen.

    e. The Hare PCL-R scoring criteria used by Allen. This is a separate publication which Allen did not purchase or use.

    f. All documents received from any source and reviewed by the experts.

2. Failure to prepare copies of published research which directly contradicted Allen's and Self's assertions.

3. Failure to secure Allen's and Self's previous testimony to show that in Roberson's trial they have contradicted previous testimony.

4.  Failure to secure Allen's and Self's curricula vitae before trial and researched their resumes to assure that their qualifications were valid. The attorney could have subpoenaed their college transcripts, and master and doctoral theses, which by the experts' descriptions do not add to their capital forensic qualifications. It is unlikely that these experts have ever taken any accredited courses on capital forensic psychology.

5.  Failure to file motions for a Rule 703 hearing prior to the trial so that the qualifications and methodology of the two experts could have been explored completely. Before trial, the court would not have been able to assess the opinions by the two experts because their work was not complete until they interviewed Roberson, but a pre-trial hearing would have demonstrated their lack of an accepted methodology. By securing a hearing in advance of trial, the attorneys would have learned that Allen planned no objective testing of Roberson other than the Hare PCL-R and could have focused their attack.

6.  Failure to demand a preliminary written report from Allen and Self summarizing the documents reviewed, and their preliminary assessments of Roberson.

7.  Failure to file *Daubert* motions to quash junk science testimony entirely because it lacks support by forensic psychology. These motions would have provided a legal basis for evaluating the experts' claims and methodology. The trial court would have obtained a better working understanding of pseudo psychology. The motions would also have preserved appellate review and avoided the risk of procedural default.

8.  Failure to challenge Dr. Allen's lack of training to conduct the Hare PCL-R, the critical aspect of his opinions. The purpose of a *Daubert* hearing is to test whether an expert has qualifications to conduct the testing he claims is vital. During the brief *Daubert* hearing, the attorney did not explore Allen's competence to carry out the test. Jurors learned this by accident when the prosecutor asked the wrong question, and Dr. Allen admitted that he had never received training on how to use the Hare PCL-R. (R.R. vol. 48 at 124.) At this moment, the attorney should have moved to exclude Allen's opinions and the results of the Hare PCL-R.

9.  Although he admitted having no training on the Hare PCL-R other than one seminar, he immediately claimed, "Oh sure, I've been doing this a long time so, you know, I deal with a lot of antisocial personalities and a lot of psychopaths." (R.R. vol. 48 at 125.) The attorney should have objected and sought to exclude Allen's testimony as *Daubert* unqualified.

**B.      Failure to Cross-Examine Dr. Allen Effectively.**

At trial, even without preparation work, there were abundant aspects of Allen's testimony which should have been challenged through cross-examination, or objected to fiercely:

1.     When asked whether to explain his death penalty / capital litigation experience, Dr. Allen went on a detour. He instead discussed experience at Rusk State Hospital, which does not house capital inmates. (R.R. vol. 48 at 117.) It is true that Rusk has sections for maximum security inmates who may be serving life sentences for murder. But death row inmates are *never* taken to Rusk. All mental health treatment is provided at the Polunsky Unit, and formerly the Ellis Unit. Dr. Allen went on to state that he had conducted 1,000 risk assessments. (R.R. vol. 48 at 117-18.) These were not capital murder risk assessments. Most of these were merely mental health assessments of non-capital inmates of which risk of violence was only one component of review. Finally, after all of this trivia, Dr. Allen stated that his capital experience was limited to 40 or 50 capital murder cases.

2.     When asked to break down the 40 or 50 capital murder cases on which he worked, Dr. Allen did not answer and should have drawn a non-responsive objection. (R.R. vol. 48 at 118.) Instead, he said that he is sometimes hired by defense and sometimes by the State. He was not cross-examined on this point to show that his testimony is overwhelmingly for the State. Dr. Allen is well known for his State testimony of future dangerousness.

3.     Dr. Allen was vulnerable to his profession's cannon of ethics, which imposes requirements discussed above. *See supra* at ?. The attorney should have listed the specific requirements and forced Allen to admit that he had not complied.

4.     Dr. Allen and Dr. Self should have been forced to explain precisely their methodology for assessing one issue and one issue only: prediction of future acts of serious violence in maximum security prison units by capital murder defendants. Stripped of irrelevant information, their methodology would have appeared weak.

5.     Dr. Allen and Dr. Self should have been forced to present to jurors the copies of research articles or treatises which confirm that their methodology is valid and has predictive value. Limited solely to prediction of future acts of serious violence in maximum security prison units by capital murder defendants, Drs. Allen and Self would have been forced to admit that no supporting research exists, and their credibility and careers would have been at an end.

6.     When ask to explain how he conducts risk assessment, Dr. Allen provided a vague and sloppy summary. (R.R. vol. 48 at 121.) He should have been forced to explain his methodology step by step and identify the documents on which he relied for each step.

7.      When asked whether he evaluated information about Roberson in context of risk factors, Allen was not forced to identify the risk factors and point to research which validates that the risk factor indeed is predictive of future acts of serious violence in maximum security prison units by capital murder defendants. (R.R. vol. 48 at 121.) Remember, a risk factor is not a valid risk factor unless it separates Roberson from all of the other inmates in a maximum security prison. For instance, almost all inmates have past substance abuse so substance abuse has not been validated as a risk factor, because there are rarely drugs in maximum security units.

8.      Dr. Allen tried to align himself with Dr. Kelly Goodness by stating that his methodology was identical to hers. (R.R. vol. 48 at 121.) This is not true and Allen should have been cross-examined fiercely. Allen had not spoken to the number of witnesses Goodness did. He did not take into consideration Goodness' report or findings. Allen's review of documents show signs that he was cursory and predetermined, while Goodness appears to have been systematic and thorough.

9.      Dr. Allen testified that he applied the Hare Psychopathy Checklist Revised. (R.R. vol. 48 at 122.) He should have been carefully cross examined about his application of Hare PCL-R:

   a.      It was important to know which version Allen had;
   b.      It was necessary to know whether he had the current version;
   c.      It was vital to know whether Allen had the current scoring criteria or used his own intuition.

10.     Dr. Allen was never asked to produce his scores for the Hare PCL-R. It was vital to obtain Allen's scores for each question. The Hare PCL-R is not terribly complicated to use or understand. There are 20 categories of personality traits. Each trait receives one of three scores: 0, 1 or 2. Then one adds up the score. Maximum is 40 points. 30 is the cutoff for predicting recidivism of a parolee or probationer. There is a level of uncertainty (called standard deviation) of plus or minus 3 to 4 points either way. Therefore, a 34 score could reflect a true score of as low as 31 or 30 or as high as 37 or 38.

11.     Dr. Allen gave Roberson the maximum for each category, which is highly suspect given the nature of Roberson's background. Had the attorney had the Hare PCL-R, he could have easily walked jurors through each category of trait and asked Allen to explain his score on each one. Jurors could have scored Roberson on their own.

12.     The attorney could then have put Dr. Goodness on in rebuttal and asked her to assign scores to each of the criteria, this time using the scoring criteria written by Dr. Hare. Roberson would have been scored under 30, further undermining Allen's credibility.

13. The trial counsel did not force Allen to explain whether he used his own intuition when scoring the Hare PCL-R or used the scoring criteria written by Dr. Hare. Probably, Allen did not have Hare's scoring criteria and instead used his own intuition. Had this been revealed, it would have forced complete exclusion of Allen's testimony. This is important. The Hare PCL-R publication consists of two publications. First is the checklist which contains information about the test and the personality categories to be assessed. The second is the scoring criteria. One can think of the scoring criteria has the answer sheet. The scoring criteria is vital to have in hand when assigning values to each personality characteristic because it is the scoring criteria which *defines* the terms in terms of point values. But the scoring criteria costs money, about $200, and it is likely that Allen did not possess it. Instead, he likely simply applied his own definition and point value in place of Dr. Hare's. This is likely to be true because if he had possessed the scoring criteria, he certainly would have mentioned it because it would have added emphasis to his conclusion. Probably, Dr. Allen does not realize that there is a second publication consisting of the scoring criteria.

14. When he described the Hare PCL-R, Dr. Allen told jurors that the test had high predictive value for risk of violence. (R.R. vol. 48 at 123, 123-24.) What he did not tell jurors, however, was that the Hare PCL-R was developed to predict risk of criminal behavior by individuals in free society, not prison. The test was designed to be used by parole boards and probation departments, not forensic psychologists in capital murder trials. The reason is because the test has never been validated as predictive of violence of inmates inside prison, and for good reason: the test measures an inmates personality characteristics which he is free to follow if he is in free society; however, in prison he is not free to follow his whims and his personality characteristics are sharply controlled.

15. Failure to find out whether Allen used the mandatory scoring criteria for the Hare PCL-R. It is highly likely that Allen did not because of his explanation as to how he administered the Hare PCL-R. When asked, he said that he combined his personal experience (or clinical judgment) with the defendant's history. (R.R. vol. 48 at 129.) If he had in fact used the mandatory scoring criteria, this would have been the logical point to mention it.

16. When Dr. Allen stated that there was no controversy in the psychology profession over using the Hare PCL-R for predicting whether an inmate was a psychopath, the trial attorney should have presented the studies which condemned the use of the Hare PCL-R for this purpose. (R.R. vol. 48 at 123.) The trial attorney attempted to do this with Dr. Mark Cunningham's chapter in the Handbook of Psychology, one of the three leading texts in the field, but did not cross-examine effectively. (R.R. vol. 48 at 144-45.)

17. The attorney attempted to cross-examine Allen by contradicting him with quotes from the Handbook of Psychology. (R.R. vol. 48 at 145.) This was an excellent approach. Unfortunately, the attorney failed to drive home the points fatal to Allen's credibility.

> [Defense]: Let me quote you from this book. The PCL-R has not been demonstrated to reliably predict serious problems among American prisons among minorities women and/or an old age parole. And it cites a number of different publications.
>
> [Dr. Allen]: Un-huh. That, I'm familiar with.
>
> [Defense]: Your are familiar, so there some controversy?
>
> [Dr. Allen]: The point you're missing is that with minorities, people are wanting, and I agree, more validation studies on minorities, especially black Americans. The statement you're reading doesn't really apply to white defendants. It's been well validated (sic) among white male defendants, not well validated among minorities, especially black Americans and women.
>
> (R.R. vol. 48 at 145.)

The attorney then gave up and shifted to another point. This was unfortunate because the attorney let Allen off the hook. It is true that the PCL-R has not been validated as predictive of future violence for minorities and women. But the attorney failed to break the statement from the Handbook down. The actual quite is this:

> The PCL-R has *not* been demonstrated to reliably predict serious violence in American prisons, among minorities and women, and or on old-age parole.
>
> Cunningham, Handbook, *supra*, at 426) (emphasis in original; citations omitted.)

These commas are important. They separate different concepts. The attorney should have read to Allen, "The PCL-R has *not* been demonstrated to reliably predict serious violence in American prisons" and then *stopped* and force Allen to admit that he was using a took which *no one* has said has predictive value for men like Roberson who were destined for prison and prison alone.

Whether it is predictive of minorities and women is irrelevant because Roberson is neither. Instead of pinning Allen down on the critical failure of his use

of the Hare PCL-R, the attorney enhanced Allen's credibility by allowing Allen to make himself appear knowledgeable about the limitations of the PCL-R.

18.     Failure to object and challenge Allen on his application of risk factors. In each instance of the risks factors discussed below, there is no research to support these claims, particularly when focused on life in a maximum security unit, the only context which mattered. Counsel should have objected to the inaccurate use of the risk factor and limited discussion solely to the context of future serious violence in a maximum security unit. It is true that in free society, the factors identified by Allen probably do point to an increased likelihood of violence. However, in prison *most of the inmates* possess these characteristics. Therefore there is no logic at all in claiming that possession of one or more of this risk factors marks the inmate as more likely than another to be violent in prison.

        a.      He claimed that possessing an antisocial personality disorder constituted a risk factor for violence in prison society, but also stated that 80% of inmates have antisocial personality disorder. (R.R. vol. 48 at 125.) Therefore by definition, antisocial personality disorder cannot constitute a risk factor which distinguishes Roberson from all other inmates and highlights him as more likely to commit future acts of violence.

        b.      He claimed that lack of remorse is a risk factor predictive of future violence. (R.R. vol. 131-32.)

        c.      He claimed that lack of empathy is a risk factor predictive of future violence. (R.R. vol. 131-32.)

        d.      He claimed that affective violence is predictive of future violence. (R.R. vol. 132.) He contradicted previous testimony which he provided in capital murder trials in which he said the opposite, that instrumental violence was more predictive than affective violence.

        e.      Allen claimed that the distinction between affective violence and instrumental violence is predictive of future violence. (R.R. vol. 132, 13-34.)

        f.      Allen claimed that the number of arrests violence is predictive of future violence. (R.R. vol. 132.)

        g.      That minor juvenile misbehavior is predictive of future violence. (R.R. vol. 132.) Allen cited truancy and possession of alcohol.

        h.      That an unstable home life is predictive of future violence. (R.R. vol. 132.)

i.      Drug use is predictive of future violence.  (R.R. vol. 132.)  Again, most inmates have abused drugs or alcohol; therefore it is not a discriminating factor.

j.      That crack use in particular is predictive of future violence.  (R.R. vol. 132.)  In free society, this is probably true, but there is no such research in the context of capital murder future violence assessments.

k.      That the number of arrests is predictive of future violence.  (R.R. vol. 132.)  A better tool would be the number of convictions, but even then, Allen did not discriminate between property crimes and violent crimes.  Roberson had almost no violence convictions, the ones which he had were minor.

19.     Failure to object to reference to psychopath testimony.  As mentioned in the challenge to Dr. Allen's testimony, see this brief page 95, the field of forensic psychology condemns the sloppy use of the term "psychopath" in capital risk assessments.

20.     Failure to challenge that the term *psychopath* is not recognized as an official personality disorder by the DSM-IV or DSM-TR as claimed by Dr. Allen.  (R.R. vol. 48 at 126.)  (Counsel is not certain about this point and has requested a copy of the DSM-IV or DSM-TR to confirm.)

21.     Failure to challenge the improper definition and use of the term *psychopath*.  Dr. Allen said that psychopath is a heightened antisocial personality disorder in which a person lacks conscience, remorse and empathy.  (R.R. vol. 48 at 127.)  This is not the definition of psychopath.  The term psychopath first of all is not a condition recognized as a psychological diagnosis by the DSM-IV or DSM TR.  No one has defined psychopath to be a heightened antisocial personality disorder.  *(See* Widiger and Corbett article attached to this application.)

22.     Failure to object to the outrageous comparison of Roberson to Hitler, Saddam Hussein, Henry Lee Lucas, Ted Bundy.  (R.R. vol. 48 at 128.)

23.     Failure to demand research in which Hitler, Saddam Hussein, Henry Lee Lucas, Ted Bundy were declared psychopaths.   (R.R. vol. 48 at 128.)  Counsel agrees that these were horrible humans, but doubts that Allen can produce any peer reviewed reports that these men were tested and found to be psychopaths.

24.     Failure to demand research to prove that psychopaths commit more crimes in maximum security units than non-psychopaths as claimed by Allen.  (R.R. vol. 48 at 128.)  In fact, there is no such research.

25. Allen told jurors that some elected officials were psychopaths, some are lawyers; others are doctors, psychologists, and jailers. (R.R. vol. 48 at 129.) These offensive comments should have drawn objections as irrelevant or prejudicial, not to mention incorrect. The point to be made in cross-examination is that the term psychopath is therefore meaningless if many psychopaths can be entirely productive and non-violent. Therefore, the classification as a psychopath is not an effective predictor of violence in a maximum security unit.

26. Failure to confront Allen with his previous testimony in which he said that instrumental violence was more predictive of future violence in prison than affective violence. In fact, neither have been shown to be predictive of future violence in prison.

27. Failure to object to all of Allen's testimony that Roberson was a sexual offender or predator. (R.R. vol. 48 at 135-36.) This was a serious failure given that the State had abandoned the sexual assault of a child portion of the indictment, and that the State had not introduced *any* testimony that Roberson had victimized any woman or child. Allen was relying on the prosecutor's bald pretrial allegations that Roberson had molested his daughter, and accepted those allegations as true. The defense attorney should have objected aggressively to any reference to sexual assault until there was proof that such assaults had in fact occurred. The attorney did in fact object to Allen's attempt to testify that Roberson had sexually contacted in some way an 11-year-old child named Rachel Cox. (R.R. vol. 48 at 136.) The attorney did so a little late, after jurors heard reference to her, and did not seek a limiting instruction or mistrial. (R.R. vol. 48 at 136.) The fact that he was successful in excluding reference to Rachel shows that the trial court recognized that unsubstantiated claims were inadmissible, and that he would have been required to exclude all of Allen's reference to sexual behavior.

28. Failure to confront Allen with the level of training female guards receive in TDC. Allen claimed that the female guards at TDC constituted Roberson's "risk pool," and that he could be expected to assault them. (R.R. vol. 38 at 135.) In fact, female guards are highly trained and *never* with an inmate without a nearby male officer. Female guards are trained in techniques of defending themselves and controlling male inmates, even those larger than themselves. In any event, as discussed in this application, assaults of guards are extremely rare in TDC, and sexual assaults on female guards almost non-existent.

29. Failure to object to Allen's classification of Roberson as a psychopath, without insisting that Allen show specifically the clinical definition of the term psychopath and how Roberson meets the definition. (R.R. vol. 48 at 141.)

30.     Failure to object to Allen's statement that he believed Roberson would commit future acts of sexual violence. (R.R. vol. 48 at 141.) This could only be accomplished against female guards which is remotely unlikely, and particularly not likely for Roberson.

31.     Failure to object to Allen's statement that Roberson would commit future acts of violence. (R.R. vol. 48 at 141.) The objection was that the statement must be in the context of the next 40 years in prison in a maximum security unit.

32.     Failure to object to Allen's statement that Roberson is a predator. (R.R. vol. 48 at 141.) The objection was that the statement must be in the context of the next 40 years in prison in a maximum security unit.

33.     Failure to object and exclude to all reference to Roberson being a violent risk in free society. (R.R. vol. 48 at 141-42.) The objection was that the statement must be in the context of the next 40 years in prison in a maximum security unit. Roberson was 36 at trial. He would not have been parole eligible until 76. Therefore the only relevant question pertaining to free society risk would have been whether he would likely commit acts of violence after age 77 until death. Prior to age 76, the only relevant question was whether he would commit acts of serious violence in a maximum security unit.

34.     Failure to object to Allen's statement that Roberson was likely to commit burglary in prison. (R.R. vol. 48 at 142.) First, burglary is impossible in a maximum security unit. An inmate is not allowed to remain alone in someone else's cell or to move freely. Second, theft of another inmate's property is a far cry from burglarizing a home or office in free society. Third, burglary is not a crime of violence, which is the only issue for Allen to discuss in context of the second special issue.

C.      *Failure to Confront Inaccurate Statements by Dr. Allen that His Opinions Were Supported by Research.*

As mentioned in the challenge to Dr. Allen's testimony, Dr. Allen made a number of statements which he claimed were supported by research. In fact, research does not support several of his assertions and in some instances contradicts it. The trial attorney should have pounced on these inaccurate claims by confronting Allen with the studies or demanding proof from Allen:

35.     Dr. Allen claimed that research showed that the Hare PCL-R had predictive value for violent behavior, and that research supported using it to predict the future violence

170

of capital murders spending most of their remaining lives in a maximum security unit. (R.R. vol. 48 at 123.) There is no such research.

### D.    *Failure to Differentiate Between Prediction of Future Serious Violence in Prison and Prediction of Future Dangerousness.*

One of the most serious mistakes by trial counsel in the sentencing phase had to do with the failure to understand the purpose for expert testimony in capital sentencing. Forensic psychologists are permitted under Texas and federal law solely for one reason: because the second special issue asks jurors to answer whether there is a probability that the defendant will commit future acts of violence which will constitute a threat to society. The second special issue is limited in scope because of the narrowing process required by the Supreme Court to assure that death is assigned only for a narrow group of murderers. The second special issue does not contain the word "dangerousness." It does not contain the word "risk."

Therefore, it is a serious mistake to allow prosecutors to spin the second special issue in terms of future dangerousness. The question is not future dangerousness. If it were, *every* convicted capital murder would receive a "yes" answer because there is *always* a probability that a murder will be dangerous. Prosecutors love for jurors to interpret the second special issue in terms of whether the defendant will be dangerous in the future, because it lessens their burden of persuasion and increases the odds of a "yes" answer.

Future dangerousness is not the question, however. The question is whether a murder will commit future *acts of violence*. This is a far narrower question and restricts the scope of an expert's testimony accordingly. Therefore, each and every time a prosecutor or State expert mentions "future dangerousness," the defendant lawyer should object. Robinson's trial counsel did not object to any of this blurring of concepts.

### E. Failure to Block Dr. Allen From Offering Testimony as to Mitigating Evidence, and Misunderstanding the Role of Mitigating Evidence.

Dr. Allen testified that he was not hired to review mitigating evidence. (R.R. vol. 48 at 109-10, 144.) Nor did he state that he conducted a review to determine whether mitigating evidence existed. Once he conceded these points, he should not have been permitted to offer opinions as to whether mitigating evidence existed or not. The trial judge would have been required to sustain any defense objection that mitigation testimony by Dr. Allen was irrelevant to the second special issue, and that Dr. Allen did not meet Rule 702 or *Daubert* factual predicates.

Worse, the defense counsel allowed the prosecutor and Dr. Allen to get away with misstating the nature and purpose of the third special issue on mitigation. The mitigation question is written so that jurors decide whether there are any circumstances which mitigate against imposition of the death penalty. The question is *not* whether the are issues or facts which mitigate the defendant's *responsibility for the murder*. These are not merely fine semantics. The defendant has already been found to be responsible for the murder and any aspect of mitigation of his mens rea was considered and rejected in the liability phase of the trial. The new question for jurors is whether the defendant, who is responsible for the murder, who conducted the murder intentionally, and who will probably commit future violent acts, should not be executed because of some mitigating circumstances, which may or may not have anything to do with his responsibility for the murder.

The prosecutor and Dr. Allen were allowed to blur the purpose of the mitigating special issue and redefine the jury's role as to decide whether there existed any mitigating aspects of his *responsibility,* a different and far lighter burden of persuasion:

1. When asked his scope of work, Dr. Allen answered that he looked for "anything that mitigates against, you know, responsibility." There was no objection. (R.R. vol. 48 at 119.)

2. Dr. Allen was allowed to tell jurors that the relevant question was "Do you think anything mitigates this?" implying that this was the nature of the special issue, which actually asks whether there is anything which reduces the moral blameworthiness of the defendant's offense. There was no objection. (R.R. vol. 48 at 119.)

### F. Failure to Stop Dr. Allen From Volunteering Damaging Testimony with Non-Responsive Answers.

Moreover, Dr. Allen was allowed to inject damaging and irrelevant statements into trial which would otherwise have been inadmissable even under the relaxed standards of expert testimony:

1. When asked whether he shaded his opinions depending on who paid him, Allen diverted and explained how doing so was bad for business. (R.R. vol. 48 at 119.) The answer should have been limited to simply "no."

2. When asked to describe how he conducts a risk assessment, Dr. Allen was allowed with out challenge to digress and state, "It was pretty clear from the records that he was an antisocial personality disorder, but being a psychopath is a bit more than that." (R.R. vol. 48 at 121-22, 122).

3. When asked how he was trained on the Hare PCL-R, Dr. Allen digressed again and went on a long side trip to discuss his interpretation of the Hare PCL-R. (R.R. vol. 48 at 124.) He should have been forced to limit his answer to the fact that he went to one seminar.

In addition, the trial counsel failed to control Dr. Allen's loose testimony. Experts such as Allen predictably attempt to bolster their otherwise lackluster credibility by making non-responsive answers calculated to inject poisonous new facts, or make objectionable sidebar comments, or minimize damaging concessions. The skilled lawyer must force the expert to make painful concessions clearly and unequivocally and this requires objecting the moment the expert attempts a non-responsive detour. Here are examples:

1.      Allen's testimony could fairly be characterized as glib. He joked in bad form that President Clinton was a psychopath. (R.R. vol. 48 at 128.) This drew no objection, although allowing him to offend jurors might be a fair tactic.

2.      Allen told jurors that some elected officials were psychopaths, some are lawyers; others are doctors, psychologists, and jailers. (R.R. vol. 48 at 129.) These offensive comments should have drawn objections as irrelevant or prejudicial, not to mention incorrect.

### G.      Failure to Cross-Examine Dr. Self Effectively.

Counsel's cross-examination of Dr. Self was ineffective for the same reasons at Allen's.

More so in fact since Self did not provide any scientific or professional justification for his conclusions.

### H.      Failure to Provide Effective Rebuttal Evidence to Dr. Self or Dr. Allen Testimony.

Dr. Kelly Goodness is a fine psychologist who watched Drs. Allen's and Self's presentations and must have realized their shortcomings. Moreover, she sat through their interview of Roberson the day before and could have provided rebuttal testimony:

1.      The ideal method of presenting rebuttal testimony through Dr. Goodness would have been to use her to explain base rate data which would have contradicted all that Allen and Self said. Recall that base rate data is the body of statistical data collected from prisons which carefully log and categorize all incidents of violence. The surprising conclusion of such research is that violent is prison, particularly maximum security units, is well controlled and murders do not commit much violence.

2.      Dr. Goodness could have testified that Dr. Allen did not use the Hare PCL-R scoring criteria, if indeed this turns out to be the case.

3.      Dr. Goodness could have rated Roberson then and there with the Hare PCL-R and shown jurors how she graded Roberson on each personality characteristic.

4.      She could have destroyed Allen's classification of Roberson as a psychopath, showing that Allen failed to apply the clinical definition of the term psychopath and how Roberson fails to meet the definition. (R.R. vol. 48 at 141.)

5.   She could have explained to jurors that Dr. Allen Goldstein's multivolume treatise, Handbook on Psychology, is one of the three most important psychology publications. For Dr. Allen not to have read it, or at least the portions discussion forensic psychology, reveals that Dr. Allen is probably not competent in his field. For him to admit that he had met Goldstein but was completely unaware of his publication is absurd and should have been presented in a sharp rebuttal. (R.R. vol. 48 at 144-45.)

I.     *Defense Counsel Failed to Present to Jurors Objective Base Rate Data Which Demonstrated That the Incidence of Serious Violence Among Incarcerated Capital Murder Inmates is Low.*

As mentioned, a serious shortcoming was the counsel's failure to present jurors and cross examine Self and Allen with objective base rate data showing actual incidence of violence in prison, which would have undermined the two experts principal statements: that inmates in prison are frequently violent.

J.     *Failure to Present Available TDCJ-ID Statistics Showing Low Incidence of Violence in Prison.*

Attached to this application are stacks of internal reports from TDCJ showing the actual rates of violence in prison. These reports demonstrate that the incidence of violence is quite low, reflecting the controls in place and the absence of the stimulators which trigger violence in defendants. Trial counsel should have introduced these and similar documents and cross examined Self and Allen with them, who would have testified that they had never seen or considered such reports before.

K.     *Failure to Object on Proper Basis and Possible Procedural Default of Constitutional Claims.*

If the Court determines that the constitutional challenges to the State's forensic psychology testimony were not preserved for appeal or were procedurally defaulted in any manner, then Roberson argues that any procedural default should be excused on the basis of IAC.

175

### *L.*        *Discussion of the Duties of Appointed Counsel in Capital Case.*

A criminal defendant is entitled to the effective assistance of counsel under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963).  Effective assistance of counsel such as will withstand constitutional scrutiny is counsel "reasonably likely to render and rendering reasonably effective assistance." <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984).  Counsel's conduct is violative of the Sixth Amendment if it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Id</u>. at 686.

Research and preparation for presenting such a claim begins with the proposition that trial counsel's role is to "assure that the adversarial testing process works to procure a just result under the standards governing decisions." <u>Strickland v. Washington</u>, 104 S.Ct. 2052, 2064 (1984).  When confronted "with both the intricacies of the law and the advocacy of the public  prosecutor," <u>United States v. Ash</u>, 413 U.S. 300, 303 (1970), a defendant is entitled to counsel who will "bring to bear such skill and knowledge as will render the trial a reliable testing process." <u>Strickland</u>, 104 S.Ct. at 2065.  The constitutional right is violated when "counsel's performance as a whole," <u>United States v. Cronic</u>, 104 S.Ct. 2039, 2046 n.20 (1984), or through individual errors, <u>Strickland</u>, 104 S.Ct. at 2064, falls below an objective standard of reasonableness.  The writ will issue if the failings by counsel amount to virtually no assistance whatsoever, <u>see</u> <u>Holloway v. Arkansas</u>, 98 S.Ct. 1173, 1181 (1978) ("The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee," and "when a defendant is deprived of . . . his attorney . . . during a critical stage in, at least, the prosecution of a capital offense, <u>reversal is automatic</u>."); <u>McCoy v. Wainwright</u>, 804 F.2d 1196, 1198 (11th Cir. 1986); <u>or</u> if prejudice is shown such that "there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 104 S.Ct. at 2068.

## M.    *Application of Strickland v. Washington Requirements*.

In order to assess whether trial counsel provided the assistance guaranteed by the Sixth Amendment, one must determine, first, what it was possible for trial counsel to do, and, second, why trial counsel did what he or she did. These inquiries are exceptionally complex, involving as they do the application of the Sixth Amendment case law to legal issues framed by both state substantive and procedural law and the rules relating to other fundamental constitutional rights of state criminal defendants.

In order to prevail on a claim of ineffective assistance of counsel so as to warrant a reversal of a conviction or death sentence, a habeas petitioner must make the following two-pronged showing: first, "that counsel's performance was deficient"; and second, "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. The constitutional framework established by the Supreme Court to prove ineffective assistance thus requires Roberson to show that counsel's acts or omissions were inadequate and that Roberson's defense was actually prejudiced thereby. The test for prejudice is whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; see also Williams v. Taylor, 120 S.Ct. 1495, 1512 (2000). Accordingly, prejudice need not result from any single error alleged, but may, instead, flow from a combination of counsel's errors, which must be assessed on a cumulative basis and not item-by-item. Williams, 120 S.Ct. at 1515-16; United States v. Cronic, 466 U.S. 648, 657 n.20 (1984) (Ineffectiveness may be found where "counsel's performance as a whole" fell below professional standards).

To determine whether the Sixth Amendment standard of ineffective assistance has been met, the court must view the assistance rendered by counsel in the context of the totality of the circumstances. Strickland v. Washington, 466 U.S. at 690; Young v. Zant, 677 F.2d 792 (11th Cir. 1982). In looking at the totality of the circumstances, courts require more from trial counsel than from counsel whose client pleads guilty. Herring v. Estelle, 491 F.2d 125, 128 (5th Cir. 1974). A court must likewise be mindful that, although a capital case is judged by the same standard of effectiveness as a non-capital case, "[t]he seriousness of the charges and the degree of punishment must be considered in assessing counsel's performance." Proffitt v. Wainwright, 685 F.2d 1227, 1247 (11th Cir. 1982).

Ineffectiveness may be found where "counsel's performance as a whole," United States v. Cronic, 466 U.S. 648, 657 n.20 (1984), or through individual errors, Strickland, 466 U.S. at 686, falls below an objective standard of reasonableness and counsel's errors prejudice the defendant. Id. 466 U.S. at 687. Additionally, ineffective assistance of counsel may result where action or omission on the part of the State impedes counsel's ability to provide effective assistance at trial or on appeal. Byrd v. Owen, 272 Ga. 807, 812, 536 S.E.2d 736, 739-40 (2000).

In accordance with Strickland v. Washington, Roberson contends that his defense fell below reasonable attorney performance and that he suffered prejudice as a result.

### ANALYSIS OF THE STATE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW: THE STATE COURT'S F&CS DO NOT CONSTITUTE REASONABLE APPLICATION OF FEDERAL LAW. THEREFORE, THE AEDPA IS NOT A BAR TO RELIEF BY THIS COURT.

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA

in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi,* 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky,* 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen,* 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi,* 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

- if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

### Claim Number 10: Roberson Received Ineffective Assistance of Counsel In the Sentencing Phase of Trial in Violation of the Sixth Amendment and Fourteenth Amendment to the Federal Constitution.

Roberson received ineffective assistance of counsel in the sentencing phase of his trial. Consequently, there was a violation of the Sixth and Fourteenth Amendment right to counsel.

### A.    Waiver of all charge issues by failing to object to the jury charge in sentencing.

The Defense did not lodge certain constitutional objections to the jury charge in the sentencing phase. This may have constituted waiver or procedural default.

**B.     *Waiver of all charge issues by failing to object to the jury charge in the liability phase.***

The Defense did not lodge certain objections to the jury charge in the liability phase. This may have constituted waiver or procedural default. For instance, the counsel should have objected on constitutional grounds to the lack of an accurate definition of the term "reasonable doubt," notwithstanding a recent Court of Criminal Appeals decision stating that such definitions were unnecessary.

**C.     *Failure to Object to Improper Prosecutor Argument.***

Defense counsel did not object to improper arguments by prosecutors. Specifically, the prosecutors misled jurors by claiming that they were required by law to abandon the sexual allegation while assuring jurors that Roberson raped the little girl. These improper arguments are discussed on page 49. Defense counsel did object to the sexual assault allegations in many other instances and the attorneys may have concluded that further objection was futile, which is true. However, in the event that any court holds that challenge to the prosecutor's improper argument was waived or procedurally defaulted, then it was the result of IAC.

In addition, there are other improper argument by prosecutors outside of permissible constitutional bounds to which trial counsel did not object. These include arguing in sentencing that Roberson sexually assaulted the child, sexually assaulted women, allusions that Roberson did not take the stand to refute allegations or bring forth rebuttal evidence, and attacks on Roberson over the shoulders of his trial counsel.

### D. General Failure to Preserve Error.

Roberson also alleges that defense counsel failed to preserve error to all viable constitutional issues at trial. In the event that any court holds that an otherwise legitimate constitutional claim was waived or procedurally defaulted, then it was the result of IAC.

### E. General Failure to Brief Direct Appeal Adequately.

Roberson also alleges that defense direct appeal counsel failed to brief adequately all viable constitutional issues before the Court of Criminal Appeals. In the event that any court holds that an otherwise legitimate constitutional claim was waived or procedurally defaulted, then it was the result of IAC.

### F. Failure to Object to The Refusal of the Trial Judge to Fund Adequately the Defense in Contradiction of a Standing Anderson County Appointment Order.

Anderson County has a standing order, agreed to by all district judges, which regulates the appointment and payment of qualified counsel for capital cases. A county is required to have such an order to comply with state mandated standards for death penalty prosecution. The trial judge in Roberson's case, Judge Bentley, did not comply with this order. During the course of trial, the defense counsel and investigator submitted interim invoices for time and expenses. The attorneys only billed $75 per hour which is barely enough to cover overhead in a law practice, a bargain for the county.

With varying degrees of severity, however, Judge Bentley cut every one of these invoices and thereby effectively reduced the hourly rates of the attorneys and investigators below the approved level. There was no objection by the trial counsel, presumably because he did not want to irritate the trial judge. The trial counsel should have objected under *Wiggins* and *Chronic v. United States*,

that Roberson was being denied effective assistance of counsel because the trial judge was refusing to provide the resources necessary for an adequate defense.

### ANALYSIS OF THE STATE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW: THE STATE COURT'S F&CS DO NOT CONSTITUTE REASONABLE APPLICATION OF FEDERAL LAW. THEREFORE, THE AEDPA IS NOT A BAR TO RELIEF BY THIS COURT.

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

184

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi,* 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky,* 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen,* 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and

prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

- if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

***Claim Number 12: Under a* Ring *and* Apprendi v. New Jersey *analysis, Texas Code Crim. P. Art. 37.071 § 2(b)(1) Operates As the Functional Equivalent of an Element of a Greater Offense. Accordingly, Jury Determination of a Defendant's "Future Dangerousness" in Art. 37.071 § 2(b)(1), Which If Established is an Aggravating Circumstance or Element the Effect of Which Causes a Defendant's Execution, Must Be Proven Beyond a Reasonable Doubt, Rather Than by the Current Statutory Requirement of a "Probability" of Future Dangerousness Beyond a Reasonable Doubt, Which is a Much Lower Standard. Accordingly, Texas Code Crim. P. Art. 37.071 §2(b)(1) is Unconstitutional. As such, Roberson must not be executed.***

Art. 37.071 § 2(b)(1) of the Texas Code of Criminal Procedure states that a jury must decide beyond a reasonable doubt, before capital punishment may be imposed on a criminal defendant, "whether there is a *probability* that [the] defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* Under a *Ring* and *Apprendi* analysis, Article 37.071 § 2(b)(1) operates as the functional equivalent of an element of a greater offense. See *Ring v. Arizona*, 122 S.Ct. 2428 (U.S. 2002), pp. 10-23, and *Apprendi v. New Jersey*, 530 U.S. 466, 494, n. 19 (U.S. 2000). Why is this? The answer is that if a jury decides there is a mere probability beyond a reasonable doubt that a defendant will commit criminal acts that would constitute a continuing threat to society, the *effect* of the jury's decision (if the other elements of Art. 37.071 §§ (b)-(c) are also established) is the *execution* of the defendant, rather than the default life sentence imposed by statute under Art. 37.071. No reasonable person can argue that execution, death, being killed by the State, is somehow not a *massive* increase in punishment over the statutory default delineated in Art. 37.071 of life in prison. *Apprendi* certainly finds that it is. And *Apprendi* notes very clearly that it is the *effect* of a determination that increases a defendant's sentence, rather than the *form* of the statute in question, that matters. *Apprendi v. New Jersey,* 530 U.S. at 494.

As discussed earlier in this Application, in *Ring v. Arizona*, the Supreme Court noted that its holding in *Walton v. Arizona,* 497 U.S. 639, cannot be reconciled with the Court's holding in

*Apprendi v. New Jersey*, 530 U.S. 466, that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi* 530 U.S. at 490. The U.S. Supreme Court struck down the Arizona Supreme Court's argument that because Arizona law specified death or life imprisonment as the only sentencing options for the first-degree murder of which Mr. Ring was convicted, he was thus sentenced within the statutory range of punishment authorized by the jury verdict.

In its *Ring* decision, the Supreme Court bluntly pointed out that the Arizona Supreme Court had missed in its arguments a main point of *Apprendi*, namely that *Apprendi's* instruction *is* one of *effect, not form* (emphasis mine). 530 U.S. at 494. The Supreme Court noted that Arizona's first-degree murder statute (which is remarkably similar to Texas' death penalty statute) authorized a maximum penalty of death only in the formal sense, for it explicitly cross-referenced the statutory provision requiring the finding of an aggravating circumstance before imposition of the death penalty. The Supreme Court noted that if the Arizona Supreme Court's argument was deemed valid, then *Apprendi* was nothing more than a "meaningless and formalistic" rule of statutory drafting. *Id.* at 541. The Supreme Court promptly rejected this view. The *Ring* Court decided that only a jury can determine whether aggravating circumstances exist sufficient to justify a defendant's execution, and that such rule is afforded to defendants because of the Sixth Amendment's jury trial guarantee. The *Ring* Court held that because Arizona's enumerated aggravating factors operate as the "the functional equivalent of an element of a greater offense," *Apprendi*, 530 U.S. at 494, n. 19, the Sixth Amendment requires that such aggravating factors be found by a jury, beyond a reasonable doubt.

Accordingly, then, under *Ring* and *Apprendi,* the "future dangerousness" determination in Texas Code Crim. P Art. 37.071 § 2(b)(1), is an aggravating circumstance or element the effect of which causes a defendant's execution. The *effect* of this decision by the jury is to dramatically and significantly increases the *effect* of a capital punishment conviction in Texas far beyond the statutory default of life in prison. As such, Art. 37.071 § 2(b)(1) is unconstitutional at the present time, and was unconstitutional when a jury applied said statute to Roberson.

In order for the "future dangerousness" element of Art. 37.071 § 2(b)(1) to be constitutional, Texas Courts must treat this provision of the statute as an element. This element must be proven by the State and decided by a jury beyond all reasonable doubt, rather than by a "probability" of future dangerousness beyond a reasonable doubt. The latter standard is an entirely different, and significantly less burdensome, factor or element to prove, yet its *effect*, if decided by a jury in the affirmative, is to kill an criminal defendant. Under *Apprendi* and *Ring,* it is unconstitutional. That portion of Art. 37.071 § 2(b)(1) which uses the phrase "probability" must be stricken in order for the statute to be constitutional. Indeed, for Art. 37.071 § 2(b)(1) to be constitutional, the statute should state something similar to the following: "We, the Jury, find that the defendant, beyond all reasonable doubt, will commit future acts of violence that constitute a grave and continuing threat to society, to include loss of life and serious bodily injury." *This* suggested revision of Art. 37.071 § 2(b)(1) might be constitutional, but the current version is certainly not because it is vague, it is nebulous, and because it deprives the jury of *specifically* deciding the crucial issue, beyond a reasonable doubt, of whether Roberson is *specifically* is a continuing grave threat to society. In its current form, the statute is not treated as an element of an offense, but its *effect* is certainly that of one, which is unconstitutional. As such, Roberson must not be executed. It should also be noted

that under the above analysis, Art. 37.071 §2(b)(1), albeit revised to be in compliance with the U.S. Constitution and the Sixth and Eighth Amendments thereof, should have been pled in the State's Indictment against Roberson. It was not. Accordingly, and again, Roberson cannot be executed.

### ANALYSIS OF THE STATE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW: THE STATE COURT'S F&CS DO NOT CONSTITUTE REASONABLE APPLICATION OF FEDERAL LAW. THEREFORE, THE AEDPA IS NOT A BAR TO RELIEF BY THIS COURT.

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in

state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi,* 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky,* 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen,* 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

- if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later

petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

> ***Claim Number 13: Roberson's Fourteenth Amendment Due Process Rights as Interpreted in <u>Apprendi v. New Jersey</u> Were Violated Because the Statute under Which Applicant Was Sentenced to Death it Implicitly Put the Burden of Proving the Mitigation Special Issue on Applicant Rather than Requiring a Jury Finding Against Applicant on That Issue under the Beyond a Reasonable Doubt Standard and Because the Charging Instrument Did Not Give Applicant Notice of the Facts That the State Intended to Prove in Order to Establish Applicant's Statutory Qualification for the Death Penalty.***

In this challenge, Roberson argues that the Texas capital sentencing scheme violates an important recent decision by the Supreme Court. He contends that the jury was impermissibly instructed that there was no burden of proof assigned to the mitigation special issue. Consequently, the burden of proof was implicitly placed on him. In addition, the indictment did not provide notice of the facts that the State intended to prove in order to establish Roberson's eligibility for the death penalty.

Pursuant to the mandatory dictates of article 37.071, the trial court submitted the following Special Issue to the jury at punishment:

**<u>Special Issue No. 2</u>**

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

**<u>Answer</u>**

We the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "No."

*/s/ signature*

_____
Presiding Juror

193

2003 Clerk Record at 642 (filed Feb. 14, 2003); *see* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(1) (Vernon Supp. 2002).

Under the Texas statutory scheme, Applicant's jury was not instructed on a burden of proof on the mitigation special issue. *See Lawton v. State*, 913 S.W.2d 542 (Tex. Crim. App. 1995), *cert. denied*, 519 U.S. 826 (1996) ("the Texas legislature has not assigned a burden of proof regarding mitigating evidence"). Moreover, because of the juxtaposition of the reasonable doubt instruction with the Special Issue Number 3, the jury could have read the charge to mean that Applicant had the burden of proving beyond a reasonable doubt mitigation sufficient to warrant life rather than death. *See id.* ("the burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case").

The Supreme Court's recent decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), necessitates a finding that the Texas death penalty scheme is unconstitutional because it does not place the burden of proof on the State that would require the jury to find beyond a reasonable doubt that there are no mitigating circumstances sufficient to warrant the imposition of life rather than death and because the charging instrument does not give notice of the facts that will proven to statutorily qualify a particular defendant for the death penalty.

### A. What *Apprendi* Decided

In *Apprendi* the Supreme Court reviewed a New Jersey state prosecution, where a judge had increased the maximum punishment for possession of a firearm under a New Jersey statute which allowed an increased punishment if a defendant "acted with a purpose to intimidate an individual or group of individuals because of race, . . . ." The Court framed the question as follows: "Whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination

194

authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt." *See Apprendi*, 530 U.S. at 469.

*Apprendi* focused on a footnote in *Jones v. United States*, 526 U.S. 227 (1999), that stated "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt." *See Apprendi*, 530 U.S. at 476 (citing *Jones*, 526 U.S. at 243 n.6)).

While *Jones* was a federal prosecution, and therefore was concerned with Fifth Amendment due process, *Apprendi* took the next step of applying the rule from the *Jones* footnote to Fourteenth Amendment due process, which applies in state prosecutions. *Apprendi* stressed that it was dealing with "constitutional protections of surpassing importance." 530 U.S. at 476. After a lengthy historical discussion, the Court in *Apprendi* stated:

> Other than the fact of a prior conviction, *any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.* With that exception, we endorse the statement of the rule set forth in the concurring opinions in [*Jones*]: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established beyond a reasonable doubt."

> *See Apprendi*, 530 U.S. at 490 (emphasis added) (quoting *Jones*, 526 U.S. at 252-253 (Stevens, J., concurring); *Jones*, 526 U.S. at 253 (Scalia, J., concurring)).

Thus, *Apprendi* created three requirements: inclusion in an indictment of the punishment-enhancing factor, submission of the factor to a jury, and the allocation of proof beyond a reasonable doubt to the prosecution.

One other aspect of *Apprendi* which is particularly significant with regard to the Texas death penalty scheme is the holding that the placement of the statute at issue within the sentencing provisions of New Jersey's criminal code, rather than in the definition of offenses, did not negate the treatment of the factual issue as the equivalent of an "element" which must be proved beyond a reasonable doubt. *See Apprendi*, 530 U.S. at 494-96. In Texas the decisive factual issues are found in the Code of Criminal Procedure rather than the Penal Code, but that makes no difference for purposes of *Apprendi*. *See id.*

### B. The Texas Statute and its Interpretation

*Apprendi* should be applied to article 37.071, section 2(e)(1). Under that statute, a jury is asked to decide:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

*See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(1) (Vernon Supp. 2002).

As stated above, that issue was submitted to the jury in Roberson's trial. The jury was also instructed that if ten or more jurors answer the special issue in the affirmative, a sentence of life imprisonment would be imposed. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(f)(2) (Vernon Supp. 2002). Although they could not be instructed as such,[37] if the jurors had reached a stalemate and been unable to agree, a sentence of life imprisonment would have been imposed. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 2(g) (Vernon Supp. 2002). Thus, in Applicant's trial, the absence of a jury decision on the mitigation issue would have automatically capped Applicant's punishment

---

[37]*See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 2(a) (Vernon Supp. 2002).

at life imprisonment.  Only if all twelve jurors answer in the negative, as was the case here, could the death penalty have been imposed.  *See* Tex. Code Crim. Proc. Ann. art. 42.12, §§ 2(f)(2), 2(g) (Vernon Supp. 2002).  Thus, section 2(e)(1) plainly fits the mold of an issue on which *a factual determination raises the maximum punishment which is available*.

Because the statute under which Applicant was sentenced to die does not require the jury enter a negative finding on the mitigation special issue only if the State had proven beyond a reasonable doubt that there was no mitigating evidence sufficient to warrant imposition of a life sentence rather than death, that statute is unconstitutional.

Further, in the present case, there is no dispute that the indictment does not contain any reference to the enhancing provisions of the Capital Murder statute.  In the absence of the required answers to the special issues, the maximum punishment allowed for capital murder in Texas is life imprisonment.  *See* Tex. Penal Code Ann. § 12.31 (Vernon 1994); Tex. Code Crim. Proc. Ann. art. 37.071, § 2(g) (Vernon Supp. 2002).  Thus, under *Apprendi*, the State is required to allege the aggravating factors necessary to increase the punishment from life, the maximum without the special questions, to death if the special questions are submitted and the jury answers them in the affirmative.

Even prior to the Supreme Court's ruling in *Apprendi*, Texas rules have required that all matters that must be proved must be alleged in the indictment, including the fact of prior convictions (which is not required by *Apprendi*).  In Texas, everything that must be proved must be contained in the indictment in order to give proper notice.  *See* Tex. Code Crim. Proc. Ann. art. 21.03 (Vernon 1989).  Under a proper reading of article 21.03 and *Apprendi*, the State must allege the

aggravating factors in order to rely upon the enhanced punishment of death. The indictment did not give the required notice.

Consequently, Applicant's conviction was obtained in violation of his right to Due Process as secured by the Fourteenth Amendment as interpreted in *Apprendi*. Therefore, this Court should vacate Applicant's conviction and sentence, and remand this cause to the trial court.

### ANALYSIS OF THE STATE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW: THE STATE COURT'S F&CS DO NOT CONSTITUTE REASONABLE APPLICATION OF FEDERAL LAW. THEREFORE, THE AEDPA IS NOT A BAR TO RELIEF BY THIS COURT.

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain*, 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes*, 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi*, 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky*, 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen*, 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

- if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later

petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

> **Claim Number 14:  Applicant's Fourteenth Amendment Due Process Right  to Be Free from a Wholly Arbitrary Deprivation of Liberty and Eighth Amendment Right to Be Free from the Arbitrary and Capricious Infliction of the Death Penalty Were Violated Because the Evidence Adduced at Trial Was Legally and Factually Insufficient to Support the Jury's Answer to the Future Dangerousness Special Issue.**

### A)      Legal Bases for Claim

The Due Process Guarantee of the Fourteenth Amendment protects criminal defendants from wholly arbitrary deprivations of liberty.  *See*, *e.g.*, *Lewis v. Jeffers,* 497 U.S. 764, 782 (1990).  Further, the Eighth Amendment protects defendants from the arbitrary and capricious imposition of the death penalty.  *See id.*  Consequently, to support a death sentence, the State must present evidence establishing beyond a reasonable doubt that the answer to the future dangerousness special issue is "yes."  *See*, *e.g.*, *Flores v. Johnson,* 210 F.3d 456, 469 (5th Cir.2000) (Emilio Garza, J., specially concurring) (recognizing that "future dangerousness, like any other element of the crime, must be proven beyond a reasonable doubt").

The proper standard for determining whether the evidence satisfies the burden of proving the issue beyond a reasonable doubt is the familiar "rational factfinder" test established in  *Jackson v. Virginia*, 443 U.S. 307, 323 (1979).  *See*, *e.g.*, *Martinez v. Johnson*, 255 F.3d 229, 243-44 (5th Cir. 2001).  Thus, this Court should view the evidence in the light most favorable to the verdict and determine whether a rational juror could have answered the future dangerousness issue in the affirmative.  *See*, *e.g.*, *Salazar v. State*, 38 S.W.3d 141, 144 (Tex. Crim. App.), *cert. denied*, 122 S. Ct. 127 (2001).

### B)      Facts Supporting the Claim

Pursuant to the mandatory dictates of article 37.071, the trial court submitted the following

Special Issue to the jury at punishment:

### *Special Issue No. 1*

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, ROBERT LESLIE ROBERSON, III, would commit criminal acts of violence that would constitute a continuing threat to society?

### **Answer**

We the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "Yes."

*/s/ signature*

_____
Presiding Juror

*See* 2003 Clerk Record at 642 (filed Feb. 14, 2003); TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(1) (Vernon Supp. 2002).

In the instant case, the jury answered this issue "Yes." Applicant respectfully contends that no reasonable juror could have answered this issue in the affirmative.

Roberson bases this argument on the testimony of his three psychologists who testified collectively that he would not pose a threat in a controlled prison environment. Even Dr. Allen, the State's psychologist stated that he would be a minimal risk in prison.

When all of the evidence is considered, no rational juror would find a probability Applicant will commit future crimes of violence so as to be a continuing threat to society. Consequently, this Court should hold that the evidence is insufficient to support the jury's finding on Special Issue Number One, vacate Applicant's death sentence, and reform the judgment to reflect a sentence of life in prison.

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain*, 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes*, 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi*, 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky*, 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen*, 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

•      if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

> **Claim Number 15: Applicant's Fourteenth Amendment Due Process Right to Be Free from a Wholly Arbitrary Deprivation of Liberty and Eighth Amendment Right to Be Free from the Arbitrary and Capricious Infliction of the Death Penalty Were Violated Because the Evidence Adduced at Trial Was Legally and Factually Insufficient to Support the Conviction for Capital Murder.**

In this issue, Roberson challenges his conviction on the basis that he is factually and legally innocent of capital murder. As mentioned, this is a shaking baby case. Roberson at worst lost control and shook and struck his child. There was never, however, sufficient evidence that he intended to kill her. Even Dr. Squires conceded that this was likely.

Under the facts of this case, Roberson does not belong to a category of people eligible for the death penalty. The death penalty is reserved for the worst of the worst, and Roberson is nothing more than a drug user who lost control when his child began crying. He never possessed the intent to kill her. Without that intent to kill he cannot be eligible for the death penalty. Consequently his execution would violate the Eighth Amendment.

Roberson is not the worst of the worst, and the death penalty for him would violate the Eighth and Fourteenth Amendments because it is disproportionate. The death penalty is reserved for a narrow category of offenders and a shaking baby case cannot be in that category, particularly given the impulsivity of Roberson and his crime. This conclusion is inescapable given the progression of cases by the Supreme Court in *Atkins v. Virginia, Roper v. Simmons*, *Kennedy v. Louisiana* and *Graham v. Florida*. "Here, in addressing the question presented, the appropriate analysis is the one used in cases that involved the categorical approach, specifically *Atkins, Roper,* and *Kennedy*." *Graham*, 130 S. Ct. at 2023. In *Graham*, the Court wrote that "The concept of proportionality is central to Eighth Amendment . . . ." The death penalty is disproportionate for a shaking baby case.

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court declared that the Eighth Amendment rendered the mentally retarded ineligible for execution. According to *Atkins*, "Because of their **disabilities in areas of reasoning, judgment, and control of their impulses**, however, they

do not ***act with the level of moral culpability that characterizes the most serious adult criminal conduct***." *Atkins*, 536 U.S. at 306-07 (emphasis added).

The Court emphasized that the Eighth Amendment bars execution for those who lack the ability to control impulses, who have diminished capacities, who have subaverage intelligence, and who cannot process information logically. Although the Court was writing about the mentally retarded, it could easily have been writing about Roberson, who fits these descriptions. The Court wrote in *Atkins*, "As discussed above, clinical definitions of mental retardation require not only *subaverage intellectual functioning*, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have *diminished capacities to understand and process information,* to communicate, to abstract from mistakes and learn from experience, *to engage in logical reasoning, to control impulses,* and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that *they often act on impulse rather than pursuant to a premeditated plan*, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability." *Atkins*, 536 U.S. at 318.

Similarly, Roberson exhibited precisely the juvenile qualities of impulsiveness and inability to foresee consequences which led the Supreme Court in *Graham*. In *Graham v. Florida*, 130 S. Ct. 2011 (2010), the Supreme Court declared that the Eighth Amendment did not permit life without parole for juveniles who committed non-homicide crimes. "The Court has recognized that

defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.* at 2027. "The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." *Graham,* 130 S. Ct. 2026.

"Because juveniles lack of maturity and underdeveloped sense of responsibility . . . often result in *impetuous and ill-considered actions and decisions*, they are less likely to take a possible punishment into consideration when making decisions." *Id.* at 2028-29 (emphasis added) (internal citations and quotations omitted). "Difficulties in weighing long-term consequences [and] a corresponding impulsiveness . . . can lead to poor decisions." *Graham*, 130 S. Ct. at 2032.

Justice Kennedy wrote in *Graham* that "Certain propositions lead us to conclude, in our own independent judgment, that the death penalty is not a proportional punishment for the rape of a child." *Id.* at 2022.

In *Roper v. Simmons,* 543 U.S. 551 (2005), the Supreme Court lifted juveniles from the category of execution eligibility. The reasons for not executing juveniles applies equally to a shaking baby case like Roberson.

In *Simmons,* Justice Kennedy explained that the death penalty cannot be imposed on person who did not contemplate death, or who is a juvenile, or who is insane, or who is mentally retarded "These rules vindicate the underlying principle that the death penalty is reserved for a narrow category of crimes and offenders." *Simmons*, 543 U.S. at 568-69.

Among the reasons why juveniles are ineligible for the death penalty is because of their "impetuous and ill-considered actions and decisions." *Simmons*, 543 U.S. at 569. "The

susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult." *Id.* at 570 (citations and quotations omitted).

In *Kennedy v. Louisiana,* 554 U.S. 407 (2008), the Court declared ineligible for the death penalty those who rape a child which did not result in the death of the victim, nor was intended to. "Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." 554 U.S. at 539 (citation and internal quotation marks omitted).

Roberson has all the features of someone lacking the constitutionally requisite culpability and therefore not the worst of the worst for whom the Eighth Amendment permits execution.

- He acted impulsively, not intentionally or deliberately or with malice;

- He acted recklessly, not according to a plannned course of action;

- He reacted on pure emotion in response to a crying child, not logically;

- He was intoxicated by drugs through stupidity and addiction, not a prelude to homicide;

- He comes from a family with a long history of mental illness;

- While not mentally retarded, he is certainly lacking in intellectual capacity.

What these cases inform is that there is a certain level of culpability that the defendant must have had in order to be eligible for execution. To become the worst of the worst and therefore eligible for execution, a defendant must possess culpability. There are individuals who are "categorically less culpable than the average criminal." *Simmons*, 543 U.S. at 569.

Another way of considering this is that retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial

degree, by an impulsive action without any contemplated malice or deliberateness, such as sudden loss of control by a parent who shakes a child and unintentionally causes a brain injury. There is no penalogical justification for executing an impulsive parent.

It is "less defensible to impose the death penalty as *retribution* for past crimes and less likely that the death will have a real *deterrence* effect." For instance, juveniles are not engaged "in the kind of cost-benefit analysis that attaches any weight to the possibility of execution" *Simmons*. Identically, Roberson was not engaged "in the kind of cost-benefit analysis that attaches any weight to the possibility of execution." His execution would deter no one.

### ANALYSIS OF THE STATE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW: THE STATE COURT'S F&CS DO NOT CONSTITUTE REASONABLE APPLICATION OF FEDERAL LAW. THEREFORE, THE AEDPA IS NOT A BAR TO RELIEF BY THIS COURT.

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which

denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi,* 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky,* 466 U.S. 341, 348-49 (1984) (state court denial of

relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen,* 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

- if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted

212

petition.  We have held that in such circumstances the later filed petition would not be 'second or successive.'  *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)."  "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles."  *Burton*, slip op. at 6 (citations omitted).

> ***Claim Number 16:  Applicant's Fourteenth Amendment Right to Due Process and Eighth Amendment Right to Be Free from the Arbitrary and Capricious Infliction of the Death Penalty Were Violated Because the Statute under Which Applicant Was Sentenced to Death  Allows the Jury Too Much Discretion to Determine Who Should Live and Who Should Die and Because it Lacks the Minimal Standards and Guidance Necessary for the Jury to Avoid the Arbitrary and Capricious Imposition of the Death Penalty.***

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. CONST. amend VIII.  The ban on cruel and unusual punishments is applicable to the States via the due process clause of the Fourteenth Amendment.  *See, e.g.*, *Robinson*, 370 U.S. at 675.

The fundamental respect for humanity underlying the Eighth Amendment requires that consideration of the character and record of the individual offender and the circumstances of the particular offense are constitutionally indispensable parts of the process of inflicting the death penalty.  *See, e.g.*, *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976).  Unfortunately, the evolution of the Death Penalty has come full circle because, under the present Texas statute applied to Applicant, the jury has again been given unfettered discretion that both invites and permits arbitrary application of the ultimate penalty.  *Cf. Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (plurality op.) ("*Furman*[38] mandates that where discretion is afforded a sentencing body on a matter

---

[38]  *See Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam).

so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").

The Texas Legislature reacted to *Penry I*[39] by amending article 37.071 to include a mitigation instruction. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(1)(Vernon Supp. 2002). This instruction in effect allows the jury to impose a life sentence if, in their sole discretion, they choose to do so. *See id.*

As Justice Blackmun noted in his dissent to denial of certiorari in *Callins v. Collins*, to comply with the mandates of the Eighth Amendment, the death penalty must be fairly administered with reasonable consistency. *See Callins v. Collins*, 114 S. Ct. 1127, 1129 (1994) (mem.) (Blackmun, J., dissenting). In its current formulation, the Texas scheme does not insure such a reasonably consistent application of the ultimate penalty. Therefore, the statute should be found unconstitutional.

The very nature of the mitigation special issue allows the jury to decide, without any guidance, who should live and who should die. The mitigation special issue allows juries to decide what, if anything, is "mitigation" and to completely disregard any such mitigation evidence if they so choose. Thus, the instruction allows juries to kill a defendant simply because they are afraid of a person who is different, whether that difference is race,[40] unsightliness, mental illness, or a

---

[39] *See Penry v. Lynaugh*, 492 U.S. 302, 322-28 (1989).

[40] *Cf.* James Kimberly et al., *More Racial Testimony Found in Capital Cases*, HOUS. CHRON., June 9, 2000, at A1 (discussing testimony of expert asserting race as factor that contributes to future dangerousness that caused the U.S. Supreme Court to overturn a Texas death penalty sentence); *Saldano v. Texas*, 530 U.S. 1212 (2000) (mem.).

difference relating to a host of other improper considerations. The arbitrariness and capriciousness that results from this unfettered discretion renders the present scheme unconstitutional. *See Gregg*, 428 U.S. at 189.

Under these circumstances, this Court should declare the statutory scheme under which Applicant was convicted and sentenced to death unconstitutional in violation of the Eighth Amendment and vacate his death sentence.

### ANALYSIS OF THE STATE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW: THE STATE COURT'S F&CS DO NOT CONSTITUTE REASONABLE APPLICATION OF FEDERAL LAW. THEREFORE, THE AEDPA IS NOT A BAR TO RELIEF BY THIS COURT.

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally

defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain*, 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes*, 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi*, 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky*, 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen*, 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

- if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or

successive.'  *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)."  "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles."  *Burton*, slip op. at 6 (citations omitted).

> **Claim Number 17: Applicant's Fourteenth Amendment Right to Due Process and Eighth Amendment Rights as Interpreted in <u>Penry v. Johnson</u> Were Violated Because the Mitigation Special Issue Set Forth in the Texas Death Penalty Statute Sends Mixed Signals to the Jury Thereby Rendering Any Verdict Reached in Response to That Special Issue Intolerably Unreliable.**

This Court should hold that the Texas death penalty scheme violates the Eighth Amendment under the Supreme Court's recent decision in *Penry v. Johnson,* 121 S. Ct. 1910 (2001) (hereinafter "*Penry II*").  While the opinion in that case only repudiated a judicially-crafted mitigation instruction, the statutory mitigation special issue given in Applicant's case is similarly vulnerable to the criticism that it sends "mixed signals" to the jury.

In *Penry II*, the Supreme Court addressed a judicially-crafted response to the defect in Texas law identified in *Penry v. Lynaugh*, 492 U.S. 302 (1989) (hereinafter "*Penry I*").  In *Penry I*, the Supreme Court held that the then-existing statutory special issues did not provide an adequate mechanism  for the jury to give effect to mitigating factors which could justify the assessment of a life sentence rather than the death penalty.  *See Penry I*, 492 U.S. at 322-28.  The original concept in *Penry I* was that the statutory instructions were inadequate, even if mitigating evidence might fit within a statutory special issue, if the introduction of such evidence was a "two-edged sword," *i.e.* if the evidence could also have aggravating effect.  *See id.* at 323-24.

In *Penry II*, a supplemental instruction was given that basically told the jury that it should show its finding of sufficient mitigating evidence by converting what otherwise would be a "Yes"

answer to one of the special issues into a "No" answer. *See id.* at 1921-22. This method was deemed a "nullification instruction" because the answer which otherwise would fit a special-issue question would be "nullified" for the sake of giving effect to mitigating evidence. *See id.*

The Court began by holding that the "nullification" technique was "confusing" because the instructions, taken as a whole, were susceptible to two different readings by the jury. *See id.* The first possibility was that the jurors might understand the instruction as requiring them to "take Penry's mitigating evidence into account in determining their truthful answers to each special issue." *See id.* at 1921. If so, however, "the supplemental instruction placed the jury in no better position than was the jury in *Penry I*." *See id.* This was because "none of the special issues is broad enough to provide a vehicle for the jury to give mitigating effect to the evidence of Penry's mental retardation and childhood abuse. *See id.* (citing *Penry I*, 492 U.S. at 322-25).

The Court then went on to consider the possibility that the jury understood the supplemental instruction as a "nullification instruction." *See Penry II*, 121 S. Ct. at 1921-22. If so, the Court held, "it made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation." *See id.* The Court specifically referred to the fact that jurors took an oath to render a "true verdict" under article 35.22, Texas Code of Criminal Procedure,[41] and "nullifying" for the sake of mitigation would violate the oath. *See Penry II*, 121 S. Ct. at 1922. The Court found that there was at least a "reasonable likelihood" that jurors who believed in their oath would not follow the "nullification instruction." *See id.* Even when the explanatory role of attorneys' argument was

---

[41] *See* TEX. CODE CRIM. PROC. ANN. art. 35.22 (Vernon 1989) (jurors to be administered oath swearing "you will a true verdict render").

taken into account, the majority opinion held that "at best, the jury received mixed signals." *See id.* at 1923.

Thus, the rationale of *Penry II* is the finding that the charge sent the jury "mixed signals," even when the full charge and the trial context were considered. This rationale went to the heart of the "reliability" issue which, as noted in *Penry II*, underlay the original holding in *Penry I. See Penry II*, 121 S. Ct. at 1920-1921.

The question here then becomes whether the statutory "mitigation" issue submitted to the jury in this case also suffers from the constitutional flaw of sending "mixed signals." To pose the question is to answer it, for this Court has already acknowledged that the statutory issue is unclear as to the burden of proof. *See Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995), *cert. denied*, 519 U.S. 826 (1996).

Because the mitigation special issue submitted to the jury pursuant to the dictates of article 37.071 sent "mixed signals" to the jury, that statute is unconstitutional in violation of the Eighth Amendment as interpreted in *Penry II*. Consequently, Applicant's conviction was secured in violation of his right to Eighth Amendment rights as applicable via the Due Process clause of the Fourteenth Amendment. Therefore, this Court should reverse Applicant's conviction and sentence, and remand this cause to the trial court.

### ANALYSIS OF THE STATE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW: THE STATE COURT'S F&CS DO NOT CONSTITUTE REASONABLE APPLICATION OF FEDERAL LAW. THEREFORE, THE AEDPA IS NOT A BAR TO RELIEF BY THIS COURT.

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA

in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi,* 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky,* 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen,* 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

- if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

**Claim Number 18: The Special Sentencing Issue Asking Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Because It Does Not Provide a Means for Jurors to Give Effect to the Mitigating Circumstances Warranting a Life Sentence.**

**Claim Number 19: The Special Sentencing Issue Asking Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution Because It Does Not Provide a Means for Jurors to Give Effect to the Mitigating Circumstances Warranting a Life Sentence.**

***Claim Number 20: The Special Sentencing Issue Asking Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Because It Shifts the Burden of Proof to the Defendant to Prove that Sufficient Mitigating Circumstances Exist to Warrant a Life Sentence.***

***Claim Number 21: The Special Sentencing Issue Asking Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution Because It Shifts the Burden of Proof to the Defendant to Prove that Sufficient Mitigating Circumstances Exist to Warrant a Life Sentence.***

***Claim Number 22: The Special Sentencing Issue Asking Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Because It Does Not Require Jurors to Consider Mitigating Circumstances Alone in Determining Whether a Life Sentence is Warranted.***

***Claim Number 23: The Special Sentencing Issue Asking Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution Because It Does Not Require Jurors to Consider Mitigating Circumstances Alone in Determining Whether a Life Sentence is Warranted.***

In these issues, Roberson attacks the constitutionality of Texas Code of Criminal Procedure Article 37.071. This statute requires the jury in a death penalty case to answer a special issue in the sentencing phase answering whether there are sufficient mitigating circumstances to warrant a life sentence.

***Discussion.*** As mentioned, in the sentencing phase of the trial, the jurors were required to answer two special issues. Of concern here is the second special issue:

### Special Issue No. 2
Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

**Answer**

> We the jury, unanimously find and determine beyond a reasonable
> doubt that the answer to this Special Issue is "No."

> */s/ signature*
> _____
> Presiding Juror

2003 Clerk Record at 642 (filed Feb. 14, 2003).

First, the special issue on mitigation forces jurors to weigh the aggravating circumstances against mitigating circumstances, without informing them that such is their task. Nor are jurors told the process by which they are to work through this weighing process.

The court's charge limited jury consideration of mitigating evidence to just three categories: (1) Roberson's "background," (2) Roberson's "character," and (3) "circumstances of the offense," or (4) record. The jury was never told how to weigh this evidence against the aggravating factors found in the first special issue, and the circumstances of the offense.

It is important to understand that by the time the jurors have reached special issue number two on mitigation, the jurors would have worked through one other issue.

When the jurors turned to the first special issue, they were asked to decide whether Roberson was probably going to be violent in the future. This question also by necessity requires the jurors to sift Roberson's actions and weigh them against mitigating events or circumstances which would affect his willingness to use violence in the future, such as abstinence from alcohol use, his age, his age when paroled, his level of intelligence, the positive nature of his upbringing, his lack of aggression in jail and prison, his religious beliefs, and so forth.

So consequently, by the time the jurors even reach the second special issue on mitigation, they have considered and rejected all of the defendant's mitigating circumstances. What they need at this stage is a special issue which compels them to *consider the mitigating circumstances alone*, without any reference at all to the aggravating circumstances of the crime or his past conduct. Otherwise, special issue three is moot. Rhetorically, how could the jurors suddenly find in special issue number two that they were wrong in special issue one?

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. *See, e.g., Walton v. Arizona,* 100 S. Ct. 3047, 3055 (1990) (State's method of allocating the burdens of proof during capital sentencing phase cannot "lessen the State's burden, to prove the existence of aggravating factors"). In order to understand why *Walton* applies to the statutory "Penry" special issue, this Court must recognize that this special issue is a conduit for aggravating (as well as mitigating) factors. By asking jurors to determine whether there are "sufficient . . . mitigating circumstances," Tex. Code Crim. Pro. Art. 37.071, Sec. 2(e), the statutory special issue in effect tells jurors to consider any possible aggravating factors that may outweigh the mitigating factors present in the case. Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute. *Johnson v. Texas,* 113 S.Ct. 2568 (1993) (describing juror's determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances). Because the statute is silent about whether either the State or the Defense has the burden of proof on aggravating factors, and moreover, because the language of the special issue implies that the burden to disprove aggravating circumstances is on the

Defense, the statute is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

**Texas Law.** The Texas Court of Criminal Appeals has considered the constitutionality of the mitigation special issue and disagreed. *See, e.g., Matchett v. State*, 941 S.W.2d 922, 935 (Tex. Crim. App. 1996) (en banc) ("We have held that a mitigating instruction need not assign a burden of proof."), *cert. denied*, 117 S. Ct. 2487 (1997); *Eldridge v. State*, 940 S.W.2d 646 (Tex. Crim. App. 1996); *McFarland v. State*, 928 S.W.2d 482 (Tex. Crim. App. 1996) (en banc); *Barnes v. State*, 876 S.W.2d 316 (Tex. Crim. App. 1994), *cert. denied*, 513 U.S. 861 (1995); *Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995) (en banc), *cert. denied*, 117 S. Ct. 88 (1996).

Another problem with the mitigation special issue is that it required Roberson to prove that he should receive a life sentence. The special issue imposed the burden on him to show jurors that sufficient mitigating circumstances outweighed all of the aggravating ones associated with his two crimes and justified a life sentence.

To be sure, the special issue does not *say* that the burden of proof is on the defendant. Nor does it use the term "aggravating circumstances." Nevertheless, the effect is real.

Article 37.0711 orders jurors to answer two special issues. Article 37.0711, section 3© ) states, "The State must prove each issue submitted under subsection (b) of this article beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue submitted under Subsection (b) of the Article." Tex. Code Crim. Proc. Art. 37.0711, § 3© ) (Vernon 2002). The jury instructions in Roberson's case told jurors that the burden of proof was on the State to prove the first special issue.

227

It is a different matter, however, when jurors move to the final special issue. Here, article 37.0711 mentions nothing about the burden of proof on the mitigation special issue. There is no question, however, that the question is designed to place the burden on the defendant. First, the special issue uses the word "sufficient." Jurors must find that there is "sufficient" evidence of a mitigating circumstance to warrant a life sentence. By its nature, for there to be "sufficient" mitigating evidence, it must be the defendant who brings it.

An additional problem with the mitigation special issue is that it provides no mechanism for the jury to vote in favor of a life sentence if truly desired. First, the special issue places no legal limitation on what circumstances are considered mitigating. Second, jurors are instructed to consider all mitigating evidence without reference to the other two special issues. Third, scarcely any of the terms are defined. Fourth, "mitigating circumstances" are defined as limited only to those which reduce the defendant's "moral blameworthiness," another term left undefined. Fifth, the jurors are left to guess the proportion by which they are to weigh mitigating circumstances against aggravating circumstances. Sixth, jurors are not told that they are required to weigh aggravating circumstances, although that is actually what they are asked to do.

Consequently, there may be a juror who finds that a life sentence is warranted, even though he feels mitigating circumstances do not outweigh aggravating ones. There may be a juror who feels mercy, or compassion, or religious views, or the man's chances for salvation or rehabilitation should call for a life sentence, notwithstanding all he has learned about the ugly aspects of the crime. Such a juror, however, will find that there is no means of giving effect to his decision by writing "yes" to the mitigation special issue.

***A****NALYSIS OF THE* **S****TATE* **C****OURT'S* **F****INDINGS OF* **F****ACT AND* **C****ONCLUSIONS OF* **L****AW:* **T****HE* **S****TATE* **C****OURT'S* **F&C****S* **D****O* **N****OT* **C****ONSTITUTE* **R****EASONABLE* **A****PPLICATION OF* **F****EDERAL* **L****AW. *T****HEREFORE, THE* **AEDPA** *IS NOT A* **B****AR TO* **R****ELIEF* **B****Y* **T****HIS* **C****OURT.***

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi,* 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky,* 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen,* 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

• if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

### Ground for Relief 24: The Trial Court Violated the Eighth and Fourteenth Amendments to the United States Constitution by Failing to Instruct the Jury That the a "No" Vote by a Single Jury Member Would Result in a Life Sentence Instead of Death Despite the Statutory Requirement of 10 Votes for a "No" Answer to Article 37.071 § 2(b)(1) or for a "Yes" Vote to Article 37.071 § 2(e).

***Ground for Relief 25: The Trial Court Violated Article I, §§ 10, 13, and 19 of the Texas Constitution by Failing to Instruct the Jury That the a "No" Vote by a Single Jury Member Would Result in a Life Sentence Instead of Death Despite the Statutory Requirement of 10 Votes for a "No" Answer to Article 37.071 § 2(b)(1) or for a "Yes" Vote to Article 37.071 § 2(e).***

These two points of error challenges the practice in Texas of instructing capital jurors that ten of them must agree to vote "no" on one of the first two special issues, when in fact only a single no vote is required in order for a defendant to receive life.

The Court of Criminal Appeals has consistently upheld the constitutionality of Article 37.071(2)(a), and Roberson will not belabor the point. *Eldridge v. State*, 940 S.W.2d 646, 1996 Tex. Crim. App. LEXIS 235, *4-7 (Tex. Crim. App. 1996); *Draughon v. State,* 831 S.W.2d 331, 337-38 (Tex. Crim. App. 1992); *Emery v. State,* 881 S.W.2d 702, 711 (Tex. Crim. App. 1994); *Sattiewhite v. State,* 786 S.W.2d 271, 278 (Tex. Crim. App. 1989), and to *Clark v. State,* 881 S.W.2d 682, 692 (Tex. Crim. App. 1994). The Fifth Circuit has barred the claim for similar reasons. He raises it merely to preserve Supreme Court review.

### *ANALYSIS OF THE STATE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW: THE STATE COURT'S F&CS DO NOT CONSTITUTE REASONABLE APPLICATION OF FEDERAL LAW. THEREFORE, THE AEDPA IS NOT A BAR TO RELIEF BY THIS COURT.*

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol.

232

17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

233

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas,* 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi,* 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky,* 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen,* 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi,* 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

- if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

### Ground for Relief 26: Article 37.071 § 2(e) Is Unconstitutional Under the Eighth and Fourteenth Amendments to the United States Constitution Because Appellate Review of the Second Special Issue Is Impossible.

In this ground, Roberson makes precisely the same argument rejected in *Eldridge v. State*, 940 S.W.2d 646, 1996 Tex. Crim. App. LEXIS 235, *12-13 (Tex. Crim. App. 1996). The second special issue asks jurors to decide whether the defendant is a future danger to society. The problem is that the jury's answer is not capable of appellate review. *Eldridge* resolved the matter this way:

> Under Article 37.071 § 2(f), the jury determines whether any evidence has mitigating effect and, if so, how much. We have said that these two decisions are normative and therefore are not reviewable by this Court. *Lawton v. State,* 913 S.W.2d 542, 557 (Tex. Crim. App. 1995). So long as the jury has all potentially relevant evidence before it, we continue to defer to the jury and believe its unfettered discretion under Article 37.071 § 2(e) is constitutionally valid. *Id.* As we have consistently done in the past, we decline to review the jury's decision on the mitigation special issue. *See Hughes v. State,* 897 S.W.2d 285, 294 (Tex. Crim. App. 1994), *cert. denied,* 131 L. Ed. 2d 857, 115 S. Ct. 1967 (1995); *Colella v. State,* 915 S.W.2d 834 (Tex. Crim. App. 1995).

Appellant is therefore correct to say that appellate review of a capital jury's Article 37.071 § 2(e) decision is impossible. But this is not enough to render the capital sentencing scheme unconstitutional. This Court makes sufficiency reviews of Texas juries' guilt/innocence and Article 37.071 § 2(b)(1) future dangerousness decisions. These decisions are factbound and hence reviewable for sufficiency of the evidence. As long as these determinations can be reviewed, we are satisfied that the constitutionality of Article 37.071 is not contingent on appellate review of the second special issue. In *Burns v. State,* 761 S.W.2d 353 (Tex. Crim. App. 1988), we said that "it is doubtful [that] Eighth Amendment or Due Process considerations absolutely require this Court to reweigh punishment evidence . . ." *Id.*, at 356, n. 4., *citing Pulley v. Harris,* 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984). We have never regarded a mitigation sufficiency review as a prerequisite to the constitutionality of Article 37.071. See *Lawton,* 913 S.W.2d at 547. Accordingly, we overrule appellant's fourth point of error.

*Eldridge v. State*, 940 S.W.2d 646, 1996 Tex. Crim. App. LEXIS 235 at *14-15.

Again, the matter is raised merely to preserve for Supreme Court review. Roberson incorporates by reference the claims and arguments made by Eldridge's attorneys presented .

### ANALYSIS OF THE STATE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW: THE STATE COURT'S F&CS DO NOT CONSTITUTE REASONABLE APPLICATION OF FEDERAL LAW. THEREFORE, THE AEDPA IS NOT A BAR TO RELIEF BY THIS COURT.

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court in its 41-page July 21, 2005 findings and conclusions. See C.R. vol. 17 at 2744. Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition. *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds." *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review. *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due

process or result in a waiver of a fundamental right. *See Johnson v. Mississippi,* 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky,* 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen,* 442 U.S. 140, 150-51 (1979);

•        the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

•        "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

•        if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

•        if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and

unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

> ***Claim for Relief 28: Science Evidence Demonstrates That the Jury Instructions Used in the Sentencing Phase Failed to Explain the Concept of Mitigating Evidence, Thereby Violating Roberson's Rights to a Fair Trial, Due Process, Equal Protection, and Not to Suffer Cruel and Unusual Punishment as Guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the Federal Constitution.***

> ***Claim for Relief 29: Social Science Evidence Demonstrates That the Jury Instructions Used in the Sentencing Phase Failed to Define Key Terms "Criminal Acts of Violence," "Probability," "Continuing Threat," "Society," Thereby Violating Roberson's Rights to a Fair Trial, Due Process, Equal Protection, and Not to Suffer Cruel and Unusual Punishment as Guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the Federal Constitution.***

> ***Claim for Relief 30: Social Science Evidence Aside, The Jury Instructions Used in the Sentencing Phase Failed to Define Key Terms "Criminal Acts of Violence," "Probability," "Continuing Threat," "Society," "Mitigating Evidence," and "Culpability" Thereby Violating Roberson's Rights to a Fair Trial, Due Process, Equal Protection, and Not to Suffer Cruel and Unusual Punishment as Guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the Federal Constitution.***

Roberson next contends that several of his constitutional rights were violated by the use of jury instructions in the sentencing phase which failed to permit the jury to consider and give effect to mitigating evidence. The point here is that because of the language used in the instructions, a reasonable juror would not have believed he or she was permitted to consider mitigating evidence.

This ground for relief requires a comprehensive explanation of the demand by the Supreme Court that jury instructions not only be technically accurate, but actually succeed in conveying vital concepts to the ordinary men and women called upon to decide life and death issues.

Attached to this application are affidavits from social scientists who have reviewed capital jury instructions in other Texas capital murder cases. In those cases, the experts found that jurors probably would have been confused and misled as to the application of the death penalty procedures.

### A.    Overview of Constitutional Law

Accurate and well-understood jury instructions are not simply a good idea, they are required by the federal and state constitution. Instructions which do not state the law properly or which cannot be adequately understood by a jury violate no the Eighth Amendment's guarantee against cruel and unusual punishment and the due process clause of the Fourteenth Amendment.

Parenthetically, the terms "instruction" and "charge" will be used interchangeably to refer to the written instructions on the law supplied to a jury and designed to guide the jury to a verdict. There is a technical distinction between the two, however. The charge is often referred to as the final address to the jury by the judge in which he instructs the jury as to the law it is to apply to the case. Black's Law Dictionary 233 (6th ed. 1990). Conversely, instructions are oral statements made to the jury at various points throughout the trial. *Id.* at 356; *see also* J. Patrick Jones, Note, *Jury Instructions v. Jury Charge*, 82 W. Va. L. Rev. 555, 555-56 (1980).

The due process clause of the Fourteenth Amendment requires that juries receive adequate guidance in applying the law. *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979); *Cupp v. Naughten*, 414 U.S. 141, 147-48 (1973). Its concern is with what might be called the "accuracy" of the verdict and in assuring that no citizen is convicted unless the government is held to the high standard of

"beyond a reasonable doubt."  "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  "The reasonable doubt standard reduces the risk that an error in fact finding could deprive an innocent man his good name and freedom."  *Cupp v. Naughten,* 414 U.S. 141, 155 (1973) (Brennan, J., dissenting).  Further, the standard "impresses the jurors with their solemn responsibility to avoid being misled by suspicion, conjecture, or mere appearance."  *Id.*  Thus, it is because of the Due Process Clause's demand for accuracy, that jury instructions which can be read by a juror to presume an element of the State's case are unconstitutional.  *See, e.g., Sandstrom v. Montana*, 442 U.S. 510, 524 (1979).  Likewise, the Due Process Clause prohibits a charge requiring, as a predicate to considering a witness' testimony, that the jury find the witness' evidence true beyond a reasonable doubt.  *See Cool v. United States*, 409 U.S. 100, 104 (1972).  Obviously, the quality of instructions supplied to a jury is vital to conducting a fair trial because the accuracy with which law is applied is largely a function of each juror's ability to understand a correct statement of the law.

In capital cases, the Cruel and Unusual Punishment Clause of the Eighth Amendment requires the jury to weigh mitigating and aggravating circumstances in order to assure that death is the appropriate punishment in a particular case.  *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976).  As with the Due Process Clause, the concern underlying the Constitution's protection against Cruel and Unusual Punishment is accuracy that the punishment should be "directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 2947 (1989).  The Court will reject a jury charge which restricts a jury from considering all relevant mitigating factors.  *See id.*, 109 S. Ct. at 2947;

*Lockett v. Ohio*, 438 U.S. 586, 605-09 (1978).  Further, the instructions in a capital case must go beyond merely allowing a jury to consider the defendant's mitigating circumstances and must direct jurors to give effect to any mitigating factors in favor of a sentence short of death.  *See Penry*, 492 U.S. at _____, 109 S. Ct. at 2947, 2951.  Obviously, a jury cannot appropriately balance various mitigating and aggravating aspects of the defendant's life and conduct without clear instructions which methodically guide jurors through the necessary considerations.

In order for a defendant to receive a fair trial in compliance with these constitutional imperatives, the Supreme Court has determined that jury instructions must be technically corrects as well as comprehensible to the juror.  A verdict will be reversed for faulty instructions when (1) there is a *reasonable likelihood* that the jury misinterpreted the instructions, (2) the resulting error was harmful, and (3) the error was not corrected.  Each of the concepts raised by these rules will be examined in detail.

### B.     *Social Science Studies*

Legal scholars have long suspected that juries have difficulty understanding court instructions.  *See, e.g.,* Jerome Frank, Law and the Modern Mind 181-82 (1930); Lawrence Friedman, A History of American Law 137 (1973) (lamenting instructions as "stereotyped, antiseptic statements of abstract rules"); Robert M. Hunter, *Law in the Jury Room*, 2 Ohio St. L.J. 1 (1935) (collection of anecdotal observations).  *See generally* Arthur D. Austin, Complex Litigation Confronts the Jury System: A Case Study 55-65 (1984) (author interviewed two sets of jurors in a complex antitrust suit and found that jurors had a great deal of difficulty with the concepts involved and the poor language of instructions); John Guinther, The Jury in America 70-73 (1988) (survey of jury decision making); Saul M. Kassin & Lawrence S. Wrightsman, The American Jury on Trial

141-63 (1988) (criticism of the incomprehensibility of jury instructions); Edith Greene, *Judge's Instruction on Eyewitness Testimony: Evaluation and Revision*, 18 J. Applied Soc. Psychol. 252, 259 (1988) (standard instruction on eyewitness testimony did not increase juror understanding); Saul M. Kassin & Lawrence S. Wrightsman, *On the Requirements of Proof: The Timing of Judicial Instruction and Mock Juror Verdicts*, *in* In the Jury Box 143, 144-45 (Lawrence S. Wrightsman et al. eds., 1977) (summarizing criticisms of jury instructions); Robert L. Winslow, *The Instruction Ritual*, 13 Hast. L.J. 456 (1962) (recommending that pattern instructions define abstract legal concepts by describing within factual context).

Serious empirical testing of juror comprehension, however, did not begin until the early 1970's. *See, e.g.,* Robert F. Forston, *Judge's Instructions: A Quantitative Analysis of Jurors' Listening Comprehension*, Today's Speech, Fall 1970, at 34. All studies consistently point to failure by jurors to understand jury instructions. For example, the 1990 Michigan Juror Comprehension Project tested actual jurors who had rendered verdicts in criminal trials only a few minutes before being interviewed by researchers. As jurors completed jury duty, they were asked to complete an extensive questionnaire regarding their understanding of the pattern jury instructions used in the trial just completed. Kramer & Koenig, *supra*, at 410. The researchers found that many jurors failed to understand critical aspects of the law even after having heard the judge read the instructions, after having read the instructions themselves, and after having discussed the instructions in deliberation. *Id.* at 429-33. For example, when asked whether an assault must include actual physical injury to the victim, only 32% of those jurors who heard patterns instructions on assault--jurors who had completed only minutes before a trial in which the defendant had been charge with assault--answered correctly that an assault did not require a physical injury. *Id.* at 423; *see also id.* at 409-10.

Findings by other social scientists consistently confirm that lay persons are frequently bewildered by the wording of jury instructions. Reid Hastie et al., Inside the Jury (1983) (examination of dynamics of jury decision making); Ellsworth, *supra*, at 218-23 (finding that deliberation did not cure juror misunderstanding); Amiram Elwork, et al., *Juridic Decisions in Ignorance of the Law or in Light of It?* 1 L. & Hum. Behav. 163, 175-76 (1977) (finding that mock jurors were much more likely to comprehend and remember revised instructions than pattern ones.); Norman J. Finkel & Sharon F. Handel, *Jurors and Insanity*: *Do Test Instructions Instruct?* 1 Forensic Reports 65, 75 (1988) (finding that jury instructions on insanity had no more effect on verdicts than giving no instructions at all); Forston, *supra*, at 610-12 (finding that jurors were confused by legal concepts as well as by deliberation proceedings); Jane Goodman & Edith Greene, *The Use of Paraphrase Analysis in the Simplification of Jury Instructions*, 4 J. Soc. Behav. & Personality 237, 246-50 (1989) (finding that jurors failed to understand intent and burden of proof); Harold M. Hoffman & Joseph Brodley, *Jurors on Trial*, 17 Mo. L. Rev. 235 (1952) (revealing from juror interviews that jurors misunderstand a variety of aspects of trial); Irene Glassman Prager, *Improving Juror Understanding For Intervening Causation Instructions*, 3 Forensic Reports 187, 187-88 (1989) (finding that jurors were far more likely to understand revised instruction on intervening causation than pattern version); William W. Schwarzer, *Communicating with Juries: Problems and Remedies*, 69 Calif. L. Rev. 731, 738-39 (1981) (describing comprehensibility problems with pattern jury instructions); Laurence J. Severance & Elizabeth F. Loftus, *Improving the Ability of Jurors to Comprehend and Apply Criminal Jury Instructions*, 17 L. & Soc'y Rev. 153, 183 (1982) (finding that mock jurors given pattern instructions on intent and reasonable doubt did not perform any better than jurors who received no instructions at all); Walter M. Steele, Jr. &

Elizabeth G. Thornburg, *Jury Instructions: A Persistent Failure to Communicate*, 67 N.C.L. Rev. 77, 88-89 (1988) (finding that jurors had a poor grasp of pattern instructions but improved with revised versions).

Researchers blame poor understanding on legal phraseology and undefined terms by lawyers. *See, e.g.,* Robert P. Charrow & Veda R. Charrow, *Making Legal Language Understandable: A Psycholinguistic Study of Jury Instructions*, 79 Colum. L. Rev. 1306 (1979) (ground-breaking research on jury misunderstanding).

Even research in the last three years continues to bear out earlier studies, finding over and over that jurors commonly fail to understand capital sentencing instructions. *See* Shari S. Diamond & Judith N. Levi, *Improving Decisions on Death By Revising and Testing Jury Instructions*, 79 Judicature 224 (Mar.-Apr. 1996) (Review of *Free* Zeisel study and proposing revisions); William J. Bowers, *The Capital Jury Project: Rationale, Design, and Preview of Early Findings*, 70 Ind. L.J. 1043 (1995); Shari S. Diamond & Jonathan D. Casper, *Empirical Evidence and the Death Penalty*, 50 J. Soc. Issues 177 (1994); Shari S. Diamond, *Instructing on Death*, 48 Am. Psychol. 423 (Apr. 1993) (analyzing affect of instructions on comprehension); James Luginbuhl & Julie Howe, *Discretion in Capital Sentencing Instructions Guided or Misguided*, 70 Ind. L.J. 1161 (1995) (finding 41% of tested jurors believed mitigating evidence required proof beyond reasonable doubt).

## C.     *Application to Roberson's Trial.*

Having examined the Supreme Court's requirements at length and further considered social science reports demonstrating that jurors commonly fail to understand jury instructions, one can now turn to the case at hand. Despite the Supreme Court's demand in *Lockett* and *Penry* that capital juries be permitted to give independent mitigating weight to the defendant's character and evidence

offered in mitigation of a capital murder, the trial court submitted instructions and special issues at punishment to the jury which prohibited the jury from giving full consideration to mitigating evidence offered by Roberson.

Several shortcomings of Roberson's instructions are apparent immediately. The most critical terms are left undefined. The term "reasonable expectation" in the first issue is undefined. Jurors were left to guess the meaning of vital words in the second issue such as "probability," "criminal acts of violence," "continuing threat," and "society." There is no option permitting jurors to sentence Roberson to life without parole. Nor is there any indication that jurors could consider "society" to mean Roberson's society among inmates in a structured prison environment.

The worst aspect of Roberson's trial immediately becomes apparent. The prosecutors deliberately misled jurors to believe that Roberson was a child rapist. Were it not for the sexual assault allegations at every step of the trial, there is a high likelihood that jurors would have voted for a life sentence because they would have seen this case for what it is: a baby shaking case. The sexual assault allegations infused prejudice in every aspect of deliberations and the jury's definition of the key sentencing terms.

Applying the test initiated by Chief Justice Rehnquist in *Boyde*, there is a reasonable likelihood that the jurors in Roberson's trial failed to understand the court's charge to the jury in two critical respects. First, the jurors almost certainly failed to understand that the law permitted them to consider and give effect to the mitigating evidence offered by his lawyers in the punishment phase. Second, the jurors failed to understand that the term "probability" used in the first special punishment issue had special legal significance that meant far more than "possibility."

The next step is to determine whether these errors were harmful to Roberson and went uncorrected by other events at trial. The careful analysis required by *Yates* indicates that these errors were vitally important in relation to everything else the jury considered on these special issues. Given the brief number of words in the special issues and the irresistible force by the court's instructions and State's effort to concentrate jurors' attention on the murder of the child, and Roberson's past crimes, it is beyond reasonable doubt that the jurors relied on these misleading instructions to reach their verdict of death against Roberson. Recalling the harmless error analysis, one must first identify precisely what evidence the jury actually considered in reaching its verdict and secondly, conclude whether this evidence possessed sufficient probative force to cause the jury to reach the proper verdict despite the demand of the improper instruction.

One of the jurors provided an affidavit explaining that many of the members of the jurors misunderstood the term "society" and would have voted for life had they realized that society meant only prison. (C.R. vol. 5 at 709.)

The real question then is whether the jury could have considered Roberson's mitigating evidence in answering these two questions. One must conclude that they did not. Roberson offered substantial mitigating evidence. Such evidence is of no use as to whether he is a future threat to society. The second special issue likewise does not sufficiently allow consideration of mitigating evidence and places the burden of proof on Roberson.

Having identified that the jury would have considered the State's evidence but not Roberson's the second step in the harmful error analysis is to determine whether the evidence presented to by the State possessed such probative force to cause the jury to reach the proper verdict despite the demand of the improper instructions. Here too, the instructions fall short. The State

argued that there was evidence demonstrating the viciousness of the attack and Roberson's past crimes. The State did not present any evidence to overcome the error in the instructions that would have permitted the jury to realize they could consider mitigating evidence despite the poorly worded instructions compelling them to believe otherwise. Indeed, given the adversarial relationship, the State was not interested in presenting evidence to compel the jury to consider mitigating circumstances or evidence, or to suggest that "probability" meant far more than "possibility."

Notwithstanding the evidence presented by the State in punishment and presumptively relied upon by the jury, the State's evidence cannot be said to have been so strong (*i.e.,* of such probative force) that it is beyond reasonable doubt that the jury would have reached the same verdict even if the jury instructions (1) clearly contained language explicitly permitting unrestrained mitigating evidence, and (2) contained a carefully drafted definition of "probability." In the plainest language, the Court can only conclude that there was no constitutional violation if it concludes that it is beyond any reasonable doubt that the State's evidence was so overwhelming that the jury would have still voted for death even if the instructions had flawlessly permitted full consideration of mitigating evidence and defined "probability." It is impossible to do so in this case. There is no mechanism therefore, for the jury to grant a sentence of life to Roberson notwithstanding whatever else it may think about him or his crime.

In *Free v. Peters,* 806 F. Supp. 705 (N.D. Ill. 1992), *rev'd* 12 F.3d 700 (7th Cir. 1993), *cert. denied*, 115 U.S. 433 (1994), a federal district court ordered Illinois to resentence a death row inmate, concluding that the instructions to the jury in his case were fatally flawed. The basis for the court's decision was a detailed study by a social scientist named Dr. Hans Zeisel. The court determined that there was a reasonable likelihood under the *Boyde v. California* standard that the

248

instructions failed to provide sufficient guidance as the allocation of the burden of persuasion when determining whether to impose the death penalty upon consideration of the aggravating and mitigating factors. The district court also accepted Dr. Zeisel's finding that tests on mock jurors indicated the instructions would cause jurors to limit consideration of mitigating evidence. *Id.*

The Seventh Circuit Court of Appeals reversed, unwilling to void a state court's sentencing based on social science tests it viewed as flawed. *Free*, 12 F.3d at 704-05.

In *McDougall v. Dixon*, 921 F.2d 518 (4th Cir. 1990), *cert. denied*, 111 S. Ct. 2840 (1991), the Fourth Circuit Court of Appeals turned back a challenge to North Carolina's capital jury instructions based on testimony by a set of distinguished social science professors who determined the instructions limited consideration of mitigating evidence.

### *ANALYSIS OF THE STATE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW: THE STATE COURT'S F&CS DO NOT CONSTITUTE REASONABLE APPLICATION OF FEDERAL LAW. THEREFORE, THE AEDPA IS NOT A BAR TO RELIEF BY THIS COURT.*

Each of the claims presented by Roberson in this application have been exhausted and non procedurally defaulted. Each claim was presented at least once to the state trial court and the CCA in (1) Roberson's 2003 trial, (2) his 2004 CCA appeal brief, and (3) his 2004 state writ of habeas corpus.

Roberson's attorney objected to the definition of the term intentionally and requested a more clear explanation. (C.R. vol. 5 at 602.) He further objected on constitutional grounds to the improper and confusing use of terms in the sentencing charge to jurors. (C.R. vol. 5 at 628.) He raised these issues in his state habeas application, using the same claim numbers.

To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions

found by the state district court in its 41-page July 21, 2005 findings and conclusions.  See C.R. vol. 17 at 2744.  Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law.  First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits.  Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons:

- the substance of the claim was sufficiently presented to the state courts so that the "necessary arguable factual commonality" existed between the claim presented in state court and the claim presented in the federal habeas petition.  *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995);

- the claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds."  *See Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995);

- the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims.  The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review.  *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998);

- the state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.  *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977); *Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989));

- there has been no adjudication on the merits of the claim in state court, and the claim is exhausted, so the statute by its terms requires no deference to the state decision. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997);

- the federal claim is the 'substantial equivalent' of one presented to the state courts. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999);

- default, the state procedural rule (1) was not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result in a waiver of a fundamental right. *See Johnson v. Mississippi*, 486 U.S. 578, 587-89 (1988) (state court denial of post-conviction relief based on waiver was inadequate because state court previously allowed similar challenge despite omission); *James v. Kentucky*, 466 U.S. 341, 348-49 (1984) (state court denial of relief disallowed when based on distinction that is not clear or closely hewn); *County Court of Ulster County v. Allen*, 442 U.S. 140, 150-51 (1979);

- the state procedural bar rule is discretionary or and compliance with the rule has been lacking in some highly technical sense;

- "there is an absence of available [s]tate corrective process" or "circumstances exist that render the such process ineffective to protect the rights of the applicant."

- if there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

- if there has been a default, the petitioner is actually innocent of capital murder.

Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Moreover, in the event that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Roberson respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state

proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)." "Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

### *Conclusion*

Having considered the jury instructions in careful detail, one must conclude that they are flawed beyond repair. The analysis called for by *Sandstrom v. Montana* and *Boyde v California* demonstrates that the instructions are defective because they limited the jury's ability to consider Roberson's mitigating evidence. Moreover, the error was harmful and uncorrected. For these reasons, the Court must reverse and remand for a new trial.

**Claim Number 31: The Decision That the Evidence Was Sufficient to Support a Conviction for Capital Murder Was an Unreasonable Application of Clearly Established Constitutional Law.** *Jackson v. Virginia*, **443 U.S. 307 (1979), overruling** *Thompson v. City of Louisville*, **362 U.S. 199 (1960), citing** *In re Winship* **397 U.S. 358 (1970).**

Nobody saw it. Nobody heard it. Nobody admitted it. The crime scene and forensic evidence does not tell us who did it or what they were thinking.

From the standpoint of the jury, Roberson had improperly avoided prosecution on the child rape-murder part of the case. As the trial court allowed the case to go to the jury, Roberson seemed like a really bad man with too good of a lawyer. It did not take the jury long to take care of that little problem.

Direct appeal counsel for Roberson raised the factual and legal sufficiency issue as the sixth point of error to the Texas CCA. The substance of Roberson's argument on this point concerned the element of intent. He asserted that the evidence presented by the State as to his intent was insufficient to prove that he knowingly or intentionally committed the murder of a child under the age of six, or that such evidence was just as consistent with a finding that the appellant committed a lesser-included offense, and therefore could not be the basis of finding him guilty of capital murder beyond a reasonable doubt.

The record evidence does not make it clear how Nikki died. There was no eye or ear witness. Roberson has not confessed. The physical evidence is not convincing or satisfactory. Roberson brought Nikki to the hospital wounded but alive. The most reasonable inference from the record evidence is that Roberson simply does not know how or why Nikki died.

In addition to the very weak evidence of a sexual assault on his own child, the state adduced unsavory testimony about Roberson, including three felonies–theft and burglary. Roberson offered

expert testimony to the effect that there was much room for doubt as to whether he intentionally or knowingly killed Nikki. Even the summary of the crime facts in the CCA opinion fails to demonstrate proof of intent or knowledge beyond a reasonable doubt. Yes, Roberson was a dim-witted habitual criminal, a drug abuser with serious mental health issues and a poor set of parenting skills. But the entire body of evidence is hauntingly unsatisfactory as regards the degree of criminal culpability required to expose a citizen to the death penalty.

The most satisfactory explanation for this capital murder conviction is the weak, and legally abandoned, but nonetheless emotionally moving evidence and argument that Roberson sexually assaulted Nikki.

The *Jackson* standard presupposes a rational trier of fact. We do not have that here. The manipulation of our system done by the prosecutor under the auspices of the trial court, and later approved by the Texas CCA requires a different application of the *Jackson* standard that asks only if a rational trier of fact could have found the elements of the offense to have been proven beyond a reasonable doubt. In this case, the prosecutor and the Texas courts did all they could to make sure the jurors were not rational triers of fact. Our usual presumption in favor of jury verdicts and the convictions they support cannot apply with its usual force here without a serious offense to the Due Process Clause of the Fifth and Fourteenth Amendments, and the right to a fair and impartial jury guaranteed by the Sixth Amendment and the right to heightened reliability in capital proceedings secured by the Eighth Amendment.

Here is the way the CCA justified its decision regarding the sufficiency of the evidence of guilt:

"It was undisputed that the appellant was alone with Nikki's when she suffered the injuries. The jury also heard testimony that the appellant had a bad temper and that he would be set off by Nikki's crying, which she seemed to always do in his presence. When viewed in a light most favorable to the verdict, the evidence would allow a rational jury to find beyond a reasonable doubt that the appellant intentionally or knowingly caused Nikki's death. Point of error six is overruled."

The Texas CCA does not offer any plausible explanation why the usual presumption of innocence and the state's heavy burden of persuasion would not require that the most culpable mental state established by the circumstances present here was recklessness, not knowing.

The decision of the CCA is an unreasonable application of *In re Winship* 397 U.S. 358 (1970) [" ... the reasonable doubt standard is indispensable, for it "impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." *Id.* (Citing authority).

On this record, the CCA decision marks a return to the "no evidence" standard of *Thompson v. City of Louisville*, 362 U.S. 199 (1960), and amounts to clear error.

**Claim Number 32: the Application of the "Child under Six" Aggravator, Section 19.03(a)(8) of the Texas Penal Code Was an Unreasonable Application of Clearly Established Constitutional Law.**

**( Invalid Death Aggravator Eighth and 14th Amendments to the United States Constitution)**

Direct appeal counsel raised this issue with the Texas CCA with the following argument:

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Amendment is incorporated in the Due Process Clause of the Fourteenth Amendment and applicable even in Texas. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1972); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 463, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (plurality opinion), *rehearing denied,* 330 U.S. 853, 67 S.Ct. 673, 91 L.Ed. 1295 (1947)."There must be a valid penological reason for choosing from among the many criminal defendants the few

who are sentenced to death. [citations omitted]." *Spaziano v. Florida*, U.S. 447, 459, n.7, 104 S.Ct. 3154, 3161, 82 L.Ed.2d 340 (1984).

> [The] Eighth Amendment demands more than that a challenged punishment be acceptable to contemporary society. The Court also must ask whether it comports with the basic concept of human dignity at the core of the Amendment. . . . [The] sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering.

> *Gregg v. Georgia,* 428 U.S. 153, 182-183, 96 S.Ct. 2909,49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) (citation omitted)(emphasis added). *See also Rhodes v. Chapman,* 452 U.S. 337, 346 (1981); *Estelle v. Gamble,* 429 U.S. at 103.

* * *

[T]here is no valid penological reason for subjecting the murderers of children under 6 to the death penalty, the statute which authorizes such punishment violates the Eighth Amendment to the United States Constitution.

Roberson Direct App. Brf. at 24-25, 27 (issue number 3).

The Texas CCA rejected this argument, with these remarks:

In his first four points of error, the appellant argues that Section 19.03(a)(8) of the Texas Penal Code is unconstitutional on its face because the Legislature's decision to make capital punishment available for any murder in which the victim is under six years of age is arbitrary and not substantially related to the achievement of an important governmental objective. In his first and third points of error, he argues this violates the Texas Constitution, (31) while in his second and fourth points of error, he asserts violations of the United States Constitution. (32) Essentially, the appellant asserts an equal-protection violation because the statute discriminates on the basis of age -- or rather it discriminates against defendants like himself, based on the ages of their victims. Although he acknowledges that age discrimination normally would not be subject to strict-scrutiny review, the appellant argues that at least "heightened" review is appropriate in the case of this statute, which has implications of life and death.

We addressed this exact issue in Henderson v. State. (33) There, we considered and rejected the appellant's equal-protection argument that a stricter level of scrutiny was warranted because life-and-death issues were implicated by the statute in question. (34) We then concluded that Section 19.03(a)(8) is constitutional under a

rational-basis standard. (35) Additionally, we held that Section 19.03(a)(8) does not violate the Eighth Amendment's prohibition of cruel and unusual punishments. The appellant here presents no new arguments to merit reconsideration of our decision in Henderson. Points of error one through four are overruled.

*Roberson v. State*, No. 74,671, 2007 Tex. Crim. App. Unpub. LEXIS 1175 (Tex. Crim. App. June 20, 2007) (footnotes omitted).

The death of a child is a terrible, tragic thing. Anyone even possibly guilty of killing such a young child is likely to receive the maximum punishment. Mr. Roberson suggests that this relatively new death aggravator was added to assure prosecutors with easy victories, and not for any legitimate penological purpose. This record fails to show that Roberson is among the worst of the worst. This death sentence is no better supported than one based on the "heinous, atrocious and cruel" aggravator that was long ago condemned as improper.

Aggravating circumstances must permit the sentencer to make a "principled distinction between those who deserve the death penalty and those who do not." *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990); *Clemons v. Mississippi*, 494 U.S. 738, 758 (1990) ("invalid aggravating circumstance provided "no principled way to distinguish the case in which the death penalty is imposed, from the many cases in which it was not ").

In *Maynard v. Cartwright*, 486 U.S. 356 (1988), the United States Supreme Court unanimously set out the legal principles which control claims of this nature. In addressing the validity of a death sentence based solely on the statutory aggravating circumstance that the murder was "especially heinous, atrocious and cruel," the Court reasoned that an Eighth Amendment vagueness challenge to an aggravating factor in a capital case may not be analyzed under the familiar "as-applied" approach generally employed in due process vagueness challenges to criminal statutes. 486 U.S. at 361.

The Maynard Court emphasized that an Eighth Amendment challenge to a statutory aggravating circumstance requires a wholly different type of analysis. As a practical matter, such a challenge requires that reviewing courts evaluate the challenged aggravating circumstance on its face, entirely apart from the facts of the particular case in which it was applied. That is because an overbroad statutory aggravating circumstance vests in sentencing courts the sort of "open-ended discretion" to impose the death penalty which the Supreme Court condemned in Furman, and where a death sentence is imposed under such a regime of unbridled discretion, the state may not save the sentence by demonstrating that the result would have been the same even if the sentencer's discretion had been properly narrowed and guided. *Maynard*, 486 U.S. at 361-363.

The elevation of a murder to a capital crime based on nothing more than the age of the victim is clear error for which habeas relief must be granted.

### CLAIMS THAT THE INSTRUCTIONS SUBMITTED TO ROBERSON'S SENTENCING JURY DID NOT AFFORD THE JURORS WITH AN ADEQUATE VEHICLE TO FULLY CONSIDER AND GIVE EFFECT TO HIS MITIGATING CIRCUMSTANCES

#### *Summary of Arguments Regarding the Punishment Charge*

No longer must a Texas federal habeas petitioner risk being lost in the cert pool at the Supreme Court to vindicate his rights accorded to him by *Lockett v. Ohio* 438 U.S. 586 (1978) and its many Texas progeny. See the ***en banc*** decision in *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006), (en banc) cert denied, *Quarterman v. Nelson*, 127 S.Ct. 2974, (U.S. Jun 18, 2007) (NO. 06-1254) and the cases cited. It has now been decided by the Fifth Circuit that state courts must afford capital sentencing juries with an adequate vehicle to fully consider and give mitigating effect to mitigating circumstances. *Nelson*, supra.

258

The Texas trial judge must have anticipated part–but only part--of this change in Texas capital sentencing charging practice when he submitted his charge to the jury in February, 2003. But he must have succumbed to the blandishments of the prosecutors when he effectively nullified the improvements he made in the punishment charge with other language that took the improvements entirely away from Mr. Roberson.

The trial judge properly made  improvements to the statutory punishment charge that were apparently made to satisfy real constitutional concerns, perhaps based on the language of *Penry v. Lynaugh* and *Penry v. Johnson*, both decided before the 2003 trial in Roberson's case. By the time of the affirmance of Roberson's death sentence by the Texas Court of Criminal Appeals, *Roberson v. State*, Tex. Crim. App., (CCA) No. AP-74,671, decided June 20, 2007, unpublished, several other Supreme Court decisions were available to inform the Texas CCA about how Texas capital sentencing juries must be instructed. See *Tennard v. Dretke*, 542 U.S. 274 (2004), *Smith v. Texas*, 543 U.S. 37 (2004), *Smith v. Texas*, 550 U. S.297 (2007) *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007).

The following are excerpts from the punishment charge used in Roberson's trial:

The burden of proof for Special Issue No. 1 rests upon the State, and it must prove the issue beyond a reasonable doubt.

******

The burden of proof in this phase of the trial rests upon the State and never shifts to the Defendant. The law does not require a Defendant to prove that the answer to Special Issue No. 1 should be answered "No" nor that the answer to Special issue No. 2 should be "Yes", nor does it require the Defendant to produce any evidence at all.

****

Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, ROBERT LESLIE ROBERSON III would commit criminal acts of violence that would constitute a continuing threat to society?

The burden of proof for Special Issue No.1 rests upon the State, and it must prove the issue beyond a reasonable doubt.

You are instructed that you may not answer Special Issue No.1 "Yes" unless all jurors agree to such answer. Further, you may not answer Special Issue No. 1 "No" unless ten (10) or more jurors agree. It is not necessary that members of the jury agree on what particular evidence supports a negative answer - that is, an answer of "No" - to Special Issue No.1.

You are further instructed that if the jury makes an affirmative finding to Special Issue No.1 - that is, an answer of "Yes," then the jury shall answer Special Issue No.2.

You may not answer Special Issue No.2 "No" unless all jurors agree to such answer and you may not answer such issue "Yes" unless ten (10) or more jurors agree to such answer.

The jury, however, need not agree on what particular evidence supports an affirmative finding - that is, an answer of "Yes" - to Special Issue No.2.

2.

In determining your answers to the questions or special issues submitted to you, you shall consider all of the evidence submitted to you, you shall consider all of the evidence submitted to you in the whole of this trial, which includes that phase of the trial wherein you were called upon to determine the guilt or innocence of the Defendant, as well as this punishment phase of the trial wherein you are now called upon to determine the answers to special issues submitted to you by the Court.

3.

You shall consider all evidence submitted to you during the whole trial as to the Defendant's background or character or the circumstances of the offense that mitigates for or mitigates against the imposition of the death penalty.

4.

In the event the jury is unable to agree upon an answer to Special Issue No. 1 or Special Issue No.2 under the conditions and instructions outlined above, the presiding juror will not sign either form of answer to that special issue.

5.

You are instructed that the term "mitigating evidence," as used herein, means evidence that a juror regards as reducing the Defendant's moral blameworthiness.

6.

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider relevant mitigating circumstances, if any, supported by the evidence, presented in both phases of the trial, whether presented by the State or the Defendant. A mitigating circumstance may include, but is not limited to, any aspect of the Defendant himself or his character, background, record, or the circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them, to the extent you have given them weight, if any in assessing the Defendant's personal culpability at the time you answered the special issues.

\*\*\*\*\*\*

*See* 2003 Clerk's Record, vol. 5.

Trial counsel filed several pages of written punishment charge objections. CR 000628. These 29 objections complained of vagueness of the terms and phrases in the future dangerousness special issue, the failure to require proof of extraneous offenses and other misconduct beyond a reasonable doubt, the moral blameworthiness limiting instruction, the failure to assign to the state the burden of proof in the mitigation inquiry, the failure to assign to any party any burden of proof at all in the mitigation inquiry. The trial court overruled all charge objections were overruled before the charge was read to the jury. 49 RR2.

Thus, trial counsel set the stage for a comprehensive, multifaceted direct appeal attack on the punishment charge submitted to Mr. Roberson's jury. Unfortunately for Mr. Roberson, his direct

appeal counsel carried only three complaints about the punishment phase jury charge into his direct appeal brief. Two of the complaints dealt with the lack of a deliberateness or other enhanced culpability requirement. Appellant's Brief, Points of Error 9 and 10.

Roberson's arguments in support of Points 9 and 10 were supported by citations to *Martinez vs. State*, 924 S.W.2d 693 (Tex.Crim.App. 1996), *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed. 2d 1140 (1982), *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) and *Schad v.Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). The thrust of Roberson's argument to the CCA supporting these two points was that the Texas trial court had not instructed the sentencing jury to require proof of a culpable enough mental state to support the imposition of death in a shaken baby case.

The CCA disposed of these two claims with the following language:

> In his ninth point of error, the appellant claims the jury instructions called for under the Texas capital-murder statute (43) violate his rights under the Eighth and Fourteenth Amendments because they permit the imposition of the death penalty without a finding of enhanced culpability.

> In his tenth point of error, he argues that the lack of a "deliberateness" requirement in the capital-murder statute makes it unconstitutional under the Eighth and Fourteenth Amendments. Article 37.071 has repeatedly been held not to violate the Eighth Amendment. (44) We overrule points of error nine and ten.

> *Roberson v. State*, No. 74,671, 2007 Tex. Crim. App. Unpub. LEXIS 1175 (Tex. Crim. App. June 20, 2007).

In his third complaint about the punishment charge, direct appeal counsel for Mr. Roberson raised the claim that the punishment charge diluted the burden of proof that the Sixth, Eighth and Fourteenth Amendments required to be assigned to the state on the two special issues. *See* Appellant's Brief, Point of Error 12. The CCA described Point 12 with the following language:

In his twelfth point of error, the appellant asserts that the jury instructions on punishment violated his Sixth, Eighth, and Fourteenth Amendment rights by diluting the burden of proof on the two punishment special issues. In support of his claim, he submits the affidavit of one juror, which he suggests shows that the jury misunderstood what burden of proof was required of the State on Special Issue No.1, (24) and that the jury mistook the meaning of "society" in the context of Special Issue No. 1 as referring to society at large rather than the society of a penitentiary.

*Roberson v. State*, No. 74,671, 2007 Tex. Crim. App. Unpub. LEXIS 1175 (Tex. Crim. App. June 20, 2007) (footnote omitted).

After setting out the language of the punishment charge, the CCA disposed of Point 12 as

follows:

We find no error in these instructions as worded. Contrary to the appellant's suggested objections, the inclusion of the word "probability" in the wording of Special Issue No. 1 does not unconstitutionally conflict with the words "beyond a reasonable doubt" in the same sentence. (26) Nor is it relevant whether the jury considered society to mean "prison society" or "society at large." (27) Finding no error in the jury instructions, we need not conduct any harm analysis. Point of error twelve is overruled.

*Roberson v. State*, No. 74,671, 2007 Tex. Crim. App. Unpub. LEXIS 1175 (Tex. Crim. App. June 20, 2007) (footnotes omitted).

In his state habeas petition, Mr. Roberson adduced extra-record evidence in support of his

complaints about the punishment charge, and appellate counsel's failure to carry all of his complaints

into direct appeal. This evidence was in the form of affidavits given by the following experts in

language, law and social science:

| Tab | Description | Record Ref. |
|-----|-------------|-------------|
| 29 | Affidavit of Dr. Bethany K. Dumas, | CR 2470 |
| 30 | Affidavit of Dr. Carolyn R. Miller, | CR 2480 |
| 31 | Affidavit of Dr. James Luginbuhl, | CR 2497 |
| 32 | Affidavit of Dr. Ronald R. Butters, | CR 2513 |
| 33 | Affidavit of Dr. Barbara B. Levenbook, | CR 2537 |
| 34 | Affidavit of Dr. John N. Wall, Jr., | CR 2549 |

These affidavits mount a withering assault on the force and effect of the language used in describing the required culpable mental state and the terms and phrases in the future dangerousness special issue.

**Claim Number 33: By refusing to instruct the jury at either phase of the trial that, in order to impose death as a penalty, the state was required to establish beyond a reasonable doubt that Mr. Roberson acted deliberately, or even intentionally, in killing the victim, the decision of the Texas courts involved an unreasonable application of constitutional law clearly established in *Jurek v. Texas*, 428 U.S. 262 (1976). (Derived from Points of Error Nine and Ten on Direct Appeal to the Texas CCA.)**

In his tenth point of error to the Texas CCA, Mr. Roberson argued that the lack of a "deliberateness" requirement in the capital-murder statute makes it unconstitutional under the Eighth and Fourteenth Amendments. Citing *Jurek* and a string of its own decisions, the CCA held that Texas Code of Criminal Procedure Article 37.071 has repeatedly been held not to violate the Eighth Amendment, and overruled this points of error.

Mr. Roberson contends that the CCA made an unreasonable application of the principles laid down in *Jurek v. Texas*, 428 U.S. 262 (1976). The CCA seems oblivious to the fact that *Jurek* required the state to prove that the capital defendant acted deliberately in killing the victim. The Texas legislature has jettisoned the "deliberately" protective filtering element in all Texas capital cases. Worse, the legislature has weakened to degree of culpability required to obtain a capital murder conviction in the instant class of capital cases. In short, Roberson's jury was told that they need only find that he acted knowingly, a culpable mental state deemed lesser than intentional.

In the watered down Texas capital system, the trial judge, consistent with the current Texas statute, told the jurors that in order to support a capital murder conviction for the murder of a child under age six, the prosecutors were required to establish, at a minimum, that Roberson acted

knowingly, or with knowledge, with respect to the nature of his conduct. The trial judge gave the jury the definition of knowingly contained in Texas Penal Code Section 6.03(b) "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.*

Mr. Roberson contends 1) that the specific provision of Texas Penal Code 19.03, in the version applied, is facially unconstitutional for failure to require at least an intentional killing in order to expose the killer to the death penalty, and 2) that the jury instructions, taken as a whole, in both phases of the trial, failed to provide a rational process for the jurors decide whether Mr. Roberson was among the worst of the worst murderers who should be exposed to the imposition of death as a penalty, or to properly guide the discretion of the jury once he was deemed eligible for death as a penalty.

### The Eighth Amendment Guidelines for Aggravating Factors

Aggravating factors must "genuinely narrow the class of death-eligible persons" in a way that reasonably "justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). On their face, and as applied, aggravating circumstances must permit the sentencer to make a "principled distinction between those who deserve the death penalty and those who do not." *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990); see also *Richmond v. Lewis*, 506 U.S. 40, 46 (1992) ("a statutory aggravating factor is unconstitutionally vague if it fails to furnish principled guidance for the choice between death and a lesser penalty"); *Clemons v. Mississippi*, 494 U.S. 738, 758 (1990) ("invalid aggravating circumstance provided "no principled way to distinguish the case in which the death penalty is imposed, from the many cases in which it was not "); *Maynard v. Cartwright*, 486 U.S. 356 (1988)

("[t]he construction or application of an aggravating circumstance is unconstitutionally broad or vague if it does not channel or limit the sentencer's discretion in imposing the death penalty").

In *Maynard v. Cartwright*, supra, the Supreme Court unanimously set out the legal principles which control vagueness claims directed at an aggravator. In addressing the validity of a death sentence based solely on the statutory aggravating circumstance that the murder was "especially heinous, atrocious and cruel," the *Maynard* court reasoned that an Eighth Amendment vagueness challenge to an aggravating factor in a capital case may not be analyzed under the "as-applied" approach used in vagueness challenges to criminal statutes under the Due Process Clause. 486 U.S. at 361.

An Eighth Amendment challenge requires that reviewing court to conduct its review in several steps. First, the reviewing court must evaluate the challenged aggravating circumstance on its face, entirely apart from the facts of the particular case in which it was applied. An overbroad aggravating circumstance vests in sentencing courts the "open-ended discretion" to impose the death penalty which the Supreme Court condemned in *Furman v. Georgia*, 408 U. S. 238 (1972). Where a death sentence is imposed under a system that permits unbridled discretion, the state may not save the sentence by demonstrating that the outcome would have been the same even if the sentencer's discretion had been properly narrowed and guided. *Maynard*, 486 U.S. at 361-363.

Secondly, even if the text of a statutory aggravating circumstance does not provide meaningful guidance to a capital sentencing jury, such an aggravating circumstance can nevertheless support a death sentence if the state courts have narrowed its scope to a constitutionally sufficient degree. Finally, the reviewing court must determine whether such a narrowing construction actually guided the sentencing jury in the case under review. *Godfrey v. Georgia*, 446 U.S. 420 (1980); see

also *Walton v. Arizona*, 497 U.S. 639 (1990) (recognizing the authority of a state reviewing court to supply a limiting definition of a facially overbroad or vague aggravating circumstance).

The Court has also recognized that aggravating circumstances cannot encompass factors "that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness." *Zant v. Stephens*, 462 U.S. at 885, citing *Miller v. Florida*, 373 So.2d 882, 885-886 (Fla.1979). If the aggravating circumstance at issue is invalid for reasons such as these, due process of law would require that the jury's decision to impose death be set aside. *Id.*

As tragic as the death of a child at the hands of a parent is, it is not the same affront to the peace and dignity of a state that, without more, the killer/parent should be exposed to the death penalty. The trouble with what Texas has done here is that, at once, that state has reduced the degree of mental culpability required to expose oneself to death, and removed the usual requirement that the state prove that the capital defendant committed another serious felony logically connected to the murder. Nor has Roberson killed a symbol of organized society itself, like a peace officer, fireman or judge.

Indeed, one of the state's original arguments in answer to the facial attack in *Jurek* was that the Texas system did not contemplate the death penalty for family members or other acquaintances.

Mr. Roberson asks this Court to review the "guilt" phase charge and the punishment phase charge together to see if the demands of the constitution have been met or, as he believes, ignored. Since the guilt phase findings exposed him to a minimum life sentence or maximum death sentence, Roberson argues that they are subject to review under the heightened standards of the Eighth Amendment. Roberson contends that even with the modifications the trial judge made to the usual Texas punishment charge, his instructions were inadequate to properly guide the discretion of the

jury toward a reasoned moral response and to avoid arbitrariness in capital punishment, such that Roberson suffered the degree of harm found sufficient to obtain relief in *Penry v. Johnson*, 532 U.S. 782 (2001),  and if such a showing be required, the substantial and injurious harm contemplated by *Fry v. Pliler*, 551 U. S. ____ (2007) (No. 06-5247), decided June 11, 2007

**Mr. Roberson's arguments on his claims that the charge to the jury at the punishment phase was contrary to or involved an unreasonable application of clearly established constitutional law.**

### *Introduction*

Mr. Roberson relies on the *en banc* decision in *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006), (en banc) cert denied *Quarterman v. Nelson*, 127 S.Ct. 2974, (U.S. Jun 18, 2007) (NO. 06-1254). *Nelson* decided, for the first time in the Fifth Circuit, that the former special issue capital sentencing system in Texas did not meet the demands of the *Penry I* and *Penry II* line of cases that require that capital sentencing juries be afforded an adequate vehicle to fully consider and give effect to mitigating circumstances

### *Summary of Arguments Regarding the Charge to the Sentencing Jury*

Does the Texas capital sentencing scheme afford the jury a vehicle for full consideration of the capital defendant's mitigation case for its full mitigating effect? Mr. Roberson argues that it does not, and that it is contrary to the principles of *Nelson v. Quarterman* and its antecedents. Further, Mr. Roberson has identified portions of his mitigation case that reasonable jurors may well have disregarded or not fully considered for their mitigating effect because of the features of the Texas scheme complained of in his petition.

The clearly established constitutional law upon which Mr. Roberson largely relies in these claims is stated by Justice Rehnquist in *Boyde v. California*, 494 U.S. 370, 377 (1990) citing and

quoting the plurality opinion in *Franklin v. Lynaugh*. ( "But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty." *Franklin v. Lynaugh*, 487 U. S. 164, 487 U. S. 181 (1988) (plurality opinion).) The arguments put forth by the Respondent simply assume that since states may afford unfettered discretion to capital sentencing juries, any guidance the state gives the sentencing jurors is beyond the reach of the constitution and this court. This assumption, and the Texas capital sentencing system, are contrary to our well established principles of constitutional law that require the "guided discretion" states to make the effort to achieve a more rational and equitable administration of the death penalty. The principle applied in *Boyde*, derived from *Franklin*, was again applied by the high court in *Penry v. Lynaugh*,  492 U.S. 302 (1989)(*Penry I*)  which again cited this language from the *Franklin* plurality. In turn, *Penry I* has produced all the modern progeny in Texas capital sentencing jurisprudence, including the 2006 *en banc* decision in *Nelson*.

Based on this line of Supreme Court cases, and the *en banc* decision in *Nelson*, Mr. Roberson argues that the test in the Fifth Circuit for the validity of the features of a "guided discretion" capital sentencing scheme is this: "Does this feature of the Texas system tend toward a more rational and equitable administration of the death penalty?" In the pages that follow, Mr. Roberson will demonstrate that the answer is consistently "No."

## The evolution of the Texas mitigation inquiry

Prior to 1927, murder in Texas involved the killing of another person with "malice aforethought" and was "distinguishable from every other species of homicide by the absence of circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the homicide." Texas Penal Code, Article 1256 (1925). See generally, *Mims v. State*, 3 S.W.3d 923, (Tex. Crim. App. 1999). Murder required the mental element of "malice aforethought" (often referred to simply as "malice"). *Id.* Malice was traditionally defined as "a state or condition of the mind showing a heart regardless of social duty and fatally bent on mischief." *Id.* Thus, the state bore the burden of proving, beyond a reasonable doubt, the lack of what we now call "mitigating circumstances."

In the wake of *Furman v. Georgia*, and with the 1973 re-codification of the Texas Penal Code, the crime of "murder with malice" was abolished and Texas replaced the former scheme with the three special issue system that was tentatively declared facially constitutional in *Jurek v. Texas*, 428 U.S. 262 (1976). Some vestiges of the former system remained. The penalty phase elements of "deliberately" and "reasonable expectation of death," "continuing threat to society" and unreasonable response to provocation appear to have been designed to satisfy many of the same concerns as did the former guilt phase "murder with malice" element.

In its brief to the Supreme Court in *Jurek*, Texas 1) told the court that the death penalty would not be imposed in Texas for the murder of acquaintances, and 2) promised the high court that it would allow for the consideration of mitigating circumstances. See 1976 WL 181751 Some thirteen years later, the Supreme Court noted that the latter assurances had not been met. See *Penry I*. When the Texas legislature amended the capital sentencing scheme after *Penry I*, it removed the

protective, filtering elements of deliberately, reasonable expectation of death and unreasonable response to provocation that were before the high court in *Jurek*. At the same time, the legislature encumbered the present mitigation inquiry with a series of features that cripple that ability of the sentencing jurors to fully consider and give effect to the capital defendant's mitigation case. Mr. Roberson argues that Texas has still not made the effort to avoid arbitrariness that Justice Rehnquist spoke of in *Boyde* and the Attorney General of Texas promised in *Jurek*..

Before discussion of the crippling features of the Texas system in the context of his habeas claims attacking the mitigation inquiry, a word is in order regarding the Respondent's attempt to support the current Texas system with this language taken from *Penry v. Johnson*, 532 U. S. 732 (2001)(*Penry II*):

> At the very least, the brevity and clarity of this instruction highlight the confusing nature of the supplemental instruction actually given, and indicate that the trial court had adequate alternatives available to it as it drafted the instructions for Penry's trial.

This court should note that the Supreme Court was addressing the language of the Texas mitigation special issue, not the supplemental instruction on moral blameworthiness, the failure to assign any burden of proof or persuasion, the ostensible but false requirement that ten jurors must vote for life to obtain a life verdict, or the refusal to inform the jurors of the effect of a single holdout juror.

Mr. Roberson does not attack the brevity or clarity of the mitigation special issue submitted to his sentencing jury. The trouble is with the crippling features of the Texas system that have been engrafted onto it. These features tend to increase arbitrariness and decrease equity in the Texas capital sentencing process. For this reason, the Texas system fails to meet the demands of the Eighth and Fourteenth Amendments in the manners described below. On the pages that follow, Mr.

Roberson will explain how the current Texas system is facially contrary to our bedrock constitutional principles of capital sentencing, and how those principles have been unreasonably applied in this case.

> **Claim Number 34: The statutory moral blameworthiness instruction and the trial court's improvised "personal culpability" instruction improperly limited the scope of the Texas mitigation inquiry. *Skipper v. South Carolina*, 476 U.S. 1 (1986).**

The moral blameworthiness supplemental instruction to the mitigation inquiry ( and its improvised counter part on "personal culpability") [42] is reasonably likely to cause sentencing jurors to disregard some parts of a defendant's mitigation case. Mental health issues not amounting to outright insanity, (such as Mr. Roberson's low IQ, probable child abuse, and other mental health issues not amounting to outright insanity) are entitled to some weight as mitigation, but many reasonable jurors may refuse to consider this evidence because it does not actually excuse the crime itself. Blame and causation are too easily equated in the mind of a juror who is not instructed that moral blameworthiness in the capital sentencing context is broader than that.

Good deeds and good conduct while incarcerated may also be excluded by this supplemental instruction. In fact, anything apart from the "circumstances of the offense" may well be excluded by many reasonable jurors under this instruction. This is a clear violation of the principles of *Lockett, Penry* and, on this record, especially *Skipper v. South Carolina*, 476 U.S. 1 (1986).[Good conduct while incarcerated must be considered by the capital sentencing jury.) Further, this instruction offends the bedrock principles the Fifth Circuit recognized in the 2006 en banc *Nelson* decision, that the jurors must have a vehicle to fully consider and give mitigating effect to the defendant's

---

[42] This improvised, non-statutory charge appears at CR 00637.

mitigation case. The very broad concept of mitigation at capital sentencing simply does not coincide exactly with moral blameworthiness. For this reason the Texas mitigation inquiry is too narrow, and violates the bedrock principles of *Lockett.*

This is not just a claim of facial unconsitutionality in the Texas statute. In Roberson's case there was a genuine and robust dispute about the existence and the persuasiveness of his mitigation case. Here is how the CCA described Roberson's mitigation presentation:

> The appellant called two officers from the Anderson County jail to testify that the appellant had no history of violence or disciplinary problems while incarcerated there. The appellant then called Dr. John Krusz. Dr. Krusz's testimony consisted of that which was offered and excluded at the guilt-innocence phase, namely, a discussion of what he referred to as the appellant's "post-concussional type syndrome." (30) Dr. Krusz said that his evaluation of the appellant led him to conclude that, despite his poor ability to deal with stressful situations in the past, the appellant would be able to control his behavior in the controlled, structured environment of prison.

> On cross-examination, Dr. Krusz acknowledged that the major portion of his work was in the treatment of chronic pain and migraine headaches. He also admitted that the appellant had not informed him of his history of abuse towards his ex-wife and children. He also acknowledged that, even if the appellant was brain damaged, there are many people in the world who are brain damaged and have not murdered a child. Dr. Krusz also conceded that the appellant's brain disorder might be attributable to the appellant's long-term history of drug abuse, including intravenous drugs.

> The appellant then called Kelly R. Goodness, Ph.D. Dr. Goodness was a forensic psychologist who had interviewed the appellant while he was incarcerated during this trial, as well as other people who knew the appellant, including his family. Dr. Goodness testified that, in her opinion, the appellant had been physically abused as a child by his father, despite denials of abuse by the appellant and his family. She also said she believed that the appellant's two older children had been abused, but that she could find no conclusive evidence to say whether the abuse came from the appellant or his ex-wife. She said she believed the appellant suffered from brain damage -- specifically, that his brain was "compromised" -- as well as depression, substance dependence, and antisocial-personality disorder. She also testified that the appellant's mother had a very dominant influence on him and that, if not for her influence, he likely would not have sought custody of Nikki. In her opinion, the appellant was unlikely to attempt to escape from prison, nor was he likely to pose a

future danger while in prison. After Dr. Goodness's testimony, the appellant rested his punishment case-in-chief.

The CCA described how the state offered rebuttal evidence to Roberson's mitigation case:

In rebuttal, the State called Thomas Allen, Ph.D., a psychologist who interviewed the appellant and reviewed his records. Dr. Allen testified that, based on the severity of the crime in this case, the appellant's family history, his history of substance abuse, and other factors, he believed that the appellant was a psychopath and that it was probable he would commit future acts of violence, even in prison.

The State then called David Self, M.D., a psychiatrist who interviewed the appellant along with Dr. Allen. Dr. Self disputed Dr. Krusz's diagnosis of post-concussion syndrome. He agreed that the appellant has poor impulse control, but that led him to conclude that the appellant would be at risk to engage in future acts of criminal violence because he would be targeted by other inmates in prison as someone who had hurt a child, and he likely would have to defend himself from physical attacks. On cross-examination, Dr. Allen acknowledged that many people in the appellant's condition do not act out violently in prison, and that the appellant himself had no history of violent incidents during his prior years of incarceration.

There was no similar instruction limiting the state's evidence militating toward death to that which a juror might find to increase his moral blameworthiness. This punishment charge stands in direct violation of *Skipper*, supra.

**Claim Number 35: The failure to assign any burden of roof or persuasion to any party in the mitigation inquiry offends our basic notions of due process of law that do apply at capital sentencing. The failure to assign to the state the burden of proof and persuasion of facts adverse to the capital defendant's mitigation case also offends the Due Process Clause.** *In re Winship,* **397 U.S. 358 (1970)**

At the punishment phase, the prosecutors adduced evidence adverse to the capital defendant Roberson, but which never passed through our usual crucible of adversarial testing. Here is the summary of that evidence taken from the CCA opinion:

The State then called Della Gray, the appellant's ex-wife and the mother of his two older children. Gray testified that the appellant was physically abusive towards her both before and after they got married, including incidents where he strangled her with a coat hanger, punched her in the face and broke her nose while she was

pregnant, and beat her with a fireplace shovel. She also told of a time when she had gone out to help a friend, leaving the appellant and their son, Robert, Jr., at home alone together. When she returned, Robert, Jr. had a bruised face, and when she asked him what happened, Robert, Jr. told her he had fallen off the bed. She also described an incident in which the appellant was alone in a bedroom with their then two-year-old daughter Victoria for thirty minutes. Victoria was screaming and upset, and when the appellant finally let her out of the room she had a "hickey" on her neck. Overall, Gray described herself as scared of the appellant, such that she never reported any of the suspected abuse to the authorities. She said she currently was not allowed to spend any time with her children. On cross-examination, Gray admitted she had been involved in a lengthy custody battle against the appellant and his mother, which she ultimately lost, some eleven years previously. She also admitted to some history of alcohol and drug abuse, and that she had not provided, nor has she been asked to provide, any support for her children in the years since she lost custody of them.

There was testimony from another witness concerning a dispute with a neighbor that escalated into a physical altercation with a teenage boy. The State then rested its punishment case-in-chief.

This reviewing court cannot say that any of the adverse, but unadjudicated "facts" that find just some evidentiary support in the record have actually been found to be true by the jury by any standard of proof, let alone beyond a reasonable doubt. Nonetheless, the sentencing jurors were allowed find these "facts" to be true without regard to any burden of proof or persuasion at all. Once these "facts" were found, they could be and probably were used to make the determination that Mr. Roberson's mitigation case was not sufficient to warrant a life sentence. This is a complete dismemberment of our usual adversarial system of justice that offends our Due Process Clause. Due process must be afforded at capital sentencing. See *Graham v. Collins,* 506 U.S. 461 (1993), citing *Gardner v. Florida*, 430 U.S. 349 (1977). This is also structural error not requiring any harm analysis. *Sullivan v. Louisiana,* 508 U.S. 275 (1993)

With respect to the larger issue, whether the burden of proof and persuasion on the ultimate issue of life or death must be placed on the state, Roberson presents a list of perceived difficulties

with the way Texas and many other states submitted the notion of mitigating circumstances to the capital jury prior to *Furman v. Georgia.  See Mims, supra.*

Mr. Roberson argues that when Texas lifted the burden of proving the lack of mitigating circumstances from the state prosecutors, in the wake of *Penry I*, it moved in the wrong direction, away from the greater equity and reduced arbitrariness required in a "guided discretion" scheme, and toward a weak process that required no rigorous proof of the facts on the ground to be used to support the imposition of death as a penalty.

No Supreme Court opinion has ever approved the present Texas capital sentencing scheme. The original rules governing "guided discretion" are clearly established and still apply. In *Gregg v. Georgia*, 428 U.S. 153 (1976), the Court determined that these objectives are "best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence *and provided with standards to guide its use of the information.*" 428 U.S. at 195 (emphasis added.)  Mr. Roberson argues that the assignment of a burden of proof and persuasion to the state is essential to provide the sentencing jury with standards to guide the jurors' use of the evidence before them.

Even if the Court were to conclude that the burden of proof and persuasion on the ultimate question in the mitigation inquiry could properly be assigned to the capital defendant, that would not save the death sentence in this case. The trial court simply did not assign any burden of proof or persuasion to any party, creating a free for all designed to produce arbitrary results. The "guided discretion" principles of *Gregg, Boyde* and *Penry I* are offended by the imposition of death as a penalty in such an arbitrary way. The refusal of the state court to assign the burden of proof and persuasion to the state -- or at all – was objectively unreasonable in light of these cases.

**Claim Number 36: The failure to assign any burden of proof or persuasion at the mitigation inquiry is objectively unreasonable as it renders the decision to impose death incapable of meaningful appellate review**.

The effect of the "moral blameworthiness" instruction is to render it impossible for a reviewing court to know what evidence the jurors even considered in the mitigation inquiry. The lack of any burden of proof or persuasion as to the many unadjudicated "facts" in the record makes it impossible to conduct appellate review of the jury's decision for improper arbitrariness. This crippling feature of the Texas scheme again shows a lack of the required effort to avoid arbitrariness in the guidance of the discretion of the jury. The decision of the Texas court to uphold Mr. Roberson's death sentence without meaningful appellate review was contrary to, and an unreasonable application of the "guided discretion" principles of *Gregg, Boyde, Penry I* and *Nelson.*

**Claim Number 37: The Texas 12-10 and secrecy rule offend the guided discretion guidelines set out by the Supreme Court followed by the Fifth circuit in *Nelson.***

This claim should be read in connection, and probably merged, with claim number 25 above.

The Texas court's submission to the jury the ostensible but false requirement of a ten member majority to obtain a life verdict was contrary to, and an unreasonable application of the "guided discretion" principles of *Gregg, Boyde, Penry I* and *Nelson, supra.* This simply cannot be an effort to avoid arbitrariness. It invites the majority group of sentencing jurors to prevail upon the members of the minority to change their votes, not by reason of the merits of the case, but to avoid the artificial uncertainty created by the 12-10 rule and its counterpart, the rule of secrecy surrounding the legal effect of a single holdout vote.

This argument has been rejected by a panel of the Fifth Circuit. *Alexander v. Johnson*, 211 F.3d 895 (5th. Cir. 2000). While there is some Supreme Court support for the holding that the Eighth

Amendment does not require the trial court to inform capital sentencing jurors of the outcome in the event of a deadlock, *Jones v. United States*, 527 U.S. 373 (1999), it is clear that the court may not affirmatively mislead sentencing jurors. *Romano v. Oklahoma*, 512 U.S. 1, 114 S.Ct. 2004 (1994). *Jones* is distinguishable on the grounds that a "deadlock" at capital sentencing in Texas does not result in a deadlock at all, but a life sentence. *Romano* should control here because the ostensible but false requirement of ten votes for life does affirmatively mislead the jury.

Mr. Roberson argues that the 2006 *en banc* decision in *Nelson* requires a different result as these Texas rules interfere with the giving of mitigating effect to his mitigating evidence, and are therefore contrary to *Nelson* and its antecedents described above. See also the concurring opinion by Justice Stevens in *Smith v. Spisak*, 130 S.Ct. 676 (Jan. 12, 2010) where he finds ambiguity in the former Ohio unanimity requirement to offend clearly established constitutional law, citing *Beck v. Alabama*, 447 U. S. 625 (1980), and quoting *Spaziano v. Florida*, 468 U. S. 447, 455 (1984) ("The goal of the Beck rule, in other words, is to eliminate the distortion of the fact-finding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence"). The Texas policy decision to distort the fact finding process at capital sentencing simply does not show the required effort to avoid arbitrariness. The application of the Texas statute in Mr. Roberson's case was contrary to and an unreasonable application of the principles of *Beck* as well as *Nelson* and its antecedents.

**Claim Number 38: By failing to conduct an adequate investigation into Mr. Roberson's background, mental health record, family history and upbringing, and by failing to present the results of an adequate investigation to competent experts or to present and explain the results of his investigation to the sentencing jury, trial counsel performed deficiently and below the prevailing professional norms of the legal profession as they existed in 2003. This failure to investigate prejudiced Mr. Roberson's case for a lesser included offense and**

for a life sentence upon conviction for capital murder. *Wiggins v. Smith*, 539 U.S. 510 (2003), *Williams v. Taylor*, 529 U.S. 362, 395-97 (2000) , *Strickland v. Washington*, . 466 U.S. 668 (1984).

Mr. Roberson comes from a long line of mental defectives. He cannot help that. His trial lawyer should have found out all about it, retained the right experts, and made sure the sentencing jury did, too. But he did not.

The Texas CCA described Mr. Roberson's shallow and incomplete mitigation presentation before the sentencing jury as follows:

> The appellant called two officers from the Anderson County jail to testify that the appellant had no history of violence or disciplinary problems while incarcerated there. The appellant then called Dr. John Krusz. Dr. Krusz's testimony consisted of that which was offered and excluded at the guilt-innocence phase, namely, a discussion of what he referred to as the appellant's "post-concussional type syndrome." Dr. Krusz said that his evaluation of the appellant led him to conclude that, despite his poor ability to deal with stressful situations in the past, the appellant would be able to control his behavior in the controlled, structured environment of prison.

> On cross-examination, Dr. Krusz acknowledged that the major portion of his work was in the treatment of chronic pain and migraine headaches. He also admitted that the appellant had not informed him of his history of abuse towards his ex-wife and children. He also acknowledged that, even if the appellant was brain damaged, there are many people in the world who are brain damaged and have not murdered a child. Dr. Krusz also conceded that the appellant's brain disorder might be attributable to the appellant's long-term history of drug abuse, including intravenous drugs.

> The appellant then called Kelly R. Goodness, Ph.D. Dr. Goodness was a forensic psychologist who had interviewed the appellant while he was incarcerated during this trial, as well as other people who knew the appellant, including his family. Dr. Goodness testified that, in her opinion, the appellant had been physically abused as a child by his father, despite denials of abuse by the appellant and his family. She also said she believed that the appellant's two older children had been abused, but that she could find no conclusive evidence to say whether the abuse came from the appellant or his ex-wife. She said she believed the appellant suffered from brain damage -- specifically, that his brain was "compromised" -- as well as depression, substance dependence, and antisocial-personality disorder. She also testified that the appellant's mother had a very dominant influence on him and that, if not for her

influence, he likely would not have sought custody of Nikki. In her opinion, the appellant was unlikely to attempt to escape from prison, nor was he likely to pose a future danger while in prison. After Dr. Goodness's testimony, the appellant rested his punishment case-in-chief.

Upon a review of the available record, and upon information and belief, counsel for Mr. Roberson say that the mitigation investigation and presentation failed to meet prevailing professional norms for capital cases in Texas at the time of the 2003 trial. There can be little doubt as to how demanding were the professional norms in Texas as early as 1994. In *Ex parte Gonzales*, 204 S. W. 3d 391, (Tex. Crim. App. 2006),the Texas Court of Criminal Appeals granted penalty phase habeas relief to a petitioner sentenced to death in Texas  in that year for counsel's failure to discover that his client was abused by his father, resulting in post traumatic stress disorder. Nor does the fact that Roberson's trial counsel did present some mitigating circumstances to the sentencing jury excuse him from his failure to investigate for more and more persuasive mitigating evidence.  *See, e.g., Sears v. Upton*, 561 U. S. ____ (2010), No. 09-8854, decided June 29, 2010, where the high court granted relief from a 1993 Georgia death sentence for the failure of counsel to discover and present a more robust mitigation case that a thorough investigation would have revealed.

Mr. Roberson's federal habeas counsel have attached the affidavit of Deborah F. Wright, a mitigation specialist and the spouse of one of Roberson's federal habeas counsel. *See Exhibit 4.*  In part of one day, Mrs. Wright conducted interviews of one of Mr. Roberson's aunts and a cousin who live in Parker County, Texas. Although these relatives were not particularly forthcoming, they did confirm what the available evidence suggested–that there was a great deal of mental illness in Roberson's family. Some of the family members are thought to be bipolar, and are MHMR clients. Inherited mental illness is not acquired by choice. Nonetheless, it affects volition and behavior, and

is a classic mitigating circumstance that might cause of prosecutor not to seek death or a juror to return a life verdict.

Further the presence of mental illness in one's ancestors is unlikely to be faked or malingered. This sort of evidence could well have fortified a single juror's opinion that Roberson really does suffer from mental illness, that he is not just attempting to avoid the death penalty with self-reported mental health symptoms.

Moreover, no mental health expert would likely diagnose Roberson as having an antisocial personality disorder in the face of real, inherited mental health issues having deep roots in his ancestry.

Given court funding and time to develop his "Wiggins" claim, Mr. Roberson will further demonstrate that there really were sufficient mitigating circumstances in his background for a single juror to find sufficient to impose a life sentence, rather than a death sentence.

### Claim Number 39: By Excluding the Testimony of Defense Witness Dr. Krusz Testimony Before the Jury During the Guilt and Innocence Phase of Trial, the Texas Courts Unreasonably Denied Mr. Roberson His Right to Present a Complete Defense, Contrary to the Guarantees of the Sixth, Eighth and Fourteenth Amendments. *Holmes v. South Carolina*.

The prosecutor objected to certain mental health testimony offered by Mr. Roberson's trial counsel at the guilt phase. The trial judge exluded the evidence which was offered to rebut the inference that Roberson actually intended to kill Nikki. Roberson's direct appeal counsel raised this issue as point Eleven in his brief to the Texas CCA. Here is the argument Roberson made to the Texas court:

Appellant called Dr. John Claude Krusz, M.D., a board certified neurologist, who had examined Roberson and concluded that he had poor impulse control which impaired his judgment and made him more susceptible to inappropriate reactions to stress. (TR

Vol. 45, pg. 4, et.seq.). The State objected to this witness, and conducted a Daubert, examination in regard to the basis and scope of the doctor's opinions. Upon objection finally levied by the State, the trial court denied the Appellant the opportunity to submit this witness to the jury during the guilt and innocence phase of trial. (Id. at pg. 13). The State took the position that this line of testimony could only be admitted during this phase of trial where the Appellant had tendered a notice of insanity defense in accord with Tex. Pen. Code sec. 8.01. However, Dr. Krusz could not assert that the Appellant suffered from insanity as defined by law, but however did have impulse control issues that would help a trier of fact to understand his actions in regard to the subject incident. ( Id. at pg. 18-22). The two cases cited by the State, Nejnaoui vs. State, 44 S.W.3d 111, ( Tex. App. Houston [14th Dist.], 2001), pet. ref'd, and Thomas vs. State, 886 S.W.2d 388 (Tex.App. Houston [1st Dist.] 1994), pet. ref'd., as defining the proffered testimony being in the guise of trying to negate the issue of intent to be reviewed by the jury. A reading of Tex. Pen. Code sec. 8.01, shows that it does not provide for partial insanity or impairment as a defense that may be asserted under its provisions. Thus a Defendant would be compelled to act in virtual bad faith in order to submit the issue before a jury while it is evaluating the Defendant's knowledge or intent. As these are foundational elements of the alleged crime, a jury would be assisted in the exhibition of how one might be impaired to a limited degree or prone to influence or external inducement to commit an act, yet not have the specific requisite intent to take the life of a child as in the instant case. Further, as the jury was provided the option of several lesser included criminal offenses, with differing degrees of mens rea, there is little doubt that the evidence provided by the testimony of Dr. Krusz would be beneficial for a fair analysis of the Defendant's actions and his thought process, but not to the extent of totally negating intent as discussed by the Nejnaoui court. Thus, Appellant was deprived of essential fairness as mandated by the 6th, 8th Amend, U.S. Const. and 14th Amend. U.S. Const., in this trial by being unable to provide evidence that would reasonably assist the jury in evaluation of the case. Tex. R. Evid. 702, Duckett v. State, 797 S.W.2d 906 ( Tex.Crim.App. 1990). The harm induced by the ruling of the trial court was inherently fatal as it eliminated the ability of the Appellant in showing the true nature and character of his specific intent at the time of the incident, which is the core issue of the charge and one that did not have other supporting evidence other than speculative interpretation of the facts presented. Appellant should merit a new trial on all issues by virtue of the error of the trial court.?

Roberson Direct App. Brf. (point of error 11).

The Texas CCA rejected Roberson's point eleven. That court held that the trial judge did not

abuse his discretion in denying Roberson's request to call Dr. Krusz. The CCA found that the

witness's proposed testimony regarding organic brain syndrome and poor impulse control was not

relevant as to the Roberson's ability to form the requisite mens rea for the offense. The CCA explained that it appeared to that court that the proffered mental health testimony was merely being used as a mental-health defense not rising to the level of insanity.

The exclusion of this testimony worked a fundamental unfairness to Roberson as it denied him his right to present a complete defense secured to him by the constitution. See *Holmes v. South Carolina*, 547 U.S. 319, (2006) where the high court confirmed that a criminal defendant's federal constitutional rights were violated by an evidence rule under which the defendant ws not allowed to introduce evidence of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict.

Here is the high court's rationale for its holding in *Holmes*:

[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." United States v. Scheffer, 523 U. S. 303 . This latitude, however, has limits. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants `a meaningful opportunity to present a complete defense.' " Crane v. Kentucky, 476 U. S. 683 . This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are " `arbitrary' or `disproportionate to the purposes they are designed to serve.' " Scheffer, supra, at 308.

In this case, Mr. Roberson had a right to rebut the state's case on intent to kill. That right was denied by the Texas courts. This was clear constitutional error.

### FINAL COMMENT ON STATE FINDINGS AND CONCLUSIONS

As a post-script, a final comment on Roberson's future dangerousness issues is required in light of F&Cs asserting procedural default. As discussed, one means of avoiding procedural default is to show that the state court has inconsistently applied the state procedural barrier.

The CCA has not applied review of the future dangerousness issue evenly, and consequently the CCA's and state court's F&Cs regarding the future dangerousness issue in Roberson's case should be ignored. In *Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007), observe that the dissent complained that the majority's grant of penalty phase relief was contrary to the precedents the CCA had laid down before. Note also that the dissenters say that the use of the word "would" in the future dangerousness special issue means that the jurors need not take into account the fact that the minimum punishment is life, and that the defendant will almost certainly spend the rest of his life in prison. The CCA has completely forgotten that the state is supposed to prove that the defendant will be a "continuing threat to society." And that the society he will encounter will be that in the prison.

In a recent case, *Estrada v. State*, No. AP-75,634, 2010 Tex. Crim. App. LEXIS 722, (Tex. Crim. App. June 16, 2010), the minority in *Berry* picked up another vote and rejected Estrada's claim that the evidence was insufficient to prove the elements of the first special issue.

As the CCA has rendered the terms of the future dangerousness special issue meaningless, the finding against him may and should be ignored.

## **CONCLUSION**

As this petition demonstrates, Roberson's rights under the federal constitution were violated, unremedied by Texas courts.

## RELIEF REQUESTED

WHEREFORE, PREMISES CONSIDERED, the Applicant ROBERT ROBERSON asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights. He requests the Court to vacate his conviction and issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering release of Roberson from custody, or alternatively, to reverse Roberson's conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Roberson also asks the Court to allow a reasonable time to amend this petition rather than to dismiss for failure to exhaust remedies. He also requests reasonable time to respond to the State's answer to this petition. Finally, he asks for such other relief as the Court finds the Applicant justly entitled.

Respectfully submitted this 14 day of September 2010,

*/s/ James W. Volberding*

_____

**JAMES W. VOLBERDING**
**SBN: 00786313**

**Plaza Tower**
**110 North College Avenue**
**Suite 1850**
**Tyler, Texas 75702**

**(903) 597-6622 (Office)**
**(903) 597-5522 (fax)**
*e-mail: volberding@attglobal.net*

*/s/ John E. Wright*

_____

**JOHN E. WRIGHT**
**SBN: 20048500**

**Law Office of John E. Wright, P. C.**
**P. O. Box 6547**
**Huntsville, Texas 77342-6547**
**(936) 291-2211 Voice**
**(832) 201-0463  Fax**
*e-mail: wright49@swbell.net*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this pleading has been delivered this 14 day of September 2010 to:

Ms. Georgette P. Oden
Office of the Attorney General                                    *Counsel for the State*
Capital Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1400 (voice)
(512) 320-8132 (fax)

by the following means:

| | |
|---|---|
| _____ | By U.S. Postal Service Certified Mail, R.R.R. |
| _____ | By First Class U.S. Mail |
| _____ | By Special Courier _____ |
| _____ | By Hand Delivery |
| _____ | By Fax <u>before</u> 5 p.m., |
| _____ | By Fax <u>after</u> 5 p.m. |
| _X___ | By Email at Georgette.Oden@oag.state.tx.us |

*/s/ James W. Volberding*
_____
JAMES W. VOLBERDING