# IN THE U.S. DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| ROBERT LESLIE ROBERSON, III | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 2:09-cv-327-TJW |
| | § | Hon. Roy S. Payne |
| RICK THALER, Director | § | (Death Penalty Case) |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER WITH BRIEF IN SUPPORT

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
For Criminal Justice

*Counsel of Record

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

*GEORGETTE P. ODEN
Assistant Attorney General
Postconviction Litigation Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400

———————————————————

## ATTORNEYS FOR RESPONDENT

ANSWER WITH BRIEF IN SUPPORT

Petitioner Robert Leslie Roberson III (Roberson) was properly convicted of the capital murder of his daughter, two year-old Nikki Curtis, and was sentenced to death. He now challenges his presumptively valid death sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. For the reasons discussed below, Roberson fails to demonstrate he is entitled to federal habeas relief.

## ROBERSON'S ALLEGATIONS

Roberson presently raises the following twenty[1] allegations:

1.      Prosecutors committed misconduct by falsely accusing Roberson of sexually assaulting his daughter in violation of the Sixth, Eighth, and Fourteenth Amendments. [Roberson's Claims 1-3].

2.      Texas law lacks the procedural means to permit severance of theories of criminal liability in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. [Roberson's Claim 4].

3.      The State's expert witnesses, who testified that Roberson would be a future danger, offered unreliable and unscientific testimony in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. [Roberson's Claims 5-8].

4.      Roberson received ineffective assistance at guilt-innocence in violation of the Sixth and Fourteenth Amendments because defense counsel failed to object to the guilt/innocence jury

---

[1]      Several different numbering schemes appear in the state court and federal court proceedings. Roberson tried to track the state writ numbering in his federal petition and group the direct appeal claims together at the end, then subsequently filed six new claims. The Director groups claims of like factual origin and legal theory together. Unless otherwise noted, all subsequent references to "claim numbers" refer to the numbers here, in the Director's summary of Roberson's allegations.

charge or to the trial court's refusal to pay their invoices in full. [Roberson's Claims 9-10].[2]

5.    Roberson received ineffective assistance during sentencing because: (a) defense counsel failed to adequately investigate and present mitigation evidence; (b) they failed to challenge the State's experts and their opinions; (c) they failed to object to the jury charge at sentencing; (d) they failed to object to improper closing argument; and (e) they generally failed to preserve error. [Roberson's Claims 9-10, 38, 42].

6.    Roberson received ineffective assistance on appeal because defense counsel failed to brief the direct appeal well. [Roberson's Claim 10].

7.    Because Texas's statutory framework does not require future dangerousness to be proven beyond a reasonable doubt, and does not require the State to disprove mitigation beyond a reasonable doubt and because the indictment did not give Roberson notice of what facts the State intended to rely on in pursuing the death penalty, his Eighth and Fourteenth Amendment rights, as interpreted by Ring v. Arizona[3] and Apprendi v. New Jersey,[4] and due process rights, as interpreted by In re Winship,[5] were violated. [Roberson's Claims 12 -13, 35].

8.    Evidence at trial was legally and factually insufficient to support the jury's answer to the future dangerousness special

---

[2]    Roberson omitted his eleventh claim in his federal petition to indicate that he was not pursuing claim eleven from his state writ; however, the same factual and legal argument appears as part of his ninth claim (renumbered as Claim Four in this Answer).  Pet. 183.  The Director addresses that claim here.

[3]    536 U.S. 584 (2002).

[4]    530 U.S. 466 (2000).

[5]    397 U.S. 358 (1970).

issue in violation of Roberson's Eighth and Fourteenth Amendment rights. [Roberson's Claim 14].

9.    Evidence at trial was legally and factually insufficient to support the jury's verdict of guilty in violation of Roberson's Eighth and Fourteenth Amendment rights. [Roberson's Claims 15 and 31].

10.   The Texas statutory scheme does not insure a consistent application of the death penalty in violation of the Eighth Amendment as interpreted by Justice Blackmun's dissent in Callins v. Collins.[6] [Roberson's Claim 16].

11.   The mitigation special issue sends mixed signals violating the Eighth and Fourteenth Amendments as interpreted by Penry v. Johnson.[7] [Roberson's Claim 17].

12.   The mitigation special issue violates the Eighth and Fourteenth Amendments because it shifts the burden of proof to the defendant and because jurors cannot give adequate effect to mitigating circumstances. [Roberson's Claims 18-23, 34].

13.   Failure to inform jurors that a single holdout will result in an automatic life sentence violated Roberson's Eighth and Fourteenth Amendment rights as well as various provisions of the Texas Constitution. [Roberson's Claims 24-25, 37].

14.   Appellate review of the mitigation special issue is impossible, which violates Roberson's Eighth and Fourteenth Amendment rights. [Roberson's Claims 26, 36].

---

[6]    510 U.S. 1141, 1128 (1994).

[7]    532 U.S. 782 (2001)(Penry II).

15.  Key terminology lacked proper definition during sentencing in violation of Roberson's Fifth, Sixth, Eighth, and Fourteenth Amendment rights. [Roberson's Claims 28[8]-30, 41].

16.  There is no valid penological reason to impose death for murdering a child under six years of age. Roberson's sentence violates the Eighth and Fourteenth Amendments. [Roberson's Claim 32].

17.  "Intentionally or knowingly" is inadequate mens rea for a capital murder conviction, rendering it unconstitutional under the Eighth and Fourteenth Amendments as interpreted by Jurek v. Texas.[9] [Roberson's Claim 33].

18.  Exclusion of diminished capacity testimony from the defense neurologist during the guilt-innocence phase violated Roberson's Sixth, Eighth, and Fourteenth Amendment rights to present a defense as interpreted by Holmes v. South Carolina[10]. [Roberson's Claim 39].

19.  Prosecutors committed misconduct by willfully erring in their definition of probability during the sentencing argument in violation of the Sixth, Eighth, and Fourteenth Amendments. [Roberson's Claim 40].

20.  Admission of evidence that Roberson raped his daughter, without a limiting instruction, rendered the trial fundamentally unfair in violation of the Sixth, Eighth and Fourteenth Amendments; his attorneys should have objected and the trial court should have sua sponte given a limiting instruction. [Roberson's Claims 43-45].

---

[8]     There was no Claim 27 in his petition.

[9]     428 U.S. 262 (1976).

[10]    547 U.S. 319 (2006).

These requests for relief must fail.  Most are procedurally barred under adequate and independent state law grounds which Roberson fails to overcome with a showing of cause and prejudice or a miscarriage of justice.  A number are new and unexhausted.  In any event, these claims are without merit.  Further, Roberson cannot show that the state court unreasonably applied clearly established federal law or unreasonably determined the facts.  He fails to present clear and convincing evidence to overcome the presumption of correctness due to the state court's factual findings.  Therefore, the requested relief should be denied.

## STATEMENT OF THE CASE

In 2003, Roberson was tried and found guilty of the capital murder of his two-year-old daughter Nikki Curtis.  1 CR 2[11]; Tex. Penal Code Ann. §19.03(a)(2) (Vernon 2003); 5 CR 644.  In accordance with the jury's verdict and state law, the trial court assessed Roberson's punishment at death.  Id. at 644-45; Tex. Code Crim. Proc. Article 37.071(b).  The Texas Court of Criminal Appeals (CCA), affirmed his conviction and sentence.  Roberson v. State, 2002 WL 34217382 (Tex. Crim. App. 2002)(unpublished opinion), cert. denied, Roberson v. Texas, 552 U.S. 1314 (2008).

Roberson's first state petition for habeas corpus, raising thirty-four claims for relief, was filed while direct appeal was pending.  1 Supp. CR[12] at 29.  While

---

[11]    "CR" refers to the Clerk's Record of documents filed with the district court during Roberson's trial, preceded by volume number and followed by page number(s).

[12]    "Supp. CR" refers to the Supplemental Clerk's Record of papers filed with the trial court subsequent to his conviction, including his state writs of habeas corpus,

it was pending, Roberson filed a subsequent, pro se petition for writ of habeas corpus in state court. Ex parte Roberson, No. 63,081-02 (attached as Exhibit A). The CCA adopted the trial court's findings of fact and conclusions of law in denying Roberson's first application for writ of habeas corpus, and denied his subsequent writ as an abuse of the writ under Section 5 of Article 11.071. Ex parte Roberson, 2009 WL 2959738 (Tex. Crim. App. 2009) (unpublished).

Roberson then filed his federal petition for writ of habeas corpus. Petition, ECF No. 11. He added six more claims in a supplemental petition. Supplemental Petition, ECF No. 12. This response is timely filed.

## STATEMENT OF FACTS

### I.  Facts of the Crime

The CCA summarized the relevant evidence presented during guilt-innocence in its opinion on direct appeal.

> The State called twelve witnesses during its case-in-chief. Among them was Kelly Gurganus, a registered nurse, who testified that she was working in the emergency room of the Palestine Regional Medical Center when [Roberson] came in, pushing a wheelchair in which sat his girlfriend Teddie Cox. Gurganus said Teddie was holding something in her lap, covered in a blanket or coat of some sort. Teddie told Gurganus, "She's not breathing," at which point Gurganus removed the covering and saw Nikki Curtis lying in Teddie's lap, limp and blue. . . .
>
> Gurganus further testified that when she laid Nikki down on the bed in the trauma room, she saw bruising on Nikki's body, including on her head. She said that she then spoke with [Roberson] and asked him what happened, and that he told her that Nikki's injuries were the result of falling off of the bed. She said she immediately became suspicious because that story seemed implausible in light of

_____

preceded by volume number and followed by page number(s).

the severity of Nikki's injuries. She instructed the director of nurses to call the police. . . .

The State also called Robbin Odem, the chief nursing officer at Palestine Regional Medical Center, who testified to her own observations of Nikki's extensive head injuries, as well as her similar interaction with, and impression of, [Roberson] in the emergency room that night.

Dr. John Ross, the pediatrician who examined Nikki the day she died, testified that she had bruising on her chin, as well as along her left cheek and jaw. Dr. Ross said she also had a large subdural hematoma, which he described as "bleeding outside the brain, but inside the skull." He said there was edema on the brain tissue, and that her brain had actually shifted from the right side to the left. He said that, in his opinion, Nikki's injuries were not accidental but instead intentionally inflicted.

Dr. Thomas Konjoyan, the emergency room physician who treated Nikki the day she died, also testified that she had bruising on the left side of her jaw, and that she had uncal herniation, which is "essentially a precursor to brain death." Dr. Konjoyan said that the severity of the swelling in Nikki's brain necessitated her transfer to the Children's Medical Center in Dallas for pediatric neurosurgical services. He said that, in his opinion, it would be "basically impossible" for such an injury to have resulted from a fall out of bed. Dr. Jill Urban, a forensic pathologist for Dallas County, testified for the State that she performed the autopsy on Nikki and concluded that Nikki died as a result of "blunt force head injuries."

The jury also heard from Courtney Berryhill, Teddie Cox's eleven-year-old niece, who testified that sometimes she spent the night at the home where [Roberson] lived with Teddie, Nikki, and Teddie's ten-year-old daughter Rachel Cox. Courtney said that she once witnessed [Roberson] shake Nikki by the arms in an attempt to make her stop crying. Rachel Cox then testified that [Roberson] had a "bad temper," and that she had witnessed him shake and spank Nikki when she was crying. Rachel said she had seen this happen about ten times. She also recalled a time that [Roberson] threatened to kill Nikki.

Finally, Teddie Cox testified for the State. . . . Teddie testified that [Roberson] had a bad temper, and that he would yell at Nikki when she cried, which apparently happened every time he approached her. Teddie said she once heard [Roberson] yell at Nikki: "If you don't shut up I'm going to beat your ass." She also said that [Roberson] would hit Nikki with his hand and also once with a paddle. She said that on that occasion she told [Roberson] that he should not do that because Nikki was a baby. That whipping left bruising on Nikki's buttocks which the Bowmans later noticed. Teddie said that, when the Bowmans asked about it, [Roberson] told them that Rachel did it. She said that she confronted [Roberson] about the incident and that he promised her he would never hit Nikki again.

Teddie also testified that she witnessed [Roberson], when he was angry at Nikki, pick her up off the bed, shake her for a few seconds, and throw her back on the bed. This upset Teddie, and she briefly left [Roberson]'s home with Rachel, but [Roberson] apologized and convinced her to return. According to Teddie, this incident happened within a month of Nikki's death.

Teddie testified that, on the evening of January 30, 2002, Teddie was in the hospital after undergoing a hysterectomy procedure. Nikki was staying with the Bowmans, but Mrs. Bowman became ill, so it became necessary for [Roberson] to pick up Nikki and look after her. Teddie said [Roberson] seemed mad about this development, because he preferred to stay with her in her hospital room watching a movie on television. Teddie said [Roberson] had never once before been asked to be the sole caretaker of Nikki. She said [Roberson] did not leave immediately, but waited quite a while and, when he finally did leave, he was mad.

The next morning, Teddie was told she was being released. When she spoke to [Roberson] about picking her up, he said that he was bringing Nikki to the hospital because she wasn't breathing and he couldn't get her to wake up. Teddie noted that he did not seem upset about the situation. . . . [Roberson] eventually pulled into the parking lot. Teddie said he did not seem to be moving urgently and in fact found a parking spot instead of pulling up to the front door. Nor did he seem to be in any hurry to get Nikki out of the car.

Teddie urged him to bring Nikki to her, and he did. Teddie said Nikki was limp, blue, and did not appear to be breathing. Teddie said she asked [Roberson] what happened, and he said that they had fallen asleep in bed while watching a movie and that he awoke to her crying near the foot of the bed, on the floor. He said he made sure that she was okay and then brought her back into bed with him, and they went back to sleep. Teddie said she was skeptical of this story, because, in her experience, Nikki would always cry for Teddie when [Roberson] tried to sleep in the bed with her. In fact, Teddie said, [Roberson] later did tell her that Nikki was crying for her.

Nikki died from her injuries after being taken to the hospital in Dallas. Teddie could not accompany Nikki when she was taken to Dallas, but she did not want to return to [Roberson]'s home, so she took her daughter to stay with a relative. In the ensuing weeks, she spoke with [Roberson] occasionally, and she said he never once mentioned Nikki, and that when she did he expressed no interest in talking about her. Teddie said he did not seem sad or emotionally distraught, but that he just showed no interest. At one point, while [Roberson] was in the Anderson County Jail, Teddie said she asked him directly if he had killed Nikki. She said his response was that if he did do it, he didn't remember; that he might have "snapped," but that he doesn't remember doing so.

In his case-in-chief, [Roberson] called Patricia Conklin, Teddie's sister, who testified that, in her opinion, [Roberson] had a loving relationship with Nikki. She said that in her experience she had never seen [Roberson] spank Nikki, but that she had once seen Rachel do so. She also said that, in her opinion, Teddie had a poor reputation for truthfulness. . . . [Roberson] offered the testimony of Dr. Krusz toward the end of his case-in-chief. The State objected and was granted the opportunity to conduct a voir-dire examination of Dr. Krusz outside the presence of the jury. Dr. Krusz testified on voir dire that he had examined [Roberson] and concluded that [Roberson] suffered from organic brain syndrome (or more specifically, post-concussional syndrome), which caused him to have poor impulse control and difficulty making rational decisions. The State objected that the testimony amounted to a diminished-capacity defense, which is not recognized as a legal

justification for criminal acts. After the voir dire examination of Dr. Krusz, the trial court expressed reservations about the admissibility of his testimony:

[The Court]: Gentlemen, to be honest with you, as I listened to the doctor testify, that was my concern is, we're getting into the, you know, the negation, as they say of intent that he cannot form intent or knowledge in his mind to commit a crime.

[Roberson's Counsel]: That's not all this doctor is testifying to, your honor. First of all, it's saying how he effects [sic], not that there's an absolute absence, but of how it affects his ability to form intent and knowledge. Further, the doctor I believe will testify that are certain stress factors, particularly the situation that is the subject will present an emotional response, your Honor. The jury has the obligation to find intentional and knowing conduct. There are also other culpable mental states that we're going to request that the Court put before this jury and I believe those type, the type of organic brain injury that my client suffers has a direct and loathing effect as to whether he was in one of those intents or whether or not he was acting primarily upon an emotional basis.

The trial court ultimately agreed with the State and excluded Dr. Krusz's testimony from the guilt-innocence phase of the trial.

Roberson v. State, 2002 WL 34217382 at *1-4, 6-7.

II. Punishment Evidence

Again, the CCA summarized the relevant evidence in its opinion on direct

appeal:

At the punishment phase, the State began by offering [Roberson]'s pen packets. They showed that [Roberson] had been convicted previously of burglary of a habitation, for which he was sentenced to ten years in prison (upon revocation of his probation). They also showed a prior conviction for felony theft, for which [Roberson] received a seven-year sentence, as well as a five-year term for another theft conviction. In total, [Roberson] had been arrested at least seventeen times before murdering Nikki.

The State then called Della Gray, [Roberson]'s ex-wife and the mother of his two older children. Gray testified that [Roberson] was physically abusive towards her both before and after they got married, including incidents where he strangled her with a coat hanger, punched her in the face and broke her nose while she was pregnant, and beat her with a fireplace shovel. She also told of a time when she had gone out to help a friend, leaving [Roberson] and their son, Robert, Jr., at home alone together. When she returned, Robert, Jr. had a bruised face, and when she asked him what happened, Robert, Jr. told her he had fallen off the bed. She also described an incident in which [Roberson] was alone in a bedroom with their then-two-year-old daughter Victoria for thirty minutes. Victoria was screaming and upset, and when [Roberson] finally let her out of the room she had a "hickey" on her neck. Overall, Gray described herself as scared of [Roberson], such that she never reported any of the suspected abuse to the authorities. She said she currently was not allowed to spend any time with her children. On cross-examination, Gray admitted she had been involved in a lengthy custody battle against [Roberson] and his mother, which she ultimately lost, some eleven years previously. She also admitted to some history of alcohol and drug abuse, and that she had not provided, nor has she been asked to provide, any support for her children in the years since she lost custody of them.

There was testimony from another witness concerning a dispute with a neighbor that escalated into a physical altercation with a teenage boy. The State then rested its punishment case-in-chief.

[Roberson] called two officers from the Anderson County jail to testify that [Roberson] had no history of violence or disciplinary problems while incarcerated there. [Roberson] then called Dr. John Krusz. Dr. Krusz's testimony consisted of that which was offered and excluded at the guilt-innocence phase, namely, a discussion of what he referred to as [Roberson]'s "post-concussional type syndrome." Dr. Krusz said that his evaluation of [Roberson] led him to conclude that, despite his poor ability to deal with stressful situations in the past, [Roberson] would be able to control his behavior in the controlled, structured environment of prison.

On cross-examination, Dr. Krusz acknowledged that the major portion of his work was in the treatment of chronic pain and migraine headaches. He also admitted that [Roberson] had not informed him of his history of abuse towards his ex-wife and children. He also acknowledged that, even if [Roberson] was brain damaged, there are many people in the world who are brain damaged and have not murdered a child. Dr. Krusz also conceded that [Roberson]'s brain disorder might be attributable to [Roberson]'s long-term history of drug abuse, including intravenous drugs.

[Roberson] then called Kelly R. Goodness, Ph.D. Dr. Goodness was a forensic psychologist who had interviewed [Roberson] while he was incarcerated during this trial, as well as other people who knew [Roberson], including his family. Dr. Goodness testified that, in her opinion, [Roberson] had been physically abused as a child by his father, despite denials of abuse by [Roberson] and his family. She also said she believed that [Roberson]'s two older children had been abused, but that she could find no conclusive evidence to say whether the abuse came from [Roberson] or his ex-wife. She said she believed [Roberson] suffered from brain damage-specifically, that his brain was "compromised"—as well as depression, substance dependence, and antisocial-personality disorder. She also testified that [Roberson]'s mother had a very dominant influence on him and that, if not for her influence, he likely would not have sought custody of Nikki. In her opinion, [Roberson] was unlikely to attempt to escape from prison, nor was he likely to pose a future danger while in prison. After Dr. Goodness's testimony, [Roberson] rested his punishment case-in-chief.

In rebuttal, the State called Thomas Allen, Ph.D., a psychologist who interviewed [Roberson] and reviewed his records. Dr. Allen testified that, based on the severity of the crime in this case, [Roberson]'s family history, his history of substance abuse, and other factors, he believed that [Roberson] was a psychopath and that it was probable he would commit future acts of violence, even in prison.

The State then called David Self, M.D., a psychiatrist who interviewed [Roberson] along with Dr. Allen. Dr. Self disputed Dr.

> Krusz's diagnosis of post-concussion syndrome. He agreed that
> [Roberson] has poor impulse control, but that led him to conclude
> that [Roberson] would be at risk to engage in future acts of criminal
> violence because he would be targeted by other inmates in prison as
> someone who had hurt a child, and he likely would have to defend
> himself from physical attacks. On cross-examination, Dr. Allen
> acknowledged that many people in [Roberson]'s condition do not act
> out violently in prison, and that [Roberson] himself had no history
> of violent incidents during his prior years of incarceration.

Id. at *9-10.

## STANDARD OF REVIEW

Roberson misstates the standard of review that must be applied to this case. Roberson argues that this Court must first determine whether there was a violation of the Constitution and second, decide whether the denial of relief by the state courts was reasonable under the Anti-Terrorism and Effective Death Penalty Act (AEDPA). Pet. 18, et seq. Roberson asks this Court to first make a de novo review of the case, reach a conclusion and then determine the reasonableness of the state court determination. This Court's examination must begin by looking at the state court's decision through the deferential lens of AEDPA. See Lindh v. Murphy, 521 U.S. 320, 335-36 (1997).

As an initial matter, habeas relief is inappropriate if a claim is not cognizable on federal review. Roberson, confined pursuant to a state court judgment, is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the U.S.." 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). This is simply to screen out state law claims, not a merits review. Roberson appeals to Berghuis v. Thompkins, 130 S. Ct. 2250 (2010) and Porter v. McCollum, 130 S. Ct. 447 (2009), for the

proposition that de novo review of the merits comes first. Pet. 17.

Roberson misunderstands these decisions. In Berghuis the Supreme Court was evaluating whether the Sixth Circuit properly reversed the district court and granted relief. 130 S. Ct. at 2255-56. The district court properly applied AEDPA and concluded the state court did not unreasonably apply clearly established federal law nor did it unreasonably determine the facts. Id. at 2258. The Sixth Circuit reversed on both grounds. Id. at 2258-59. Therefore, the Supreme Court had to conduct its own merits review to evaluate the propriety of the Court of Appeals's decision. And Porter was an ineffective-assistance-of-counsel case where the state court did not evaluate deficiency, so the Supreme Court needed to address it de novo. 130 S. Ct. at 452-53. After finding counsel deficient, the Porter Court examined the state court's determination on prejudice through the AEDPA lens. Id. at 453.

Under 28 U.S.C. § 2254(d), a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claim by the state court, (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court; or (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." Harrington v. Richter, 131 S. Ct. 770, 785 (2011) (quoting (Terry) Williams v. Taylor, 529 U.S. 362, 412 (2000)); 28 U.S.C. § 2254(d). The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or

confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. (Terry) Williams, 529 U.S. at 405-06.

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. Id., 529 U.S. at 406. To this end, a state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. Id. at 407-09. And as the Supreme Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Richter, 131 S. Ct. at 786 (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." Id. The burden of retrying a case many years after the fact should not be imposed on the State "unless each ground supporting the state court decision is examined and found to be unreasonable under AEDPA." Wetzel v. Lambert, 132 S. Ct. 1195, 1199 (2012) (emphasis in original).

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. Richter, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)); see also Woodford v. Visciotti, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-

court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Alvarado, 541 U.S. at 664. This is particularly true when reviewing a state court's application of Strickland v. Washington, 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d), creates a difficult to surmount, "doubly" deferential assumption in favor of the state court denial. Richter, 131 S. Ct. at 786.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 786.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. [28 U.S.C. §] 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

Id. (emphasis added) (internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning. Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001); see also Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); Catalan v. Cockrell, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning or written opinion

. . . ."). And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." Early v. Packer, 537 U.S. 3, 8 (2002); Richter, 131 S. Ct. at 786.

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard. (Terry) Williams, 529 U.S. at 381. Stated differently:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Richter, 131 S. Ct. at 786-87 (emphasis added). And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand . . ." because such a process suggests the proposed rule is not clearly established. Alvarado, 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to

the state court's conclusions of mixed law and fact." Valdez v. Cockrell, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

And except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state court fact finding must have been presented to the state court. Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner. 28 U.S.C. § 2254(d)(2); Cullen v. Pinholster, 131 S. Ct. 1388, 1400-01 (2011).

Finally, Roberson's request for an evidentiary hearing must be denied. Pet. 24. Where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. (Michael) Williams v. Taylor, 529 U.S. 420, 436 (2000). For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court

is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). Id. at 433.

"Mere requests for evidentiary hearings [in state court] will not suffice; the petitioner must be diligent in pursuing the factual development of his claim." Dowthitt v. Johnson, 230 F.3d 733, 758 (5th Cir. 2000). Under Texas law, an evidentiary hearing on an application for writ of habeas corpus is not necessary where the state court determines that no "controverted, previously unresolved factual issues" exist. Tex. Code Crim. Proc. art. 11.071 §§ 8, 9 (West 2011). It follows that, where an applicant fails to make a reasonable attempt to prove the necessity for such a hearing—that is, fails to show that there are controverted, previously unresolved factual issues in need of resolution—that individual is not diligent in developing the facts that underlie his claim. 17 Supp. CR 2743.

For instance, in Dowthitt, the petitioner's mere request for an evidentiary hearing in state court, and that court's subsequent denial of his request, was not enough to lift him out of the restrictive rubric set forth in § 2254(e)(2). 230 F.3d at 758. Indeed, Dowthitt failed to present affidavits to support his motion or show that those affidavits "could not be obtained absent an order or discovery hearing." Id. Moreover, his proffers, rather than affidavits, did not demonstrate due diligence. Id.

To resolve disputed factual issues, the state habeas court may require affidavits, depositions, interrogatories, and evidentiary hearings or may use personal recollection. Art. 11.071, § 9(a). Here, the state court used its personal recollection and court documents where necessary. Roberson presented numerous extra documents including affidavits, photographs, notes, and articles.

20

1 Supp. CR 49-58. Roberson provided one affidavit from trial counsel Steve Evans, and one from the trial court Judge Bascom Bentley III, but only asked them to discuss the search of Roberson's jail cell. 3 Supp. CR 547-48, 549-50. He provided two from his psychologist Dr. Goodness, one apparently to authenticate her curriculum vitae and one too late to be considered by the state court. Id. at 558; 17 Supp. CR 2725-32; 17 Supp. CR 2782. And although Roberson moved for a hearing in state court, he failed to specify the disputed factual issues to be resolved. 1 Supp. CR 44. He merely concluded that there "are serious controverted factual issues." Id. Indeed, the state court determined that there were none. 17 Supp. CR 2743. Hence, he failed to demonstrate to the state court the necessity for a live hearing. See Dowthitt, 230 F.3d at 758.

Therefore, because Roberson was not diligent in developing the facts in state court, a federal hearing is barred unless Roberson meets the statutory requirements. 28 U.S.C. § 2254(e)(2). Roberson does not show that any of his claims involve a new rule of constitutional law or facts that could not have reasonably been discovered earlier. See § 2254(e)(2)(A). Nor does he show that the facts underlying his claims establish by clear and convincing evidence that but for constitutional error no reasonable fact finder would have found him guilty of capital murder. See § 2254(e)(2)(B). Roberson is not entitled to a federal evidentiary hearing.

But even if Roberson can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. Clark v. Johnson, 227 F.3d 273, 284-85 (5th Cir. 2000).

PROCEDURAL DEFAULT

I. Procedural Defaults On Adequate and Independent State Grounds.

Most of Roberson's claims were dismissed by the state court as procedurally barred on adequate and independent state law grounds for dismissal. In the alternative, the state court addressed the merits of his claims and found them wholly unpersuasive. The specific bars and alternative merits analysis will be addressed individually in each separate claim.

> A. Claims which are procedurally defaulted on adequate and independent state-law grounds cannot be reviewed on the merits in federal court.

This Court cannot review the merits of procedurally defaulted claims. Magwood v. Patterson, 130 S. Ct. 2788, 2801 (2010). A habeas claim can be procedurally defaulted in either of two ways. Coleman v. Dretke, 395 F.3d 216, 220 (5th Cir. 2004). First, if the prisoner has never fairly presented that claim to the highest available state court, the claim is unexhausted. 28 U.S.C. § 2254(b)(1)(A). Second, if the highest available state court has dismissed the claim on a state-law procedural ground instead of deciding it on the merits, the claim has been decided on an independent and adequate state-law ground. Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997). To rule in Roberson's favor on such arguments, this Court would have to construe Texas precedent in a way that "contradict[s] a recent decision of the highest state court." Lords Landing Village Condominium Council of Unit Owners v. Continental Insurance Co., 520 U.S. 893, 896 (1997). This Court can ignore the resulting procedural bar only if it is willing to second-guess the Texas high court's interpretation of its own law, an undertaking for which it is ill suited. E.g., Estelle v. McGuire, 502 U.S. at 67-

68 ("We reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

When a state court holds a claim barred on independent and adequate state-law grounds and reaches the merits of the claim in the alternative, the claim is procedurally barred in the federal habeas court. Harris v. Reed, 489 U.S. 255, 264 n. 10 (1989); Hughes v. Dretke, 412 F.3d 582, 592-93 (5th Cir. 2005); Thacker v. Dretke, 396 F.3d 607, 614 (5th Cir.2005).

> 1.   Failure to fully brief or state a claim that is cognizable in habeas—the Ex parte Maldonado bar.

A number of claims were so poorly briefed, they failed to state a claim or present facts upon which relief could be granted, and the state court held them to be procedurally barred and declined to review them on state habeas. 17 Supp. CR 2745, 2751, 2756; see Ex parte Maldonado, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985); Ex parte McPherson, 32 S.W.3d 860, 861 (Tex. Crim. App. 2000); Ex parte San Migel, 973 S.W.2d 310, 311 (Tex. Crim. App. 1998); Ex parte Morrow, 952 S.W.2d 530, 534 (Tex. Crim. App. 1997). This is commonly referred to as the Ex parte Maldonado bar.

The state court relied on regularly and consistently applied state law regarding the cognizability of claims on state habeas and requirements for pleadings. 17 Supp. CR at 2745-46, 2751-52, 2755-56, 2758-59, 2761, 2763, 2769, 2771; Ex parte McPherson, 32 S.W.3d at 861; Ex parte Maldonado, 688 S.W.2d at 116. In denying relief, the Maldonado court found that

> In a postconviction collateral attack, the burden is on the applicant to allege and prove facts which, if true, entitle him to relief. . . . In other words, it is not sufficient that the petition allege the denial of

23

a fair and impartial trial or due process of law, which are mere conclusions of law; neither is it adequate to allege the bare fact that the court's charge was somehow erroneous. . . . Once alleged, the burden on the applicant to prove such a denial is heavy and cannot be carried by merely attaching a certified copy of the court's charge to the application for writ of habeas corpus, as was done here.

The application before us utterly fails to allege facts which, if true, entitle the applicant to collateral relief; the application is accordingly dismissed. This dismissal is without prejudice to applicant's right to replead and support this allegation with adequate reasoning, argument and testimonial and recorded evidence which illustrates the error so infected the trial process as to deny him a fair and impartial trial.

Id. The Maldonado bar is a regularly applied procedural bar in Texas, as the federal courts have recognized. See, e.g., Evans v. Thaler, 2010 WL 8056694 at *16 (W.D. Tex. 2010); Hardy v. Thaler, 2010 WL 1995398 at *9 (S.D. Tex. 2010); Ex parte Williams, 2003 WL 1787634 (Tex. Crim. App. 2003); Ex parte McPherson, 32 S.W.3d at 861; Ex parte San Migel, 973 S.W.2d at 311; Ex parte White, 726 S.W.2d 149, 150 (Tex. Crim. App. 1987); c.f. Martin v. Thaler, 2009 WL 3756890, *26 (W.D. Tex. 2009).

> 2.     Should have been raised on direct appeal— the Ex parte Gardner[13] bar.

Because Roberson could have and should have raised a number of claims on direct appeal but did not, the state court declined to review them on state habeas. 17 Supp. CR 2745-46, 2750, 2765; citing Ex parte Gardner, 959 S.W.2d at 199; Ex parte Barber, 879 S.W.2d 889, 891 n.1 (Tex. Crim. App. 1994); Ex parte Goodman, 816 S.W.2d 383, 385 (Tex. Crim. App. 1991).

---

[13]     959 S.W.2d 189 (Tex. Crim. App. 1996)(op. on reh'g)

Roberson presented no new evidence which, if true, would entitle him to relief. Roberson had no reason for not raising these claims on direct appeal since they only assert legal arguments that depend on the facts contained in the appellate record. Where the record on direct appeal is adequate to evaluate a claim for relief, Texas courts agree the claim should be raised on direct appeal to avoid delay and the needless expenditure of judicial resources. Ex parte Barber, 879 S.W.2d 889, 891 n.1 (Tex. Crim. App. 1994). The Gardner court explained, "It is well-settled 'that the writ of habeas corpus should not be used to litigate matters which should have been raised on direct appeal.'" Gardner, 959 S.W.2d at 199.

The Fifth Circuit has recognized that application of the Gardner rule creates a bar to federal habeas review. Brewer v. Quarterman, 466 F.3d 344, 347 (5th Cir. 2006); Busby v. Dretke, 359 F.3d 708, 719 (5th Cir. 2004); Finley v. Johnson, 243 F.3d 215, 219 (5th Cir. 2001); Soria v. Johnson, 207 F.3d 232, 249 (5th Cir. 2000). The state court relied on a procedural bar and plainly stated that it was doing so. 17 Supp. CR 2745-46, 2750, 2758, 2761-63, 2765, 2770, 2773-76.

3.    Claims barred for failure to contemporaneously object and preserve error.

Because Roberson failed to give the trial court a chance to correct any errors by contemporaneously objecting on a number of issues, the state court below declined to address them on their merits and found them procedurally defaulted. 17 Supp. CR 2746, 2750-51, 2763, 2765, 2773, 2775-76, 2780-81, citing Saldano v. State, 70 S.W.3d 873, 890-91 (Tex. Crim. App. 2002); Wright

v. State, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000); Ladd v. State, 3 S.W.3d 547, 566 (Tex. Crim. App. 1999); Dewberry v. State, 4 S.W.3d 735, 752 & n.16 (Tex. Crim. App. 1999); Curry v. State, 910 S.W.2d 490, 496 n. 2 (Tex. Crim. App. 1995); Broxton v. State, 909 S.W.2d 912, 917-18 (Tex. Crim. App. 1995); Garcia v. State, 887 S.W.2d 846, 861 (Tex. Crim. App. 1994); Briggs v. State, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990)(stating that even constitutional error may be waived).

The Fifth Circuit has repeatedly recognized that the Texas "contemporaneous objection rule" is an adequate procedural bar for purposes of federal habeas corpus review. Watts v. Quarterman, 244 F.App'x 572, 575 (5th Cir. 2007); Parr v. Quarterman, 472 F.3d 245, 253 (5th Cir. 2006); Dowthitt, 230 F.3d at 752; Corwin v. Johnson, 150 F.3d 467, 473 (5th Cir. 1998); Turner v. Johnson, 106 F.3d 1178, 1183 n.41 (5th Cir. 1997); Amos v. Scott, 61 F.3d 333, 339-340 (5th Cir. 1995).

4. Claims barred as successive.

Defense expert Dr. Goodness's new, unsworn affidavit, belatedly presented to the state habeas court in support of the argument in claims one through three, was found by that court to be successive. 17 Supp. CR 2782 (citing Tex. Code Crim. Proc. article 11.071 §5). Article 11.071 §5(a) provides that a state court may not consider the merits of or grant relief on claims presented in a successive state habeas application absent facts giving rise to a statutory exception. Roberson made no showing that one of the Article 11.071 exceptions would apply to allow review of this claim in state court. The successive writ bar is regularly and consistently applied. See Balentine v. Thaler, 626 F.3d 842, 857 (5th Cir.

2010); Hughes v. Quarterman, 530 F.3d 336, 342 (5th Cir. 2008) (citing Emery v. Johnson, 139 F.3d 191, 196 (5th Cir. 1998) (abuse-of-the-writ statutory rule); Muniz v. Johnson, 132 F.3d 214, 221 (5th Cir. 1998); Nobles, 127 F.3d at 422; Fearance v. Scott, 56 F.3d 633, 642 (5th Cir. 1995) (abuse-of-the-writ doctrine).

    5.    Claims barred as unexhausted.

Relief "shall not be granted" under any circumstances unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1); Beazley v. Johnson, 242 F.3d 248, 263 (5th Cir. 2001). "The exhaustion requirement is satisfied if petitioner has fairly 'presented the substance of his claim to the state courts.'" Conner v. Quarterman, 477 F.3d 287, 291 (5th Cir. 2007) (quoting Vasquez v. Hillery, 474 U.S. 254, 258 (1986)). In the instant case, just as in Gray v. Netherland, "the procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." 518 U.S. 152, 162 (1996) (barring claim on basis that claim would be barred in state court if it were presented there); Nichols v. Scott, 69 F.3d 1255, 1280 (5th Cir. 1995). Relief may be denied on unexhausted claims, but it cannot be granted. 28 U.S.C. § 2254 (b)(1)(A); (b)(2); Mercadel v. Cain, 179 F.3d 271, 276-78 (5th Cir. 1999).

The Fifth Circuit has held that where a petitioner raises claims in federal court that have not previously been presented to the state courts, and Article 11.071 § 5(a) would apply to foreclose review of the claims if presented in a successive state habeas application, such is an adequate state procedural bar

27

foreclosing federal habeas review of the claims. Nobles, 127 F.3d at 422; Muniz, 132 F.3d at 221. Roberson does not attempt to distinguish his case from Nobles and Muniz; nor does he attempt to demonstrate cause and prejudice for his failure to raise the claims in his initial state habeas application. Thus, circuit precedent compels the denial of this claim as procedurally defaulted.

  B.  Roberson fails to make a showing of cause and prejudice, or a miscarriage of justice, to overcome the procedural bars.

As a rule, a federal court may not entertain a state prisoner's habeas claims "when (1) 'a state court [has] declined to address [those] claims because the prisoner had failed to meet a state procedural requirement,' and (2) 'the state judgment rests on independent and adequate state procedural grounds.'" Maples v. Thomas, 132 S. Ct. 912, 922 (2012) (citing Walker v. Martin, 131 S. Ct. 1120, 1127 (2011)). The bar to federal review may be lifted, however, if "the prisoner can demonstrate cause for the [procedural] default [in state court] and actual prejudice as a result of the alleged violation of federal law." Coleman v. Thompson, 501 U.S. 722, 750 (1991). "The cause and prejudice requirement. . . shows due regard for States' finality and comity interests while ensuring that 'fundamental fairness [remains] the central concern of the writ of habeas corpus.'" Dretke v. Haley, 541 U.S. 386, 393 (2004).

Cause for a procedural default exists where "something external to the petitioner, something that cannot fairly be attributed to him[,] ... 'impeded [his] efforts to comply with the State's procedural rule.'" Coleman, 501 U.S. at 753. "Objective factors that constitute cause include interference by officials that makes compliance with the State's procedural rule impracticable, and a showing

that the factual or legal basis for a claim was not reasonably available to counsel." McCleskey v. Zant, 499 U.S. 467, 494 (1991)(internal quotations omitted). A finding of prejudice requires a "showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982); see also Murray v. Carrier, 477 U.S. 478, 493 (1986). If a petitioner fails to prove cause, the federal reviewing court need not address the prejudice prong of the test. Engle v. Isaac, 456 U.S. 107, 134 n. 43 (1982).

In an effort to "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case," Schlup v. Delo, 513 U.S. 298, 324 (1995), the Supreme Court has also recognized a miscarriage-of-justice exception. "[I]n appropriate cases," the Court has said, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration,'" Carrier, 477 U.S. at 495 (quoting Engle, 456 U.S. at 135). In Schlup, the Supreme Court held that prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." 513 U.S. at 327. "To be credible," a gateway claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 324. The Schlup standard is demanding and permits review only in the "extraordinary" case. Id.

at 327; see also at 324 (emphasizing that "in the vast majority of cases, claims of actual innocence are rarely successful"). Roberson's burden at the gateway stage, then, is to demonstrate that more likely than not any reasonable juror would have reasonable doubt. House v. Bell, 547 U.S. 518, 538 (2006).

To meet this burden, Roberson repeatedly copied-and-pasted a series of conditional assertions, some addressing exhaustion and others regarding cause and prejudice, that are said to apply to his claims collectively:

> To file this application before the September 16, 2010 AEDPA deadline, it was not possible for Roberson's attorneys to brief the litany of waiver and procedural default findings and conclusions found by the state district court . . . Roberson's attorneys plan to file a supplemental brief addressing these findings and documenting that this Court is not barred from the merits of any of his claims, and that each claim satisfies the AEDPA standard for habeas relief.

> For the moment, however, Roberson denies each of the state court's findings of fact and conclusions of law. First, he argues that each claim was timely presented to the state courts, which denied each claim on the merits. Second, if the Respondent argues that a claim was procedurally defaulted, then Roberson asserts that it was not, or alternatively, that he is excused for one or more of the following reasons: . . . the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds". . . the state procedural rule was (1) not in effect at the time of the alleged default; (2) was not clear and regularly followed; (3) does not serve a state interest and is designed merely to frustrate asserted federal rights, and, (4) violates due process or result [sic] in a waiver of a fundamental right. . . . the state procedural bar rule is discretionary or and [sic] compliance with the rule has been lacking in some highly technical sense . . . [I]f there has been a default, [Roberson] can demonstrate "cause" for and "prejudice" from the default [which] . . . includes but is not limited to concealment of evidence by the State, ineffective assistance of counsel [IAC] at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.

> [And] if there has been a default, the petitioner is actually innocent of capital murder.

> Roberson requests a hearing in which he may demonstrate cause and prejudice to avoid the consequences of default.

Pet. 32-34, 156-58, 178, 184, 190, 198, 203, 210, 215, 220, 229, 232, 236, 249 (citing Boyd v. Scott, 45 F.3d 876, 880-81 (5th Cir. 1994); Johnson v. Mississippi, 486 U.S. 578, 587-89 (1988); James v. Kentucky, 466 U.S. 341, 348-49 (1984), and County Court of Ulster County v. Allen, 442 U.S. 140, 150-51 (1979)).

Roberson has had fifteen months within which to amend his petition, and yet has not chosen to avail himself of this opportunity. This was his chance to make his cause and prejudice showing, not to assert that he would do so later. By failing to adequately brief these cursory arguments, Roberson waived them. See Green v. Johnson, 160 F.3d 1029, 1036 n.2 ("It is not the job of an appellate court to go on a fishing expedition through the record to find facts favoring or disfavoring an appellant's arguments. Rather, it is the job of a party before this court to supply in its brief relevant record cites in order that this court may properly review his arguments."); Trevino v. Johnson, 168 F.3d 173, 181 n. 3 (5th Cir. 1999) ("Because they are inadequately argued, we consider these issues waived."); Cavallini v. State Farm Mut. Auto Ins. Co., 44 F.3d 256, 260 n. 9 (5th Cir. 1995) ("failure to provide any legal or factual analysis of an issue results in waiver"); United States v. Maldonado, 42 F.3d 906, 910 n. 7 (5th Cir. 1995) (failure to do more than vaguely refer to an issue constitutes waiver).

The cases Roberson cited are antithetical to his position. For instance, Boyd merely confirms that a state court can properly address the merits of

federal claims in an alternative holding when the original procedural bar is based on adequate and independent state grounds, and such reasons are clearly and expressly stated. 45 F.3d at 880, n.9. This is exactly what the state court did here; for example: "The Court further concludes as a matter of law that applicant is procedurally barred from raising this issue by way of the writ of habeas corpus because he could have—but did not—raise the issue on direct appeal . . . Should some court determine that this issue is properly before this Court on the writ of habeas corpus, the Court makes the following findings on the merits of the claim in the alternative." 17 Supp. CR 2746-47; see also, id. at 2751, 2756, 2762-63, 2765, 2770-71, 2774, 2776-77, 2781, 2783.

In Johnson v. Mississippi, petitioner's failure to raise his claim on direct appeal constituted a procedural bar under Mississippi law. 486 U.S. at 587. The Supreme Court confirmed that procedural bars can constitute an adequate and independent state ground for affirming a sentence if they have been consistently or regularly applied, but found that the Mississippi law in question did not qualify given those specific facts. Id. Likewise, in James v. Kentucky, the Supreme Court merely confirmed the "consistently and regularly" requirement, under disparate facts and unique Kentucky law. 466 U.S. at 346-49. Lastly, in Allen, the Supreme Court dealt with a factual situation entirely the opposite of the instant case. 442 U.S. at 152-54. Here, the Director does not seek to assert a novel procedural bar which lay dormant and ignored in the state court proceedings; instead, the procedural bars were well-established and asserted from the beginning, precluding merits review by the court below, and thus by this Court.

The state court decision expressly stated that its decisions were based on state procedural grounds. 17 Supp. CR 2746-47, 2751, 2756, 2762-63, 2765, 2770-71, 2774, 2776-77, 2781, 2783. The state procedural rule embodied in Ex parte Maldonado has been in effect since the 1950s. See Ex parte Edwards, 242 S.W.2d 397, 397-98 (Tex. Crim. App. 1951); Ex parte Young, 418 S.W.2d 824, 828 (Tex. Crim. App. 1967). The state procedural rule embodied in Ex parte Gardner has been in effect in Texas since 1898.[14] The contemporaneous objection rule is likewise long-standing. Parr, 472 F.3d at 253; Dowthitt, 230 F.3d at 752; Corwin, 150 F.3d at 473. All these bars are regularly and consistently applied. All serve the state interest of conserving judicial resources and resolving cases efficiently and are not designed merely to frustrate asserted federal rights. They neither violate due process nor cause the waiver of a fundamental right.

Roberson conclusorily alleges concealment of evidence by the State, ineffective assistance at trial or appeal, "inaccurate" application of a state procedural rule, or a miscarriage of justice, without any explanations, as cause for his defaults— omitting a statement of what evidence was concealed, why the rule was "inaccurate[ly]" applied, or how there is a miscarriage of justice. Pet. 33. Nor does he argue, much less establish, why he is actually innocent of capital murder.[15]

---

[14] Ex parte Barfield, 44 S.W. 1095 (Tex. Crim. App. 1898); Ex parte Garcia, 234 S.W. 892, 893 (Tex. Crim. App. 1921).

[15] Roberson mailed a wholly different account of the crime to the CCA in 2007, in which he blamed his lover for the murder. See Exhibit B. As this was not included in his argument before this Court or properly before the state court, it is waived as unbriefed. Cavallini, 44 F.3d at 260 n. 9.

C.     Ineffective assistance of counsel as cause for default.

In his state writ petition, Roberson attempted to create a catch-all cause for default by claiming appellate counsel was ineffective, stating simply, "Roberson also alleges that defense direct appeal counsel failed to brief adequately all viable constitutional issues before the Court of Criminal Appeals. In the event that any court holds that an otherwise legitimate constitutional claim was waived or procedurally defaulted, then it was the result of IAC." 1 Supp. CR 219. This is wholly inadequate to exhaust an ineffective-assistance claim, as it fails to argue or show deficiency and prejudice. Ineffective assistance of counsel can constitute cause for a procedural default only if the IAC claim is, itself, exhausted in state court. Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000). This brief allegation was therefore insufficient to exhaust the argument in state court. Cavallini, 44 F.3d at 260 n. 9. As such, this generic claim of IAC at appeal cannot constitute cause for procedural defaults. Further, negligence on the part of a prisoner's attorney does not qualify as "cause," so long as counsel's performance is not constitutionally ineffective, even if negligent or erroneous. Carrier, 477 U.S. at 488. That is so because the attorney is the prisoner's agent, and under "well-settled principles of agency law," the principal bears the risk of negligent conduct on the part of his agent. Maples, 132 S. Ct. at 922.[16]

_____

[16]     Nor does the decision in Martinez v. Ryan constitute good cause for Roberson's default. 566 U.S. ___, 2012 WL 912950 (2012). That case applied strictly to claims of IAC at trial, and only in states where the first opportunity to raise IAC claims occurs in state habeas. Id. at *11, 13-14. Texas is not such a state, as trial IAC claims can be raised in a motion for new trial or direct appeal. Tex. R. App. Proc. 21.3;

Because Roberson failed to follow state procedural laws, he is precluded from further factual development or merits review of procedurally defaulted claims in federal court because he fails to show cause and prejudice, or to argue, much less establish by clear and convincing evidence, that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2).

## ANSWER

I.   **Prosecutors Committed No Misconduct. Their Trial Strategy Was Based on Evidence That Roberson Sexually Assaulted his Daughter, Not Malice.**

Roberson alleges that the prosecutors committed misconduct for a handful of related reasons. He begins by contending, "the State never possessed evidence that Roberson sexually assaulted the child," but prosecutors alleged "what [they knew] to be false evidence and arguments to the trial court and jury for the surreptitious objective of prejudicing the jury to obtain a death verdict", in violation of the Sixth, Eighth, and Fourteenth Amendments. Pet. 37, 68 (citing Napue v. Illinois, 360 U.S. 264 (1959)). As support for his claim that the prosecutor had an improper motive, he alleges that a search of Roberson's cell indicated "the prosecutor may be misusing the system in other respects." Id. at 42-51, 53. Second, Roberson argues that the prosecutor erred when he told the jury that state law required him to elect which manner and means would be

---

Lopez v. State, 343 S.W.3d 137, 142-44 (Tex. Crim. App. 2011); Reyes v. State, 849 S.W.2d 812 (Tex. Crim. App. 1993).

presented to the jury for a verdict. Pet. 51. Third, Roberson complains that the State's evidence of sexual assault was inadmissible extraneous offense evidence. Pet. 63. Roberson concludes there is a reasonable probability that he would not have been sentenced to death but for the State's actions. Id. at 64.

A.    Procedural defaults prevent review of his claims.

The state court found Roberson's prosecutorial-misconduct claims were procedurally barred. 17 Supp. CR 2745-46. He failed to contemporaneously object on this basis, although he did complain that the trial court should sever the two manners-and-means. 5 RR[17] 19-20. But when he moved to sever, trial counsel limited his argument to state law and the Sixth Amendment, and was patently concerned about other sexual offenses by Roberson being admitted as extraneous offenses, relevant to the sexual-assault-predicate murder charge. 5 RR 20-21. He had no objection to the possibility that the State could elect to only go forward with the child-under-six-predicated murder charge at the conclusion of its case; his objection was to the possibility of those other sexual offenses being before the jury. 5 RR 23. The Eighth and Fourteenth Amendments were never mentioned. Id.

Further, the state court found the claim alleging misconduct because there was no evidence of sexual assault to be barred for failure to state a claim upon which relief could be granted, as there was no legal precedent barring the prosecutor from proceeding to trial on a valid grand jury indictment. 17 Supp. CR 2745. The misconduct claims were also procedurally barred because they

---

[17]    "RR" stands for the Reporter's Record of testimony at trial, preceded by volume number and followed by page number(s).

should have been raised on direct appeal,[18] because Roberson presented no new evidence in support of his claim.  Id. at 2746.

Roberson fails to address any of the procedural bars except for his general hypothetical contentions and his promise to answer the bars in a future pleading.  This is inadequate to establish cause or prejudice, and was answered above in Procedural Default, Section I-B.

B.      The state court findings.

Ruling on the merits of this claim in the alternative, the state court found there was no evidence the prosecutor proceeded to trial "in bad faith or with an intent to improperly prejudice [Roberson]'s right to a fair trial by proceeding on both manner and means alleged in the indictment.   17 Supp. CR 2747. Moreover, there was no evidence before the state court that the prosecutor believed that he could not prove the sexual assault portion of the indictment.  Id.

The state court found that prosecutor innocently erred in saying state law did not permit submission of both manner and means to the jury, and found there was no evidence that he abandoned the sexual assault paragraph because he believed the evidence was insufficient. Id. at 2748-49.  The state court also found that defense counsel reasonably did not object, as it was to Roberson's

---

[18]      While Roberson's direct-appeal claim number five appears superficially, topically similar to the first four claims in his state writ, it appealed to different legal theory in hopes of relief.  On direct appeal, he attacked the joinder of the two manner and means, and the trial court's denial of his motion to sever the two counts.  Roberson v. State, No. 74,671, Appellant's Brief 30-35.  On state habeas, his complaint argued prosecutorial misconduct on the basis of inadequate evidence, and that the state law lacks a procedure for severance.  These claims were not raised on direct appeal, and they should have been.

advantage to only have one manner and means before the jury. 17 Supp. CR 2749. Roberson also failed to prove that jury argument about the sexual assault violated his constitutional rights. The testimony of Andrea Sims and her findings of sexual assault were admissible as same-transaction contextual evidence and under Texas Code of Criminal Procedure Article 38.36(a). Id. Had the State attempted to try Roberson sequentially, one manner and means at a time as he suggested, it would have violated Roberson's protection against being placed in jeopardy twice and would not have been permitted by the court. Id.

C.      The merits of the no-evidence-misconduct claim.

Should this Court address the merits of his claim, in the alternative, Roberson's contentions are unpersuasive. The state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law. Due process prohibits the State from knowingly using perjured testimony at trial or from allowing untrue testimony to go uncorrected. See Giglio v. United States, 405 U.S. 150, 153 (1972); Napue, 360 U.S. at 269. To obtain relief, Roberson must show that (1) the testimony was actually false; (2) the State knew it was false; and (3) the testimony was material. See Knox v. Johnson, 224 F.3d 470, 477 (5th Cir. 2000) (citing Giglio, 405 U.S. at 153); Faulder v. Johnson, 81 F.3d 515, 519 (1996). False testimony is material if there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. Creel v. Johnson, 162 F.3d 385, 391 (5th Cir. 1998); Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993).

Roberson's argument flows from his wishful misstatement of the facts: "The State never possessed evidence" that Roberson sexually assaulted his

38

daughter. Pet. 37. The record speaks to the contrary. During the State's case, testimony from the Sexual Assault Nurse Examiner Andrea Sims revealed injury to Nikki's anus which the nurse believed to indicate a probable sexual assault. 41 RR 124-28. No semen was found in the vagina or anus. Id. at 150-51. The pediatrician who examined Nikki observed anal damage but could neither confirm nor disprove the allegation of sexual assault. 42 RR 97-99. Emergency room records reveal visible tears in Nikki's anus and two other possible signs of sexual abuse—a torn frenulum and anal laxity. 41 RR 127-142. These signs indicated a probable sexual assault. 41 RR 131. As Roberson noted, this nurse's report was relied on by the State as it sought the indictment against Roberson. Pet. 38.

The prosecutor also knew that the pediatrician, Dr. Squires, corroborated the anal tear, but thought the anal laxity could have been due to Nikki's brain damage. 42 RR 96-100, 118-119. While the pediatrician could not be certain that sexual abuse had taken place, she could not rule it out, and she agreed that anal penetration would not necessarily have caused visible damage. Id. Dr. Urban, the autopsy pathologist, also did not observe damage to Nikki's genitalia, but testified that a great many children who are sexually assaulted reveal no physical proof of the assault. 43 RR 97. Roberson presents no evidence indicating any of this testimony was perjured or otherwise false.

There was no advantage to the State to also charge him with sexual assault, as it could more easily prove Nikki was a child under six. Roberson accuses the prosecutor of wanting to "increase the odds of a death sentence in what otherwise would be a shaken baby case." Pet. 36. "[I]t bears repeating that

[Roberson's] case was never anything more than a shaken baby case. It was constructed by the Anderson County District Attorney into a capital case." Id. at 122. But this "nothing more than shaken" baby actually died, so it is Roberson who "constructed it into" a capital case. The prosecutor's reluctance to read the indictment during group voir dire, 5 RR 12, and his plea offer of life, which Roberson declined, in themselves prove that the prosecutor was not improperly motivated to bias the jury or get a death sentence. 41 RR 2-3.

The State's job was made more onerous, not less, by the existence of the sexual assault charge; while it is difficult to find jurors who do not disqualify themselves for cause during the voir dire of a child murder case, it is doubly difficult to find them when the victim was raped. The trial court acknowledged this reality. 3 RR 22; Pet. 52. Roberson himself recites at least twenty-nine jurors who asked to be excused or were later dismissed because of their reaction to the nature of the crime. Pet. 41.

After reluctantly conceding the ample record evidence indicating that he sexually assaulted Nikki, Roberson backtracks:

> The prosecutor must have known that this evidence would not pass muster, either with the trial judge or this Court. He must have realized that if this evidence played out as it appears in the medical reports, he would be forced to abandon the sexual assault allegations or see them dismissed on directed verdict or on appeal.

Pet. 40. Nothing in the record supports his conjecture, and the trial court's factual findings directly contradict such a hypothesis. 17 Supp. CR 2747-49. Roberson acknowledges that medical professionals reported facts consistent with

sexual abuse.[19] An indictment returned by a legal and unbiased grand jury, that is valid on its face, mandates a trial of the charge on its merits. Brooks v. State, 642 S.W.2d 791, 795 (Tex. Crim. App. 1982); Ex parte Plumb, 595 S.W.2d 544, 545 (Tex. Crim. App. 1980). Roberson agreed, noting in the state court that the State is and should be permitted to present evidence on the charges in the indictment. 1 Supp. CR 124. Instead of establishing that the State knowingly presented false evidence, this claim attacks an otherwise legitimate strategic decision on the part of the State, absent the prosecutor's innocent mistake—present evidence to a grand jury, proceed to trial on a valid indictment, and elect one manner and means over another because of how the actual testimony appears in person.

The state court found that there was no evidence that the prosecutor proceeded to trial in bad faith or with an intent to improperly prejudice Roberson's trial by presenting evidence on both theories of the case as alleged in the indictment. 17 Supp. CR 2747. It found there was no evidence that the prosecutor either believed, or had reason to believe, at the beginning of the trial that he could not prove the sexual assault allegation of the indictment. Id. Roberson presents nothing to challenge the propriety of the state court's factual findings or legal conclusions. Because Roberson fails to show that the evidence presented was false, or that the State knew it to be false, his Napue/Giglio claim is meritless. Giglio, 405 U.S. at 153.

---

[19] One believed sexual assault was probable, the other could not rule it out, but both observed Nikki's torn anus. 41 RR 131; 42 RR 97-99.

Second, he contends that the prosecutor misstated the law when he told the jury that state law required him to proceed on only one manner and means. 46 RR 53, 60-61; Pet. 51. But defense counsel did not object when the prosecutor said this to the judge or when he repeated this during the closing argument or at any other time. 5 RR 20-21, 23-24; 46 RR 53, 60-61. His only objection at trial was to complain that his motion to sever was denied in violation of state procedure and the Sixth Amendment. 5 RR 20-25 (citing United States v. Singh, 261 F.3d 530, 533-34 (5th Cir. 2001)), which he raised again on direct appeal. Roberson v. State, No. 74,671, Appellant's Brief 30, 34. This will be further addressed in Claim II, below.

State law permits both manner and means to be submitted to the jury, so the prosecutor did misstate the law. 17 Supp. CR 2748-49; Kitchens v. State, 823 S.W.2d 256 (Tex. Crim. App. 1991). But there was no evidence that the prosecutor knew this or intentionally misstated the law. 17 Supp. CR 2748-49. Nor did anything suggest the prosecutor abandoned the sexual assault charge for lack of evidence or any other reason aside from a good-faith misunderstanding. Id. There was no benefit to Roberson to correcting the State's error and keeping both allegations before the jury. Id. at 2749. Even if the jury had agreed the State failed to prove the sexual assault allegation, Roberson would still have been convicted on the child-under-six charge. Indictments are phrased in the conjunctive while juries are instructed in the disjunctive. Kitchens, 823 S.W.2d at 258. Further, none of the prosecutor's argument caused constitutional harm to Roberson. 17 Supp. CR 2749.

Third, Roberson complains that the sexual-assault evidence was actually extraneous-offense evidence admitted in violation of his due process rights, tainting his jury from voir dire through closing argument. Pet. 40, 63-64. Roberson recites the number of times the State referred to Nikki's sexual abuse and notes the tone of voice the prosecutor used, implying that voir dire on this issue was error. Id. at 40-48, 49. The sexual assault evidence was admissible to prove the charge of murder during the commission of sexual assault, so by definition the prosecutor had to voir dire the venire on it, and it was neither "character-conformity" evidence nor "extraneous-offense" evidence. The prosecutor said so during a pretrial hearing on Roberson's motion to sever, noting that the sexual-assault evidence was admissible and relevant to the "intentional or knowing" element and the "motive, scheme, plan, [or] absence of mistake." 5 RR 23-24.

The state court properly found that the sexual-assault evidence was relevant and admissible as both same-transaction contextual evidence, and under Texas Code of Criminal Procedure Article 38.36. 17 Supp. CR 2749 (citing Tex. Code Crim. Proc. article 38.36(a); see also Gephart v. Beto, 441 F.2d 319, 320-21 (5th Cir. 1971); Castaldo v. State, 78 S.W.3d 345, 350 (Tex. Crim. App. 2002); Hall v. State, 67 S.W.3d 870, 876 (Tex. Crim. App. 2002)(vacated on other grounds, 537 U.S. 802 (2002)); Swarb v. State, 125 S.W. 3d 672, 681-82 (Tex. App.–Houston [1st Dist.] 2003, pet. dism'd); Tennel v. State, 181 S.W. 458, 459 (Tex. Crim. App. 1915)). That provision of the criminal procedure statute holds:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and

circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

Tex. Code Crim. Proc. art. 38.36(a). For example, the State's closing argument, asking why Nikki did not want to go with Roberson that evening, highlights a "relevant fact and circumstance surrounding the killing and the previous relationship existing between the accused and the deceased." Id.; 46 RR 24; Pet. 49. Thus, the evidence that Nikki had been sexually assaulted would inevitably be heard by the jury.

Roberson urges at length that the peremptory challenge of a veniremember and the search of his jail cell prior to trial is proof that the prosecutors had an improper motive. He makes no federal claim for habeas relief relating to either the challenge of this juror or to the search, nor is there a claim of constitutional violation relating to the prosecutor's motive.[20] Pet. 52-63.

D.     The merits of the erroneous-definition-misconduct claim.

Roberson argues that the prosecutor "abused his office and intentionally fostered a false impression" by arguing at sentencing that probability meant a "low probability" when he knew Texas courts had defined it as more likely than

_____

[20]     In an abundance of caution, the Director notes that the state court found Roberson had waived any complaint about the search of his cell by agreeing to the State's stipulation that it would not use anything obtained in the search. 17 Supp. CR 2746. Further it found that any claim arising from the search was procedurally barred because he did not raise any additional objections and because he did not raise the issue on direct appeal. Id.

not.  Supp. Pet. 1-2 (citing "Black's Law Dictionary," Robison v. State, 888 S.W.2d 473 (Tex. Crim. App. 1994); Hughes v. State, 878 S.W.2d 142, 147–148 (Tex. Crim. App. 1992) (opinion on original submission); Cuevas v. State, 742 S.W.2d 331, 347 (Tex. Crim. App. 1987)).  Roberson's only objection to the charge asked that probability be defined as a percentage, starting with ninety-five percent and ranging to "at least fifty percent," which is inconsistent with his present contention that it must be more than fifty percent.  5 CR 628-630; cf. Supp. Pet. 1-2.

Roberson lacks any support for his argument.  He cites Black's Law Dictionary, but this actually supports the prosecutor's wording instead of his own.  Supp. Pet. 2 (probability defined as "the likelihood of a proposition or hypothesis being true").  Robison simply says in dicta that probability means more than a one-in-a-hundred chance.  888 S.W.2d at 481.[21]  Hughes proves the prosecutor committed no misconduct: "The term 'probability' is not statutorily defined, and this Court has repeatedly held the trial court does not err in refusing to instruct the jury as to the definition of the term 'probability' as used in the second punishment issue."  878 S.W.2d at 147.  Cuevas was overruled by Hughes on related but different grounds.  Id. at 147 n. 6.  "In its usual acceptation, a 'probability' is something more than a 'possibility.'" Id.  at 148.  The Texas legislature required no specific meaning for probability.  Coble v.

---

[21]    Robison has never been cited in Texas or any other state for the proposition that probability means more likely than not.  In fact, in Goff v. State, the CCA referred to Robison as holding that probability does not mean 'any chance' but it was not required to have a specific definition, further confirming that the prosecutor was unbound by the dicta Roberson cites.  931 S.W.2d 537, 551 (Tex. Crim. App. 1996).

State, 330 S.W.3d 253, 267 (Tex. Crim. App. 2010). Texas courts have refused to define probability in this context. Druery v. State, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007) (citing Earhart v. State, 877 S.W.2d 759, 767 (Tex. Crim. App. 1994)).

Roberson's prosecutorial misconduct claims were procedurally barred on adequate and independent state grounds, unexhausted, and the state court alternatively denied his claims on the merits. Because Roberson has shown no reason why the state court's decision was contrary to, or unreasonably applied, clearly-established federal law, nor that it was based on an unreasonable determination of the facts, these claims should be denied.

II.    Texas's Provision for Severing Charges Does not Offend the Constitution.

Next, Roberson complains that the two theories of liability on which he was indicted should have been severed, and the court's failure to do so violated his Fourteenth Amendment right to due process. Pet. 64-67. Roberson relies on Chambers v. Mississippi, 410 U.S. 284, 294 (1973)—which holds that the Fourteenth Amendment requires a fair opportunity to defend against the State's accusations—to argue that he was denied this fundamental right. Pet. 65-66. Roberson complains that the trial court should have severed the two theories of liability contained in the indictment, pursuant to Texas Penal Code Section 3.04, see Pet. 64, 67, and conducted a suppression hearing pursuant to Texas Code of Criminal Procedure Article 38.32, so that he could challenge and exclude the sexual assault evidence which he alleges the State had "no legitimate basis in law" for presenting. Pet. 66-67.

The state court ruled that this was procedurally barred because it should have been raised on direct appeal. 17 Supp. CR 2745-46. Once again, Roberson fails to address the procedural bar except for his general hypothetical contentions and his promise to answer the bars in a future pleading. This is inadequate to establish cause or prejudice.

Before the CCA on direct appeal, Roberson alleged that the trial court should have severed the two capital-murder paragraphs in the indictment pursuant to Section 3.04 of the Texas Penal Code. See Roberson v. State, No. 74,671, 2002 WL 34217382, *6 (Tex. Crim. App. 2007). In his pre-trial motion to sever, Roberson complained that the State intended to introduce numerous incidents of extraneous conduct in support of the sexual-assault predicate count, and that such evidence would be irrelevant to the other capital count, and prejudicial because the autopsy report found no evidence of sexual assault on the victim's body. Id. The trial court denied the motion, and when the State subsequently abandoned the sexual-assault capital-murder count after the close of evidence, the trial court denied his motion for a mistrial based on the denial of his motion to sever. Id. The CCA noted previous decisions holding that "an indictment may contain as many separate paragraphs charging the same offense as is necessary to meet the contingencies of evidence." Id. (citing Graham v. State, 19 S.W.3d 851, 853 (Tex. Crim. App. 2000); Hathorn v. State, 848 S.W.2d 101, 113 (Tex. Crim. App. 1992)). And where an indictment charges different theories for committing a single capital murder, Section 3.04(a) is inapplicable. Id. The CCA held that Roberson was not harmed by the trial court's decision to "support the continued joinder of the two capital counts" because the indictment

in this case did not allege two separate offenses, but rather one offense under two different theories. Id. The CCA concluded that the trial court did not err by denying Roberson's motion to sever under Section 3.04, and the trial court's ruling to not implicate any federal constitutional right. Id.

On state habeas review, the trial court found, pursuant to Kitchens v. State, that the State was entitled to submit both manner and means alleged in the indictment to the jury in this case, 17 Supp. CR 2748, and that severance was not required. Id. at 2749. The trial court concluded that the evidence regarding the sexual assault of the victim would have been admissible as same transaction contextual evidence under Texas Code of Criminal Procedure Article 38.36(a), regardless of whether the State specifically alleged the sexual assault as an aggravating element in the indictment. Id. And finally, the court found that had the State attempted to try Roberson sequentially—one manner and means of committing capital murder at a time—the State would have violated Roberson's right to be free from double jeopardy. Id. Roberson fails to prove that the state court unreasonably determined the facts or incorrectly applied clearly established federal law, and thus merits no relief.

However, no severance was required or even allowed, and ultimately would have proven more harmful than helpful. Furthermore, the evidence was properly admitted regardless of which manner and means of proving capital murder the State pursued. And finally, Roberson fails to prove any violation of his right to due process.

As noted on direct appeal, the CCA has concluded that Article 3.04(a) of the Texas Penal Code does not apply where the indictment alleges—as it did

48

here—alternate theories for committing one offense. See Graham, 19 S.W.3d at 853; Hathorn, 848 S.W.2d at 113. Therefore, Roberson could not have sought severance under this statutory law. Furthermore, the trial court reasonably concluded that, pursuant to Kitchens, severance of the two manner and means of committing the single capital murder as alleged in the indictment was not required. 17 Supp. CR 2749. Kitchens specifically holds that alternate pleading of the differing methods of committing one offense may be charged in one indictment. 823 S.W.2d at 258; see also Quinones v. State, 592 S.W.2d 933 (Tex. Crim. App. 1980). In affirming Kitchens's capital murder conviction, the CCA noted:

> This Court has held that alternate pleading of the differing methods of committing one offense may be charged in one indictment. And although the indictment may allege the differing methods of committing the offense in the conjunctive, it is proper for the jury to be charged in the disjunctive. It is appropriate where the alternate theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted. Indeed, the Supreme Court has determined that "there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."

Kitchens, 823 S.W.2d at 258 (citing Schad v. Arizona, 501 U.S. 624, 632 (1991)(plurality opinion) (quoting McKoy v. North Carolina, 494 U.S. 433, 449 (1990))). The Fifth Circuit concurred that under Texas law, the various aggravating felonies are merely means to commit the offense of capital murder and not separate elements of capital murder:

> "Where a statute creates a single offense, such as Tex. Penal Code Ann. § 19.03, the different acts by which that offense may be

49

committed may be alleged in the same count of an indictment."
Thus, the jury was not charged here with two different offenses in
the alternative, but rather with two alternate means of committing
the offense of capital murder. The [Court of Criminal Appeals']
disposition on this point counts as a disposition on the merits under
the AEDPA and receives the deference required by the AEDPA. The
[Court of Criminal Appeals'] determination of this issue does not
conflict with U.S. Supreme Court precedent on this point.

Reed v. Dretke, 2005 WL 1796200 at *21 (N.D. Tex. 2005)(unpublished) (citing

Jernigan v. State, 661 S.W.2d 936, 942 (Tex. Crim. App. 1983), Dowthitt, 230

F.3d at 756-57, and Schad, 501 U.S. at 644) (rev'd, remanded on other grounds

by Reed v. Quarterman, 555 F.3d 364 (5th Cir. 2009)). This finding is not in

conflict with Supreme Court precedent. See Schad, 501 U.S. at 630-45. Because

the jury need not unanimously decide upon which theory they believe the

defendant is guilty, the lack of severance of the alternate theories for the

commission of one capital murder similarly should not offend the constitution.

Furthermore, a second trial for the same offense—as suggested by

Roberson—would have been forbidden by the Fifth Amendment Double Jeopardy

Clause which protects against successive punishments and successive

prosecutions for the same offense. United States v. Dixon, 509 U.S. 688, 695-96

(1993); North Carolina v. Pearce, 395 U.S. 711, 717 (1969). Therefore, the trial

court reasonably found that any attempt by the State to try Roberson

sequentially would have been prohibited. 17 Supp. CR 2749; see Saenz v. State,

166 S.W.3d 270, 272-74 (Tex. Crim. App. 2005) (double jeopardy clause violated

when separate life sentences were imposed for each victim of multi-victim capital

murder committed in same criminal transaction); Parades v. Thaler, 617 F.3d 315, 320-21 (5th Cir. 2010).

And even if permissible, severance would be of no benefit to Roberson, as he would be subjected to multiple trials, giving the State multiple opportunities to obtain a conviction against him—the very abuse the Double Jeopardy Clause sought to prevent. See Benton v. Maryland, 395 U.S. 784, 795-96 (1969) ("'[T]he State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' This underlying notion has from the very beginning been part of our constitutional tradition.") (citing Green v. United States, 355 U.S. 184, 187-88 (1957)).

In any case, the trial court reasonably concluded that the sexual assault evidence would have been admissible as same-transaction contextual evidence under Tex. Code Crim. Proc. Article 38.36(a), regardless of whether the State pursued conviction under a theory of murder-plus-sexual assault or under the theory that the victim was under the age of six. 17 Supp. CR 2749. Roberson argues that there was "no legitimate basis in law" for presenting the sexual assault evidence, Pet. 66, however, as discussed in the previous section, such evidence was properly admitted.

Finally, Chambers v. Mississippi offers no support for Roberson's claim that he was denied his right to due process. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to

51

defend against the State's accusations." Chambers, 410 U.S. at 294. In Chambers, the application of state evidentiary rules served to exclude or prevent cross-examination of witnesses pivotal to the petitioner's exculpatory defense. 410 U.S. at 289-94. The Supreme Court noted the "rights to confront and cross-examine witnesses and to call witnesses in one's own behalf" as essential to due process, and identified the "minimum essentials of a fair trial" as the right to reasonable notice of the charges against him and an opportunity to be heard in his defense, including the right to examine witnesses, to offer testimony, and to be represented by counsel. 410 U.S. at 294 (citing In re Oliver, 333 U.S. 257, 273 (1948)). Roberson has failed to identify how he was denied these essential elements of a fair trial. See Pet. 64-66. Roberson was aware of the charges against him. He was provided counsel, and he was permitted the opportunity to proffer evidence and to cross-examine the witnesses against him.

Roberson nevertheless complains that it was the trial court's refusal to exclude the State's sexual assault evidence that denied him a fundamental right to present a defense. However, none of the cases cited by Roberson support the proposition that the due process right to present a defense includes a right to exclude evidence by the State. Rather, these cases address restrictions on the defendant's ability to respond to the State's case.[22] A fundamental element of

_____

[22] See Crane v. Kentucky, 476 U.S. 683 (1986) (exclusion of testimony concerning circumstances of defendant's confession on ground that testimony pertained solely to issue of voluntariness resolved against defendant in pretrial ruling, deprived him of a fair trial); California v. Trombetta, 467 U.S. 479, 491 (1984) (Due Process Clause does not require law enforcement agencies to preserve breath-analysis samples of suspected drunk drivers for results of breath-analysis tests to be admissible in criminal prosecutions); Washington v. Texas, 388 U.S. 14, 23 (1967) (holding that

due process requires that the accused have the right to confront the prosecution's witnesses, and a right to present his own version of the facts so that the jury may decide where the truth lies. Washington v. Texas, 388 U.S. at 19. In Crane v. Kentucky, the petitioner sought to suppress his confession; the trial court held a hearing and concluded it was voluntary and admissible. 476 U.S. at 684. At trial, the petitioner sought to introduce evidence of the environment in which the confession was obtained in an effort to cast doubt on its credibility. Id. The trial court excluded the evidence, concluding it pertained solely to the issue of the voluntariness of the confession, upon which the court had already ruled. Id. The

---

defendant was denied Sixth Amendment right to compulsory process for obtaining witnesses by state statute providing that principals, accomplices, or accessories in same crime cannot be witnesses for each other, thus denying defendant right to place on stand witness who was capable of testifying to events that he had observed and whose testimony was relevant and material to defense); see also Mancuse v. Stubbs, 408 U.S. 204, 216 (1972) (Since counsel availed himself of adequate opportunity to cross-examine witness at petitioner's first trial, the transcript of now-unavailable witness's testimony in the first trial bore sufficient "indicia of reliability" and afforded satisfactory basis for jury to evaluate truth of prior statement, thus no constitutional error in permitting prior-recorded testimony to be read to the jury at second trial); Berger v. California, 393 U.S. 314, 315-16 (1969) (holding that absence of a witness from the jurisdiction would not justify use at trial of preliminary hearing testimony unless the State had made a good-faith effort to secure the witness's presence, should be applied retroactively to case where crime victim testified at preliminary hearing but was unavailable at time of trial); Pointer v. United States, 380 U.S. 400, 403-08 (1965) (holding that the Sixth Amendment's right of confrontation is a fundamental right under Fourteenth Amendment, thus the introduction of a witness statement, taken at a time when defendant was not represented by counsel and did not have an opportunity to cross-examine witness, violated his constitutional rights); Mattox v. United States, 156 U.S. 237, 242-43 (1895) (addressing the importance of the defendant's right to confront and cross-examine witnesses against him); United States v. McClure, 546 F.2d 670, 673 (5th Cir. 1977) (jury could not properly convict petitioner absent opportunity to hear excluded testimony bearing upon his theory of defense and weigh its credibility).

Supreme Court addressed not whether the refusal to suppress the confession violated Crane's right to due process, but whether the exclusion of the evidence pertaining to the environment in which it was obtained violated the petitioner's right to due process. Id. Questions regarding the credibility of evidence are for the jury to decide, regardless of the trial court's pretrial rulings on admissibility. Id. at 688; see also California v. Trombetta, 467 U.S. at 490 (petitioner could nevertheless challenge the accuracy of the breath-analysis tests before the jury without having access to the State's test samples).

At the very least, Chambers stands for the limited proposition that "certain egregious evidentiary errors may be redressed by the due process clause." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998)(citing Barefoot v. Estelle, 697 F.2d 593, 597 (5th Cir. 1983)). No such "egregious error" exists in the case. As discussed, the sexual assault evidence was properly admitted against him regardless of whether severance was granted or not. And Roberson had the opportunity to defend himself against the sexual assault allegation through cross-examination of the State's witnesses and the elicitation of evidence suggesting there was no sexual assault. Roberson points to no instance where he was the denied the opportunity to present a case to the jury. Therefore, he suffered no due process violation.

III.   The State's Experts Presented Admissible and Reliable Testimony At Trial.

In claim three, Roberson contends that the State's expert witnesses offered unreliable and unscientific evidence in violation of Daubert v. Merrill Dow

Pharmaceuticals,[23] Kumho Tire v. Carmichael[24] and the Fifth, Sixth, Eighth and Fourteenth Amendments. Pet. 73-145, et. seq (Roberson's claims five through eight). There was a Daubert hearing at trial, in which only Dr. Allen testified, but no objections were raised or argued by the defense. 48 RR 108-115.

The state court held this claim to be procedurally barred three different ways. First, because he failed to object at trial. 17 Supp. CR 2750 (citing Ladd, 3 S.W.3d at 566, Wright, 28 S.W.3d at 536; Dewberry, 4 S.W.3d at 752 & n.16, and Briggs, 789 S.W.2d at 924). Nor were any objections to these experts posed during their testimony before the jury. Second, this claim is procedurally barred because Roberson should have raised it on direct appeal. 17 Supp. CR 2750 (citing Ex parte Gardner, 959 S.W.2d at 199 and Ex parte Goodman, 816 S.W.2d at 385). As the state court found, there was no excuse for Roberson not objecting in the trial court, nor was there any reason this claim could not have been raised on appeal, as the "voluminous scholarly articles" did not even relate to the issues, and the trial "Court decline[d] to make [Roberson's] claim for him." Id. at 2750-51.

Third, under state law, the portion alleging violations of Daubert and Kumho was procedurally barred because it was not cognizable on habeas. 17 Supp. CR 2751. The state court noted that Daubert (and presumably Kumho as well) "simply construe[s] the federal rule of evidence relating to expert witness qualification in a civil case and does not purport to establish a constitutional

---

[23]     509 U.S. 579 (1993).

[24]     526 U.S. 137 (1999).

standard or right." Id. The CCA commented in another habeas case: "The Supreme Court noted that a federal rule violation 'does not present exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.' The same is true in our habeas proceedings." Ex parte Tuley, 109 S.W.3d 388, 393-94 (Tex. Crim. App. 2002) (citing United States v. Timmreck, 441 U.S. 780, 783-84 (1979)); see also Ex parte Graves, 70 S.W.3d 103, 116-17 (Tex. Crim. App. 2002).

Once again, Roberson fails to address any of the procedural bars except for his general hypothetical contentions and his promise to answer the bars in a future pleading. This is inadequate to establish cause or prejudice.

In the alternative, the state court dismissed this claim as meritless. Roberson's description and interpretation of the expert testimony in his state writ petition was found to be "incomplete and inaccurate," causing the state court to instead "accept[] and specifically adopt[] the State's summary of this evidence as accurate." 17 Supp. CR 2753. Roberson's federal writ petition simply copies and pastes the identical description and interpretation of the prosecution experts' testimony, which is likewise inaccurate. Compare 1 Supp. CR 148-98 with Pet. 106-59.

The state court further found that, given the absence of any objection at trial, the State's experts were properly admitted, "particularly since their training and experience was at least comparable to that of the defense expert," and since the defense expert Dr. Goodness commended the State's interview with Roberson. 17 Supp. CR 2752. The court found that neither Dr. Self nor Dr. Allen attempted to forecast Roberson's future criminal activity, and that they,

and Dr. Goodness, considered the context of the prison environment as they assessed Roberson's risk of committing violent acts. Id. at 2751-52.

Specifically, the state court found Roberson's "base rate data" argument unpersuasive and irrelevant to determining the risk of future criminal violence in this context. Id. at 2753. The state court concluded as a matter of state law that the prison "society" is not the only environment relevant to a future dangerousness assessment. 17 Supp. CR 2753 (citing Mathis v. State, 67 S.W.3d 918, 922 (Tex. Crim. App. 2002)). Roberson further failed to convince the state court that there was only one valid methodology for assessing risk for future dangerousness. Id. As a matter of law, the court found that comparative risk for violence relative to other inmates was irrelevant to the Texas future dangerousness special issue. Id. As a result, the state court concluded that Roberson failed to prove that the admission of this testimony violated any of his constitutional rights. Id. at 2754.

Roberson's claim has three facets. First, that his death sentence hinges on the wrongful use of the Hare Psychopathy Checklist. Pet. 74. Second, that the State's prediction of future dangerousness was unreliable because it did not follow the necessary procedures. Id. at 88. Then Roberson makes an about-face and argues that no procedure exists that can result in a constitutional prediction of future dangerousness. Id. at 139.

A.    The Hare Checklist was a small part of Dr. Allen's analysis; his opinion on future dangerousness tracked the defense expert's conclusion and its admission does not offend Roberson's constitutional rights.

Roberson leads with an attack on the Hare Checklist. Pet. 74 n.5. The defense chose not to object to the Hare and instead sought to impeach it on direct- and cross-examination. 48 RR 22, 145-55. Roberson fails to address the state court's findings and conclusions. There are several valid methodologies for assessing future dangerousness. 17 Supp. CR 2753. Implicit in this finding is the implied credibility ruling that Roberson's authorities and argument on this issue were not convincing. In Self v. Collins, the Fifth Circuit accorded credibility choices made by a state court a presumption of correctness under 28 U.S.C. § 2254(d), and came to the same conclusion with regard to implicit credibility choices. 973 F.2d 1198, 1214 (5th Cir. 1992). Implicit findings are entitled to weight equal to those that are expressly stated in the trial court's findings of fact. Marshall v. Lonberger, 459 U.S. 422, 433-41 (1983); Lavernia v. Lynaugh, 845 F.2d at 500.

Roberson cites four cases for the proposition that the Hare is inadmissible and unreliable. Pet. 80, 82, 84. None articulate clearly established federal law, and they may thus be disregarded. 28 U.S.C. § 2254(d)(1)–(2). Only one, United States v. Barnette, 211 F.3d 803 (4th Cir. 2000), was even mentioned in Roberson's petition to the court below, rendering the other three unexhausted, legally and factually. Further, Roberson simply appended "United States v. Barnette, 2000" to the end of a string cite in his state writ petition, implying that it was a Supreme Court opinion, without making any argument whatsoever concerning its relevance. 1 Supp. CR 139. In Barnette, the Fourth Circuit actually held the opposite of Roberson's claim: "We need not address whether Daubert applies to sentencing hearings, because, even assuming that it does, we

find the evidence [from the Hare] meets its standard for admissibility." Barnette, 211 F.3d at 815.[25]

The holding in Stitt [26] was based on recantation from the expert offering the Hare evidence absent any contest; there was no Daubert claim raised. The third, Sampson, reveals that Roberson cited mere dicta; the court did not and "was not required to decide whether to admit expert testimony on future dangerousness." United States v. Sampson, 335 F.Supp.2d 166, 220 (D. Mass. 2004).[27] The last case, United States v. Taylor, was a pre-trial ruling not challenged on appeal, excluding the Hare in a non-capital case in which future dangerousness was not an issue; the psychiatric question had to do with substance abuse. 320 F.Supp.2d 790, 794 (N.D. Ind. 2004).

Roberson fails to impugn Dr. Allen's use of the device. 48 RR 111, 115, 121-23. In fact, Roberson concedes that it has high predictive value for "risk of criminal behavior by individuals in free society," which is part of the future

---

[25] The Barnette court further acknowledged that "disagreement between professionals" does not by itself render the Hare unreliable or unconstitutional. 211 F.3d at 816.

[26] Stitt v. United States, 369 F.Supp.2d 679, 699 (E.D. Va. 2005), aff'd by, remanded by United States v. Stitt, 441 F.3d 297 (4th Cir.), recalled by, vacated by, appeal dism'd by United States v. Stitt, 459 F.3d 483 (4th Cir. 2006).

[27] "[A]ny such [future dangerousness] testimony was inadmissible under 18 U.S.C. § 3593(c) because its probative value would be outweighed by the danger of unfair prejudice. Once again, this question is not controlled by Barefoot, 463 U.S. at 905-06, because that case held that it was not unconstitutional to permit expert evidence on future dangerousness. It did not address questions of federal evidence law generally or the [Federal Death Penalty Act]'s balancing test specifically. Id. at 899 n. 6." Sampson, 335 F.Supp.2d at 227. Additionally, under federal law juries only consider future dangerousness within the prison. Id. at 223.

dangerousness calculation under state law. Pet. 165; 48 RR 123-24. Also, Dr. Allen did not rely solely on Roberson's Hare score but instead used it to confirm his other findings. 48 RR 121-30. He acknowledged the dangers inherent in relying upon the checklist in the hands of an inadequately trained examiner and explained at length the other essential factors he considered in making his risk analysis, which trial defense counsel suggested were similar to Dr. Goodness's method. 48 RR 145-55.

Finally, even Dr. Goodness conducted a Hare analysis, according to prison psychologist William Burleson and her own admission.[28] 47 RR 142-43; 17 Supp. CR 2731. Ultimately, Dr. Allen opined that Roberson would pose a minimal risk in a prison environment. 48 RR 155. Roberson cannot complain that his death sentence hinged on such testimony, when his own expert said the same thing. 48 RR 56, 60, 95, 105. It certainly does not rise to the level of proof required to grant relief.

B.    The future dangerousness prediction by the State's experts was based on reasonable and valid methodology.

Roberson claims that the State's experts' opinions "should never have been admitted because their opinions were not based on any science at all. . . [T]hese two psychologists [sic] failed to follow acceptable scientific methodology." Pet. 89. He supports this attack with sentences from a case he cites merely as "Barefoot v. Estelle, 1983," id., obfuscating their origin in the dissent. This is not clearly established federal law. This portion of his third claim, appearing in his

_____

[28]    During the trial, Dr. Goodness denied ever administering the Hare, but later she did come up with her version of Roberson's score on the checklist. 48 RR 22.

petition at pages 90-139, is identical to the brief presented to the state court. 1 Supp. CR 132-181. Because Roberson did nothing more than copy and paste from his earlier pleading without explaining why the state court's ruling unreasonably applied clearly established federal law, or unreasonably determined the facts, Roberson fails to demonstrate he is entitled to relief. Richter, 131 S. Ct. at 785. In truth, Roberson only presents arguments about the weight to be given the evidence, not its admissibility.

Roberson complains that the State's experts inadequately considered the means the prison system has for controlling violence and failed to take Roberson's history of nonviolence while incarcerated into account. He insists that "[t]he context of prison . . . is the single most important consideration . . . since the inmate in Texas is going to serve a minimum 40-year sentence." Pet. 94. To the contrary, the Texas future-dangerousness special issue asks whether a defendant would constitute a continuing threat "whether in or out of prison" without regard to how long the defendant would actually spend in prison if sentenced to life.[29] 17 Supp. CR 2753 (citing Mathis, 67 S.W.3d at 922). This was the context considered by the State's experts. 48 RR 142, 166. All agreed that context is important in assessing risk and that Roberson's past pattern of behavior was critical to predict future behavior. 48 RR 23, 47-48, 56, 60, 95, 105,

---

[29]    "This 'commonsense' or 'core' interpretation of the future-dangerousness special issue is also consistent with the Legislature's use of the word 'would' instead of 'will' in this special issue." Estrada v. State, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010).

114, 142, 151-53, 155, 165-66, 169-70. Dr. Allen and Dr. Self even agreed that Roberson's risk was less if he were in prison. Id. at 142, 166.

Roberson's contention that reliable assessment necessarily must examine base rates or any other statistical phenomena is without legal support. Pet. 94-95; 17 Supp. CR 2753. This is especially true considering Dr. Goodness performed no such analysis. 48 RR 23, 47-48, 55-57, 60, 95, 101, 105. A careful reading of his discussion of "base rate data" reveals that the concept is inconsistent with the state law defining society as including the free world. Druery, 225 S.W.3d at 506-07. Dr. Goodness and Dr. Allen agreed that Roberson's risk would be minimal in a prison environment. 48 RR 56, 60, 105, 114, 142. Dr. Self felt the risk would be moderate, because as a child-killer, Roberson would be targeted by other inmates who were rougher criminals than the types previously incarcerated with Roberson, he was physically larger than some other inmates whom he could thus bully, and he could obtain drugs in prison. 48 RR 165-66, 167, 170, 172. All three doctors believed Roberson to pose a greater risk in the free world. 48 RR 95, 142, 166. Because of the consistency of the experts' opinions and the relatively low risk foreseen if Roberson were in prison, Roberson can hardly claim to have been prejudiced by the admission of another opinion confirming his own expert's views.

Roberson protests being labeled a psychopath, which "inflame[d]" the jurors. Pet. 95. By Dr. Goodness's own definition, he is a psychopath. 48 RR 22, 91. Compared to the evidence of Nikki's brutal beating and possible sexual assault, labeling him a psychopath hardly further inflamed his jury; even the defense expert agreed that Roberson has antisocial personality disorder and

psychopathy as evidenced by his complete lack of remorse for murdering his daughter. 48 RR 86-87, 89, 91. The Hare Checklist was the subject of direct and cross-examination questions, 48 RR 22, 92, 123-24, 145-46, 147, 150-51, which addressed the same issues Roberson raises. The Hare was hardly the centerpiece of the State's case, and both State's experts explicitly denied the ability to forecast Roberson's future criminal activity. 48 RR 146-66; 17 Supp. CR 2752.

Dr. Self and Dr. Allen were as qualified as Roberson's experts— both have doctoral degrees, and both have significant, long-term training and experience in forensic evaluation of violent criminal offenders, including capital murderers. 17 Supp. CR 2752; 48 RR 118 et. seq. Dr. Allen has been involved in numerous capital cases[30] for both State and defense. 48 RR 118. Dr. Goodness testified that Dr. Self did a "very nice job" of interviewing Roberson, and she declined to criticize the techniques the State's experts used. 48 RR 71.

Roberson further faults the State's experts for not evaluating Roberson sooner and for longer. Pet. 133-34. But they were legally bound to wait. After the guilty verdict, Roberson announced his intent to introduce psychiatric evidence, prompting the State to seek his examination. 46 RR 75-77. Counsel spoke with Dr. Allen on the telephone and agreed to both to the timing and duration of the State's evaluation, and cannot complain about it now. 46 RR 75-

---

[30]     Surely it is an inadvertent misrepresentation to claim that "[Dr. Allen] has never worked at with [sic] offenders on death row," given that counsel for Roberson actually represented the petitioner in Danielle Simpson v. Quarterman, No. 1:04-CV-485 (E.D. Beaumont), in which Dr. Allen evaluated the offender and testified regarding his Atkins v. Virginia claim, Pet. 139; 536 U.S. 304 (2002).

77, 81 and 47 RR 2-3 (citing Lagrone v. State, 942 S.W.2d 602 (Tex. Crim. App. 1997)); see also Coleman, 501 U.S. at 750-51; Yakus v. United States, 321 U.S. 414, 444 (1944). The Fifth Amendment required the State to refrain from such examinations until Roberson introduced, or made it clear that he would introduce, psychiatric testimony in the penalty phase. Buchanan v. Kentucky, 483 U.S. 402, 422-23 (1987); Estelle v. Smith, 451 U.S. 454, 468 (1981); Lagrone, 942 S.W.2d at 610-12; Soria v. State, 933 S.W.2d 46, 58-60 (Tex. Crim. App. 1996).

Like the rest of Roberson's points, this goes to the weight to be given their testimony, not its admissibility. Dr. Self told the jury that his opinions were less certain than they could have been with longer, more extensive evaluation opportunities. 48 RR 173. Roberson fails to explain how any deficiency in the State's clinical interview would have rendered the opinions inadmissible, particularly since Barefoot permits hypothetical testimony about future dangerousness in the absence of any personal evaluation. 463 U.S. at 903-04.

Dr. Allen's opinions regarding affective and instrumental violence are also criticized. Pet. 117-126. Roberson conflates three things: which kind of violence is easier to predict, reasons why a particular individual is a risk for future violence, and which kind of violence will result in qualitatively/quantitatively greater horrors. Id. at 117-122. In the prior testimony to which Roberson refers, Dr. Allen opines whether affective violence is easier to predict than instrumental, and/or offers a judgment whether that specific defendant is a future danger and why, and/or an opinion of how violent the crime is likely to be. At no point does Dr. Allen compare Roberson's risk of violence to that of

64

"someone who intentionally picks up a knife or gun or a rope." Pet. 123. Nor does Dr. Allen contradict himself, within or between cases. 48 RR 134; Pet. 121 (citing State v. Robert Ladd); Pet. 119-20 (citing State v. Rickey Lynn Lewis); Pet. 120-21 (citing State v. Charles D. Tuttle).

In these cases, and in Roberson's, Dr. Allen took into account the unique circumstances of the crime and the defendant when forming his opinion, rather than categorically reaching a conclusion according to the type of violence. Affective and instrumental violence can coexist. 48 RR 133-34; Pet. 122 (citing State v. Robert Ladd). Because past behavior tends to predict future behavior, both affective and instrumental violence will tend to predict future violence. But Roberson imports these concepts into unrelated cases and contexts, tosses terms like "rage-based" versus "intentional" violence around (as if they, too, were mutually exclusive), and assumes that his own summaries of Dr. Allen's words are more definitive than the words themselves, all to give the impression that Dr. Allen is biased.

But Roberson's account was found inaccurate and incomplete by the state court. 17 Supp. CR 2753. Because Roberson does nothing more than copy and paste from his earlier pleading without explaining why the state court's ruling unreasonably determined the facts or misapplied federal law, Roberson fails to demonstrate he is entitled to relief. Richter, 131 S. Ct. at 785.

C.    Future dangerousness predictions are constitutional and relevant evidence. Juries are the best means of determining their credibility, and Roberson's position would prevent defendants from introducing such testimony on their own behalf.

Roberson argues that predictions of future dangerousness are inherently unreliable. Pet. 139-59. To credit this position requires dismissing his arguments and authorities in the previous section as unpersuasive. Again, Roberson copies and pastes his state writ argument, found at 1 Supp. CR 182-98, without responding to the state court's findings and conclusions denying relief. Pet. 140-56. His generic counter to all procedural bars, exhaustion arguments, and the like along with his excuse that he did not have time to answer the state court's decision is repeated shortly thereafter; it was answered above, in Procedural Default, Section I-B.

Under Daubert and Kumho, Roberson insists "it is never possible to make meaningful forecasts of future dangerousness under any conditions because such predictions have never been proven to be scientifically reliable." Pet. 139, 142. The Fifth Circuit disagreed, noting that Daubert does not apply to sentencing (including capital sentencing), and that a "jury could benefit from the opinion of a psychological expert on [future dangerousness]." United States v. Fields, 483 F.3d 313, 345 (5th Cir. 2007). Granting relief on this basis would harm defendants who wanted to introduce evidence that they would not pose a future danger. Because the future-dangerousness special issue has repeatedly been upheld by the Supreme Court, Roberson cannot demonstrate that he is entitled to any relief. Moreover, the reassessment Roberson desires would be barred by the non-retroactivity doctrine of Teague v. Lane, 489 U.S. 288 (1989). As a result, his claim should be denied.

Under the future-dangerousness special issue, the State must prove beyond a reasonable doubt that there is a probability that Roberson would

commit criminal acts of violence that would constitute a continuing threat to society. 5 CR 641. This common-place issue[31] is part of the Texas capital-punishment scheme that has been repeatedly upheld by the Supreme Court and continues to withstand constitutional scrutiny. Jurek v. Texas, 428 U.S. 262, 272-74 (1976); Franklin v. Lynaugh, 487 U.S. 164 (1988); Johnson v. Texas, 509 U.S. 350, 373 (1993); see also Scheanette v. Quarterman, 482 F.3d 815, 827-28 (5th Cir. 2007) (special issue is not so vague as to require additional instruction or definition by the court) (citing Woods v. Johnson, 75 F.3d 1017, 1033-34 (5th Cir. 1996), and James v. Collins, 987 F.2d 1116, 1120 & n.5 (5th Cir. 1993)).

The reliability of future dangerousness predictions was addressed in Barefoot. 463 U.S. 880. There, the petitioner argued that expert predictions of future dangerousness were unreliable, and that admitting the psychiatrist's answers to hypothetical questions, without a personal evaluation of the defendant, was erroneous. Id. at 896. The Supreme Court disagreed, and specifically refused to convert the American Psychiatric Association's condemnation of psychiatric predictions of future dangerousness (which Roberson cites) into a constitutional rule barring an entire category of expert testimony. Id. at 899; see also Estelle v. Smith, 451 U.S. at 473 (same view rejected by Court, stating that it was in "no sense disapproving the use of

---

[31]     Twenty-one states include a defendant's future dangerousness among the aggravating circumstances to be considered during capital sentencing, aside from Texas and Oregon which do not weigh aggravation and mitigation factors but instead present future dangerousness as a question to the sentencing jury. Kennedy v. Louisiana, 554 U.S. 407, 440 (2008); Jonathan R. Sorensen & Rocky L. Pilgrim, Criminology: An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants, 90 J.Crim. & Criminology 1251, 1252 (2000).

psychiatric testimony bearing on future dangerousness.");Rivas v. Thaler, 432 F.App'x. 395, 404 (5th Cir. 2011); Fields, 483 F.3d at 341-46 & n. 28.

> Psychiatric testimony predicting dangerousness may be countered not only as erroneous in a particular case but as generally so unreliable that it should be ignored. If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors.

Barefoot, 463 U.S. at 898-99. Thus, the Supreme Court has already found that predictions of future dangerousness are not inherently unreliable.[32] A recent opinion by Justice Stevens confirmed the breadth and continuing viability of Barefoot. See United States v. Scheffer, 523 U.S. 303, 334 (1998) (Stevens, J., dissenting) ("There is no legal requirement that expert testimony must satisfy a particular degree of reliability to be admissible. Expert testimony about a defendant's 'future dangerousness' to determine his eligibility for the death penalty, even if wrong 'most of the time,' is routinely admitted.") (emphasis added). No member of the Scheffer Court disagreed.

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard. (Terry) Williams, 529 U.S. at 381. "Cracking glaciers" (Pet. 148, 150) are insufficient; the AEDPA

---

[32] Even if the Supreme Court agreed with Roberson and wanted to re-evaluate the viability of the majority opinion in Barefoot in light of Daubert, this is not the case to do so because Roberson's claim is procedurally barred.

requires the open ocean of clearly established federal law to support a grant of relief:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Richter, 131 S. Ct. at 786-87 (emphasis added). This Court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand" because such a process suggests the proposed rule is not clearly established. Alvarado, 541 U.S. at 666.

Just this year, the Supreme Court reaffirmed that the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." Perry v. New Hampshire, 132 S. Ct. 716, 723 (2012). "Our legal system . . . is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses." Kansas v. Ventris, 556 U.S. 586, 594, n. * (2009). Only when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice," Dowling v. United States, 493 U.S. 342, 352 (1990)(internal quotation marks omitted), has the Supreme Court imposed a constraint tied to the Due Process Clause. See, e.g., Napue, 360 U.S. at 269 (due process prohibits the State's "knowin[g] use [of] false evidence," because such use violates "any concept of ordered liberty."). Albeit in a different context, Perry emphasizes that "the potential unreliability of a type of evidence

does not alone render its introduction at the defendant's trial fundamentally unfair." 132 S. Ct. at 728 (citing Ventris, 556 U.S. at 594, n. * (declining to "craft a broa[d] exclusionary rule for uncorroborated statements obtained [from jailhouse snitches]," even though "rewarded informant testimony" may be inherently untrustworthy), and Dowling, 493 U.S., at 353 (rejecting argument that the introduction of evidence concerning acquitted conduct is fundamentally unfair because such evidence is "inherently unreliable")).

Furthermore, the Fifth Circuit refused to hold that Daubert requires the exclusion of expert future dangerousness testimony because to do so would constitute a new rule on collateral review in violation of Teague. Tigner v. Cockrell, 264 F.3d 521, 526-27 (5th Cir. 2001). Under Teague, new rules of constitutional criminal procedure[33] will not be announced on federal habeas review and then retroactively applied unless an exception applies. 489 U.S. at 301. The first exception to Teague's retroactivity limitation is for rules that would place primary conduct beyond the government's power to proscribe or a class of persons beyond its power to punish in certain ways. Graham v. Collins, 506 U.S. 461, 477 (1993). The second Teague exception is reserved for bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial. Id. In Roberson's case, however, he fails to establish that the relief he

---

[33] "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or on the federal Government[.] To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." Teague, 489 U.S. at 301.

requests falls under either exception to Teague's retroactivity limitation.[34] As such, Roberson's allegation is unquestionably barred by the non-retroactivity principle of Teague.

Not only has the future dangerousness special issue itself been held constitutional, but courts are able to review the sufficiency of the evidence in determining whether the State did meet its burden of proof beyond a reasonable doubt. In McGinn v. State the CCA rejected the idea of conducting a factual sufficiency review of the jury's finding of a probability of future dangerousness. 961 S.W.2d 161, 166-68 (Tex. Crim. App. 1998) (citing Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996)). However, the CCA held that reviewing the legal sufficiency of the issue under Jackson v. Virginia "is feasible because that standard views evidence in the light that supports the jury's verdict, and asks only whether circumstances are present that a rational person somewhere could find prove a probability of future dangerousness beyond a reasonable doubt." Id. at 169. Indeed, this legal sufficiency review was conducted during Roberson's own direct appeal. Roberson v. State, 2002 WL 34217382, at *9-12. Furthermore, as explained in Section VIII below, the Fifth Circuit follows this Jackson standard in assessing the sufficiency of evidence, and federal courts review the state-court adjudication to assess whether it is an objectively unreasonable application of Jackson. Given these many levels of review, Roberson's concerns are erroneous. Pet. 148-56. Accordingly, his allegation is without merit and does not entitle him to relief.

---

[34]    Indeed, Roberson fails to even discuss Teague. Pet. 142-59.

IV.  Roberson Received Effective Assistance of Counsel During Guilt-Innocence.

Roberson complains counsel were ineffective during guilt-innocence because defense counsel failed to object to the jury charge and to the trial court's cuts in his attorneys' vouchers (parts of Roberson's claim 10.)  Pet. 182-84.

> Claims of ineffective assistance [of counsel] have become routine. If we are to believe the briefs filed by appellate lawyers, the only reason defendants are convicted is the bumbling of their predecessors. But lawyers are not miracle workers. Most convictions follow ineluctably from the defendants' illegal deeds, and nothing the lawyers do or omit has striking effect.

Burris v. Farley, 51 F.3d 655, 662 (7th Cir. 1995).  Roberson's arguments duplicate those he raised in the state habeas court without variance. 1 Supp. CR 218-20.  Because Roberson does nothing more than copy and paste from his earlier pleading, he fails to demonstrate he is entitled to relief.  Richter, 131 S. Ct. at 785.

Roberson also claims ineffective assistance at sentencing, raising a Wiggins-type claim which will be addressed below, in section V.  Pet. 278-79.  However, one sentence of his claim affects the IAC-at-guilt-innocence argument so it is addressed here.  "This failure to investigate prejudiced Mr. Roberson's case for a lesser included offense and for a life sentence upon conviction for capital murder."  Id.  (emphasis added.)  Roberson's eligibility for a lesser-included offense is unmentioned for the remainder of that claim, and indeed, his petition.  Nor was this argument ever made in the state court below, either on direct appeal or state habeas.  As such it is unexhausted and waived.  28 U.S.C. § 2254(b)(1)(A);  Maldonado, 42 F.3d at 910 n. 7 (5th Cir. 1995) (failure to do

more than vaguely refer to an issue constitutes waiver); Cavallini, 44 F.3d at 260 n. 9 (5th Cir. 1995) ("failure to provide any legal or factual analysis of an issue results in waiver").

A.     Procedural default.

The state court found these IAC-at-guilt-innocence claims to be procedurally barred.  Roberson presented nothing outside the appellate record to support them, therefore they should have been raised on direct appeal.  17 Supp. CR 2755-56, 2758, 2761-62.  They were also barred for failing to state a claim upon which relief can be granted, because Roberson "failed to state sufficient facts or present any evidence so as to present these claims properly for review in habeas corpus."  Id.  Roberson's only reply was that he did not have time to brief this properly and would do so later.  This was addressed above in Procedural Default, Section I-B.

B.     State court findings.

The state court used the appropriate legal standard for evaluating ineffective-assistance claims.    17 Supp. CR 2754-55 (citing Strickland v. Washington, 466 U.S. 668 (1984)).  It found that Roberson presented no facts or evidence in support of either claim, "and failed even to allege how any error was harmful or entitled him to relief from his conviction or sentence."  17 Supp. CR 2758-59 (citing Ex parte McPherson, 32 S.W.3d at 861). The state court emphasized that Roberson did not "even allege[] how counsel's actions were ineffective, [nor has he] attempted to explain why the actions were not 'in the exercise of reasonable professional judgment,' [and] . . . failed to allege or prove what objections should have been made to the jury charges which were not

73

made, how counsel was ineffective in omitting such objections, and how he was prejudiced by the lack of such unspecified objections." 17 Supp CR 2759. As a result, this "ground for relief is wholly without merit." Id.

Regarding the denied-attorney-vouchers claim, the state court found his only argument for prejudice was "one has to believe that at some point this impacted the defense." Id. at 2761. "[Roberson] has failed to even allege that any defense need was not met at the Court's expense; he has not asserted that any action was not taken—due to lack of funding—that needed to be taken to provide an adequate defense." Id. After reviewing the records, the state court found Roberson's claim to be "frivolous" and that Roberson

> has failed to even attach the complete billing records to his application in support of this ground. The Court finds and recollects that all of [Roberson's] requests for investigative and expert assistance were granted by this Court. . . that of the more than twenty requests for payment, the Court approved payment in whole or in part on every request.

Id. at 2761-62. Additionally, the state court totaled the amounts paid and found that through the middle of the trial, the defense team was paid over $150,000. Id. at 2762. The trial court had personal recollection of payments made "in the Court's discretion, for all reasonable services and expenses submitted" and only omitted "payment for cost of normal office supplies, law books, and [continuing-legal-education] seminars [as] not reasonable." Id. Finally, the state court recalled that additional payments during the remainder of the trial were made for reasonable services and expenses, which were not included in either the clerk's record or Roberson's application. Id. In summary, the state court found

"that [Roberson's] defense attorneys and their agents and associates diligently performed their work; the Court finds there is no support in evidence before the Court for applicant's claim that any unspecified lack of funding deprived [Roberson] of effective assistance of counsel." Id. at 2763.

C.    His ineffective assistance claim is meritless.

The burden of proof in a habeas proceeding attacking the effectiveness of trial counsel is on Roberson who must demonstrate both ineffectiveness and resultant prejudice. Carson v. Collins, 993 F.2d 461, 466 (5th Cir. 1993). In order to establish deficient performance, Roberson must show that counsel's representation "fell below an objective standard of reasonableness." Strickland. 466 U.S. at 687-88. In so doing, he must overcome a strong presumption that the conduct of his trial counsel fell within a wide range of reasonable professional assistance. Id. at 687-91; Loyd v. Whitley, 977 F.2d 149, 156 (5th Cir. 1992). "[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the constitution." Strickland, 466 U.S. at 692.

In order to establish prejudice, Roberson "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." Id. at 694; Loyd, 977 F.2d at 159. This showing of prejudice must be "rather appreciable;" a mere allegation of prejudice is not sufficient to satisfy the prejudice prong of Strickland. Armstead v. Scott, 37 F.3d 202, 206 (5th Cir. 1994). A failure to establish either deficient performance or prejudice makes it unnecessary to

75

examine the other prong. Strickland, 466 U.S. at 697; Black v. Collins, 962 F.2d 394, 401 (5th Cir. 1992).

Where the merits of an ineffectiveness claim have been rejected by the state–as in this case–the "pivotal question" in a § 2254 proceeding "is whether the state court's application of the Strickland standard was unreasonable" and that this inquiry "is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 131 S.Ct at 785 (citations omitted). Stated differently, a "state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself" since the standards created by Strickland and § 2254(d) are both highly deferential. Id.; Premo v. Moore, 131 S. Ct. 733, 744-45 (2011). The Supreme Court has referred to this as a "doubly deferential" process. Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). Federal courts are thus tasked with taking "a 'highly deferential' look at counsel's performance [under Strickland] . . . through the 'deferential lens of § 2254(d)[.]" Pinholster, 131 S. Ct. at 1403 (citing Mirzayance, 556 U.S. at 121, n. 2).

Accordingly, the question to be asked "is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Pinholster, 131 S.Ct at 1426. A litigant "must demonstrate that it was necessarily unreasonable for the [state court]" to rule as it did. Id. at 1403. The burden is on the habeas petitioner to overcome every reasonable argument supporting the state court decision, whether articulated by the state courts or not. Wetzel, 132 S. Ct. at 1199; Richter, 131 S.Ct at 784-85. This is so because § 2254 actions are not intended as "a substitute for ordinary error correction through appeal" but

as a "guard against extreme malfunctions in the state criminal justice systems." Richter, 131 S.Ct at 786.

1.    The guilt-innocence jury charge was unobjectionable.

The entirety of Roberson's first complaint is that his trial attorneys

> did not lodge certain objections to the jury charge in the liability phase. This may have constituted waiver or procedural default. For instance, the counsel should have objected on constitutional grounds to the lack of an accurate definition of the term "reasonable doubt," notwithstanding a recent Court of Criminal Appeals decision stating that such definitions were unnecessary.

Pet. 182.  He fails to explain how the charge was objectionable aside from lacking a definition that he concedes was not required under state law.  An attorney is not required to make futile objections.  Strickland, 466 U.S. at 691; Shields v. Dretke, 122 F.App'x 133, 151 (5th Cir. 2005) (citing Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994)); Koch v. Puckett, 907 F.2d 524, 527 (5th Cir. 1990).  The Constitution does not require trial courts to define reasonable doubt. Victor v. Nebraska, 511 U.S. 1, 5 (1994).  Roberson does not explain why he would have been acquitted but for this charging error.  Further, since Roberson does not challenge his conviction on the basis of lacking a definition of reasonable doubt in the guilt-innocence jury charge, its absence cannot constitute waiver or procedural default.   This argument is waived as inadequately briefed. See Green, 160 F.3d at 1036 n.2; Yohey v. Collins, 985 F.2d 222, 224-25 (5th Cir. 1993) ("[Appellant] has abandoned these arguments by failing to argue them in the body of his brief.").

2.    Roberson's denied-attorney-vouchers claim is frivolous.

Roberson argues that his attorneys should have objected under "Wiggins"[35] and "Chronic v. United States,"[36] [sic] because the trial judge violated the county's standing order in not paying the full amount of every request for payment filed by the defense attorneys. Pet. 183. Roberson does not attach anything in support of this claim to his petition, nor did he when making this claim in the state court below. Id. at xxii-xxxi (indices of supporting documents); 1 Supp. CR 49-58. Not a single request for payment, receipt, invoice, or bill substantiates his claim—not even the county's standing order. Id. Roberson surmises that counsel did not object "because he did not want to irritate the trial judge," which is a reasonable strategic consideration unaddressed by this claim. Pet. 183. Roberson makes no constitutional-violation or prejudice argument whatsoever.

Roberson again expects this Court to pick through the record and hunt through cases he mis-cites to create an argument for him. This constitutes waiver. Cavallini, 44 F.3d at 260 n. 9; Maldonado, 42 F.3d at 910 n. 7. He cannot identify a single request which was disapproved or denied by the trial court. Roberson fails to prove he is entitled to relief under AEDPA. Neither Wiggins nor Cronic stand for the proposition that attorneys must object to any denial of funding requests or that effective assistance requires courts approve every voucher request for office expenses such as long-distance phone bills, 3 CR 382 & 441, CLE courses, 3 CR 377, law books, 3 CR 382, or paralegal services

---

[35]      Wiggins v. Smith, 539 U.S. 510 (2003).

[36]      United States v. Cronic, 466 U.S. 648 (1984).

and office supplies, 3 CR 409, 426. Further, Roberson fails to explain how the state court's decision was based on an unreasonable determination of the facts before it.

The record reflects that the trial court issued payment on every bill submitted by defense counsel, Dr. Goodness, or the defense investigator. Through the middle of the trial, defense attorney Evans was paid at least $71,600 with $4952.35 billed but unpaid. 3 CR 373, 438; 5 CR 596. Defense attorney Van Meter was paid at least $41,850 with $2631.45 billed but unpaid. 3 CR 403, 411; 4 CR 443, 508, 587. Defense investigator Olsen was paid at least $23,508 with $124.53 billed but unpaid, and Dr. Goodness was paid at least $15,000 leaving $2.50 billed but unpaid. 2 CR 280, 283; 3 CR 366, 416; 4 CR 448, 568; 5 CR 606; 2 CR 287; 3 CR 370, 419; 4 CR 557; 5 CR 626. This ground for relief is frivolous and should be dismissed.

V.    Roberson Received Effective Assistance of Counsel During Sentencing.

Roberson complains his attorneys failed to adequately investigate and present a mitigation case; they failed to properly challenge the State's future-dangerousness case; they did not object to the punishment jury charge; they failed to object to the State's closing argument, and generally failed to preserve error. (parts of Roberson's claims 9 and 10, claim 38 and 42). Pet. 159-186, 279-81; Supp. Pet. 1.

A.    Exhaustion.

Roberson's claim that his attorneys failed to object to the prosecutor's closing argument about the meaning of probability, supp. pet. 2 (his claim 42), is wholly new and unexhausted, having never been presented to any state court,

and therefore it cannot form a basis for relief. 28 U.S.C. § 2254(b)(1)(A); Beazley, 242 F.3d at 263.

Roberson's failure-to-investigate claim, that his attorneys inadequately investigated mitigation evidence, is also unexhausted. Pet. 278-79 (his claim 38) (citing Wiggins, 539 U.S. 510, (Terry) Williams, 529 U.S. at 395-97, and Strickland, 466 U.S. 668). These arguments were never made in the state court, either on direct appeal or state habeas. Relief "shall not be granted" under any circumstances unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1); Beazley, 242 F.3d at 263. Roberson must prove cause and prejudice to have these claims considered. Gray, 518 U.S. at 162. Martinez v. Ryan does not excuse his failure to establish cause because Roberson could have claimed ineffective assistance at sentencing in a motion for new trial or on direct appeal. 2012 WL 912950 at *5.

B.     Other procedural bars.

Because Roberson presented nothing in support of the rest of his future-dangerousness and failure-to-object subclaims that could not have been presented to a court of appeals, the state court found them procedurally defaulted. 17 Supp. CR 2755, 2758 (citing Ex parte Gardner, 959 S.W.2d at 199). "[Roberson] failed to gather and introduce new evidence not contained in the direct appeal record", therefore he should have raised these arguments on direct appeal. Id. at 2755-56.

The state court further found his future-dangerousness subclaim to be procedurally barred because he presented no evidence of how the State's experts would have responded to his hypothetical questions "—as opposed to mere

speculation and argument— . . . and since [Roberson] has failed to present any affidavit or evidence from his trial counsel that his cross-examination was not a reasonable part of his trial strategy." 17 Supp. CR 2756. As a result, Roberson "failed to adequately state a claim upon which relief could be granted, because he has failed to allege specifically or to prove how the cross-examination of the State's experts contained in the trial record was deficient." Id.

As to Roberson's contentions of ineffective assistance for failing to object to jury charges, jury argument, and generally failing to preserve error, the state court found them procedurally barred because he "failed to state sufficient facts or present any evidence so as to present these claims properly for review in habeas corpus [and] failed to assert any facts supporting any specific claim of ineffectiveness and failed even to allege how any error was harmful or entitled him to relief from his conviction or sentence." 17 Supp. CR 2758-59 (citing Ex parte McPherson, 32 S.W.3d at 861).

Because all these bars are independent and adequate grounds upon which to deny relief, Roberson must prove cause and prejudice to have this claim considered. Gray, 518 U.S. at 162. Roberson does not attempt to distinguish his case from Nobles and Muniz; nor does he attempt to demonstrate cause and prejudice for his failure to raise the claims in his initial state habeas application. Nobles, 127 F.3d at 422; Muniz, 132 F.3d at 221. Martinez v. Ryan does not excuse his failure to establish cause because the first opportunity Roberson had to claim IAC at sentencing was during a motion for new trial or on direct appeal. 2012 WL 912950 at *5. Thus, circuit precedent compels the denial of this claim as procedurally defaulted.

81

C.    State court findings.

The state court reviewed the record and found that trial counsel's

actions and examination of the State's experts constituted part of a
reasonable trial strategy, particularly since trial counsel was able
to effectively point out the similarities between Dr. Allen's and Dr.
Goodness's testimony, he was able to use those similarities to
attempt to impeach Dr. Self's more damaging opinions, and he was
able to point out that the State's experts had limited exposure to
[Roberson] compared to Dr. Goodness.

17 Supp. CR 2756-57. This judgment of the witnesses' credibility and the effects

of the attorney's questioning is presumed to be correct.  § 2254(e)(1); Jackson v.

Johnson, 150 F.3d 520, 524 (5th Cir. 1998).  This presumption of correctness is

especially strong where, as here, the state habeas court and the trial court are

one and the same.  See Schriro v. Landrigan, 550 U.S. 465, 476 (2007); Clark v.

Johnson, 202 F.3d 760, 764 (5th Cir. 2000).

Continuing, the state court found "that the extensive cross-examination

and badgering of the State's witnesses proposed by [Roberson] . . . would have

been detrimental to [Roberson's] defense, because the course of action proposed

by [Roberson] would have served to emphasis [sic] the opinions already

expressed by the State's experts while alienating and irritating the jury."  17

Supp. CR 2757.  The state court went on to find that "there is no evidence that

the defense expert Dr. Goodness could have competently testified regarding

[Roberson's] 'base rate data' theory, or that such testimony would even have

been admissible."  Id.  Additionally, the court found "there is no evidence that

Dr. Goodness could have performed an ad hoc Hare analysis of [Roberson] on

redirect" and "had she done so, it would only have served to impeach her

previous testimony that she did not believe such analysis to be appropriate in the context of a capital murder trial." Id. Having assessed the credibility of the witnesses, the state court opined, "there is no evidence before the Court that Dr. Goodness could or would have 'destroyed' Dr. Allen's assessment of [Roberson] as a psychopath; rather, the Court find that had Dr. Goodness been questioned further, she would more likely have only supported Dr. Allen's diagnosis." Id.

Summing up, the state court noted Roberson's complete failure "to allege or prove what actions of trial counsel were outside the scope" of effective assistance, and that, "in the light of the absolute absence in this record of any explanation of trial counsel's actions—through counsel's affidavit or otherwise—which would tend to prove that counsel's actions were not part of a reasonable strategy or that they were outside the range of reasonably effective assistance or that they harmed [Roberson], this Court is without authority to find ineffective assistance of counsel. . ." 17 Supp. CR 2758 (citing Bone v. State, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002)).

Specifically regarding Roberson's arguments about objections to the sentencing jury charge, to the closing argument, and failure to preserve error generally, the state court found that Roberson only "even attempted to link . . . specific facts in the trial record [to one claim,]— that counsel failed to object to the prosecutor's claim that [the State] was required to elect between paragraphs"—and that Roberson "failed to allege or prove how this actually prejudiced his right to a fair trial." 17 Supp. CR 2759. Roberson failed to allege or prove prejudice on all the rest of his ineffectiveness-at-sentencing claims. Id. He had "not even alleged how counsel's actions were ineffective, [nor had he]

attempted to explain why the actions were not 'in the exercise of reasonable professional judgment." Id. The state court faulted Roberson for failing to specify what objections should have been made to the jury charge, how counsel was deficient for omitting them, and how Roberson was prejudiced by their absence. Id.

Likewise, the state court believed Roberson failed to allege or prove that counsel's choice not to object to jury argument was not a reasonable trial strategy, and found that this could have been intended to avoid further emphasizing the arguments. Id. at 2759-60. It also found that Roberson failed to prove that any objections to jury argument would likely have been sustained, nor that there was reversible error to which objection could be made. Id. at 2760.

D.     This claim is unpersuasive.

Roberson merely copies and pastes his state writ petition, appending a generic hypothetical reply to procedural bars and state court findings alike. This was addressed above in Procedural Default, Section I-B. He also raises two unexhausted claims. Pet. 278-81 (his claim 38) and Supp. Pet. 2 (his claim 42). He requests a hearing in federal court, but fails to make the necessary showing under AEDPA, as argued above in Procedural Default, Section II. All of these sub-claims are unpersuasive.

The pivotal question is whether the state court's application of the Strickland standard was unreasonable. Richter, 131 S. Ct. at 785. This is different from asking whether defense counsel's performance fell below Strickland's standard. Id. Roberson explicitly asks this Court to conduct a de

novo review, Pet. 177-78, but AEDPA demands more. Under §2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. Richter, 131 S. Ct. at 788. Roberson's approach all but ignores "the only question that matters under §2254(d)(1)." Lockyer v. Andrade, 538 U.S. 63, 71 (2003).

Roberson asks this Court to grant his Strickland claim without even discussing the state court's analysis in rejecting it. This overlooks arguments that justify the state court's result and ignores the limitations of §2254(d), including its requirement that the state court's decision be evaluated according to the precedents of the Supreme Court. Richter, 131 S. Ct. at 786; see Renico v. Lett, 130 S. Ct. 1855, 1866 (2010). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. Lockyer, 538 U.S. at 75.

1.    The defense approach was strategic.

Roberson announces conditionally that "if necessary to avoid procedural default," he will argue "that IAC by his trial and appellate counsel establishes cause and prejudice to avoid the default." Pet. 159. He never mentions this again, rendering this waived. Cavallini, 44 F.3d at 260 n. 9. Further, a claim of ineffective assistance to excuse default must itself be exhausted, and this was not. 1 CR 198 (note this sentence is missing from the otherwise-identical state habeas version); Edwards, 529 U.S. at 451-52; see Procedural Default, Section I-C, above.

Roberson expands voluminously on the topics he would have covered with the State's experts. Pet. 161-75. He complains that deeper investigation would have resulted in a superior cross-examination. Id. He disagrees with the doctors' understanding of antisocial personality disorder and psychopathy. Id. at 167-68. And he would have objected with far greater frequency. Id. at 167-75. However, Roberson is not entitled to "error-free" counsel. See Emery v. Johnson, 139 F.3d 191, 197 (5th Cir. 1997) ("The Sixth Amendment does not guarantee criminal defendants the right to error free representation."); Skillern v. Estelle, 720 F.2d 839, 851 (5th Cir. 1983); Martin v. Maggio, 711 F.2d 1273, 1279, 1281 (5th Cir. 1981)). The Supreme Court "address[es] not what is prudent or appropriate, but only what is constitutionally compelled." Cronic, 466 U.S. at 665, n. 38. Standing alone, counsel's choices do not constitute deficient performance unless they are so unreasonable that it rebuts the strong presumption that counsel's performance "falls within the wide range of reasonable professional assistance." Emery, 139 F.3d at 197 (quoting Strickland, 466 U.S. at 689). Assuming arguendo counsel performed deficiently, Roberson must also prove prejudice. However, he cannot even prove deficiency.

In order to establish that counsel were ineffective due to a failure to investigate further, Roberson must state with specificity what the investigation would have revealed, what specific evidence would have been disclosed, and how the evidence would have altered the outcome of the trial. Anderson v. Collins, 18 F.3d 1208, 1221 (5th Cir. 1994). This he fails to do. Though Roberson asserts that the State's experts contradicted their previous testimony in the instant case, Pet. 161, he failed to show any real contradictions and only made it clear

that he confuses and conflates various aspects of the risk assessments. See Answer, Section III-B, above. He further fails to show how such an impeachment would change the outcome, or that the state court's denial of this claim was unreasonable.

Roberson makes hypothetical and admittedly "trivia[l]" arguments about Dr. Allen's testimony and counsel's lack of "fierce[ness]" during cross-examination, but can substantiate none of the claims, insisting hyperbolically that the State's experts' "credibility and careers would have been at an end." Pet. 163-64. Roberson acknowledges the Hare was designed to be accurately used by individuals with far less training than a forensic psychologist. Pet. 165. Further, Roberson now concedes that "the factors identified by [Dr.] Allen probably do point to an increased likelihood of violence." Pet. 167. His analysis ignores the state court's findings and conclusions on deficiency and prejudice. Pet. 163-78.

For example, Roberson fails to present the experts' curriculae vitae, or to show that the defense attorneys were ignorant of the State's experts' backgrounds. Id. at 161-62. Nor does Roberson show that the experts' college grades were relevant to their capacity as witnesses. Id. at 162. Roberson does not even know the answers to the questions he faults counsel for not asking ("It is unlikely that these experts have ever taken any accredited courses on capital forensic psychology.") Id. Roberson fails to explain why risk assessments of violent mentally-ill offenders at Rusk State Hospital are different from assessing death row offenders. Id. at 163. Nor does Roberson show that either doctor could have been excluded on the basis of a Rule 703 or Daubert motion, especially

considering he conducted a Daubert hearing and chose not to call Dr. Self or to object to either witness's testimony or qualifications. Id. at 162; 17 Supp. CR 2751-52. State law and clearly established federal law is adverse on this point. Id. at 2752 (citing Griffith v. State, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998)); see Answer, Section III-C above. He also fails to substantiate his novel view that future-dangerousness evaluations are not for future dangerousness. Pet. 164.

It can hardly be emphasized enough that trial counsel did conduct a Daubert hearing, 48 RR 108-115, but the state court found Roberson's postconviction arguments about it unpersuasive, plausibly because defense counsel could have made the strategic choice not to spend the time fruitlessly interrogating the witness while the jury waited, to avoid angering the jury or the judge. Again, state law goes against Roberson and there is no clearly established federal law to the contrary. 17 Supp. CR 2752 (citing Griffith v. State, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998)); see also Fields, 483 F.3d at 341-46 & n. 28; Tigner, 264 F.3d at 526-27. Roberson simply focuses on degrees of difference between counsel's actual cross-examination and the "ideal" cross-examination. Pet. 162, 166. Arguments which make logical sense on paper may well do great damage if pursued in real life; hounding and "badgering" a scientific expert over the grammatical import of sentence structure can ruin one's credibility with the jury. 17 Supp. CR 2757. This kind of judgment call is rarely possible to make from the cold record available to postconviction courts and counsel. Gonzalez v. United States, 553 U.S. 242, 250 (2008); Louis v. Blackburn, 630 F.2d 1105, 1109-10 (5th Cir. 1980). Much of Roberson's critique of the Hare was already before the jury—Dr. Goodness made it clear that she

questioned using the Hare because there was debate in the forensic community about its appropriateness, arguing that "many say it's unethical because we do not have research that tells us what a high score on that instrument means for a person who's incarcerated." 48 RR 22. The defense emphasized that the Hare score does not predict dangerousness and that its use in a capital cases was contested among professionals in the field. Id. at 22-23. Dr. Allen admitted he was not trained by Dr. Hare himself, 48 RR 125, and that a "very good textbook" challenged the application of the Hare because of a lack of research on its reliability. Id. at 145.

Further, there was overwhelming evidence of future dangerousness. Roberson had been sentenced to prison three times and was arrested at least seventeen times before murdering Nikki. His ex-wife testified about his violence including strangling her, breaking her nose while she was pregnant, beating her with a shovel as well as bruising their son's face and giving their toddler daughter a hickey. Other testimony established Roberson's history of violent attacks on a teenage boy and an adult man. It is nearly impossible to prove prejudice when a jury has already rejected the arguments, albeit when presented with less eloquence than Roberson now displays. The Sixth Amendment does not guarantee perfect cross-examination skills, only adequate representation. Emery, 139 F.3d at 197.

Roberson belatedly supplemented his state writ with an unsworn affidavit from Dr. Goodness on June 8, 2005. 17 Supp. CR 2731. The state court found Roberson to be dilatory and the affidavit to be untimely, successive, and procedurally barred. 17 Supp. CR 2782 (citing Tex. Code Crim. Proc. art. 11.071

§ 5). Alternatively, the state court found her affidavit to be unpersuasive. 17 Supp. CR 2783. Roberson's Hare Checklist score was just two points below the cutoff for "psychopath" when Dr. Goodness administered it, also lacking the Hare specific training and hardly "destroying" Dr. Allen's opinion. Id.; 17 Supp. CR 2731; Pet. 174. Her affidavit was found "of minimal value in this . . . proceeding and . . . not persuasive in regard [to] any of [Roberson's] claims." Id. Nor is there evidence that she could have introduced base rate data. Pet. 174-75; 17 Supp. CR 2731. Since Roberson now contends she could have testified that "murders do not commit much violence" in prison, pet. 174, defense counsel's strategic choice not to pursue such an incredible line of testimony is clear.

Another grave error: "the term psychopath is not recognized as an official personality disorder by the DSM-IV or DSM-TR as claimed by [Dr.] Allen. (Counsel is not certain about this point and has requested a copy . . . to confirm.)" Pet. 168. This manual[37] reveals several problems with Roberson's position:

> The essential feature of Antisocial Personality Disorder is a pervasive pattern of disregard for, and violation of, the rights of others . . . This pattern has also been referred to as psychopathy . . . Lack of empathy, inflated self-appraisal, and superficial charm are

---

[37] The DSM-IV-TR, which stands for "Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision," is one book, not two, and can easily be purchased online through booksellers such as Amazon, http://www.amazon.com/Diagnostic-Statistical-Disorders-DSM-IV-TR-Revision/dp/0890420254. A copy can also be found in the reference section of the public library, in the same city in which counsel for Roberson practices; simply enter "DSM IV TR" in the search box, below:
http://www.tylerlibrary.com/uhtbin/cgisirsi.exe/?ps=FMVP3B8DfA/TYLR/125610006/123 (last visited 3/20/12).

features that have been commonly included in traditional conceptions of psychopathy that may be particularly distinguishing of the disorder and more predictive of recidivism in prison or forensic settings where criminal, delinquent, or aggressive acts are likely to be non-specific.

Task Force on DSM-IV, Am. Psychiatric Ass'n, Diagnostic and Statistical Manual, 702-03 (Allen Frances, M.D. et al. eds., 4th ed. Text Revision 2000). This alone supports Dr. Allen's claim that psychopaths have an increased risk of future dangerousness compared to ordinary antisocial personalities. Pet. 168. It further supports trial counsel's choice not to go down this path, which contradicts Dr. Allen's helpful opinion that Roberson would be less violent in prison due to the absence of his preferred victim type. Richter, 131 S. Ct. at 788 ("Under §2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision.") The DSM-IV-TR also supports the State's clinical assessment approach, never once requiring that a particular diagnostic instrument to be used:

Because deceit and manipulation are central features of Antisocial Personality Disorder, it may be especially helpful to integrate information acquired from systematic clinical assessment with information collected from collateral sources.

Id. at 702.

Roberson has a number of other quibbles with how trial counsel handled the future-dangerousness evidence, Pet. 167-70, but fails to address "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Pinholster, 131 S. Ct. at 1426. At best he declares "there could not be a trial strategy for failing to challenge the experts' testimony at every step."

Pet. 161. However, in the next breath Roberson admits Dr. Allen's opinion was beneficial for his case. Id. Counsel could have felt that further impeachment attempts would only have decreased the jury's focus on Allen's concession, could have irritated them, could have diminished defense counsel's credibility, or could have overwhelmed the jury with repetition of the negative facts about Roberson. See Ladd v. Cockrell, 311 F.3d 349, 360 (5th Cir. 2002) (recognizing where evidence is double-edged in nature reasonable counsel might not have used it); Roberson fails to "demonstrate that it was necessarily unreasonable for the [state court]" to rule as it did. Pinholster, 131 S. Ct. at 1403. The burden is on Roberson to overcome any reasonable argument supporting the state court decision whether articulated by the state courts or not. Richter, 131 S.Ct at 784-85. This he has failed to do.

2.      Roberson's objections would have accomplished nothing.

Roberson has a laundry list of picayune objections he would have urged to the State's experts' testimony. Pet. 158-75 (his claim 9).[38] That portion concludes

> [I]f the Court determines that the constitutional challenges to the State's forensic psychology testimony were not preserved for appeal or were procedurally defaulted in any manner, then Roberson

---

[38]      He says trial counsel should have objected to statements that some lawyers/doctors/etc. are psychopaths (Pet. 169), that Roberson is a sex offender (id.), that Roberson is a psychopath (id.), that he will commit future acts of sexual violence (id. at 170), that Roberson is a predator who would commit future acts of violence without specifying the context of "40 years in a maximum security unit," (id.), that Roberson poses any risk in free society (id.), that Roberson would commit burglary in prison (id.), the use of the term "future dangerousness" (id. at 171), that the question was if anything "mitigates this," (id. at 173), to non-responsive answers (id. at 173-74) and to a joke that President Clinton was a psychopath (id. at 174).

argues that any procedural default should be excused on the basis of IAC.

Pet. 175. Roberson also criticizes counsel for waiving charge issues, not objecting to improper jury argument, and generally failing to preserve error. Id. at 181-83 (his claim 10).

The burden is on the habeas petitioner to overcome any reasonable argument supporting the state court decision whether articulated by the state courts or not. Richter, 131 S. Ct. at 784-85. Roberson must show that the trial judge would have committed error in overruling such an objection. See Wood v. Quarterman, 503 F.3d 408, 413 (5th Cir. 2007) ("failure to raise a meritless objection is not ineffective lawyering; it is the very opposite"). Additionally, the failure of trial counsel to urge a meritless or futile objection or motion does not "prejudice" a defendant within the meaning of Strickland because there is no reasonable probability of a different outcome to the defendant's trial but for the absence of the meritless objection or motion. See United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

The objections to the State's experts' testimony were demanded on grounds of relevance, "prejudice," incorrectness, Daubert/Rule 702, "bad form," or none at all. Pet. 169-75. The Strickland Court noted: "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional

judgment." 466 U.S. at 690. Simply alleging a failure to object without specifying legal basis for an objection is insufficient to show the trial judge should have granted the objection.

The Daubert issue was addressed above in Section III A & C. State law requires future dangerousness to be assessed in society including the free world. 17 Supp. CR 2753 (citing Mathis, 67 S.W.3d at 922). The admissibility of evidence according to state procedural rules is not cognizable in federal habeas. Jackson v. Johnson, 194 F.3d at 656; Smith v. McCotter, 786 F.2d 697, 702-703 (5th Cir. 1981). The undersigned is unaware of any clearly established federal law prohibiting the admission of evidence because a party feels it is "in bad form" or is "incorrect." The Constitution is not offended by the admission of prejudicial evidence; it is only unfair prejudice, substantially outweighing probative values, which permits the exclusion of relevant matters under Rule 403. United States v. McRae, 593 F.2d 700, 707 (5th Cir. 1979). "Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'" Dollar v. Long Mfg. N.C., Inc., 561 F.2d 613, 618 (5th Cir.1977); see also 22 Charles Alan Wright & Kenneth A. Graham, Jr., Federal Practice and Procedure § 5221 (1978).

Attorneys are not required to make futile objections. Strickland, 466 U.S. at 691; Shields, 122 F.App'x at 151;Clark, 19 F.3d at 966. Roberson fails to prove that there was no reasonable argument that could have supported the state court's denial of relief. Further, his attempt to immunize himself against procedural bars generally, by casting a blanket aspersion of ineffective assistance, is waived as inadequately briefed. See Green, 160 F.3d at 1036 n.2;

Yohey, 985 F.2d at 224-25. The state court found it procedurally barred because he failed to present facts or law sufficient to raise the issue for habeas review, and therefore, this vague sentence can hardly be said to have exhausted the ineffective assistance claim in the state court. 17 Supp. CR 2758-60.

Roberson's jury-charge argument that "[t]he Defense did not lodge certain constitutional objections to the jury charge in the sentencing phase. This may have constituted waiver or procedural default" is vague, unbriefed and waived. Pet. 182. His preservation-of-error argument is likewise inadequately briefed. Id. at 183 ("[D]efense counsel failed to preserve error to all viable constitutional issues at trial. In the event that any court holds that an otherwise legitimate constitutional claim was waived or procedurally defaulted, then it was the result of IAC.") See Green, 160 F.3d at 1036 n.2; Fed. R. App. Proc. 28(a)(4) (appellant must identify "the facts relevant to the issues presented for review, with appropriate references to the record," or to record excerpts filed in an appendix); Cavallini, 44 F.3d at 260 n. 9. Roberson completely ignores the twenty-nine individual written objections filed by trial counsel regarding the trial court's charge at punishment. 5 CR 628-34.

His improper-closing-argument claim is no better. Pet. 182. He argues the prosecutor erred in telling the jury that the State had to elect on which manner and means they would go forward, id., but does not locate such a statement in the penalty phase closing argument, nor does this address the state court finding, discussed above in Section II, that this mistake inured to his benefit. Because it was to Roberson's benefit, trial counsel probably strategically refrained from objecting, insulating this from a deficiency attack.

Nor does Roberson argue prejudice at all. Pet. 182. He contends trial counsel should have objected to the State's argument at closing regarding sexual assault allegations "outside of permissible constitutional bounds." Id. Because evidence introduced during guilt-innocence established that Nikki appeared to have suffered a sexual assault at the hands of her father, and Dr. Goodness referred to Rosetta Boyer's claim that Roberson raped her, 48 RR 50, 94-95, any objection would have been futile. Roberson does not refer to the record to support his allegations of a self-incrimination violation and of "attacks . . . over the shoulders of counsel," so the Director cannot respond, rendering these allegations waived as well. Green, 160 F.3d at 1036 n.2; Fed. R. App. Proc. 28(a)(4).

Finally, Roberson faults counsel for not objecting to the State's jury argument on the meaning of "probability." Supp. Pet. 1-2. Roberson's written objection regarding the definition of probability pertained to the jury charge, and it asked that the word be defined as a percentage, starting with ninety-five percent and ranging to "at least fifty percent," which is inconsistent with his present contention that it must be more than fifty percent. 5 CR 628-630; cf. Supp. Pet. 1-2. Roberson lacks any support for his argument. Coble, 330 S.W.3d at 267. Because there was no error in the State's discussion of probability, counsel cannot be faulted for declining to object on this grounds.

As a result, he cannot make a Pinholster/Richter showing that it was necessarily unreasonable for the state court to deny relief. Pinholster, 131 S. Ct. at 1403; Richter, 131 S. Ct at 784-85.

3. Roberson's unexhausted failure-to-investigate-mitigation claim cannot justify relief.

Roberson argues that his trial counsel's presentation of mitigating evidence was deficient. Pet. 278-81. Relief may be denied on unexhausted claims, such as this, but it cannot be granted. 28 U.S.C. § 2254 (b)(1)(A); (b)(2); Mercadel, 179 F.3d at 276-78. Roberson specifically points to a conversation with an aunt and a cousin who suggest that Roberson's family suffered from mental illness. Pet. 280. Roberson asserts that familial mental illness is something people are unlikely to fake or lie about, therefore it would have bolstered the evidence his attorneys did present about his mental illness. Id. at 281. "Moreover, no mental health expert would likely diagnose Roberson as having antisocial personality disorder in the face of real, inherited mental health issues having deep roots in his ancestry." Id. This is illogical—a family history of mental illness does not immunize Roberson from having a personality disorder.

Roberson's attorneys thoroughly investigated his background and mental state. They subpoenaed the Child Protective Services (CPS) records and met with CPS counsel. 5 CR 599. They considered a number of psychological and physical examinations of Roberson and reviewed his EEG and MRI results with medical and psychiatric experts on more than one occasion. 5 CR 597-99. Their investigator's records are consistent with counsel's account, revealing a number of interviews with family, neighbors, and others. 5 CR 607-610. Roberson does not contest that ample evidence about his background, abusive childhood, and mental deficiencies was introduced at trial. If he had a congenital mental

illness, surely the experts he retained would have discovered it and shared it with the jury.

The only support for his claims is an affidavit from a mitigation specialist which indicates that "some of the family members are thought to be bipolar, and are MHMR clients."  Id.  Roberson acknowledges these statements merely "confirm what the available evidence suggested" and presents nothing to indicate that his attorneys did not already know about his familial history.  Id.

Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue, unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value.  Ross v. Estelle, 694 F.2d 1008, 1011 (5th Cir. 1983); Green v. McGougan, 744 F.2d 1189, 1191 (5th Cir. 1984); Koch v. Puckett, 907 F.2d 524, 530 (5th Cir. 1990).  In Schlang v. Heard, the Fifth Circuit held that "[m]ere conclusory statements do not raise a constitutional issue in a habeas case."  691 F.2d 796, 799 (5th Cir. 1982).  Roberson has not shown a reasonable probability that but for trial counsel's performance, the outcome would have been different.  Ransom v. Johnson, 126 F.3d 716, 723-24 (5th Cir. 1997); cf. Wiggins, 539 U.S. at 534-35 (holding that counsel's failure to investigate and present evidence that the petitioner "suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care" was unreasonable and prejudiced the petitioner).  Ironically, Roberson rejected a life plea offer, further minimizing his prejudice argument.  41 RR 2.  Roberson has not "show[n] that his proposed mitigating evidence of ... a troubled family life raises more than a mere possibility of a different outcome, and not the required reasonable probability."

Lamb v. Johnson, 179 F.3d 352, 360 (5th Cir. 1999) (internal quotation marks omitted).

Roberson's conclusory claim of uncalled witnesses should be dismissed. Day v. Quarterman, 566 F.3d 527, 538-39 (5th Cir. 2009); Ross, 694 F.2d at 1011. Roberson has not supplied the state courts or this Court with affidavits from the uncalled aunt and cousin. "Where the only evidence of a missing witness' testimony is from the defendant, this Court views claims of ineffective assistance with great caution." Lockhart v. McCotter, 782 F.2d 1275, 1282 (5th Cir. 1986). Second, both the aunt and cousin specifically indicated they would not testify. Petitioner's Exhibit (PX) 4 at 3-4. "In order for the appellant to demonstrate the requisite Strickland prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985). Finally, "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981). Roberson's account of these witnesses and their unwillingness to be straightforward indicate it would have been a wise strategic choice not to call them at the trial. PX 4.

During the punishment phase of trial, Dr. Krusz, a neurologist, testified that Roberson was of subaverage intelligence, had abnormal brain function and brain damage that impaired his ability to inhibit impulses and exercise judgment, but that he could be managed with medication in the controlled environment of prison. 47 RR 87-105. Dr. Burleson, a prison psychologist, also

testified that Roberson would not be a danger in prison. 47 RR 137-43. Dr. Goodness, a clinical psychologist, testified that Roberson had developmental problems and a "compromised brain" leading to lessened ability to control impulses, had trouble in school, a low IQ, was probably physically abused by his father, grew up in an "abnormal" home, that he and his wife had significant substance abuse problems, that he or his wife may have abused their two children Victoria and Robert, that he spent a major portion of his adulthood in prison, that there may have been a genetic component to his mental illness and brain malfunction given his family's history of mental illness, that he suffered from a cognitive disorder and antisocial personality disorder, but that he generally adapted well to life in prison, had no pattern of violence in prison, and had not displayed aggression towards guards, male or female. 48 RR 25-37. Roberson's counsel also called two jailers who testified Roberson posed no problems or threats while awaiting trial. 47 RR 70-77.

Further, the State's case on punishment was strong. In addition to the facts of the crime, the State presented evidence of Roberson's prior arrests and prior domestic violence against his ex-wife and children; Dr. Goodness testified about allegations Roberson had raped his former sister-in-law, and Teddie Cox testified Roberson stabbed a man in the head with a boxcutter. 48 RR 94-95, 177.

Because counsel did investigate mitigating evidence, Roberson's argument does not lend itself to resolution in this context. Kitchens v. Johnson, 190 F.3d 698, 703 (5th Cir. 1999). "We must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough?

Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second guessing."  Skinner v. Quarterman, 576 F.3d 214, 220 (5th Cir. 2009) (quoting Dowthitt, 230 F.3d at 743).  The Fifth Circuit has held that  "hypothetical or theoretical testimony will not justify the issuance of a writ[.]" Martin v. McCotter, 796 F.2d 813, 819 (5th Cir. 1986).  Since Roberson has not overcome the presumption that the "challenged action 'might be considered sound trial strategy,'" Strickland, 466 at 689, he cannot satisfy his burden of proof.  Roberson's allegation of ineffectiveness should be dismissed as conclusory because he has not supplied any court with the testimonial affidavits of the uncalled witnesses; he has not proven that the uncalled witnesses would have appeared and testified favorably to his case; and trial counsel's actions in not calling these witnesses is presumed to be strategical. Roberson cannot show deficiency or prejudice and thus, is not entitled to relief on this ground.

VI.    Roberson Received Effective Assistance of Counsel on Appeal.

Roberson's appellate ineffectiveness claim reads, in its entirety, as follows:

> Roberson also alleged that defense direct appeal counsel failed to brief adequately all viable constitutional issues before the Court of Criminal Appeals.  In the event that any court holds that an otherwise legitimate constitutional claim was waived or procedurally defaulted, then it was the result of IAC.

Pet. 183 (part of his claim 10).

The state court found this to be procedurally barred because he failed to brief it, to state the facts, or to present any evidence so as to present the claim properly for review on habeas.  17 Supp. CR 2758.  He failed to allege either deficiency or prejudice, and as such his claim was found to be procedurally

barred. Id. at 2758-59 (citing Ex parte McPherson, 32 S.W.3d at 861); see Ex parte Maldonado, 688 S.W.2d at 116.

In the alternative, the state court dismissed his claim on the merits. 17 Supp. CR 2760. The state court noted that the defense brief asserted thirteen points of error, that it was a lengthy trial, and that exclusion of some possible issues was a "virtual necessity." Id. Further, Roberson "failed to plead or prove that any omitted claims would have been more likely to succeed than the claims already asserted on direct appeal, or that counsel's omission of such claims was not a reasonable exercise of appellate counsel's professional judgment." Id. In summary,

> The Court finds and concludes as a matter of law that because [Roberson] has failed to allege or prove facts which, if true, would support his various hypothetical claims of ineffective assistance, because he has failed to present any evidence to the Court demonstrating . . . appellate counsels' reasons for counsels' actions, and because he has failed to allege or prove how he was harmed by any unspecified deficiency in counsel's performance, his . . . ground for relief is wholly without merit.

Id.

With an IAC-on-appeal claim, a petitioner must satisfy the two-pronged test enunciated in Strickland. Smith v. Robbins, 528 U.S. 259, 285 (2000). To prove prejudice, Roberson must show that but for counsel's deficient performance "he would have prevailed on appeal." Id. The Fifth Circuit has held that appellate counsel's failure to raise certain issues on appeal does not deprive an appellant of effective assistance of counsel where the petitioner did not show the existence of any trial errors with even arguable merit. Hooks v.

Roberts, 480 F.2d 1196, 1198 (5th Cir. 1973). An appellate attorney need not, and should not, raise every nonfrivolous claim, but rather should "winnow out weaker arguments" to maximize the likelihood of success on appeal. Jones v. Barnes, 463 U.S. 745, 751-52 (1983).

Because Roberson refers to no specific claim that should have been pressed, cannot show that his case would have been overturned on appeal absent counsel's error, and recites no facts or clearly established federal law that the state court failed to observe, he does not prove he is entitled to relief. Richter, 131 S. Ct. at 788. To prevail, Roberson "must demonstrate that it was necessarily unreasonable for the [state court]" to rule as it did. Pinholster, 131 S. Ct. at 1403. The burden is on Roberson to overcome any reasonable argument supporting the state court decision whether articulated by the state courts or not. Richter, 131 S. Ct. at 784-85. This he has failed to do.

VII.  Roberson's Apprendi/Ring Challenge to the Punishment-Phase Special Issues is Meritless and Teague-barred. Further, Due Process Does Not Require the State to Disprove Mitigation Beyond a Reasonable Doubt.

Roberson argues that future dangerousness must be proven, and that mitigation must be disproven, beyond a reasonable doubt. Pet. 187 (his claim 12), 193 (his claim 13), and 274 (his claim 35) (citing the Fifth, Sixth, Eighth, and Fourteenth Amendments, Ring v. Arizona, Apprendi v. New Jersey, and In re Winship.) He also maintains that the jury charge is "vague and nebulous." Pet. 189. Roberson insists that "his jury was impermissibly instructed that there was no burden of proof assigned to the mitigation special issue," placing the burden of proof on him instead, and that the indictment did not give him

notice of the facts the State intended to use to establish his eligibility for death. Id. at 193, 197 (citing Tex. Code Crim. Proc. Ann. art. 21.03 (Vernon 1989)).

Finally, Roberson objects that evidence in the State's penalty phase case was not "passed through our usual crucible of adversarial testing" because there was no burden of proof regarding extraneous offenses, and the trial court failed to assign anyone the burden of proof on the ultimate inquiry in the mitigation question. Pet. 276. But the instructions given Roberson's jury reveal Roberson's allegations are simply untrue:

> The relevant parts of the jury charge on punishment in this case read as follows:
> The burden of proof for Special Issue No. 1 rests upon the State, and it must prove the issue beyond a reasonable doubt.
> * * *
> The burden of proof in this phase of the trial rests upon the State and never shifts to the Defendant. The law does not require a Defendant to prove that the answer to Special Issue No. 1 should be answered "No" nor that the answer to Special issue No. 2 should be "Yes", nor does it require the Defendant to produce any evidence at all.
> * * *
> Special Issue No. 1
> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, ROBERT LESLIE ROBERSON III would commit criminal acts of violence that would constitute a continuing threat to society?

Roberson v. State, 2002 WL 34217382 at *8; 5 CR 636-41; 17 Supp. CR 2767, (citing 5 CR 636).

A.    Procedural bars

Regarding the future dangerousness claim, the state court found Roberson failed to state a claim upon which relief could be granted and was thus

procedurally barred. 17 Supp. CR 2763; Ex parte Maldonado, 688 S.W.2d at 116; Rayford v. State, 125 S.W.3d 521, 533 (Tex. Crim. App. 2003). Roberson also failed to contemporaneously object. 17 Supp. CR 2763, 2765; see Ladd, 3 S.W.3d at 566, Wright, 28 S.W.3d at 536. His written objections did not raise these specific contentions. 5 CR 628-34.

The state court further found the mitigation claim to be procedurally barred because he did not raise it on direct appeal. 17 Supp. CR 2765. And it found the claim that punishment issues are required to be alleged in the indictment to be procedurally barred because he did not contemporaneously object nor did he raise this on direct appeal. 17 Supp. CR 2768.

Roberson's claim thirty-five, that admission of extraneous bad acts absent proof beyond a reasonable doubt violates his due process rights, was never presented to the state court and is unexhausted. As a result, it is procedurally barred. Relief may be denied on unexhausted claims, such as this, but it cannot be granted. 28 U.S.C. § 2254 (b)(1)(A); (b)(2); Mercadel, 179 F.3d at 276-78.

B.    State court findings

On direct appeal, Roberson complained that the future dangerousness special issue should require proof beyond a reasonable doubt, and rested his claim on the affidavit of a juror.[39]  Roberson v. State, No. 74,671, Appellant's

---

[39]    The post-verdict inquiry of jury members, as live witnesses or by affidavit, is inappropriate and precluded by Federal Rules of Evidence 606(b). Parr v. Quarterman, 472 F.3d 245, 258 (5th Cir. 2006); Byrne v. Butler, 845 F.2d 501, 509-10 n. 8 (5th Cir. 1988); it is likewise precluded under the Texas Rules of Criminal Evidence 606(b). Garrett v. State, 946 S.W.2d 338, 340-41 (Tex. Crim. App. 1997)(PDR dism'd) (Overstreet, Judge, dissenting on appellant's pet. for disc. rev.)

Brief 50-51; 5 CR 709. He did not refer to any clearly established federal law aside from the Sixth and Fourteenth Amendments. App. Brief 50-51. The CCA found no error in the instructions. Roberson v. State, 2002 WL 34217382 at *8.

> Contrary to the appellant's suggested objections, the inclusion of the word "probability" in the wording of Special Issue No. 1 does not unconstitutionally conflict with the words "beyond a reasonable doubt" in the same sentence. Nor is it relevant whether the jury considered society to mean "prison society" or "society at large." Finding no error in the jury instructions, we need not conduct any harm analysis.

Id. (citing Rayford, 125 S.W.3d at 534; Collier v. State, 959 S.W.2d 621, 623 (Tex. Crim. App. 1997)(quoting Morris v. State, 940 S.W.2d 610, 613 (Tex. Crim. App. 1996))); see also Resendiz v. State, 112 S.W.3d 541, 550 (Tex. Crim. App. 2003) and Robison v. State, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994).

Roberson presented the same claims, word for word, in his state habeas petition. 1 Supp. CR 221-29, cf. Pet. 187-98. In the alternative, the state court found that the jury was instructed according to the law which provides that future dangerousness must be decided by the jury beyond a reasonable doubt. 17 Supp. CR 2764. Further, it found that his argument regarding any conflict between probability and beyond a reasonable doubt was "nothing more than a claim that the wording of the first special issue is unconstitutionally vague, a claim which has been repeated decided adversely to [Roberson.]" Id. (citing Jurek, 428 U.S. 262; Rayford, 125 S.W.3d at 532-35; Blue v. State, 125 S.W.3d 491, 499-505 (Tex. Crim. App. 2003)).

The state court further found that he failed to prove he was entitled to relief for any due process or Eighth Amendment violations. 17 Supp. CR 2765.

This is because Apprendi "is inapplicable to the mitigation issue both logically and due to the specific exclusion stated in the Apprendi opinion." Id. It continued, "[B]y its language, Apprendi applies to separate statutes which seek to increase the maximum punishment. . . . The Court concludes as a matter of law that the mitigation issue . . . exists to allow a decrease in the maximum punishment, not an increase[.]" Id. at 2765-66. "[U]nlike in Jones and Apprendi, the judge in a Texas capital case has no discretion regarding the punishment range[.]" Id. at 2766. The state court rejected Roberson's position, noting "[Roberson] has failed to direct this Court to any reasons why Apprendi should be extended to apply to such logically dissimilar circumstances." Id. The state court reasoned that mitigation is not an element of the offense which the jury must find beyond a reasonable doubt, because mitigation is not a negative fact which must be found before death can be imposed. Id. It is a defensive issue which inures to the offender's benefit. Id. at 2767. Further, Ring and Apprendi both specifically provide that they do not apply to mitigation issues which reduce, rather than enhance, the maximum punishment. Id. at 2767 (citing Apprendi, 530 U.S. at 490 n. 16, and Ring, 536 U.S. at 597 n.4).

The state court called attention to an instruction it gave Roberson's jury to which he was not entitled, which read in part that

> the burden of proof in this phase of the trial still rests upon the State and never shifts to the Defendant. The law does not require a Defendant to prove that the answer to Special Issue No. 1 should be answered 'no' nor that the answer to Special Issue No. 2 should be 'yes,' nor does it require the Defendant to produce any evidence at all.

17 Supp. CR 2767 (citing 5 CR 636 (emphasis in original)). The state court had already instructed the jury in accordance with article 37.071 that "the burden of proof for special Issue No. 1 rests upon the State, and it must prove the issue beyond a reasonable doubt." 5 CR 636. The state court concluded that Roberson failed to allege or argue any facts which, if true, would entitle him to relief. 17 Supp. CR 2768. Finally, the state court found that Apprendi did not compel the State to allege special issue factual matters in the indictment. Id. at 2769 (citing Rayford, 125 S.W.3d at 533). It concluded that Roberson's claims were without factual or legal merit. 17 Supp. CR 2769.

C.    This claim is meritless.

On the record in this case, Roberson's jury was correctly instructed that the burden of proof on the future dangerousness special issue "rests upon the State, and it must prove the affirmative of such issue beyond a reasonable doubt." 5 CR 636. The jury was further instructed that the State bore the burden of proving the answers to both special issue questions, emphasizing that Roberson had no obligation to produce any evidence. Id. at 638. Any alleged uncertainty concerning the burden of proof was cured by the jury charge, especially since "[j]uries are presumed to follow their instructions." Richardson v. Marsh, 481 U.S. 200, 211 (1987). Accordingly, Roberson cannot show fundamental error or that the state-court adjudication was incorrect and objectively unreasonable.

1.    The future dangerousness issue.

Roberson maintains that the term "probability" in the future-dangerousness special issue renders the beyond-a-reasonable-doubt standard of proof meaningless, in violation of Apprendi and Ring. Pet. 187.

Texas Code of Criminal Procedure Article 37.071 Section 1 provides that if a defendant is found guilty of capital murder in a case in which the State does not seek the death penalty, the punishment is life imprisonment. Section 2 provides that if a defendant is tried for a capital offense in which the State seeks the death penalty, then a separate sentencing proceeding is held "to determine whether the defendant shall be sentenced to death or life imprisonment." Thus, when the State is seeking the death penalty, the prescribed statutory maximum is death. It is not an "enhancement" of the prescribed maximum sentence of life; it is an alternative available sentence. Rayford, 125 S.W.3d at 533. Apprendi applies to facts that increase the penalty beyond the "prescribed statutory maximum." Under Article 37.071, the statutory maximum is fixed at death. A positive jury finding on the mitigation issue does not have the potential of increasing the penalty; rather, it has the potential to reduce a defendant's sentence. Resendiz, 112 S.W.3d at 550.

Nor can Roberson rely on Ring, because Ring focused exclusively on certain judicial findings regarding aggravating factors. 536 U.S. at 597 n. 4. Unlike the sentencing schemes challenged in Ring and Apprendi, the Texas mitigation special issue does not operate as "the functional equivalent of an element of a greater offense." Apprendi, 530 U.S. at 494 n. 19. Moreover, the trial judge has no fact-finding role in a capital murder case under Texas law. Tex. Crim. Proc. Code art. 37.071 § 2(e).

109

No statutory definition exists for the term "probability." This does not unconstitutionally lower his burden of proof. See Penry II, 532 U.S. at 803 (suggesting the constitutionality of the current capital sentencing scheme). Further, Roberson's argument is Teague-barred. Rowell v. Dretke, 398 F.3d 370, 377-79 (5th Cir. 2005), citing 28 U.S.C. § 2253(c)(2), Slack v. McDaniel, 529 U.S. 473, 478 (2000).

      2.     The mitigation issue.

Roberson contends that Ring and Apprendi dictate that the mitigation special issue must be disproven to the jury beyond a reasonable doubt, and that the facts to be relied on must be set out in the indictment. Pet. 193-95. Roberson's claim has been rejected by the federal courts.[40] Blue v. Thaler, 665 F.3d 647, 668 (5th Cir. 2011); Druery, 647 F.3d at 546; Rowell v. Dretke, 398 F.3d 370, 378 (5th Cir. 2005).

Under Texas law, the mitigation special issue is not an element of the offense of capital murder nor is it an aggravating circumstance as defined by Tuilaepa v. California. 512 U.S. 967, 972 (1994). Rather, it is the vehicle through which the jury is given the opportunity to make an individualized determination of the offender's moral culpability, as required by the Supreme Court. Penry II, 532 U.S. at 797; Eddings v. Oklahoma, 455 U.S. 104, 111-12 (1982); Woodson v. North Carolina, 428 U.S. 280, 303-04 (1976). In making the decision, the jury is instructed to consider all the evidence, including the

---

[40]    In fact, counsel raised this same claim in Simpson v. Quarterman. 2007 WL 1008193 (E.D. Tex. 2007)(unpublished). There, as here, the claim was meritless. Id. at *19, citing Rowell, 398 F.3d at 377-79.

circumstances of the offense, the defendant's character and background, and the defendant's general moral culpability. 5 CR 637; Tex. Code Crim. Proc. art. 37.071 § 2 (e) & (f). The mitigation issue confers upon the jury a broad ability to show leniency and reduce the defendant's sentence to life imprisonment; it is untenable that this special issue is functionally equivalent to an aggravating factor.

Texas's mitigation special issue needs not be assigned a burden of proof. Blue, 665 F.3d at 668; Druery, 647 F.3d at 546; Rowell, 398 F.3d at 378. Texas impliedly places the burden on the defendant. Lawton v. State, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995); Eldridge v. State, 940 S.W.2d 646, 652 & n.9 (Tex. Crim. App. 1996). Texas's death-penalty statute "does not violate Apprendi or Ring by failing to require the State to prove beyond a reasonable doubt the absence of mitigating circumstances." Ortiz v. Quarterman, 504 F.3d 492, 505 (5th Cir. 2007) (citing Scheanette, 482 F.3d at 828, and Granados v. Quarterman, 455 F.3d 536 (5th Cir. 2006)). The state court's denial of this claim is not objectively unreasonable. Avila v. Quarterman, 560 F.3d 299, 314-15 (5th Cir. 2009). Roberson's interpretation would present the absurd circumstance of requiring prosecutors to prove a negative beyond a reasonable doubt. It is impossible under the Texas capital sentencing system—which leaves it to individual jurors to decide what evidence is mitigating and whether that evidence suggests that mercy be imposed—to prove the absence of mitigating evidence beyond a reasonable doubt.

Recall the portion of Walton left untouched by Ring, stating that the Eighth Amendment did not bar a state from imposing a burden of proof on the

defendant to "establish, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency." Walton v. Arizona, 497 U.S. 639, 649-51 (1990). The Supreme Court noted that nothing in its Eighth Amendment jurisprudence precluded the state from "specifying how mitigating circumstances are to be proved." Id. at 649. Id.

Neither Apprendi nor Ring held that aggravating factors in a state capital case must appear in the indictment. Apprendi, 530 U.S. at 477 n. 3; Ring, 536 U.S. at 597 n. 4; see also United States v. Bourgeois, 423 F.3d 501, 507 (5th Cir. 2005) (noting that the Supreme Court has yet to hold that aggravating factors must be charged in the indictment). Accordingly, the state court's alternative ruling on the merits was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the U.S.. See Simpson, 2007 WL 1008193 at *20; Martinez v. Dretke, 2005 WL 1383350 (N.D. Tex. 2005) (unpublished)(finding that the state court's decision that the indictment was not fundamentally defective for failing to allege future dangerousness was not contrary to, nor did it involve an unreasonable application of, clearly established federal law).

3.    Extraneous bad acts do not have to be proven by the State beyond a reasonable doubt.

Roberson contends that the admission during punishment of the unadjudicated crimes he committed violated his due process rights because "this reviewing court cannot say [they] have actually been found to be true by the jury by any standard of proof, let alone beyond a reasonable doubt" and that the omission of a burden of proof and persuasion is structural error. Pet. 275 (his

claim 35) (citing Graham v. Collins, 506 U.S. 461 (1993), Gardner v. Florida, 430 U.S. 349 (1977), and Sullivan v. Louisiana, 508 U.S. 275 (1993)). Roberson's jury received the following instructions at sentencing:

> The burden of proof in this phase of the trial still rests upon the State and never shifts to the Defendant. The law does not require Defendant to prove that the answer to Special Issue No. 1 should be answered No, nor that the answer to Special Issue No. 2 should be Yes, nor does it require the Defendant to produce any evidence at all.

> You are further instructed that if there is any testimony before you in this case regarding the defendant having committed offenses other than the offense alleged against him in the indictment, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses if any were committed and only [then] may you consider the same in determining the answers to the special issues.

5 CR 638.

Roberson insists that his death sentence should be set aside for uncertainly over whether the jury believed the State's presentation beyond a reasonable doubt. Pet. 275. Any alleged uncertainty concerning the burden of proof was cured by the jury charge, especially since "[j]uries are presumed to follow their instructions." Richardson, 481 U.S. at 211. On the record in this case, Roberson's jury was instructed that the burden of proof on the future dangerousness special issue rests upon the State, to be proven beyond a reasonable doubt. Recall that Roberson received the added bonus of a mitigation instruction putting the burden on the State as well, as discussed above in Section VII-B. Roberson's speculation and conjecture do not warrant relief. Kinnamon v. Scott, 40 F.3d 731, 734-35 (5th Cir. 1994) (finding "speculation" to

be no basis for habeas relief).  Accordingly, Roberson cannot show fundamental error or that the state-court adjudication was incorrect and objectively unreasonable.

Although Texas law requires that unadjudicated offenses be proven beyond a reasonable doubt in non-capital cases before the jury can consider the evidence, this fact does not give credence to Roberson's argument that the State should be assigned a similar burden in capital cases in order to disprove the defense's case for mitigation. The evidence in capital cases is controlled by Article 37.071 of the Texas Code of Criminal Procedure, which "contains no such restriction on the introduction of extraneous offense evidence." Jackson v. State, 992 S.W.2d 469, 477 (Tex. Crim. App. 1999) (quoting Tex. Code Crim. Proc. art. 37.03, § 3, Tex. Code Crim. Proc. art. 37.071).  And while due process requires the State to prove the elements of an offense charged beyond a reasonable doubt, In re Winship, 397 U.S. at 364, neither the Fifth Circuit nor the Supreme Court has stated that a similar burden exists regarding the admission of evidence of unadjudicated offenses in capital cases. Harris v. Johnson, 81 F.3d 535, 541 (5th Cir. 1996).

Because Roberson seeks to extend Ring beyond its current holding and because there is no clearly established Supreme Court precedent the relief Roberson seeks, his claims are barred by Teague.  Summerlin, 542 U.S. at 357-58. This Court should deny habeas corpus relief on Roberson's defaulted, meritless, and Teague-barred claims.

VIII.  Evidence of Roberson's Future Dangerousness Was Legally Sufficient.

Roberson maintains that his Eighth and Fourteenth Amendment rights were violated because even in the light most favorable to the verdict, there was insufficient evidence of his future dangerousness to support the jury's conclusion. Pet. 201-02. His heading argues both legal and factual insufficiency, but his briefing exclusively cites the authority and standards for legal insufficiency. Id. at 201. Factual sufficiency attacks on the punishment issues are not cognizable on federal habeas corpus review. Estelle v. McGuire, 502 U.S. at 67.

A.    State court findings

Roberson first raised this issue on direct appeal and contended the evidence was insufficient because: (1) he did not have a history of violence in jail, (2) prison would control his impulses well, (3) even the State's experts agreed his risk of violence in prison was low to moderate, and (4) the State overemphasized the nature and importance of the scuffle between Roberson and his neighbor. Roberson v. State, No. 74,671, Appellant's Brief 52-57. The Court of Criminal Appeals described at length the evidence presented during the penalty phase. Roberson v. State, 2002 WL 34217382 at *9-10. It then dismissed this claim, concluding:

> We note that the crime itself—killing a two-year-old child by beating or shaking her—was particularly violent. We also note that [Roberson] had a lengthy criminal record, even in the absence of a violent-crime conviction. Both sides presented expert testimony as to [Roberson]'s future dangerousness, but we do not find [Roberson]'s expert testimony to be significantly more compelling than that which was presented by the State. In short, viewed in the light most favorable to the verdict, we find a rational jury could have answered "yes" to Special Issue No. 1, the issue of future

115

dangerousness. The evidence was therefore sufficient to support the jury's answer beyond a reasonable doubt.

Id. at *11.

Roberson next petitioned for postconviction relief in the state court, but declined to explain why or how the evidence was inadequate, beyond noting that even Dr. Allen said Roberson's risk of violence while in prison was low. 1 Supp. CR 229-30. The state court held "that the facts of the instant case . . . are sufficient alone to justify an affirmative answer. The Court finds that the instant offense was pointless, vicious, and sadistic. . . [Roberson] demonstrated a lack of remorse or real concern." 17 Supp. CR 2770-71 (citing Mathis, 67 S.W.3d. at 922). Further, the state court denied relief because

> the punishment evidence presented by both the State and the defense proved that [Roberson] is an anti-social personality with a history of criminal behavior and demonstrated inability to conform to probation and parole conditions. . . [Roberson] has an inability to control his impulses [and] the instant offense was consistent with prior aggressive behavior towards the helpless victim. . . he would be at high risk to commit future violence in the free world, and that he lacks control over his rage reactions.

Id. at 2771.

B.     Merits

The legal authority to conduct factual sufficiency reviews derives from the Texas Constitution and statutory authority, not from any federal constitutional right. White v. State, 922 S.W.2d 126, 129-30 (Tex. Crim. App. 1996). Thus, the Texas courts' more exacting factual sufficiency standard does not implicate federal constitutional concerns. Woods v. Cockrell, 307 F.3d 353, 358 (5th Cir. 2002). Neither the Supreme Court nor the Fifth Circuit have recognized factual

116

insufficiency as a valid basis for federal habeas relief. Brown v. Thaler, 2012 WL 677179 at *18 (N.D. Tex. 2012). Accordingly, any factual sufficiency claim fails because Roberson has not shown a deprivation of any federal constitutional right.

In Jackson v. Virginia, the Supreme Court enunciated the standard of review when a state prisoner challenges the legal sufficiency of the evidence in a federal habeas corpus proceeding. The issue is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 320. In applying this standard, "all of the evidence is to be considered in the light most favorable to the prosecution." Id. "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. Finally, "in challenges to state convictions under 28 U.S.C. § 2254, only Jackson v. Virginia need be satisfied, even if state law would impose a more demanding standard of proof." West v. Johnson, 92 F.3d 1385, 1394 (5th Cir. 1996).

While Roberson implies that there were conflicts in the evidence which could have been resolved in his favor, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not appear affirmatively in the record—that the trier of fact resolved any such conflicts in favor of the prosecution," and the federal habeas court "must defer to that resolution." Jackson, 443 U.S. at 326; Brown, 2012 WL 677179 at *18; McCoy v. Dretke, 2005 WL 1148694 (N.D. Tex. 2005)

117

at *14-15.  The evidence need not exclude every reasonable hypothesis of "non-future dangerousness" or be wholly inconsistent with every conclusion except that of the verdict, and the jury is free to choose among reasonable constructions of the evidence. United States v. Bermea, 30 F.3d 1539, 1551 (5th Cir. 1994). Because Roberson failed to show that the state court unreasonably determined the facts or unreasonably applied clearly established federal law in denying this claim, he cannot prove that he deserves relief.

IX.    Evidence Supporting The Verdict Was Legally Sufficient.  His Sentence is Not Disproportionate and He is Not Actually Innocent.

Roberson maintains that the evidence of his guilt was legally and factually insufficient in violation of his Eighth and Fourteenth Amendment rights.  Pet. 205 (his claim 15).  Then he complains that the state appellate denial of the legal and factual sufficiency challenges to the guilty verdict was an unreasonable application of Jackson v. Virginia. Pet. 254 (his claim 31).  But his argument before this Court focuses on disproportionality of his sentence under the Atkins/Simmons/Kennedy/Graham line of cases.[41]  Pet. 205-13.  "This is a shaking [sic] baby case," he continually insists, because "Roberson at worst lost control and shook and struck his child."  Pet. 206.  Roberson is "a dysfunctional mental cripple. . . nothing more than a drug user who lost control when his child began crying." Pet. iv, 206.  Because Roberson is "not the worst of the worst," he claims his death sentence is unconstitutional under the Eighth and Fourteenth

---

[41]     Atkins v. Virginia, 536 U.S. 304 (2002); Roper v. Simmons, 543 U.S. 551 (2005); Kennedy v. Louisiana, 554 U.S. 407 (2008); Graham v. Florida, 130 S. Ct. 2011 (2010).

Amendments. Id. "The death penalty is disproportionate for a shaking [sic] baby case." Id. He also claims he is actually innocent because no one witnessed the beating. Pet. 253 (his claim 31). But his claim challenging the factual sufficiency of the evidence is not cognizable on federal habeas review. Estelle v. McGuire, 502 U.S. at 67-68; Ramirez v. Dretke, 398 F.3d 691, 694 (5th Cir. 2005); Pemberton v. Collins, 991 F.2d 1218, 1223 (5th Cir. 1993); Smith, 786 F.2d at 700; Clewis v. State, 922 S.W.2d 126, 131-34 (Tex. Crim. App. 1996). Nor is a claim of actual innocence. Herrera v. Collins, 506 U.S. 390, 400 (1993); Townsend v. Sain, 372 U.S. 293, 317 (1963); Moore v. Dempsey, 261 U.S. 86, 87-88 (1923).

A.    Procedural bars

The state habeas court found his legal and factual sufficiency challenge to be procedurally barred as uncognizable. 17 Supp. CR 2771. See Ex parte McLain, 869 S.W.2d 349, 349-50 (Tex. Crim. App. 1994) ("[H]abeas corpus is available only to review jurisdictional defects, or denials of fundamental or constitutional rights. Among those claims which are not cognizable by way of post conviction collateral attack is a challenge to the sufficiency of the evidence."); Coleman v. Quarterman, 456 F.3d 537, 546 (5th Cir. 2006); Renz v. Scott, 28 F.3d 431, 432 (5th Cir. 1994); Ex parte McWilliams, 634 S.W.2d 815 (Tex. Crim. App. 1982); Ex parte Ash, 514 S.W.2d 762 (Tex. Crim. App. 1974).

The actual-innocence and disproportionality claims are new and unexhausted. On direct appeal, Roberson contended that the evidence at trial was legally insufficient to prove mens rea, because such evidence was just as consistent with a finding that the appellant committed a lesser-included offense.

119

Roberson v. State, No. 74,671, Appellant's Brief 37. He added that it was factually insufficient because of the non-specific intent evidence. Id. at 40-41. He never made a disproportionality argument nor did he frame it as an "actual innocence" claim. Id. at 37-41. Nor did these arguments appear in his state writ, where argument on this claim totaled six sentences summarily "incorporat[ing] all arguments above and the attachments to this application." 1 Supp. CR 231. However, the arguments to which he referred only addressed his Jackson claim regarding future dangerousness, which had nothing to do with mens rea. Id. at 229-31. Relief may be denied on unexhausted claims, such as this, but it cannot be granted. 28 U.S.C. § 2254 (b)(1)(A); (b)(2); Mercadel, 179 F.3d at 276-78. His arguments on cause and prejudice were addressed above in Procedural Default Section I-B.

    B.    State court findings

On direct appeal, Roberson contended the evidence at trial was legally insufficient to prove the mens rea for murder, instead of a lesser-included offense. Roberson v. State, No. 74,671, Appellant's Brief 37. The CCA applied the Jackson v. Virginia standard. Roberson v. State, 2002 WL 34217382 at *1. After a detailed recitation of the evidence at guilt-innocence, the CCA opined:

> [W]e find Dr. Squires's testimony as quoted here unremarkable, in the sense that, rather than negating [Roberson]'s intent, she appeared to be merely refraining from testifying to an ultimate issue of the case—[Roberson]'s guilt. As a doctor, it is entirely prudent for her to only testify as to what she could conclude medically from her examination of Nikki.
>
> Moreover, proof of a culpable mental state almost necessarily relies on circumstantial evidence. Therefore, it is entirely appropriate for

120

a fact finder to infer intent, regardless of whether any witness can or cannot testify to direct knowledge of someone's intent . . . Therefore, regardless of Dr. Squires's opinion of [Roberson]'s intent, the jury could have reasonably inferred [Roberson]'s intent from the severity of Nikki's injuries as well as from the testimony of three other doctors who examined her and concluded that such injuries must have resulted from intentional blows to her head rather than from an accidental fall off the bed, as [Roberson] claimed. It was undisputed that [Roberson] was alone with Nikki when she suffered the injuries. The jury also heard testimony that [Roberson] had a bad temper and that he would be set off by Nikki's crying, which she seemed to always do in his presence. When viewed in a light most favorable to the verdict, the evidence would allow a rational jury to find beyond a reasonable doubt that [Roberson] intentionally or knowingly caused Nikki's death.

Roberson v. State, 2002 WL 34217382 at *4-5. Even addressing his factual sufficiency challenge, with its more favorable, easier-to-meet legal standard, the CCA held:

Viewing it in a neutral light, we do not find that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or that the proof of guilt is greatly outweighed by contrary proof. In his defense case-in-chief, [Roberson] called one witness, Ms. Conklin, in an attempt to impeach the credibility of Teddie Cox and counter her testimony as to [Roberson]'s relationship with Nikki. The defense cross-examined all of the State's testifying medical experts, but did not generally contest that [Roberson] was responsible for Nikki's injuries. Rather, [Roberson]'s theory at trial—and the basis for his factual-sufficiency claim on appeal—was that the evidence did not prove that he had the necessary intent to have committed capital murder. Viewing the evidence neutrally, we find it factually sufficient to support a finding that he did have such intent, and that such a finding is not against the great weight and preponderance of the adverse evidence presented.

Id. at *5. During postconviction proceedings, the state court further found:

[Roberson] was admittedly the only adult in the house with Nikki on the night she was fatally injured . . . every medical expert testified that her injuries would have altered her consciousness immediately, . . . she would have shown drastic and obvious signs of distress, and . . . she would have been unable to talk and struggling for breath. . . [T]he medical examiner and other doctors testified that Nikki's injuries would not have resulted from a blow or two, but resulted from an extreme and violent attack with a mixture of violent shaking and impacts between Nikki's head and some other object or objects. The experts testified that no minimally competent adult could inflict those injuries without knowing that they would cause extreme injury, and that the actions of the person inflicting the injury were "non-accidental" and intentionally abusive. The Court finds all of this testimony credible and worthy of belief.

17 Supp. CR 2772.

C.    Roberson's claims are unpersuasive.

Roberson presents a hodge-podge of unexhausted arguments to augment his previously rejected mens rea challenge. He insultingly likens Roberson's callous, brutal abuse to the impaired reasoning and impulse control of a person with retardation. Pet. 206-07. He alleges that Roberson savagely attacked his daughter because he "exhibited precisely the juvenile qualities of impulsiveness and inability to foresee consequences" the Graham Court discussed in forbidding life without parole for juveniles who do not take lives. Id. at 207. Because juveniles act impetuously, and Roberson acted impetuously, he should be spared the consequences of his crime, because Roper does so for juveniles. Id. at 208. And because the Kennedy Court refused to authorize capital punishment for those who rape children because no deaths were intended, Roberson believes he should benefit as well, since he claims he did not intend Nikki's death. Id. at 209. In summary,

> retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished . . . by an impulsive action without any contemplated malice or deliberateness. . . There is no penalogical [sic] justification for executing an impulsive parent.

Id. at 209-10. However, Roberson was not sentenced to death for being a drug user, a "mental cripple," an impulsive parent, or for having poor coping skills. Nor was he sentenced to death for merely shaking his daughter. The jury concluded he intentionally or knowingly murdered her, and answered the special issue questions based on the evidence.

To the extent Roberson argues there was factually insufficient evidence of his mens rea, such a claim is not cognizable on federal habeas corpus review. Estelle v. McGuire, 502 U.S. at 67; White, 922 S.W.2d at 129-30; Woods, 307 F.3d at 358; Brown, 2012 WL 677179 at *18.

In assessing legal sufficiency, Roberson implies that there were conflicts in the evidence about his mens rea which could have been resolved in his favor, but the trier of fact resolved them in favor of the prosecution and this Court "must defer to that resolution." Jackson, 443 U.S. at 326; Brown, 2012 WL 677179 at *18; McCoy, 2005 WL 1148694 at *14-15. The evidence need not exclude every reasonable hypothesis of a reckless act, or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence. Bermea, 30 F.3d at 1551. Because Roberson failed to show that the state court unreasonably determined the facts or unreasonably applied clearly established federal law in denying this claim, he cannot prove that he deserves relief.

To the extent Roberson advocates for a new class of offenders or offenses to whom the death penalty cannot apply, such a decision would be barred by Teague. The state court did not feel compelled by existing precedent to conclude that the rule Roberson seeks was required by the Constitution. Goeke, 514 U.S. at 118. In fact, in his direct appeal brief Roberson conceded that clearly established federal law contradicts his proportionality argument.[42] Nor can Roberson demonstrate that a Teague exception applies; his rule neither places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," Teague, 489 U.S. at 307, nor does it requires the observance of "those procedures that ... are implicit in the concept of ordered liberty." Id. Thus, to the extent Roberson advances a new interpretation of the Eighth and Fourteenth Amendments, the non-retroactivity doctrine of Teague bars relief.

Roberson is not mentally retarded, a juvenile, or insane. He presents no new evidence indicating actual innocence. The jury was able to consider all Roberson's versions—that Nikki fell and hit her head, that he just snapped, that he lacked parenting skills and was uncontrollably enraged by his sick baby's crying, that he could not recall what happened—and they determined that he intentionally or knowingly caused her death. Roberson can continue to assert

---

[42]     Roberson v. State, No. 74,671, Appellant's Brief 45-46 ("Stated differently, the Supreme Court equated an intent to kill with reckless disregard for human life, and combined with major participation, is sufficient to subject a person to capital punishment." (citing Schad, 501 U.S. 624)).

that he did not intentionally shake and strike his daughter until her head was a mushy pulp, but the evidence indicates that he did.

> D. The direct appeal court reasonably applied clearly established federal law.

Roberson contests the decision of the state appeals court on his legal sufficiency challenge to the guilty verdict. Pet. 253-55 (his claim 31). He argues that the state court failed to properly apply the legal sufficiency standard of review because there was no rational trier of fact in his trial. Id. at 254. The state court should have instead "ask[ed] only if a rational trier of fact could have found the elements of the offense to be proven beyond a reasonable doubt." Id. Because "the prosecutor and the Texas courts did all they could to make sure the jurors were not rational triers of fact[, o]ur usual presumption in favor of jury verdicts . . . cannot apply here" without violating the Fifth, Sixth, Eighth, and Fourteenth Amendments. Id. The state court should have applied the presumption of innocence to the circumstantial evidence and held that his mental state was reckless, not knowing. Id. at 255. The decision was an unreasonable application of In re Winship and amounts to clear error. Id.

The state court properly applied clearly established federal law in assessing the legal sufficiency of the evidence, that is: examining the evidence in the light most favorable to the prosecution, to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt Roberson v. State, 2002 WL 34217382 at *1 (citing Jackson, 443 U.S. at 319). This is the correct burden of proof described in Winship. 397 U.S. at 362. The state court correctly asked whether "any" rational jury could

have found him guilty. Roberson v. State, 2002 WL 34217382 at *1. Roberson fails to support his vague "irrational trier of fact" argument with legal authority. Pet. 254. His allegation of malfeasance by the prosecutor was addressed above in Claim I. The presumption of innocence is precluded by a legal sufficiency challenge which explicitly views the evidence in the light most favorable to the verdict. Id. at 255; Jackson, 443 U.S. at 319.

Roberson contends that "[t]he most reasonable inference from the record is that Roberson simply does not know how or why Nikki died." Pet. 253. This Court must presume that the trier of fact resolved any conflicts in the record in favor of the prosecution, and the federal habeas court must defer to that resolution. Roberson v. State, 2002 WL 34217382 at *4-5; Jackson, 443 U.S. at 326; Brown, 2012 WL 677179 at *18; McCoy, 2005 WL 1148694 at *14-15. The evidence need not be wholly inconsistent with innocence, and the jury is free to choose among reasonable constructions of the evidence. Bermea, 30 F.3d at 1551. Roberson has failed to prove he is entitled to relief.

X.      The Callins v. Collins [43] Dissent Is Not Clearly Established Federal Law.

Next he argues that the Texas death-penalty scheme is unconstitutional because it is impossible to simultaneously restrict the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence mitigating against its imposition. Pet. 213-15. Justice Blackmun's dissent in Callins v. Collins forms Roberson's argument. Id.

---

[43]      510 U.S. 1141 (1994).

The state courts reasonably determined that his claim was procedurally barred by his failure to contemporaneously object.  17 Supp. CR 2773 (citing Curry, 910 S.W.2d at 496 n.2).  In addition, it was barred because Roberson could have but did not raise this claim on direct appeal.  Id. (citing Ex parte Gardner 959 S.W.2d at 199, and Ex parte Barber, 879 S.W.2d at 891 n.1). Roberson has failed to demonstrate cause and prejudice.  Carrier, 477 U.S. at 485; Engle, 456 U.S. at 129; Wainwright, 433 U.S. at 87. Thus, this Court should not reach this claim.

In the alternative the state habeas court dismissed this as meritless.  17 Supp. CR 2774 (citing Turner v. State, 87 S.W.3d 111, 118 (Tex. Crim. App. 2002)).  Turner noted that this claim had been rejected on the merits previously by both the Court of Criminal Appeals and the U.S. Supreme Court. Id. (citing Chamberlain v. State, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) and Callins, 510 U.S. at 1141-42 (Scalia, J., concurring)).

To pass constitutional muster, a capital punishment system must be "at once consistent and principled but also humane and sensible to the uniqueness of the individual."  Eddings, 455 U.S. at 110.  Explained further, a system must "channel the [capital] sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing a sentence of death.'" Franklin, 487 U.S. at 181 (quoting Godfrey v. Georgia, 446 U.S. 420, 428 (1980)).  Sentencers must not have unbridled discretion when determining a defendant's fate, nor may the death penalty be administered in an "arbitrary and unpredictable fashion."  Id. at 181(citing California v. Brown, 479 U.S. 538, 541 (1987)).

To the extent that Roberson alleges that these twin objectives of limited discretion with individualized sentencing are practically impossible to achieve, his claim must fail. Hughes, 412 F.3d at 594. The Supreme Court has repeatedly held that the Texas capital sentencing scheme is constitutionally sound. Jurek, 428 U.S. 269-71; Franklin, 487 U.S. at 182; Johnson, 509 U.S. at 373. They "have previously recognized that the Texas Special Issues adequately 'allo[w] the jury to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provid[e] for jury discretion.'" Franklin, 487 U.S. at 182 (quoting Lowenfield v. Phelps, 484 U.S. 231, 245 (1988)). The Texas scheme ensures that the sentencer will have adequate guidance when determining sentencing because it authorizes the defense to present to the jury, in a separate hearing, any relevant mitigating circumstance related to the defendant. Johnson, 509 U.S. at 363; Abdul-Kabir v. Quarterman, 550 U.S. 233, 246 (2007); Brewer v. Quarterman, 550 U.S. 286, 289 (2007). The Texas special issues system therefore guides "the jury's consideration of the mitigating evidence while still providing for sufficient jury discretion." Johnson, 509 U.S. at 364. Further, the mitigation instruction was crafted pursuant to legislative changes resulting from the Supreme Court's decision in Penry v. Lynaugh (Penry I), 492 U.S. 302 (1989), see Cockrell v. State, 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996), and was approved, at least implicitly, by the Supreme Court in Penry II, when the Court noted that

> [a] clearly drafted catchall instruction on mitigating evidence also might have complied with Penry I. Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference. ... Penry's counsel, while not conceding

128

the issue, admitted that he "would have a tough time saying that [Penry I] was not complied with under the new Texas procedure."

532 U.S. at 803.

Because the Supreme Court has never adopted the Callins dissent, relief on this claim is barred by Teague. Hughes, 412 F.3d at 594. Roberson fails to articulate any argument to show that the state courts unreasonably applied clearly established federal law in finding that Roberson's death sentence was constitutionally imposed. 17 Supp. CR 2774. Therefore, federal relief should be denied.

XI.    The Mitigation Special Issue Does Not Send Mixed Signals.

Roberson next insists that the Texas mitigation special issue sends mixed signals in violation of Penry II and the Eighth and Fourteenth Amendments. Pet. 220 (his claim 17). The signals are mixed, he says, because the statutory issue is unclear about the burden of proof. Id. (citing Lawton, 913 S.W.2d at 557).

The state court held this procedurally barred because Roberson failed to contemporaneously object or raise it on direct appeal. 17 Supp. CR 2774-75 (citing Curry, 910 S.W.2d at 496 n.2); see also Ex parte Gardner 959 S.W.2d at 199, and Ex parte Barber, 879 S.W.2d at 891 n.1. Roberson has failed to demonstrate cause and prejudice. Carrier, 477 U.S. at 485; Engle, 456 U.S. at 129; Wainwright, 433 U.S. at 87.

The state court found this claim to be meritless in the alternative, because the mixed signals mentioned in Penry II resulted from using a statutory nullification instruction that was eliminated by the 1991 amendment to the

129

Texas Code of Criminal Procedure; that amendment added the current statutory mitigation instructions and special issue used in this case. 17 Supp. CR 2775 (citing Penry II, 532 U.S. at 803). The state court concluded that the Supreme Court implicitly approved of the statutory special issue used in Roberson's trial as a cure for the mixed signals inherent in the pre-statutory nullification instruction. Id. at 2775-76.

Roberson did not respond to this or explain why the state court was unreasonable in its application and interpretation of clearly established federal law. His only authority is Lawton, a CCA decision. Pet. 220 (citing Lawton, 913 S.W.2d at 557). Lawton simply agreed that the Texas legislature has not assigned a burden of proof regarding mitigating evidence.

Roberson implies that the failure of the legislature to assign clear burdens of production and proof regarding Article 37.071 § 2(e) creates an unconstitutional uncertainty in the capital punishment scheme. Pet. 220. Roberson's argument confuses the federal constitution's demand that death eligibility be narrowed to a reasonably clear and well-defined group of offenses, as in Furman v. Georgia, 408 U.S. 238 (1972), with its demand that individual jurors be allowed to make individualized, well-reasoned responses in determining whether factors exist which mitigate against the imposition of the death sentence, as in Penry I, 492 U.S. at 302. See Tuilaepa, 512 U.S. 967 (discussing the constitution's apparently conflicting demands). The federal constitution's requirement of clarity in defining death eligibility is not applicable to provisions which allow the jury to consider and give effect to mitigating evidence. Gregg v. Georgia, 428 U.S. 153, 199 (1976). In short, Furman dealt

with the untrammeled discretion to impose the death sentence, but the untrammeled discretion to afford life to a death eligible defendant does not offend the U.S. Constitution.

Roberson's argument has been consistently rejected by the Fifth Circuit. Foster v. Thaler, 369 F.App'x 598, 606 (5th Cir. 2010) (unpublished) (denying COA on claim that Texas's capital scheme sends mixed signals where mitigation special issue was presented to jury and did not suffer from same defects identified in Penry II); Oliver v. Quarterman, 254 F.App'x 381, 387 (5th Cir. 2007) (unpublished) (denying COA on claim that failure to assign burden of proof on mitigation special issue sent mixed signals to jury in violation of Penry II); Mann v. Quarterman, 236 F.App'x. 908, 911-12 (5th Cir. 2007) (unpublished) (denying COA on claim that absence of burden-of-proof allocation sent mixed signals in violation of Penry II). Because he cannot show that the state court unreasonably applied clearly established federal law, Roberson fails to prove he is entitled to relief.

XII. Texas's Mitigation Special Issues Gave Roberson's Jurors Every Opportunity to Consider a Life Sentence.

In a handful of claims, Roberson faults the statutory mitigation special issue for a number of concerns—it asks the jury to weigh aggravating circumstances against mitigating ones; it gives them no means to give effect to the mitigating circumstances; the defendant bears the burden of proving mitigation; it does not require jurors to consider mitigating circumstances by themselves; and both the statutory moral blameworthiness instruction as well as the trial court's "personal culpability" instruction unfairly limited what the

jury could consider as mitigating evidence. Pet. 223-28, 72-74 (his claims 18-23 and 34) (citing the Eighth and Fourteenth Amendments and Skipper v. South Carolina, 476 U.S. 1 (1986)).

The state court found these claims to be procedurally barred because Roberson failed to contemporaneously object or to raise them during the direct appeal. 17 Supp. CR 2764-65. See Curry, 910 S.W.2d at 496 n.2; Ex parte Gardner 959 S.W.2d at 199, and Ex parte Barber, 879 S.W.2d at 891 n.1. Roberson has failed to demonstrate cause and prejudice. Carrier, 477 U.S. at 485; Engle, 456 U.S. at 129; Wainwright, 433 U.S. at 87.

Roberson's Skipper claim, attacking the moral blameworthiness and personal culpability instructions, is new and completely unexhausted. Relief may be denied on unexhausted claims, such as this, but it cannot be granted. 28 U.S.C. § 2254 (b)(1)(A); (b)(2); Mercadel, 179 F.3d at 276-78.

The state court found, in the alternative, that Roberson failed to prove he was entitled to relief. 17 Supp. CR 2765. Recall that the jury was instructed that the State had the burden of proof on both special issues, an instruction that was not legally required. Id. at 2767. The mitigation issue does not require the jury to consider any aggravating circumstances, and instead confers on the jury the "ability to dispense mercy, even after it has found a defendant eligible for the death penalty." Id. at 2768 (citing Mosley v. State, 983 S.W.2d 249, 262-63 (Tex. Crim. App. 1998)). Roberson's claims were denied because he failed to set out facts or argument that entitled him to relief. Id. at 2769.

In the alternative, Roberson's claim is unpersuasive. Roberson alleges that the mitigation special issue requires balancing of aggravating and

132

mitigating circumstances. Pet. 226 (citing Johnson, 509 U.S. 350). To the contrary, "Texas is a 'non-weighing state' in that its capital-sentencing scheme does not direct the appellate court or even the jury to 'weigh' aggravating factors against mitigating ones." Hughes v. Johnson, 191 F.3d 607, 623 (5th Cir. 1999) (emphasis added) (citing James v. Collins, 987 F.2d 1116, 1120 (5th Cir. 1993)). Because no clearly established Supreme Court precedent requires that jurors be instructed to "weigh" evidence or "how to weigh" evidence in a non-weighing state, Roberson's request for habeas relief would require the Court to issue a new rule that would be barred by Teague principles.

Roberson gets this mistaken idea from two sources: Johnson v. Texas, and dicta in Walton v. Arizona which refers to the inapposite structure of Arizona's capital sentencing scheme.[44] Pet. 226. Johnson dealt with an older version of the Texas sentencing scheme, one without a mitigation special issue, that did not apply to Roberson's trial. 509 U.S. at 353 & n.1. Roberson's other idea, that the future dangerousness special issue necessarily involves the jury rejecting the offender's mitigation evidence, is unpersuasive. Pet. 226. The mitigating evidence could be rejected there, if it was meant to counter the State's case on future dangerousness, and yet still be reconsidered on its own merit to answer the mitigation special issue.

---

[44] Under Arizona law, the judge alone determines the existence of aggravating and mitigating circumstances and "shall impose" a death sentence if he finds one or more of several enumerated aggravating circumstances and that there are no mitigating circumstances sufficiently substantial to call for leniency. Walton, 497 U.S. at 643.

The Texas capital-sentencing scheme has been approved numerous times by the Fifth Circuit and the Supreme Court. Franklin, 487 U.S. at 182 (noting that "Texas scheme has continued to pass constitutional muster"); Rowell, 398 F.3d at 378 ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof.") Thus, Teague bars granting relief on this issue.

Second, he contends that the mitigation special issue is unconstitutional because it does not assign a burden of proof as to aggravating or to mitigating circumstances. Pet. 226. This is again a moot point, because the explicit language of the jury instruction in this case puts the burden of proof on both special issues on the State. 5 CR 638. This was addressed above, in response to Roberson's Apprendi/Ring arguments. Roberson's claim has been repeatedly been rejected by the Fifth Circuit. Rowell, 398 F.3d at 378; Ortiz, 504 F.3d at 505; Scheanette, 482 F.3d at 828; Granados, 455 F.3d 536; Avila, 560 F.3d at 314-15.

Roberson lists six other complaints about the mitigation question, in six sentences, without any legal authority or explanation. Pet. 228. They are waived as unbriefed. Yohey, 985 F.2d at 224-25; Cavallini, 44 F.3d at 260 n. 9. Some are obviously cribbed from pre-1991 briefing—complaining about the mitigation instruction "without reference to the other two special issues," for example. Pet. 228 (emphasis added.) Another contradicts an argument made just three pages previously—the instruction either overlimits or underlimits what can be considered as mitigating, but it cannot do both. See id. at 225, 228. He also contends that terms are not defined, which will be addressed below in

Section XV. In summary, he acknowledges that the words of the statute are adequate but he surmises they may have unintended effects in jurors' minds. Id. at 227. Roberson's speculation and conjecture do not warrant relief. Kinnamon, 40 F.3d at 734-35.

In Roberson's thirty-fourth claim, he argues that the "moral blameworthiness" and "personal culpability" instructions are reasonably likely to cause sentencing jurors to disregard some parts of a defendant's mitigation case. Pet. 272 (citing Skipper, 476 U.S. 1, Lockett, Penry, and "the bedrock principles the Fifth Circuit recognized . . . in Nelson."[45]). The instructions to which he refers read as follows:

> You are instructed that the term mitigating evidence as used herein means evidence that a juror regards as reducing the Defendant's moral blameworthiness.
>
> You are instructed that when you deliberate on the questions posed in the special issues you are to consider relevant mitigating circumstances if any supported by the evidence presented in both phases of the trial, whether presented by the State or the Defendant. A mitigating circumstance may include, but is not limited to, any aspect of the Defendant himself or his character, background, record, or the circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore give effect and consideration to them to the extent you have given them weight, if any, in assessing the Defendant's personal culpability at the time you answered the special issues.

5 CR 637.

---

[45]    Nelson v. Quarterman, 472 F.3d 287 (5th Cir. 2006)(en banc).

The Fifth Circuit rejected this in Blue v Thaler[46] saying that the capital-sentencing scheme presently codified in Article 37.071 "does not unconstitutionally 'preclude the jury from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 665 F.3d at 666; see also Lockett, 438 U.S. at 604. This was also rejected in Beazley v. Johnson, 242 F.3d at 259-60. Beazley maintained on direct appeal that the Texas statute's definition of 'mitigating evidence' is facially unconstitutional because it limits 'mitigation' to factors that render a capital defendant less morally 'blameworthy' for commission of the capital murder." The Beazley Court concluded that "all mitigating evidence can be given effect under the broad definition of mitigating evidence found in" § 2(e)(1), and that § 2(f)(4)'s "definition of mitigation evidence does not limit the evidence considered under" § 2(e)(1). Id. On this latter point, the Fifth Circuit stressed that "'[v]irtually any mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability.'" Id. (citing Graham v. Collins, 506 U.S. at 476). Over the last ten years, the Fifth Circuit has reaffirmed its holding in Beazley in at least one published and four unpublished decisions. Blue, 665 F.3d at 666; Cantu v. Quarterman, 341 F.App'x. 55, 60-61 (5th Cir. 2009) (per curiam) (unpublished); Roach v. Quarterman, 220 F.App'x. 270, 277 (5th Cir. 2007) (unpublished); Jackson v. Dretke, 181 F.App'x. 400, 412–13 (5th Cir. 2006)

---

[46]     665 F.3d 647 (5th Cir. 2011).

(unpublished); O'Brien v. Dretke, 156 F.App'x. 724, 735–36 (5th Cir. 2005) (per curiam) (unpublished).

Roberson advances Nelson as a counter-argument. Pet. 272. However, the petitioner in Nelson was sentenced under the pre-1991 special issues scheme, which did not include the mitigation special issue. See Nelson, 472 F.3d at 290 & n. 1. Nelson holds only that the future-dangerousness special issue does not, by itself, enable the jury to give full effect to certain kinds of mitigating evidence, including mental illness. Id. at 307-09. Nelson did not overturn Beazley's holding that the mitigation special issue allows the jury to give full effect to any and all forms of mitigating evidence. For the same reason, Roberson's argument that his low IQ, troubled childhood, and mental health issues could not be adequately considered under the mitigation issue, Pet. 272, is a non-starter. Blue, 665 F.3d at 667 n.99.

Next, Roberson argues that the Supreme Court's decision in Skipper v. South Carolina establishes that mitigation evidence extends beyond evidence that tends to reduce the defendant's moral culpability or blameworthiness. Pet. 272. Skipper holds that a defendant must be allowed to put on evidence of his good conduct in prison as mitigation evidence at a punishment-phase trial. See 476 U.S. at 4–5. A few years later, the Franklin Court held that when a Texas capital defendant puts on such evidence, the future-dangerousness special issue gives the jury an adequate vehicle for considering it. 487 U.S. at 178 (plurality opinion); id. at 185-86 (O'Connor, J., concurring in the judgment); see also Nelson, 472 F.3d at 295. Thus, it is beyond dispute that Roberson's jury was instructed in a manner that enabled them to consider the mitigating effect of his

good conduct in prison. And nothing in Skipper lends any support to Roberson's broader contention that it is unconstitutional to define mitigating evidence as evidence that reduces moral blameworthiness.

All of Roberson's proposed punishment evidence was admitted. Further, his jury was instructed to consider "all of the evidence submitted to you in the whole of this trial." 5 CR 637. Roberson declines to explain what specific mitigation evidence could not be considered under the above rubric. As such, Roberson fails to adequately brief his claim. Green, 160 F.3d at 1036 n.2. Roberson further insinuates that Skipper requires a limiting instruction, forbidding evidence militating towards death unless it increased his moral blameworthiness. Pet. 274. Nothing of the sort appears in Skipper or any other Supreme Court opinion. Such a contention is illogical. Roberson fails to prove he is entitled to relief.

## XII. The Texas 10-12 Rule Is Constitutional.

Under Texas's capital sentencing scheme, a jury is instructed on what is commonly referred to as the "10-12 Rule": (1) that at least 10 jurors must agree before they may answer "No" to the future dangerousness issue or "Yes" to the mitigation issue, and (2) that all 12 jurors must agree before answering "Yes" to the future dangerousness special issue and "No" to the mitigation special issue. Tex. Code Crim. Proc. art. 37.071, § § 2(d)(2) & (f)(2). Roberson complains that this practice violates the Eighth and Fourteenth Amendments, and a collection of state constitutional provisions. Pet. 232, 277-78 (his claims 24, 25 and 37).

Because Roberson failed to explain why the state constitutional protections differed from the federal guarantees, the state court ruled as a matter of state

138

law that he waived any review of a separate state law claim. 17 Supp. CR 2777 (citing Lawton, 913 S.W.2d at 558). Further, his state law claims are not cognizable on federal habeas review. Estelle, 502 U.S. at 67; Creel v. Johnson, 162 F.3d 385, 395 (5th Cir. 1998).

The state court also found these claims to be procedurally barred for failure to contemporaneously object and to raise them on direct appeal. 17 Supp. CR 2776 (citing Saldano, 70 S.W.3d at 890-91; Broxton, 909 S.W.2d at 917-18; Garcia, 887 S.W.2d at 861, and Ex parte Gardner, 959 S.W.2d at 199). Roberson has failed to demonstrate cause and prejudice. Carrier, 477 U.S. at 485; Engle, 456 U.S. at 129; Wainwright, 433 U.S. at 87. In the alternative, the state court found his claims to be meritless, having been repeatedly rejected previously. 17 Supp. CR 2777 (citing Cantu v. State, 842 S.W.2d 667, 692-93 (Tex. Crim. App. 1992) and Resendiz, 112 S.W.3d at 550).

Roberson candidly admits that this claim has never been successful in any court, either state or federal. Pet. 232, 277-78 (citing Alexander v. Johnson, 211 F.3d 895 (5th Cir. 2000)). In addition to be being barred by Teague, Roberson's substantive argument is meritless. In Jones v. United States, 527 U.S. 373 (1999), the Supreme Court concluded that a jury need not be told what happens procedurally when a verdict cannot be reached. While the jury may not be "affirmatively misled regarding its role in the sentencing process," a court is not required to instruct the jury "as to the consequences of a breakdown in the deliberative process." Id. at 381-82. The Fifth Circuit similarly holds that an accused facing the death penalty is not entitled to an instruction as to the effect of a sentencing deadlock. ShisInday v. Quarterman, 511 F.3d 514, 523 (5th Cir.

2007) (citing Jones). Furthermore, the Fifth Circuit has expressly rejected the contention that Texas's 10-12 Rule prevents jurors from considering mitigating circumstances. See Jacobs v. Scott, 31 F.3d 1319, 1328-29 (5th Cir. 1994).

Roberson contends that Romano controls and requires relief. Pet. 278 (citing Romano v. Oklahoma, 512 U.S. 1 (1994)). The Romano Court explained that remarks by a prosecutor or the court affirmatively mislead the jury regarding its responsibility for the sentencing decision if "'the remarks . . . improperly describe[ ] the role assigned to the jury by local law.'" Id. at 9 (quoting Dugger v. Adams, 489 U.S. 401, 407 (1989)). However, the Jones Court held that "a failure to instruct the jury as to the consequences of deadlock" in no way affirmatively misleads the jury about its role in the sentencing process. 527 U.S. at 381-82. The Fifth Circuit has concluded that Jones insulates the 10-12 Rule from constitutional attack. See Blue, 665 F.3d at 669-70; Druery, 647 F.3d at 544; Alexander, 211 F.3d at 897 n. 5. And it has also held that the 10-12 Rule passes constitutional muster independently of the holding announced in Jones.[47] Because no clearly established federal law invalidates the 10-12 Rule or calls its constitutionality into doubt, Roberson is not entitled to relief on this issue.

As an afterthought, Roberson later contends that the state court's denial of his claim was "contrary to and an unreasonable application of the 'guided discretion' principles of Gregg, Boyde, Penry I, and Nelson." Pet. 277 (his claim

---

[47] See Blue, 665 F.3d at 670 n. 123; Miller v. Johnson, 200 F.3d 274, 288–89 (5th Cir. 2000) (citing Jacobs, 31 F.3d at 1329); see generally Greer v. Thaler, 380 F.App'x. 373, 389 (5th Cir. 2010) (per curiam) (unpublished) (noting that the Supreme Court's holding in Jones does not address the argument that the 10–12 Rule "creates the risk that a juror would be misled" before rejecting that argument as meritless).

37).[48]   This is wholly unexhausted and procedurally defaulted.   That quote comprises his entire argument regarding those decisions and their application to this claim. Roberson does not even cite the decisions to which he refers nor does he explain their relevance to this argument.   As such, it is waived as unbriefed.   Green, 160 F.3d at 1036 n.2; Yohey, 985 F.2d at 224-25; Cavallini, 44 F.3d at 260 n. 9.

In an earlier section of his pleading, Roberson refers to these cases for the first time, beginning with a quote from Franklin v. Lynaugh, "But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" Pet. 269 (citing Franklin, 487 U.S. at 181 (plurality opinion)). Roberson's interpretation of this quote is that "principles of constitutional law . . . require the 'guided discretion' states to make the effort to achieve a more rational and equitable administration of the death penalty." Pet. 269.  He fails to support this interpretation with authority from Gregg, Boyde, or Penry I (or any other clearly established federal law, including Franklin) which supposedly dictates that some states are 'guided discretion' states, which states fall in that category, or that describes what "more rational and equitable" means in this context.   At best, Roberson asserts that Texas's sentencing scheme is contrary to Nelson, a decision of the Fifth Circuit Court of Appeals (and therefore, not

---

[48]     Boyde v. California, 494 U.S. 370 (1990).

clearly established federal law) and Beck v. Alabama, 447 U.S. 625 (1980). Pet. 278.

Beck is inapposite, holding that a sentence of death may not be constitutionally imposed when the jury was not permitted to consider a verdict of guilt of a lesser included noncapital offense if the evidence would have supported such a verdict. 447 U.S. at 627. Roberson fails to prove that the state court's adjudication is incorrect and objectively unreasonable, so the Court should deny habeas relief.

XIV. Constitutionality of the Mitigation Special Issue Does Not Depend on its Reviewability on Direct Appeal.

Roberson complains that his death sentence offends the Eighth and Fourteenth Amendments because the Texas courts do not conduct any appellate review of the jury's answer to the mitigation special issue. Pet. 236, 277 (his claims 26 and 36). He refers to briefing filed in another inmate's case and "incorporates by reference the claims and arguments made by Eldridge's attorneys presented," id. at 236, and makes a new objection that the absence of a burden of proof regarding "unadjudicated facts in the record" makes appellate review of mitigation impossible. Id. at 277.

Roberson refuses to explain his contention, which he "raise[s] merely to preserve [it] for Supreme Court review," and instead quotes from the state court opinion in Eldridge v. State to demonstrate how the state court would presumably have resolved this claim, if Roberson had made it himself in the state court (which he did not). Pet. 236 (quoting Eldridge, 940 S.W.2d 646, 652 (Tex. Crim. App. 1996) (abrogation recognized by Sparks v. State, 2010 WL

142

4132769 at *26 n. 88 (Tex. Crim. App. 2010); called into doubt by Mosley v. State, 983 S.W.2d 249, 264 n. 18 (Tex. Crim. App. 1998))).

It is impossible for the Director to respond to an argument which is not made. The Fifth Circuit has expressly refused to review arguments incorporated by reference in capital cases. Perillo v. Johnson, 79 F.3d 441, 443 n. 1 (5th Cir. 1996). A party cannot circumvent briefing requirements by incorporating by reference pleadings filed in the lower court, much less pleadings filed in another case entirely, and improperly briefed issues will not be addressed on appeal. United States v. Hall, 152 F.3d 381, 398 n.9 (5th Cir. 1998); Yohey, 985 F.2d at 224-25; Beazley, 242 F.3d at 266.

These objections were not made contemporaneously at trial, nor raised on direct appeal, and thus the state court found them to be procedurally barred. 17 Supp. CR 2776 (citing Saldano, 70 S.W.3d at 890-91, Ex parte Gardner, 959 S.W.2d at 199). Roberson has failed to demonstrate cause and prejudice. Carrier, 477 U.S. at 485; Engle, 456 U.S. at 129; Wainwright, 433 U.S. at 87.

Further, his "unadjudicated facts" claim is wholly unexhausted. Relief may be denied on unexhausted claims, such as this, but it cannot be granted. 28 U.S.C. § 2254 (b)(1)(A); (b)(2); Mercadel, 179 F.3d at 276-78. Roberson's jury was instructed that the State bore the burden of proof on both special issues, and twice that the State had to prove extraneous offenses true beyond a reasonable doubt before the jury could consider them against Roberson, rendering this burden of proof argument irrelevant. 5 CR 617, 638.

In the alternative, Roberson's claim is unpersuasive. As the mitigation special issue comprises the selection decision,[49] no constitutional violation can arise from Texas' actions. The Tuilaepa Court explained that it is only the eligibility decision that must be made with "maximum transparency" so that it may be rationally reviewed. 512 U.S. at 973. In Texas, eligibility is determined at the trial on guilt/innocence, and it is, in part, determined a second time when the jury considers whether the defendant will be a future danger.[50] See Jurek, 428 U.S. at 268-72 (plurality opinion); see also Tex. Penal Code § 19.03. As discussed more thoroughly below, the Court of Criminal Appeals does in fact review the evidence introduced to culminate in a death sentence.

On the other hand, of the selection decision, the Court recognized that the jury is free to consider "a myriad of factors to determine whether death is the appropriate punishment. Indeed, the sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." 512 U.S. at 979-80. Such unfettered discretion assures a capital defendant that the punishment imposed is "an individual determination on the basis of the character of the individual and circumstances of the crime." Zant v. Stephens, 462 U.S. 862, 879 (1983). That is, the jury is free to hear, consider,

---

[49]    At the selection decision, "the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence." Tuilaepa, 512 U.S. at 972.

[50]    However, the future dangerousness special issue is also a "selection" factor, since it has been construed under most circumstances to "allow the consideration of particularized mitigating factors." Lowenfield, 484 U.S. at 245.

and give effect to all relevant evidence before assessing such a severe penalty. As such, there is no restriction on the jury's ability to extend mercy and choose not to sentence a defendant to death. Requiring an appellate court to second-guess a jury's subjective determination of extenuating circumstances would inevitably result in courts prioritizing certain mitigating factors over others and, therefore, restricting a sentencing jury's capacity to individually assess the circumstances and situation of each defendant in violation of the Court's directive.

Thus, although a capital defendant is entitled to "meaningful appellate review" of a death sentence under the Eighth and Fourteenth Amendments, appellate courts are not required to conduct an independent review of the jury's mitigation finding. See McClesky v. Kemp, 481 U.S. 279, 308 (1987); Pulley v. Harris, 465 U.S. 37, 45-46 (1984). Indeed, the Supreme Court has explained,

> an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance. Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record. This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed "[those] compassionate or mitigating factors stemming from the diverse frailties of humankind." When we held that a defendant has a constitutional right to the consideration of [mitigating] factors . . . we clearly envisioned that that consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses.

Caldwell v. Mississippi, 472 U.S. 320, 330-31 (1985) (internal citations omitted) (emphasis added). In Woods v. Cockrell, the Fifth Circuit explained why the Texas capital-punishment scheme was not constitutionally obligated to provide

appellate review of the mitigation special issue. 307 F.3d. at 359. This has consistently been the Fifth Circuit's stance. Reneau v. Cockrell, 31 F.App'x. 151 (5th Cir. 2001); Hughes, 191 F.3d at 621. It is on this basis that the Court of Criminal Appeals has repeatedly declined to review the sufficiency of the evidence to support a jury's negative answer to the mitigation special issue.

> Under Article 37.071[, Section] 2(f), the jury determines whether any evidence has mitigating effect and, if so, how much. . . . [T]hese two decisions are normative and therefore not reviewable by this Court. So long as the jury has all the potentially relevant evidence before it, we continue to defer to the jury. . . . [T]here is simply no way for an appellate court to review the jury's normative judgment that the evidence did or did not warrant a life sentence.

Eldridge, 940 S.W.2d at 652, 653 (citations and quotations omitted).

Nevertheless, Roberson takes issue with the state court's decision not to review the sufficiency of the mitigating evidence, asserting that a reasonable juror could not have considered the mitigating evidence he presented and sentenced him to death. The crux of his argument seems to be that neither the jury nor the Court of Criminal Appeals considered the evidence, in direct contravention of the Constitution. No one can say with certainty what weight, if any, the jury gave to Roberson's evidence of his good character, the fact that he had a difficult childhood or a substance abuse problem at the time of the offense and his record of good behavior while incarcerated. See Colella v. State, 915 S.W.2d 834, 844 (Tex. Crim. App. 1995) ("The amount of weight that the factfinder might give any particular piece of mitigating evidence is left to the 'range of judgment and discretion' exercised by each juror." (citation omitted)); see also Eddings, 455 U.S. at 114 ("The sentencer, and the Court of Criminal

Appeals on review, may determine the weight to be given relevant mitigating evidence[,] [b]ut they may not give it no weight by excluding such evidence from their consideration.") (footnote omitted). But that is irrelevant.

As discussed throughout this answer, the Court has been unwavering in its demand that the states enable capital sentencing juries to consider and give effect to mitigating evidence. See Eddings, 455 U.S. at 113-14 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.") The evidence Roberson presented not only had mitigating relevance to the future dangerousness special issue, it could have also been considered as "reduc[ing] [his] moral blameworthiness." Thus, had the jury chosen to do so, it could have given effect to this evidence by imposing a life sentence. Simply because the sentence was death rather than life, it does not follow that the jury impermissibly refused to consider his mitigating evidence.[51]

---

[51]    In Johnson v. Texas, the Court placed special emphasis on the fact that Texas juries are aware of the consequences of their actions thus are "likely to weigh mitigating evidence as it formulates these answers in a manner similar to the employed by capital juries in 'pure balancing states.'" 509 U.S. at 370-71 (quoting Franklin, 487 U.S. at 182 n.12). See Tex. Code Crim. Proc. art. 37.071. Further, outside of pure speculation based on a self-serving and myopic interpretation of the evidence, Roberson has not demonstrated that this jury disregarded his evidence completely, especially in light of its instruction to consider all of the evidence. 5 CR 636; see Buchanan v. Angelone, 522 U.S. 269, 278 (1998). The responsibility foisted upon a jury in a capital murder trial is serious. We cannot blithely assume they do not take it seriously. The Lockett Court presumed that "'jurors . . . confronted with the awesome responsibility of decreeing death for a fellow human [would] act with due regard for the consequences of their decision.'" 438 U.S. at 598 (quoting McGautha v. California, 402 U.S. 183, 208 (1971)). Nothing in the record suggests the jury in this case acted in a contrary manner.

147

Nor does it follow that Texas' refusal to review the jury's negative answer to the mitigation special issue somehow runs afoul of the Eighth Amendment's requirement for "meaningful appellate review" of the imposition of the death sentence.

For all of these reasons, Roberson's challenge to the mitigation special issue must be rejected. Because no precedent currently dictates the rule Roberson seeks, consideration of his attack is foreclosed under Teague.

## XV. Key Terminology was Properly Defined During Sentencing.

Roberson contends a reasonable juror would have believed they were not permitted to consider mitigating evidence, because the jury charge at sentencing did not explain what mitigating evidence is, and did not define certain terms,[52] thereby violating Roberson's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Pet. 239 (his claims 28-30.) Further, the trial court failed to correct the State's definition of the word "probability" during sentencing jury argument, fostering a "fundamental miscarriage of justice," and violating Roberson's Sixth, Eighth, and Fourteenth Amendment rights. Supp. Pet. 1 (his claim 41).

Because Roberson never presented his claim about erroneous definition of the word "probability" in the sentencing argument to the state courts, it is unexhausted and procedurally defaulted. 28 U.S.C. § 2254(b)(1)(A); Beazley, 242 F.3d at 263. Roberson must prove cause and prejudice to have this claim

---

[52] The undefined terms are: "criminal acts of violence," "probability," "continuing threat," "society," "culpability," and "reasonable expectation." Pet. 239, 246.

considered. Gray, 518 U.S. at 162. Roberson does not attempt to distinguish his case from Nobles and Muniz; nor does he attempt to demonstrate cause and prejudice for his failure to raise the claims in his initial state habeas application. Nobles, 127 F.3d at 422; Muniz, 132 F.3d at 221. Nor does Roberson show that the federal court's failure to consider the claim will result in a miscarriage of justice. Coleman, 501 U.S. at 730; Carrier, 477 U.S. at 485. A miscarriage of justice in this context means Roberson is actually innocent of the crime of which he was convicted. Sawyer, 505 U.S. at 339-40. Thus, this Court should not reach this claim.

Because Roberson failed to contemporaneously object at trial or to raise the rest of these claims on direct appeal, the state court found them procedurally barred. 17 Supp. CR 2776. Roberson has failed to demonstrate cause and prejudice. Carrier, 477 U.S. at 485; Engle, 456 U.S. at 129; Wainwright, 433 U.S. at 87. And his written objection to the charge asked that probability be defined as a percentage, starting with ninety-five percent and ranging to "at least fifty percent," which is inconsistent with his present contention that it must be more than fifty percent. 5 CR 628-630; cf. Supp. Pet. 1-2.

In the alternative, the state court found that the charge given to Roberson's jury was proper, that the Constitution did not require an explanation of what mitigating evidence is or definitions of commonly used words, and Roberson's claims were meritless. 17 Supp. CR 2779-80 (citing 5 CR 629-32, Rayford, 125 S.W.3d at 532-35; Chamberlain, 998 S.W.2d at 237-38; Corwin v. State, 870 S.W.2d 23, 36 (Tex. Crim. App. 1993), Cantu v. State, 939 S.W.2d 627, 649 (Tex. Crim. App. 1997)).

From the start, Roberson's argument is circular and conclusory. Roberson cites chapter and verse from studies, none of which examine the law in his case or the instructions given his jury. Pet. 243. He complains that life without parole (LWOP) was not an option but never mentions why this is relevant, whether it is mandated by the Constitution, or how an LWOP option would have changed the outcome. Id. at 246. Roberson's argument that prosecutors "misled jurors to believe Roberson was a child rapist" which "infused prejudice in [sic] . . . the jury's definition of the key sentencing terms" was addressed in Argument Section I, above. Id. He hypothesized that in violation of Boyde, his jury failed to understand they were allowed to consider the mitigation evidence, or that 'probability' meant something other than 'possibility.' Id. Boyde is inapposite to his claims here. Roberson fails to articulate any further argument on this point, which is waived as unbriefed. Green, 160 F.3d at 1036 n.2; Yohey, 985 F.2d at 224-25; Cavallini, 44 F.3d at 260 n. 9. His guess as to what jurors understood can be given no weight. Kinnamon, 40 F.3d at 734-35 (finding "speculation" to be no basis for habeas relief).

Because the special issues contain a "brief number of words," "the irresistible force by [sic] the court's instructions" and the "State's effort to concentrate jurors' attention on the murder of the child," Roberson asserts "one must conclude that [the jury] did not" consider his mitigating evidence. Pet. 247. It was entirely proper for the State to focus on the crime of which Roberson was accused. One cannot assume juries fail to consider mitigating evidence because they answer the special issues against Roberson. Yet this is the sole basis for Roberson's contention that "the second special issue does not sufficiently allow

consideration of mitigating evidence and places the burden of proof on Roberson." Id. He illogically faults the State for not presenting more evidence to convince the jury they could consider mitigating evidence. Id. at 248. In all of this verbiage, Roberson still fails to explain how or why the statutory language is inadequate. Id.

Roberson cites opinions from Illinois's district court and the Fourth Circuit for the proposition that other states' juries misunderstand other states' instructions regarding other states' aggravating and mitigating factors. Pet. 248-49 (citing Free v. Peters, 806 F.Supp. 705 (N.D. Ill. 1992) and McDougall v. Dixon, 921 F.2d 518 (4th Cir. 1990)). Even if true, it is irrelevant. Further, the Illinois case was reversed in an illuminating opinion by Judge Posner of the Seventh Circuit, Free v. Peters, 12 F.3d 700, 704-05 (7th Cir. 1993), and the Fourth Circuit holding is directly contrary to Roberson's position. McDougall, 921 F.2d at 532-33. These opinions are not clearly established federal law, of course. But the fact that Roberson is driven to cite these cases highlights the complete absence of any Supreme Court precedent that was misapplied or misunderstood by the state court.

Roberson's claim fails because it misconstrues the nature of Texas's capital sentencing scheme. "Texas is not a 'weighing jurisdiction' where capital sentencing jurors must balance 'aggravating' versus 'mitigating' factors before rendering a verdict at the punishment phase of trial." Trevino v. Thaler, 678 F. Supp. 2d 445, 491 (W.D. Tex. 2009) (citing Hughes, 191 F.3d at 621-23). As a result, the undefined terms identified by Roberson do not apply to an aggravating factor that determines death eligibility, but rather to one of the

special punishment issues that determine whether the death penalty is appropriate. Woods v. Johnson, 75 F.3d at 1033-34 (rejecting argument that the terms used in the special issues are "aggravating factors" and unconstitutionally vague absent definition).

Furthermore, the existence of undefined terms does not render the future dangerousness issue unconstitutional. Instead, each term is "fully capable of commonsense, practical meaning that eliminates the need for lengthy, legalistic definition." Trevino, 678 F. Supp. 2d at 491-92 (citing, e.g., Leal v. Dretke, 428 F.3d 543, 553 (5th Cir. 2005) (listing the many Fifth Circuit opinions rejecting complaints about the failure of the Texas courts to define the terms "probability," "criminal acts of violence," or "continuing threat to society")). This special issue has been held constitutional by the Supreme Court, Jurek, 428 U.S. at 272-74, and it continues to withstand constitutional scrutiny. Scheanette, 482 F.3d at 827-28 (citing Woods, 75 F.3d at 1033-34, and James v. Collins, 987 F.2d 1116, 1120 & n.5 (5th Cir. 1993)). Roberson's claim is squarely foreclosed by controlling precedent, and this Court is barred by Teague from announcing a contrary holding.

Because the prosecutor did not err in his statement of the law regarding the meaning of probability, as argued above in Claim I, the trial court did not err in not interrupting the closing argument—especially considering Roberson's failure to object. Absent any error, there is no fundamental miscarriage of justice.

XVI.  The Constitution Allows Capital Punishment for the Murder of Children Under Six.

"The elevation of a murder to a capital crime based on nothing more than the age of the victim is clear error for which habeas relief must be granted," claims Roberson.  Pet. 258 (his claim 32.)  This claim is unexhausted and procedurally barred, as well as meritless.

Roberson moved to quash the indictment on state constitutional grounds and the Fifth, Sixth and Fourteenth Amendments.  1 CR 21.  On direct appeal, Roberson raised this argument as a Sixth, Eighth and Fourteenth Amendment equal rotection claim, alleging that "there is no valid penological reason for subjecting the murderers of children under six to the death penalty."  Roberson v. State, No. 64,761, Appellant's Brief 20, 24-25, 27.  The state court denied relief, noting that the statute was constitutional under a rational-basis standard and under the Eighth Amendment.  Roberson v. State, 2002 WL 34217382 at *11 (citing Henderson v. State, 962 S.W.2d 544, 560-61, 563 (Tex. Crim. App. 1997) and Ripkowski v. State, 61 S.W.3d 378 (Tex. Crim. App. 2001)).

Roberson insists the Texas legislature added this crime for an improper purpose ("to assure prosecutors with easy victories,") and complains again that Roberson does not deserve death because he is not "the worst of the worst."  Pet. 257.  He abandoned the equal protection argument and replaced it with an Eighth Amendment vagueness claim that is wholly unexhausted.  He now analogizes the death-eligible crime of murder of a child under six with the "heinous, atrocious, and cruel" aggravator, found in Oklahoma law, struck down by the Supreme Court for vagueness.  Pet. 257 (citing Maynard v. Cartwright,

486 U.S. 356 (1988)). "An overbroad statutory aggravating circumstance" offends Furman, he insists. Pet. 258.

This argument is new and unexhausted because it was never made in the state court. Relief "shall not be granted" under any circumstances unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1); Beazley, 242 F.3d at 263. Roberson does not attempt to distinguish his case from Nobles and Muniz; nor does he attempt to demonstrate cause and prejudice for his failure to raise the claims in his initial state habeas application. Gray, 518 U.S. at 162; Nichols, 69 F.3d at 1280. Thus this claim is procedurally defaulted.

In the alternative, his new claim is unpersuasive. Roberson appeals to Maynard for support. Pet. 258 (citing Maynard, 486 U.S. at 361-63). Maynard dealt with a case in a "weighing state" and found that the "heinous, atrocious or cruel" aggravator was vague under the Eighth Amendment because "it fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in Furman v. Georgia." Id. at 361-62.

Roberson's claim fails first because "a child under six years of age" can hardly be vague or overbroad. It is a clear and objectively-determinable status. Second, it has nothing to do with what a sentencing jury must find in order to impose the death penalty. It is an element of the crime of capital murder, but simply being convicted of capital murder does not guarantee the death penalty. Again, "Texas is not a 'weighing jurisdiction' where capital sentencing jurors must balance 'aggravating' versus 'mitigating' factors before rendering a verdict

at the punishment phase of trial." Trevino, 678 F. Supp. 2d at 491. The "child under six" criteria identified by Roberson does not factor into the special punishment issues that determine whether the death penalty is appropriate. Woods v. Johnson, 75 F.3d at 1033-34 (rejecting argument that the terms used in the special issues are "aggravating factors" and unconstitutionally vague absent definition). The victim's status determines death eligibility, but it is not one of the special punishment issues that determine whether the death penalty is appropriate. Maynard is inapplicable to Roberson's circumstance. Because no precedent currently dictates the rule Roberson seeks, consideration of this claim is foreclosed under Teague.

XVII.    A Capital Murder Conviction Based on Mens Rea of Intentionally or Knowingly is Constitutional.

Roberson next argues that the lack of a "deliberateness" requirement in the capital-murder statute makes it unconstitutional under the Eighth and Fourteenth Amendments. Pet. 264. He contends the state court on direct appeal misapplied Jurek, which approved of the capital murder statute when it still contained the deliberateness special issue. Id. Roberson complains that a guilty verdict based on knowingly or intentionally is cruel and unusual. Id. In summary, he asks this Court to "review the guilt phase charge and punishment phase charge together to see if the demands of the constitution have been met . . . or ignored." Id. at 267.

A.    Exhaustion and state court findings.

On direct appeal, Roberson attacked his sentence. He argued that the Eighth and Fourteenth Amendments forbid the death sentence for those who do

155

not kill, attempt to kill, or intend to kill another. Roberson v. State, No. 64,761, Appellant's Brief 44-45 (citing Enmund v. Florida, 458 U.S. 782, 797 (1982)). He also referred to Tison v. Arizona, 481 U.S. 137 (1987), for the proposition that

> [R]eckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

Appellant's Brief 45-6 (citing Tison, 481 U.S. at 157). Roberson alleged that neither special issue—future dangerousness nor mitigation—contained within it a finding of a "highly culpable mental state." Appellant's Brief 46. "Because the jury in this case was not asked to find any of the aggravating factors required under Enmund and Tison to render a party eligible for capital punishment," Roberson contended his sentence violated the Eighth Amendment. Id.

Roberson's present argument attacks his conviction and was never made in the state court. Abandoning Enmund and Tison, he argues that Jurek requires the deliberateness special issue; he connects the sentencing special issue to proof of guilt at the guilt-innocence stage by illogically claiming that without a deliberateness finding, his conviction rests on proof of lesser mens rea. Pet. 264. Further, he argues that the Texas statute violates the Eighth Amendment because unnamed "aggravating factors" are unconstitutionally vague in contravention of principles laid out in Zant v. Stephens,[53] Lewis v.

---

[53]    462 U.S. 862, 877 (1983).

Jeffers,[54] Richmond v. Lewis,[55] Clemons v. Mississippi,[56] Maynard, Furman, Godfrey v. Georgia,[57] and Miller v. Florida.[58] Pet. 265-67. His new claim is unexhausted and procedurally barred. Relief may be denied on unexhausted claims, such as this, but it cannot be granted. 28 U.S.C. § 2254 (b)(1)(A); (b)(2); Mercadel, 179 F.3d at 276-78.

In response to his direct appeal, that the sentencing charge permitted his death sentence without a finding of "enhanced culpability" or "deliberateness," the Court of Criminal Appeals denied relief because the Texas capital sentencing statute had repeatedly been held not to violate the Eighth Amendment. Roberson v. State, 2002 WL 34217382 at *12 (citing generally Jurek, 428 U.S. 262; Threadgill v. State, 146 S.W.3d 654, 672–73 (Tex. Crim. App. 2004);Garcia v. State, 126 S.W.3d 921, 929 (Tex. Crim. App. 2004); Reyes v. State, 84 S.W.3d 633, 637 (Tex. Crim. App. 2002)).

B.      Roberson fails to prove this claim has merit.

In the alternative this claim is unpersuasive. The prior version of Article 37.071, before its amendment in 1991, included the deliberateness question as one of three capital sentencing issues. Sonnier v. State, 913 S.W.2d 511, 519 n.3 (Tex. Crim. App. 1995). The deliberateness issue was "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another

---

[54]      497 U.S. 764, 774 (1990).
[55]      506 U.S. 40, 46 (1992).
[56]      494 U.S. 738, 758 (1990).
[57]      446 U.S. 420 (1980).
[58]      373 So.2d 882, 885-86 (Fla. 1979).

would occur." See Acts 1973, 63rd Leg., ch. 426, p. 1125, §1, eff. June 14, 1973.

The deliberateness special issue has since been replaced with another question, to be given if the jury might have found the defendant guilty as a party, see Tex. Penal Code §§ 7.01, 7.02, asking "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." See Acts 1991, 72nd Leg., ch. 838, p. 2899, § 1, eff. Sept. 1, 1991. Under neither version of Article 37.071 was the deliberateness question an element of the crime; it was a special issue question that helped meaningfully channel the jury's interpretation of penalty phase evidence in answering the future dangerousness question. Sonnier, 913 S.W.2d at 517.

In Jurek, the Supreme Court focused on two aspects of the Texas sentencing scheme. First, the Court focused on the narrow statutory definition of capital murder found in Section 19.03 of the Texas Penal Code. 428 U.S. at 270-271. Then, the Court focused on Article 37.071 and asked whether it provided a vehicle for consideration of mitigating evidence; focusing entirely on the future dangerousness special issue, the Court found it could provide a sufficient vehicle for the consideration of mitigating evidence. Id. at 271-273. The Jurek Court in no way suggested that the question of deliberation was pivotal to its decision; to the contrary, an honest reading suggests that the question of deliberation was irrelevant to the Court's concerns and analysis under Furman. Sonnier, 913 S.W.2d at 519-20.

There is nothing in the 1991 amendment to Article 37.071 which would change the Jurek holding. 428 U.S. at 273-274. Indeed, the addition of the new

special issue regarding mitigating evidence brings Article 37.071 into further compliance with the concerns of the Eighth Amendment as expressed by Jurek. Under Penal Code Section 19.02 (b)(1), the State still had to prove Roberson intentionally or knowingly caused the death of his daughter. This is sufficient. Lowenfield, 484 U.S. at 241-46 (citing Jurek, 428 U.S. 262); see Davis v. Thaler, 2011 WL 3880465 (N.D. Tex. 2011) at *8 (evidence of Davis's size and strength relative to his five-year-old daughter, coupled with her severe, numerous, and varied injuries, are sufficient proof of the culpable mental state relevant to the jury's guilty verdict for capital murder); Lindsey v. State, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973) (noting that the extent of the injuries and the relative size and strength of the parties was a key consideration in evaluating whether the whipping of a three year-old boy was administered with the intent to murder). Roberson contends that eliminating the deliberateness special issue "weakened to [sic] degree of culpability required to obtain a capital murder conviction." Pet. 264. The absence of the deliberateness issue does not change the mental state that must be proven to obtain a guilty verdict. Sonnier, 913 S.W.2d at 517. Roberson's jury was instructed that they could not find him guilty unless they believed beyond a reasonable doubt that he acted intentionally or knowingly. 5 CR 617. Whether his jury had to answer the deliberateness special issue or not, Roberson's guilty verdict would still have hinged on the mens rea of intentional or knowing.

No constitutional error is apparent. But even if this were error of federal constitutional origin, under Supreme Court precedent such an error would not be structural. In Neder, the Supreme Court addressed a trial court's complete

159

failure to submit an element of the offense to the jury.  The Supreme Court held that such an error "differs markedly from the constitutional violations we have found to defy harmless error review."  527 U.S. at 8.  The Supreme Court concluded that the complete omission of an element of an offense was not structural error but was subject to harmless error review.  Id.  If the omission of an element of an offense is not structural, the omission of a punishment issue would not seem to be structural error either.  And, more to the point, the Supreme Court has not labeled it as structural.  Roberson fails to show how the omission of the deliberateness question was contrary to clearly established federal law, nor can he demonstrate that it caused him any harm whatsoever.

Under Enmund and Tison, the deliberateness special issue was not constitutionally required because Roberson was the actual murderer, not a party to the murder.  Tison says even if Roberson did not intentionally kill his daughter, just the reckless disregard for her life implicit in beating her and shaking her so violently represents the highly culpable mental state sufficient to sentence him to death.  481 U.S. at 157.  If recklessness is adequate mens rea for Eighth Amendment purposes, then certainly "intentionally and knowingly" is constitutionally sound.  Roberson can cite no clearly established federal law declaring capital murder based on intentional or knowing conduct to be unconstitutional.  While the Fifth Circuit has not addressed this directly, the Tenth Circuit found "willful, purposeful and knowing" actions that allowed a child to be murdered by another to be proportional and constitutionally sound under Enmund and Tison.  Gilson v. Sirmons, 520 F.3d 1196, 1225-26 (10th Cir. 2008).  Roberson fails to prove he is entitled to relief.

XVIII.     There Is No Constitutional Right to Present Irrelevant Evidence.

Roberson protests the trial court's ruling which forbade his neurologist to testify during the guilt-innocence phase of his trial. Pet. 281-82. Because he was not able to prove his diminished capacity to form the requisite mens rea, Roberson contends his Sixth, Eighth and Fourteenth Amendment rights to present a complete defense as interpreted by Holmes v. South Carolina[59] were violated. Id.

Roberson objected at trial, and raised this issue on direct appeal. 45 RR 10-17; Roberson v. State, No. 64,761, Appellant's Brief 48-49. The state court denied relief. Roberson v. State, 2002 WL 34217382 at *7-8. Texas law does not recognize a diminished capacity affirmative defense. Id. (citing Jackson v. State, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005)). However, when such evidence is offered as an attempt to negate the mens rea, the evidence is admissible subject to the requirements of Rule 403. Id. (citing Jackson, 160 S.W.3d at 574). The state court also considered the Supreme Court's ruling in Clark v. Arizona,[60] which held that exclusion of expert testimony about mental capacity did not violate due process unless the defendant raised the insanity defense. Roberson v. State, 2002 WL 34217382 at *7 (citing Clark, 548 U.S. at 770-71 (quoting Holmes, 547 U.S. at 326)).

Comporting with the Supreme Court's position in Clark, the state court noted it "will continue to give the trial judge the discretion to determine whether mental-health evidence proposed by the defendant is relevant to mens rea and

---

[59]     547 U.S. 319 (2006).
[60]     548 U.S. 735 (2006).

admissible." Roberson v. State, 2002 WL 34217382 at *8. It further found that the trial judge did not abuse his discretion in denying Roberson's request to call Dr. Krusz. Id. The proposed testimony regarding organic brain syndrome and poor impulse control was found not to be relevant to Roberson's ability to form the requisite mens rea for the offense. "It appears that it was merely being used as a mental-health defense not rising to the level of insanity." Id.

Roberson fails to address the factual findings or legal reasoning of the state court. Pet. 282-83. Instead, he reprints his direct appeal briefing and the state court's opinion, adding only five new sentences, which read:

> The exclusion of this testimony worked as a fundamental unfairness to Roberson as it denied him his right to present a complete defense secured to [sic] him by the constitution. See Holmes v. South Carolina, where the high court confirmed that a criminal defendant's federal constitutional rights were violated by an evidence rule under which the defendant ws [sic] not allowed to introduce evidence of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict. . . . In this case, Mr. Roberson had a right to rebut the state's case on intent to kill. That right was denied by the Texas courts. This was clear constitutional error.

Pet. 283 (quotation and cite from Holmes omitted.) This is inadequate to prove he is entitled to relief.

Roberson invites this Court to create a hybrid defense in which he is admittedly sane but less able to form the intent to commit murder. Texas does not recognize any such defense as a legal justification for criminal acts. Tex. Pen. Code Ann. § 8.01(a); Jackson, 160 S.W.2d at 573, 575. However, Texas permits such evidence to be admitted as an attempt to negate mens rea, only if the

evidence meets the requirements of Rule 403.  Roberson v. State, 2002 WL 34217382 at *7; Jackson, 160 S.W.2d at 575..

The CCA relied on the Supreme Court's decision in Clark in reviewing Roberson's claim.  Under Clark, the right to introduce relevant evidence can be curtailed if there is a good reason for doing so.

> While the Constitution ... prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

Clark, 548 U.S. at 770 (quoting Holmes, 547 U.S. at 326); see Crane, 476 U.S. at 689-690 (permitting exclusion of evidence that "poses an undue risk of 'harassment, prejudice, [or] confusion of the issues' " (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986))); see also Chambers, 410 U.S. at 302.

The Supreme Court has held that Roberson's proposition, that the Due Process Clause guarantees the right to introduce all relevant evidence, is "simply indefensible."  Montana v. Egelhoff, 518 U.S. 37,42 (1996)(plurality opinion). "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988).  As due process permits such mental-health evidence to be kept out entirely except when used for insanity defenses, its consideration may be subject to limitation.  Roberson v. State, 2002 WL 34217382 at *7-8 (quoting Clark, 548 U.S. at 778).  Roberson fails to address the state court's interpretation and application of this clearly

established federal law.  Pet. 281-83.  Instead, he briefly refers to Holmes, id. at 283, which is inapposite.

At best, Holmes notes that evidence rules that"infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve'" may abridge the defendant's right to present a complete defense.  547 U.S. at 324.  Nothing in Holmes supports Roberson's request to create a new constitutional rule, that evidence which may have bearing on mens rea is not subject to the balancing test in Rule 403.  In fact, the Holmes Court specifically praised the Rule 403 rationale, applied in Clark and in Roberson's case, saying

> [W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. See, e.g., Fed. Rule Evid. 403. . . Plainly referring to rules of this type, we have stated that the Constitution permits judges "to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'"

547 U.S. at 326-27 (quoting Crane, 476 U.S., at 689–690 (quoting Van Arsdall, 475 U.S. at  679; ellipsis and brackets in original)); see also Egelhoff, 518 U.S. at 42 (plurality opinion) (terming such rules "familiar and unquestionably constitutional").  Roberson fails to address these points or explain how the state court misapplied clearly established federal law.  Further, the interpretation he advocates would be barred by Teague.

XIX. The Prosecutor Did Not Commit Misconduct By Defining Probability As He Did During Sentencing Jury Argument.

Roberson argues that the prosecutor "abused his office and intentionally fostered a false impression" by arguing at sentencing that probability meant a "low probability" when he knew Texas courts had defined it as more likely than not. Supp. Pet. 1-2 (his claim 40) (citing "Black's Law Dictionary," Robison v. State, 888 S.W.2d 473 (Tex. Crim. App. 1994), Hughes v. State, 878 S.W.2d 142, 147-148 (Tex. Crim. App. 1992) (opinion on original submission); Cuevas v. State, 742 S.W.2d 331, 347 (Tex. Crim. App. 1987)). Roberson's only trial objections to the charge asked that probability be defined as a percentage, starting with ninety-five percent and ranging to "at least fifty percent," which is inconsistent with his present contention that it must be more than fifty percent. 5 CR 628-630; cf. Supp. Pet. 1-2.

This claim is wholly new and unexhausted, having never been presented to any state court, and therefore it does not entitle him to relief. 28 U.S.C. § 2254(b)(1)(A); Beazley, 242 F.3d at 263. Roberson must prove cause and prejudice to have this claim considered. Gray, 518 U.S. at 162. Roberson does not attempt to distinguish his case from Nobles and Muniz; nor does he attempt to demonstrate cause and prejudice for his failure to raise the claims in his initial state habeas application. Nobles, 127 F.3d at 422; Muniz, 132 F.3d at 221. Nor does Roberson show that the federal court's failure to consider the claim will result in a miscarriage of justice. Coleman, 501 U.S. at 730; Carrier, 477 U.S. at 485. A miscarriage of justice in this context means Roberson is actually innocent of the crime of which he was convicted. Sawyer, 505 U.S. at

339-40. Because this claim does not implicate the actual innocence exception to the procedural default doctrine, it is barred from merits review by this Court.

Roberson's argument is unpersuasive. At best, Roberson argues that the prosecutor's argument misinterpreted state law. It is axiomatic that habeas relief is available only if Roberson is incarcerated in violation of his federal constitutional rights. Green, 160 F.3d 1029 at 1036. Therefore, to the extent Roberson argues the prosecutor's argument was inconsistent with state law, his claim is not cognizable under federal habeas review. Creel, 162 F.3d at 395; Weeks v. Scott, 55 F.3d 1059, 1063 (5th Cir. 1995); Smith v. McCotter, 786 F.2d at 702-703.

He cites to Black's Law Dictionary, but it supports the prosecutor's wording instead of his own. Supp. Pet. 2 (probability defined as "the likelihood of a proposition or hypothesis being true"). Robison simply says in dicta that probability means more than a one-in-a-hundred chance. 888 S.W.2d at 481.[61] Hughes proves the prosecutor committed no misconduct: "The term 'probability' is not statutorily defined, and this Court has repeatedly held the trial court does not err in refusing to instruct the jury as to the definition of the term 'probability' as used in the second punishment issue." 878 S.W.2d at 147. "In its usual acceptation, a 'probability' is something more than a 'possibility.'" Id. at 148. The Texas legislature required no specific meaning for probability.

---

[61]    Robison has never been cited in the State of Texas or any other state for the proposition that probability means more likely than not. In fact, in Goff v. State, the CCA said Robison held that probability does not mean any chance but was not required to have a specific definition, further confirming that the prosecutor was unbound by the dicta Roberson cites. 931 S.W.2d 537, 551 (Tex. Crim. App. 1996).

Coble v. State, 330 S.W.3d 253, 267 (Tex. Crim. App. 2010). Texas courts have refused to define probability in this context. Druery v. State, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007), citing Earhart v. State, 877 S.W.2d 759, 767 (Tex. Crim. App. 1994). Because Roberson fails to show the prosecutor's argument was contrary to state law, he cannot show any misconduct. Further, he fails to show that his constitutional rights were violated by this definition of probability, and cannot prove he is entitled to relief.

XX. Evidence That Roberson Sexually Assaulted Nikki Required No Additional Limiting Instructions During Guilt-Innocence.

Roberson contends that the evidence of Nikki's sexual assault required another limiting instruction during the guilt-innocence phase, therefore his attorneys rendered ineffective assistance at trial for failing to ask for it; the trial court erred in not sua sponte giving one, and the trial was rendered fundamentally unfair because trial counsel did not make this request. Supp. Pet. 4 (his claims 43-45).

These claims are wholly unexhausted and procedurally barred. 28 U.S.C. § 2254(b)(1); Beazley, 242 F.3d at 263; Conner, 477 F.3d at 291; Nichols, 69 F.3d at 1280. Roberson does not attempt to distinguish his case from Nobles and Muniz; nor does he attempt to demonstrate cause and prejudice for his failure to raise the claims in his initial state habeas application. Coleman, 501 U.S. at 730; Carrier, 477 U.S. at 485. A miscarriage of justice in this context means Roberson is actually innocent of the crime of which he was convicted. Sawyer, 505 U.S. at 339-40. Because these claims do not implicate the actual innocence

exception to the procedural default doctrine, they are barred from merits review by this Court. In the alternative, his claims are unpersuasive.

A.     Trial court error.

To warrant relief, trial court error must do more than merely affect the verdict; it must render the trial as a whole fundamentally unfair. Bailey v. Procunier, 744 F.2d 1166, 1168 (5th Cir. 1984); Nelson v. Estelle, 642 F.2d 903, 907 (5th Cir. 1981). In determining whether an error by the trial court rendered the trial fundamentally unfair, there must be a reasonable probability that the verdict would be different had the trial been conducted properly. See Rogers v. Lynaugh, 848 F.2d 606, 609 (5th Cir. 1988). Moreover, on federal habeas review of state court convictions, a federal harmless error standard applies. See Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993); Billiot v. Puckett, 135 F.3d 311, 318 (5th Cir. 1998); Vanderbilt v. Collins, 994 F.2d 189, 198 (5th Cir. 1993). This is true whether or not the state court recognized the error. Fry v. Pliler, 551 U.S. 112, 121-22 (2007). Therefore, to be actionable, the trial court error must have "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)); see Billiot, 135 F.3d at 318; Shaw v. Collins, 5 F.3d 128, 132 (5th Cir. 1993); Lowery v. Collins, 996 F.2d 770, 772 (5th Cir. 1993); Vanderbilt, 994 F.2d at 199. Under this standard, Roberson is not entitled to federal habeas relief based on trial error unless he can establish that the error resulted in actual prejudice. See Brecht, 507 U.S. at 637. "[A] state defendant has no constitutional right to an errorless trial." Bailey, 744 F.2d at 1168; accord Banks v. McGougan, 717 F.2d 186, 190 (5th Cir. 1983).

But Roberson's guilt-phase jury instructions were perfectly proper. Article 38.36(a) of the Texas Code of Criminal Procedure permits the introduction of "all relevant facts and circumstances surrounding the killing and the previous relationship between the accused and the deceased." This statute made extraneous bad acts relevant for all purposes, thus rendering a limiting instruction unnecessary. See Ex parte Varelas, 45 S.W.3d 627, 637 (Tex. Crim. App. 2001) (Keller, P.J., dissenting).[62] Further, under state law, unless a party requests a limiting instruction at the time the evidence is proffered, it is not error to admit it generally without a limiting instruction, sua sponte or otherwise, later on. Delgado v. State, 235 S.W.3d 244, 251 (Tex. Crim. App. 2007). Because the sexual assault evidence was relevant to one of the manner and means charged at the time it was proffered, it was proper for it to be admitted generally, and therefore also proper for counsel not to request the limiting instruction. Id.

During the guilt phase, the jury was instructed that Roberson was charged by indictment with the offense of murdering a child under six years of age. 5 CR 613. There was no mention of any other charge "by indictment." Id. At both guilt-innocence and at sentencing, Roberson's jury was instructed that the burden of proof still rested on the State to prove everything beyond a reasonable doubt, including "offenses other than the offense alleged against him in the indictment." 5 CR 617, 638 (emphasis added). As there was only one offense

---

[62]    As the Varelas majority explained, the court in Smith v. State, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999), concluded that Article 38.36 could be applied congruously with Rule of Evidence 404(b). 45 S.W.3d at 642 n.5.

"charged by indictment" during the guilt phase, any reasonable juror would have interpreted "any testimony before you in this case regarding [Roberson] having committed offenses other than the offense alleged against him in the indictment" to include the sexual offenses against Nikki. Under state law, Roberson's failure to object would have absolved the court of any duty to give any limiting instruction on the use of extraneous offenses in guilt-phase jury charge. Delgado, 235 S.W.3d at 251.

Roberson has not demonstrated how this influenced the jury's verdict. Brecht, 507 U.S. at 637. In addition to the contextual evidence about that evening and his abusive relationship with Nikki, the jury heard and saw horrific evidence about the extent of the beating that took her life and Roberson's admissions to Teddie Cox about "just snapping" and to Dr. Goodness about "losing it"; it is hard to see how the State "fail[ed] to make a strong showing that [Roberson] committed the offense." Supp. Pet. 5. At any rate, Roberson fails to argue harm beyond merely asserting he was harmed. Id. "Mere conclusory statements do not raise a constitutional issue in a habeas case." Schlang, 691 F.2d at 799. Accordingly, "the presentation of conclusory allegations unsupported by specifics is subject to summary dismissal." Blackledge v. Allison, 431 U.S. 63, 74 (1977).[63]

---

[63] In an abundance of caution, the Director points out that any alteration of this claim into a sentencing-phase challenge would be unexhausted as well as meritless. The Fifth Circuit holds that the "use of evidence of unadjudicated extraneous offenses, at the sentencing phase of Texas capital murder trials, does not implicate constitutional concerns." Harris v. Johnson, 81 F.3d 535, 541 (5th Cir. 1996) (citing Williams v. Lynaugh, 814 F.2d 205 (5th Cir. 1987); Callins v. Collins, 998 F.2d 269 (5th Cir. 1993)). Further, the Constitution does not require the State prove

B.     Trial counsel was effective.

Roberson alleges he was denied effective assistance of counsel during guilt-innocence because his trial counsel did not request more limiting instructions regarding his sexual assault of Nikki, and therefore his trial was fundamentally unfair.  Supp. Pet. 4.[64]  Because the instructions given the jury were proper, failure to object to them cannot be deficient and his trial was wholly fair.

In determining the merits of an alleged Sixth Amendment violation, courts "must be highly deferential," and every effort must be made to eliminate the "distorting effect of hindsight."  Strickland, 466 U.S. at 689.  A reviewing court is required to presume counsel's "conduct fell within the wide range of reasonable professional assistance." Id.  The question of whether to request such a limiting instruction is one of strategy.  Posey v. State, 966 S.W.2d 57, 63 (Tex. Crim. App. 1998).

> Texas courts have frequently stated that the decision of whether to request a limiting instruction concerning the proper use of certain evidence, including extraneous offenses, may be a matter of trial strategy.  This is in accord with federal precedent as well, in which trial courts are generally wary of giving a limiting instruction sua sponte because a party might well intentionally forego a limiting instruction as part of its "deliberate ... trial strategy to minimize the jury's recollection of the unfavorable evidence."

---

extraneous unadjudicated offenses beyond a reasonable doubt.  Id.  Thus, counsel cannot be ineffective for failing to request an instruction that is neither required by state law nor the Constitution.

[64]     Roberson's claims 43 and 45 are virtually identical, varying only in claming a fundamentally unfair trial because counsel did not object in one, and claiming ineffective assistance for the same reason in the other.  Supp. Pet. 4.

Delgado, 235 S.W.2d at 250 (citing United States v. Johnson, 46 F.3d 1166, 1171 (D.C. Cir. 1995); United States v. Rhodes, 62 F.3d 1449, 1453–54 (D.C. Cir. 1995); Ward v. Dretke, 420 F.3d 479, 491 (5th Cir. 2005); Kessler v. Dretke, 137 F.App'x 710, 711-12 (5th Cir. 2005); Daniel D. Blinka, Ethics, Evidence, and the Modern Adversary Trial, 19 Geo. J. Legal Ethics 1, 19 (2006) (noting that opponent of evidence will "frequently forego limiting instructions for fear that they will only emphasize the damaging inference")).

Moreover, the deficiency prong need not be considered if the petitioner has failed to demonstrate prejudice. Strickland, 466 U.S. at 697; Martin v. Cain, 206 F.3d 450, 457 (5th Cir. 2000). To meet this burden, he must do more than simply allege prejudice; instead, he must "affirmatively prove" it. Strickland, 466 U.S. at 693; Hill v. Lockhart, 474 U.S. 52, 58 (1985). Roberson has failed to do so. Supp. Pet. 4-6. "Mere conclusory statements do not raise a constitutional issue in a habeas case." Schlang, 691 F.2d at 799. Accordingly, "the presentation of conclusory allegations unsupported by specifics is subject to summary dismissal." Blackledge, 431 U.S. at 74.

For the foregoing reasons, Roberson's petition for writ of habeas corpus should be denied.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER

Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

\*       /s/ Georgette P. Oden
                                                          

GEORGETTE P. ODEN
Assistant Attorney General
\*Attorney-in-charge
State Bar No. 24029752

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1400
facsimile (512) 320-8132
Georgette.Oden@oag.state.tx.us

## CERTIFICATE OF SERVICE

I do hereby certify that on April 2, 2012, I electronically mailed a copy of this pleading to Counsel for Roberson at the following addresses: james@jamesvolberding.com and volberding@attglobal.net and in addition, mailed a paper copy to Counsel at:

James Volberding
Plaza Tower
110 North College Avenue
Suite 1850
Tyler, Texas 75702

                                        /s/ Georgette P. Oden
                                        GEORGETTE P. ODEN
                                        Assistant Attorney General