## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

ROBERT ROBERSON, III,

        Petitioner,

v.                                                                        NO. 2:09-CV-327

RICK THALER, Director,

        Respondent.

## REPLY TO ANSWER OF RESPONDENT THALER

TO THE HONORABLE U.S. DISTRICT COURT:

COMES NOW Petitioner, Robert L. Roberson, III, and respectfully submits this Reply to the Answer of Respondent Thaler (Doc. No. 27):

### INTRODUCTION: PROSECUTION OF SEXUAL ASSAULT CHARGE WAS UNDERTAKEN WITH NO REASONABLE BELIEF THAT A CONVICTION WOULD FOLLOW

In *Kugler v. Helfant*, the Supreme Court explained that a bad faith prosecution is one that "has been brought without a reasonable expectation of obtaining a valid conviction." 421 U.S. 117 (1975).  It is striking that nowhere in the State's brief does it seriously dispute that the prosecution of Roberson under TEX. PENAL CODE §19.03(a)(3) was undertaken with no reasonable belief that a conviction would follow.  Nor does the State's brief refute the contention that Roberson was only charged with violation of §19.03(a)(3) because the newly elected D.A., Doug Lowe, was under pressure for results.  For more than four decades, the Fifth Circuit has

authorized federal district courts to enjoin state prosecutions under such circumstances.  *Shaw v. Garrison*, 467 F.2d 113 (5th Cir. 1972) (affirming district court that enjoined New Orleans District Attorney from prosecuting a man for perjury when the prosecution was brought in bad faith and for political motives).

## I.      PROCEDURAL DEFAULT

Several years ago Texas prosecutors began asking state courts to write that capital inmates' federal constitutional claims were "procedurally barred" for failure to comply with state law contemporary objection rules. This permitted those prosecutors to argue later to federal judges that they could not review the inmate's federal claim under section 2254(d) because a state court had already found it "procedurally barred."  The concept of procedural bar, however, is a federal rule in which a federal constitutional claim can be barred from review "[w]hen a petitioner fails to properly raise his federal claims in state court" --- in other words, properly exhaust in the correct manner. *See Cone v. Bell*, 556 U.S. 449, 465-66 (2009) ("the adequacy of state procedural bars to the assertion of federal questions . . . is not within the State's prerogative finally to decide; rather, adequacy is itself a federal question.") (internal citations omitted).

## II.      PROSECUTORIAL MISCONDUCT

The State frames a purported excuse for its prosecutorial misconduct as, 'If Nurse Andrea Sims believes Nikki was sexually assaulted, the Prosecutor had a license to charge Roberson under TEX. PENAL CODE §19.03(a)(3).' State's Br. at 39 ("this nurse's report was relied on by the State as it sought the indictment against Roberson."  No reported case in American history has permitted a prosecution undertaken with no reasonable belief that a conviction would follow on such flimsy evidence.

Moreover, Nurse Sims NEVER said or wrote that she believed Nikki had been molested. In her written report in the medical chart, she wrote the note of "possible sexual assault" because she saw some small anal tears.  This is not her belief that it occurred, only that were was an indication of possibility.   Proving the paucity of rape evidence but depth of Doug Lowe's malevolence, *he did not call Andrea Sims at the trial to testify.*

Here is the entirety of his presentation of testimony from Mr. John Ross, treating physician:

> [Mr. Lowe]: All right.  Doctor, let me visit with you about one final area and that's nurse Andrea Sims did a SANE examination. Did that take place in your presence?
>
> [Dr. Ross]:  I'm sorry?
>
> [Mr. Lowe]: Nurse Sims did a sexual assault nurse exam.  Did that take place in your presence or were you involved in that at all?
>
> [Dr. Ross]:  Very minimally.  I was in and out of the room.  I understand that they were doing it. I was not there for all of that and I didn't make any comments about it.
>
> [Mr. Lowe]: All right.  Did you undertake to do any sort of examination yourself to see if the child had been sexually assaulted?
>
> [Dr. Ross]: I did not.
>
> [Mr. Lowe]: All right.  So you don't have any opinion on that?
>
> [Dr. Ross]:   I don't have any opinion.
>
> [Mr. Lowe]: Judge, I'll pass the witness.
>
> Tr. 42 at 22.

Lowe obtained an indictment against Robinson for raping a child, and this dialogue reveals that Lowe did not even ask Dr. Ross his opinions about child rape before the trial to learn what he would say.

Nor did Dr. Janet Squires, Lowe's primary medical witness, indicate that Roberson had raped the child.  Here is the totality of her comments on the subject:

[Mr. Lowe]: What medical findings did you make?

[Dr. Squires]: I listed out the findings here because I did examine this child totally and on exam she was a beautiful, . . . The rest of her body, there were no scars, no unusual bruising or anything.  The other part of her body, I was asked to look at and pay attention to and I did, was around the anus.  I was aware of the fact that in the referring hospital here in Palestine one of doctors had concern that the anal area was a little open and perhaps had been traumatized, so I looked particularly at that area and my assessment was there was a little tiny laceration.  If you looked at it like a clock, at 9 nine o'clock.  I thought that was nonspecific, did not show major trauma, and I did not feel there were any findings.

Because at the time there was concern about a possibility of sexual abuse.  I did do some special collections there, but I did not see any findings.  So that was my general findings.

. . .

[Mr. Lowe]: Okay.  Thank you, doctor.  All right.  Then let me talk to you about this anal exam.  Part of your--  I guess, do you start from a place where you think that every kid that comes to you is sexually abused?

[Dr. Squires]: No.

[Mr. Lowe]: All right.  So why would you do an anal exam then?

[Dr. Squires]: Well, because we had other findings that this child had been abused and also I was aware of the fact that the doctors in the other emergency room had questioned it.  So when they called me to come that was one of the questions I was asked, 'Would you look at this and give us your assessment?'

[Mr. Lowe]: All right.  So you stated that there was slightly red and--

[Dr. Squires]: Patulous just means not tight.  It means the muscle is very lax.

[Mr. Lowe]:  And there is a small laceration at nine o'clock?

[Dr. Squires]: Yes.

[Mr. Lowe]: And there's no significant bruising?

[Dr. Squires]: Yes.

4

[Mr. Lowe]: All right.  So based on that exam you're not here to say, 'I believe she was sexually assaulted'?  You're not prepared to make that medical conclusion, are you?

[Dr. Squires]: That's correct.

Tr. Vol. 42 at 96-99.

Obviously, Lowe knew that Dr. Squires could not confirm sexual assault before he filed the indictment. And the person who asked her, "Would you look at this and give us your assessment?" was Lowe. ***Before he sought Roberson's indictment he knew unequivocally that no evidence at all existed that Roberson raped the child.***

Therefore, to the extent that the AG and the Findings of Fact and Conclusions of Law contend that Nurse Sims reasonably believed an assault occurred, then the state record objectively and flatly contradicts this.  It necessarily follows that such a finding of fact is unreasonable under §2254(d)(1), and Roberson has met his burden under subsection (e).

### III.    SEVERANCE ISSUE

Thaler's response (State's Br. at 46-54) suffers a misunderstanding of the law of joinder and severance of offenses.

### A.    The State Misreads *Graham v. State*

The State misreads *Graham v. State*, 19 S.W.3d 851.  The Texas Court of Criminal Appeals was clear that, "[a]n indictment may contain as many separate paragraphs charging the same offense **as is necessary to meet the contingencies of the evidence**." *Id*. at 853 (emphasis added).  In Roberson's case, it is uncontroverted that there was no contingency of evidence concerning sexual assault since the prosecution withdrew this charge after the presentation of its

case in chief.  *Accord Rojas-Diaz v. State*, 2010 Tex. App. LEXIS 2814 (Tex. App. Dallas 2010) (reversing trial court's failure to sever aggravated robbery from burglary charge).

**B.     Doctrinal Principles From The Hallmark Case of *State v. Boscarino***

The hallmark case on the subject of joined in the sexual assault context is *State v. Boscarino*, 204 Conn. 714 (Conn. 1987).  Boscarino was charged with one count of kidnapping in the first, three counts of assault in the second degree, and one count of sexual assault in the first degree.  In a separate case, he was charged with one count of burglary in the first degree, and three counts of sexual assault in the first degree.  Overruling Boscarino's motion to sever, these two cases, along with two other cases that also involved alleged sexual assaults, were consolidated for trial before a single jury.

Reversing, the Connecticut Supreme Court explained:

> The cases for which the defendant was jointly tried did not involve discrete, easily distinguishable factual scenarios. Each of the four cases involved alleged sexual assaults. Except for the South Windsor case, all of the incidents occurred in adjacent towns within     a few months of one another. In all four cases the alleged assailant carried a knife, and in two of the assaults the assailant was reportedly naked. In all four cases the respective victims provided similar descriptions of their assailant to police and identified the defendant as the culprit before and during trial. These factual similarities, which the state concedes were insufficient to make the evidence in each case substantively admissible at the trial of the others, were significant enough to impair the defendant's right to the jury's fair and independent consideration of the evidence in each case.

> The prejudicial impact of joinder in these cases was exacerbated by the violent nature of the crimes with which the defendant was charged. **Joinder gave the state the opportunity to present the jury with the intimate details of each of these offenses, an  opportunity that would have been unavailable if the cases had been tried separately.**

*Id*. at 722-723 (emphasis added).

## C.     Federal Habeas Relief Afforded When Severance Not Granted

The Ninth Circuit afforded habeas relief on a severance issue in *Bean v. Calderon*, 163

F.3d 1073 (9th Cir. 1998).  Anthony Bean was convicted of the first-degree murder, robbery, and

burglary of two women, Beth Schatz and Eileen Fox, and sentenced to death.  By all accounts,

the evidence of the murder of Fox was weak while the evidence concerning the murder of Schatz

was strong:

> The evidence connecting Bean to the Schatz crimes included his undisputed fingerprint on the kitchen window screen; his undisputed partial palm print on the kitchen counter;  tennis shoe imprints matching shoes he shared with his brother; and his statements to      Norman Hamilton and Anders, revealing his role in assaulting Beth Schatz and in robbing the Schatzes.
>
> By contrast, the sole direct evidence of Bean's complicity in the Fox offenses involved a fingerprint on broken sunglasses found beside Eileen Fox's body, a fingerprint that Bean vigorously  disputed  at  trial  through  expert testimony.

*Id*. at 1085.

Explaining the error in the trial court's refusal to sever these crimes, the Ninth Circuit

stated:

> Not only did the trial court join counts for which the evidence was not cross-admissible, but the State repeatedly encouraged the jury to consider the two sets of charges in concert, as reflecting the modus operandi characteristic of Bean's criminal activities. Thus, the jury could not 'reasonably [have been] expected to 'compartmentalize the evidence' so that evidence of one crime [did] not taint the jury's consideration of another  crime,' *United States v. Johnson*, 820 F.2d 1065, 1071 (9th Cir. 1987), when the State's closing argument and the import of several of the instructions it heard urged it to do just the opposite.

*Id.* at 1084.

## D.     Application of *Boscarino* and *Bean*

The holdings of both *Boscarino* and *Bean* apply with even greater to Roberson's

situation, where the alternative (and ultimately abandoned) trial theory maintained that Roberson

killed Nikki in the course of a rape.  However, it seems fairly uncontroverted that the sexual

assault was only charged to "give the state the opportunity to present the jury with the intimate details of each of these offenses, an opportunity that would have been unavailable if the cases had been tried separately."

### E.    Judicial Accuracy

The bedrock desire of all due process constitutional analysis by the Supreme Court is judicial accuracy --- the imperative that the trier of fact reach the correct decision whether to convict or acquit, and if convicted, the accurate tailored sentence, based on complete and accurate vetted evidence.

In Roberson's case this judicial accuracy process failed.   The jurors were placed, deliberately by the state, in the impossible position of having been sworn by oath to decide accurately whether Roberson was guilty of capital murder of a child, and told persuasively by Lowe through voir dire and opening statement that he had raped the child before killing her. And once Lowe completed his case, he dismissed without comment the rape charge.  Then trial judge insisted the jurors still make an accurate decision as to Roberson's guilt and sentence, instructing them to set the rape allegation out of their minds while doing so as they completed their oath imposed obligations. No reasonable juror, and probably no human at all, could ever put out of his or her mind the repeated, credible, forceful assertions that Roberson had raped this two-year-old before murdering her, and then decide his conviction and sentence unbiased on the remaining facts, even if instructed by written and oral limiting instructions, as here. This is beyond human ability, and destroys due process fundamentally and utterly.

The Supreme Court is hostile to placing jurors in this sort of ethical conundrum, where they are forced to decide a citizen's fate accurately, while simultaneously being ordered to comply with competing obligations beyond their means to comply, creating capricious, and

therefore constitutionally intolerable, decision making.  The Court has told Texas this repeatedly, as recently as 2007.

Following the Court's 1989 decision in *Penry* to require Texas to allow its capital jurors to consider the inmate's mitigating circumstances, there was a two year period when Texas judges applied a legal band aid to Texas capital juror instructions.  While the first two special issues asked whether the defendant had killed deliberately and would be a future danger, judges told jurors to ignore their sworn oath to answer these two special issues honestly and instead falsely answer one of the questions "no" if found sufficient mitigating evidence to justify a life sentence. This became known as "the nullification instruction." Here is how the Supreme Court explained the Texas twisting of the ethical obligations of jurors:

> For the brief period between *Penry I* and the Texas Legislature's addition of a catchall   special issue, Texas courts attempted to cure *Penry* error with a nullification charge. In Smith's case the trial court instructed that if a juror was convinced the correct answer to each special-issue question was "yes," but nevertheless concluded the defendant did not deserve death in light of all the mitigating evidence, the juror must answer one special-issue question "no." The charge was not incorporated into the verdict form. *See, e.g.*, 1 App. 123–124.  In essence the jury was instructed to misrepresent its answer to one of the     two special issues when necessary to take account of the mitigating evidence.

*Smith v. Texas*, No. 05-11304, 550 U.S. ___ (2007) (*Smith II*) (emphasis ours).

In *Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*), the Court reversed John Penry's death sentence a second time when it learned that Texas had imposed its suspect nullification instruction, worried that, "it would have been both logically and ethically impossible for a juror to follow both sets of instructions." *Id.* at 797–802.  The Court concluded, "the jury was essentially instructed to return a false answer to a special issue in order to avoid a death sentence." *Id.*

When prosecutors responded that they clarified the nullification instruction, the Court shook its head, "this explanation only reminded the jurors that they had to answer the special issues dishonestly in order to give effect to Penry's mitigating evidence." *Id.* at 797–802.

In *Smith v. Texas*, 543 U. S. 37 (2004) (per curiam) (*Smith I*), the Court returned to the Texas nullification issue, which Texas said it had fixed by ordering that jurors "shall" consider all mitigating evidence and to change one of their answers to the deliberateness and future dangerousness issues. Flatly criticizing Texas for its thick-headed refusal to understand the ethical imposition on jurors and distortion of the truth finding function, the Court explained,

> [T]he clearer instruction given to petitioner's jury did not resolve the ethical problem . . . To the contrary, the mandatory language in the charge could possibly have intensified the dilemma faced by ethical jurors. . . . Even if we were to assume that the jurors could  easily and effectively have comprehended an orally delivered instruction directing them to    disregard,   in   certain   limited circumstances, a mandatory written instruction . . . would   not  change  the  fact that the jury was essentially instructed to return false answers to a  special    issue in order to avoid a death sentence.

> *Smith v. Texas*, 543 U. S. at 45-48 (emphasis ours).

In 2007, the Supreme Court took up Smith's case again when the CCA disobeyed orders.

Listen to the Court's criticism of the ethical imposition onto jurors:

> *Penry II* and *Smith I* recognized the ethical dilemma, the confusion, and the capriciousness introduced into jury deliberations by directing the jury to distort the meaning of an instruction and a verdict form. *Penry II, supra*, at 797–802; *Smith I, supra,* at 45–48. These are problems distinct from Penry error and ***may be grounds for reversal  as an independent matter***; but we need not reach that issue here, just as the Court did not need to reach it in *Penry II* or *Smith I.*

> *Smith v. Texas*, No. 05-11304, 550 U.S. ___ (2007) (*Smith II*) (emphasis ours).

This phrase, "may be grounds for reversal as an independent matter," is where were here. The Court has made clear, and our facts prove here, that the Court views attempts to manipulate

jurors with false information and demand jurors chose between their beliefs and their oaths as violations of due process and the Eighth Amendment.

## IV.   THE STATE MISREADS *PINHOLSTER*

Respondent Thaler presents a flawed argument that *Pinholster* prevents this court from substantiating the Sixth Amendment issue, when in fact *Pinholster* was clear that district courts continue to expand the record once 2254(d) has been satisfied or does not apply.  (State Br. at 19, 76, 91.)

### A.   Introduction

In *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), the Supreme Court held for the first time that federal review under §2254(d)(1) of state court convictions is ordinarily limited to the factual record before the state courts.  In so holding, the Court not only placed a modicum of restriction on the ability of federal courts to conduct their own inquiries into the facts underlying state convictions, it also limited the effect of several of its own prior rulings as well as at least one statutory provision governing habeas corpus procedures.  The Supreme Court stopped short, however, of saying that federal courts can never hold evidentiary hearings in habeas corpus cases, and reserved something of an undefined role for federal proceedings to supplement the state court record.

Problematically, Respondent Thaler's brief urges this Court to expand *Pinholster* outside of itself-defining limitation to 2254(d)(1) into a general prohibition on evidentiary hearings.  But the nature of logic of the *Pinholster* opinion does not admit to such a broad-sweeping assertion.

### B.   The Legal Impact of *Pinholster*

Roberson readily recognizes that ways in which *Pinholster* changed the procedural landscapein habeas corpus proceedings.  For example, the decision specifically precluded federal

courts from considering new facts when deciding if Petitioners are able to clear the §2254(d)(1) hurdle.  The Court ruled that subdivision (d), precluding habeas relief unless a decision was contrary to or an unreasonable application of Supreme Court precedent, implicitly limits federal review of factual issues to the record before the state court. Second, the Court, by relying on subdivision (d) to arrive at its ruling, obviated the need to resort to subdivision (e)(2), the provision specifically addressing federal hearings, at least in deciding whether the mandates of 2254(d) have been met.  Where the petitioner's claim is adjudicated in state court, federal courts can no longer consider new evidence under the Court's interpretation of subdivision (d), and there is no need to consider whether a new hearing is also prohibited by subdivision (e)(2).

### C.        Lacunae In *Pinholster*'s Legal Firmament

#### 1.        Basic Principle

While the Court's ruling in *Pinholster* was expansive, it was not without limits. The Court left open the possibility that a hearing could be granted in an appropriate case, such as where a claim was never adjudicated in state court and therefore subdivision (d) does not apply, or in certain other circumstances.  While *Pinholster* prohibits review of new allegations or proof of an old claim, well established habeas law would allow a defendant with a new claim to obtain review, despite the procedural failure to exhaust the claim in state court, if he can show that he had cause for failing to raise the claim below and that he would be prejudiced by non-review of the claim.

This exception takes two forms.  Subsection "D" might be otherwise satisfied, or the petitioner's claim might arise in a totally different context entirely.

### 2.      Part "D" is Otherwise Satisfied

The *Pinholster* opinion was clear that an evidentiary hearing under §2254(e)(2) remains appropriate "where §2254(d)(1) does not bar habeas relief." *Id*. at 1401. *See Love v. Cate*, 2011 WL 3874873, at *4 n.1 (9th Cir. 2011) (Graber, J., dissenting) (noting that, where a court already has found an unreasonable application of federal law, a federal court may hold an evidentiary hearing to determine whether a prosecutor's peremptory strike was racially motivated); *Bemore v. Martel*, 2011 U.S. Dist. LEXIS 72296, at *5-8 (S.D. Cal. July 6, 2011) (conducting an evidentiary hearing because, under § 2254(e)(2), petitioner had not failed to diligently develop facts underlying his claims in state court; but noting that it would only be able to consider new facts from the hearing if "Petitioner first satisfies section 2254(d)" (emphasis omitted).

The Southern District of Michigan has explained:

> *Pinholster* concerns the application of 2254(d) and not 2254(a). It holds that a habeas court may not consider new evidence in determining under 2254(d) whether a state court decision was unreasonable.

*Ballinger v. Prelesnik*, 2011 WL 5216277, at *1 (E.D. Mich. 2011) (emphasis added) (denying a motion for reconsideration of the court's decision  to  grant  an  evidentiary  hearing because it had "already determined that §2254(d)'s hurdle has been cleared" and now was considering whether petitioner was being unconstitutionally held under [§] 2254(a)).

### 3.      Habeas Grounds Separate and Apart from §2254(d)

"Both the majority and dissent in *Pinholster* recognized that new evidence could, under some circumstances, give rise to new claims for relief potentially not subject to § 2254(d)." Samuel R. Wiseman, *Habeas After Pinholster*, 53 B.C. L. REV. 953, 986 (2012).  In footnote 10 of the Pinholster opinion, the majority described two scenarios--one in which a petitioner raises a Brady claim in state postconviction review and after completion of the review discovers

exculpatory *Brady* material, and another in which the petitioner does not raise a Brady claim in state court and then discovers Brady material--and argued that the petitioner will only have a new claim under AEDPA in the latter scenario).  Applying these principles, the *Ballinger* court stated:

> [*Pinholster*] does not hold that a habeas court may not consider new evidence in determining whether a petitioner is being held in custody in violation of his constitutional rights under 2254(a).
>
> *Ballinger*, at *1.

The essence of this argument is that *Pinholster* only applies to a court's decision under 2254(d).  In turn, section 2254(d) only applies to "any claim that was adjudicated on the merits in State court." While the generally rule is that claims not presented state courts are barred from review by federal habeas courts, there are exceptions to that rule. *See, e.g. Martinez*.  When a federal habeas court is able to review a claim that has not been presented to the state court, *Pinholster* does not apply.

In the event that this Court believes Roberson is correct that the equitable principles established in *Martinez v. Ryan* (*supra*) permit review of his ineffective assistance of counsel claim, this court would be able to hold an evidentiary hearing related to that claim.  As discussed above, *Martinez* provides an exception to section 2254(d)'s exhaustion requirement.  If *Martinez* applies to this claim, then this Court may reach the merits of this claim in spite of the fact that the ineffectiveness claim was not presented to the state court.  As previously explained, a claim not presented to the state court is not "adjudicated on the merits in State court" and section 2254(d) does not apply. *See* 28 U.S.C. § 2254(d).  *Pinholster* also would not apply.  The Supreme Court made clear that this exception to 2254(d) was based on the principles of equity. *Martinez*, 132 S. Ct. at 1318-19.

## V.    INEFFECTIVE ASSISTANCE OF COUNSEL: THE STATE MISREADS *MARTINEZ V. RYAN*

### A.    Introduction

The State miscomprehends the Supreme Court's holding in *Martinez v. Ryan*, 132 S.Ct.1309 (2012).  State's Br. at 34 n.16.

*Martinez* recognizes a limited exception to *Coleman v. Thompson*, 501 U.S. 722, 746-47, 111 S. Ct. 2546, 2562-63, 115 L. Ed. 2d 640 (1991).  Specifically, in *Martinez*, the Court said:

> To protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel, it is necessary to modify the unqualified statement in Coleman that an attorney's ignorance or inadvertence in a post-conviction proceeding does not qualify as cause to excuse a procedural default. This opinion qualifies Coleman by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.

*Id*. at 1315.

### B.    The State Seeks to Elevate the Form of a 'State Mandate' (Which Was Not Listed in *Martinez*) Over the Substance of Functional Inhibitions on Raising Ineffective Assistance Argument

To find that Roberson could not be one of those prisoners with a potentially legitimate claim of ineffective assistance of trial counsel that *Martinez* clearly designs to protect, Respondent Thaler must read the above use of "initial-review collateral proceedings" to mean 'state mandated initial-review collateral proceedings' rather than rely on the literal definition of an "initial-review collateral proceeding."   Yet the Supreme Court did not include "state-mandated" or any such phrase in pronouncing this exception. The Court also did not exclude the application of this equitable exception to prisoners like Roberson, who raised IAC claims in a collateral proceeding as strongly suggested by the state. Yet the Court specifically excluded "attorney errors in other kinds of proceedings, including appeals from initial-review collateral

proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Id*. at 1320.

In *Martinez*, the Supreme Court specifically noted that Arizona habeas courts look to the merits of the ineffectiveness claim, that no other court prior to the collateral proceeding has addressed the claim, and "defendants pursuing first-tier review . . . are generally ill equipped to represent themselves because they do not have a brief from counsel or an opinion of the court addressing their claim of error." *Id*. at 1317 (internal marks omitted).   That is exactly the situation with Roberson. The Texas habeas court would have been the first court to look to the merits of his ineffective assistance of trial counsel claim.   As to the third factor above, Roberson (just like petitioner Martinez was) were both represented by counsel, but the Supreme Court extended the exception both to unrepresented and represented defendants.  *Id*. at 1318.

The Supreme Court unequivocally made an "equitable ruling" creating an exception to a default in instances with and without counsel.   In an "equitable ruling," there is no practical or legal way to distinguish between a prisoner asserting that his initial-review collateral proceeding counsel was ineffective for failing to assert an ineffective-assistance-of-trial-counsel claim in a state that requires the claim to be raised collaterally and a state that strongly suggests that the claim should be raised collaterally. In both instances, the claim would properly be raised collaterally.   The only reasonable distinction between the two would be in the context of a constitutional ruling, which is not what the Supreme Court made.  This conclusion is buttressed by the Supreme Court's statement that the purpose of the exception is to "protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel." *Id*. at 1385.

**C.       The Fifth Circuit Remanded on the *Martinez* Issue in *Lindsey v. Cain***

The proper statement of the Fifth Circuit's treatment of Martinez is the Fifth Circuit's

opinion remanding in *Lindsey v. Cain*, 2012 U.S. App. LEXIS 7953 (5th Cir. 2012).  Granting a

COA and remanding for further proceedings in light of *Martinez*, the Court stated:

> When a state, like Louisiana, requires that a prisoner raise an ineffective
> assistance of counsel claim on collateral review, a prisoner can demonstrate cause
> for the default in two circumstances: (1) 'where the state courts did not appoint
> counsel in the initial review collateral proceeding for a claim of ineffective
> assistance at trial' and 'where appointed counsel in the initial-review collateral
> proceeding, where the claim should have been raised, was ineffective under the
> standards of *Strickland v. Washington*.  Further, the prisoner must also show that
> 'the underlying ineffective-assistance-of-trial counsel claim is a substantial one,
> which is to say that the prisoner must demonstrate that the claim has some merit.
> *Cf. Miller-El v. Cockrell* (describing standards for certificates of appealability to
> issue).' *Id*. (internal citations omitted).
>
> Accordingly, a COA is granted on the dismissal of Lindsey's ineffective
> assistance of counsel claims that were procedurally defaulted; the judgment is
> vacated as to those claims; and the matter remanded for further proceedings in
> light of *Martinez*.
>
> *Id*. at *18.

The holding of *Lindsey* applies with even greater valence to Roberson than it did on the

facts presented in that case. Louisiana, like Texas, allows a prisoner to raise ineffective

assistance of counsel on direct appeal "when the record contains sufficient evidence to decide the

issue and the issue is properly raised by assignment of error on appeal." *State v. Brashears*, 811

So.2d 985 (La. App. 5 Cir. 2002). *Accord Williams v. Alabama*, 2012 U.S. Dist. LEXIS 51850,

(N.D.Ala. April 12, 2012) (petitioner demonstrated cause under Martinez to overcome

procedural default of his ineffective assistance of counsel claim.); In Texas, only when

"counsel's ineffectiveness is so apparent from the record" will an appellant prevail on direct

appeal absent a hearing on a motion for new trial asserting an ineffective assistance of counsel

claim." *Freeman v. State*, 125 S.W.3d 505, 506–07 (Tex.Crim.App.2003). Of course, given the

30 day time limit allowed in Texas to file a motion for a new trial, and the voluminous records involved in capital cases, the rule that ineffectiveness can be raised on direct appeal allows a microscopic exception to swallow whole. *See* Tex. Rules App. Proc. 21.4. *See, e.g. Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012) (Martinez does apply to Oregon, even though Oregon sometimes allows ineffective assistance claims on direct appeal, when those claims can be adduced from the record), and *Lindsey v. Cain*, 2012 WL 1366040, at *1 (5th Cir. 2012) (*Martinez* does apply to Louisiana even though it, like Texas, technically allows ineffective-assistance claims on direct appeal).

## VI.    RESPONDENT THALER MISCOMPREHENDS THE IMPORT OF *APPRENDI* AND *RING*

The State's response to Roberson's *Apprendi/Ring* challenge is mistaken.  (State's Br. at 103-114).

The FFCL's holding that "*Apprendi* is inapplicable to the mitigation issue" FFCL at ¶97, was contrary to clearly established Supreme Court precedent as established by *Ring v. Arizona,* which was rendered well before the Court of Criminal Appeals decided *Roberson.   Ring v. Arizona,* 536 U.S. 584 (2002).   Indeed, this exact argument was explicitly addressed, and rejected, in *Ring.   Ring*, 536 U.S. at 603-09 (Explaining Arizona's argument that the a judge's finding of aggravating factors permitting the death penalty to be imposed does not increase the possible punishment range for those convicted of first degree murder because the punishment for such an offense is "death or life imprisonment," is irreconcilable with *Apprendi*.).   *Ring* held that the Sixth Amendment applies to fact finding necessary for putting a person to death.   *Id.* at 609. In other words, *Apprendi* applies to capital sentencing schemes where factual findings are necessary to a verdict of death.   Those factual findings "must be submitted to a jury, and proven beyond a reasonable doubt."   *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000).

Before a defendant may be sentenced to death in Texas, the jury must answer statutory special issues in a certain way.  *See* TEX. CODE CRIM. PRO. ART. 37.071 (Art. 37.071).  Pursuant to Art. 37.071, sec. 2(b), the jury was first asked the following question:  "Do you find beyond a reasonable doubt that there is a probability that the defendant, Robert Leslie Roberson, would commit criminal acts of violence that would constitute a continuing threat to society?"  This instruction complies with the *Ring* requirement that the jury find this 'aggravating factor' beyond a reasonable doubt before death can be imposed.

The jury in Roberson's case answered the first special issue in the affirmative and was instructed to move onto the second special issue:  "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Robert Leslie Roberson, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentenced be imposed?"  *See* Art. 37.071(e)(1). By answering this special issue in the negative, a jury sentences a defendant to death.  If this second special issue encompassed only mitigating factors, then *Ring* would not apply.  However, Texas allows the jury to consider aggravating factors during the consideration of the second special issue, without requiring those aggravating factors to be proven beyond a reasonable doubt.  *See Jackson v. State,* 992 S.W.2d 469, 478 (Tex. Crim. App. 1989) ("[W]e have recently recognized that aggravating circumstances can be considered in connection with the mitigation special issue.").  This allows a jury who believes there are sufficient mitigating factors to warrant a life sentence to overlook those mitigating factors on the grounds that they are outweighed by aggravating factors.  The Constitutional problem is these aggravating factors do not have to be proven beyond a reasonable doubt.

Respondent Thaler argues the jury was instructed that aggravating factors used in the mitigation special issue had to be proven beyond a reasonable doubt. *Reply Brief* at 110-111. The state basis this argument on the instructions in the jury charge related to extraneous offenses or bad acts. The jury was instructed the extraneous offenses or bad acts must be proven by the state beyond a reasonable doubt. *Id.* However, the state overlooks that the jury was also instructed to "consider all evidence submitted to you during the whole trial as to the defendant's **background or character** . . . that militates for or mitigates against the imposition of the death penalty" in reaching its decision on the special issues. S*ee* TEX. CODE CRIM. PRO. ART. 37.071 § 2 (d)(1). Also, in special issue number two the jury was specifically instructed to take "into consideration all of the evidence, including the . . . defendant's character and background" in deciding if there were sufficient mitigating circumstances to warrant a life sentence. These instructions allowed the jury to take into account aggravating background or character evidence in deciding special issue number two, but failed to instruct the jury that it could only take this aggravating evidence into account if it was proven beyond a reasonable doubt.

There were multiple arguments made by the prosecution in its closing which could be seen as aggravating factors to be considered in mitigation, and which also would not be covered by the extraneous bad acts or offenses instruction. These are all arguments which the jury could use as aggravating factors to rule against Roberson in the mitigation special issue, and because the jury was specifically instructed to consider character and background in deciding that special issue it is likely these arguments affected the jury's verdict. However, the jury was never instructed it could only consider aggravating factors when answering the mitigation special issue if they were proven beyond a reasonable doubt. This problem was compounded by the fact that special issue number two specifically permitted the jury to take the "defendant's character and

background" into account, and that the jury was previously instructed that character or background evidence could "militate[] for or mitigate[] against" a sentence of death.

Finally, the Fifth Circuit cases cited by the state have no precedential value to this particular claim. *See Reply* at 111. Each of the cases cited by the state hold that the Texas death penalty scheme does not violate the federal Constitution by failing to require the state to prove the absence of mitigating circumstances beyond a reasonable doubt. *Id.* (*citing Scheanette v. Quarterman,* 482 F.3d 815 (5th Cir. 2007*); Ortiz v. Quarterman,* 504 F.3d 492 (5th Cir. 2007; *Granados v. Quarterman,* 455 F.3d 529 (5th Cir. 2007); *Rowell v. Dretke,* 398 F.3d 370 (5th Cir. 2007*).*

Roberson does not argue that the state should have to prove the lack of mitigating circumstances beyond a reasonable doubt. Instead, Roberson argues that the state should have to prove any aggravating factors considered by the jury when deciding the mitigation special issue beyond a reasonable doubt. This is based on Texas's own rule which allows a jury to consider aggravating factors when deciding the mitigation special issue. *See Jackson v. State,* 992 S.W.2d 469, 478 (Tex. Crim. App. 1989). It is entirely possible that a jury would find that there were sufficient mitigating factors to warrant a sentence of life, but that these factors, when balanced against aggravating factors which were not proven beyond a reasonable doubt, are no longer sufficient to warrant a life sentence. Thus, unproven aggravated factors in Texas can convert a life sentence to a death sentence. Because the aggravating factors considered by Texas capital juries during their consideration of the mitigation special issue are "the functional equivalent of an element of a greater offense," the Sixth Amendment requires that they be submitted to a jury and proven beyond a reasonable doubt. *Ring*, 536 U.S. at 609 (*citing Apprendi*, 530 U.S., at 494, n. 19).

## VII.   TEXAS'S 12/10 RULE IS UNCONSTITUTIONAL

Roberson argues that the Texas' capital sentencing scheme, by affirmatively misleading jurors about their individual ability to give effect to their personal belief regarding mitigation, violates the Eighth and Fourteenth Amendments.  This claim is based on *Mills v. Maryland*, where the Court ruled that the petitioner's sentence could not stand where it was possible that some "jurors were prevented from considering factors which may call for a less severe penalty [than death.]" 486 U.S. 367, 376 (1988).  As the Fifth Circuit has repeatedly recognized, "[s]ubsequent to *Mills*, the Supreme Court has explained that 'Mills requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death.'" *See, e.g., Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir. 2000) (citing *McKoy v. North Carolina*, 494 U.S. 433, 442–43, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990)); *Jacobs v. Scott*, 31 F.3d 1319, 1328 (5th Cir. 1994).

The constitutional defect with Texas' current jury instructions is that they, by statute and as applied in Roberson's case, mislead jurors about their individual ability to give effect to mitigating circumstances.  Although Texas' sentencing statute gives individual jurors the power to prevent the death penalty if they believe mitigating circumstances call for a sentence of life, that same statute also misleads jurors into believing their individual belief is immaterial unless they are able to persuade nine of their fellow jurors that their view of the evidence is correct.  *See* TEX. CODE CRIM. PRO. ART. 37.071 (Art. 37.071).[1]  Roberson does not argue that it is necessary to instruct jurors about the consequences of a single holdout juror although that would give meaning to Art. 37.071 Sec. 2 (g) (if the jury is unable to answer either of the special issues the

---

[1] In judging the constitutionality of the of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme. *California v. Brown*, 479 U.S. 538, 541 (1985).

[2] Petitioner understands that the Eighth Amendment does not require that the jurors be instructed

court shall sentence the defendant to life in prison).[2]   Rather, Roberson argues that Texas'

sentencing scheme misleads jurors about their individual ability to "give effect to mitigating

evidence when deciding the ultimate question whether to vote for a death sentence." *McKoy*, 494

U.S. at 442-43.

The state replies that this claim has been consistently rejected by the Fifth Circuit on two

grounds: both on the merits and because the argument is Teague barred.   However, the Fifth

Circuit in rejecting this claim has repeatedly relied upon cases decided before Texas Code of

Criminal Procedure 37.071 was drastically changed in September of 1991, even when in denying

this claim for post-1991 cases. In so doing the Fifth Circuit has not addressed the fact that the

Texas Sentencing Scheme has changed, or how this change affects the analysis of this claim.

Before 1991, Texas' death penalty sentencing scheme consisted of asking Jurors a series

of three questions:

(1)    whether the conduct of the defendant that caused the death of the deceased was
       committed deliberately and with the reasonable expectation that the death of the
       deceased or another would result;

(2)    whether there is a probability that the defendant would commit criminal acts of
       violence that would constitute a continuing threat to society; and

(3)    if raised by the evidence, whether the conduct of the defendant in killing the
       deceased was unreasonable in response to the provocation, if any, by the
       deceased.

Art. 37.071(b) (Supp.1975-1976).

---

[2] Petitioner understands that the Eighth Amendment does not require that the jurors be instructed
as to the consequences of their failure to agree. *Jones v. United States*, 527 U.S. 373, 381 (1999).
However, a jury cannot be "affirmatively misled regarding its role in the sentencing process."
*Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). The "12-10" rule produces this type of misleading
effect. In fact, it misleads and diminishes the individual role of each juror in the assessment of
punishment by suggesting that a life sentence cannot be assessed unless ten jurors believe a life
sentence is appropriate.

These questions remained until the law was drastically changed in September of 1991.

If the jurors unanimously agreed that each of these questions had been proven beyond a reasonable doubt, then they answered them 'yes,' and a sentence of death would result. *Id.* If the jury answered any of these questions 'no,' then life imprisonment would result. *Id*. Much like today, a yes answer had to be unanimous and a no answer had to be supported by ten of the jurors. *Id*.

Although the pre-1991 sentencing statute failed to specifically allow consideration of mitigation evidence, the Supreme Court upheld the statute because the Texas Court of Criminal Appeals "indicated that it will interpret this second question so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show." *Jurek v. Texas*, 428 U.S. 262, 272 (1976).   Thus, juries in Texas were allowed to consider mitigation evidence, although they were never told so.  Of course the infirmities of the pre-1991 sentencing scheme were brought to light when the Supreme Court held that Johnny Paul Penry had been sentenced to death in violation of the Eighth Amendment because his jury had not been adequately instructed with respect to mitigating evidence. *See Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*); *Penry v. Johnson*, 532 U.S. 782 (2001).   As a result, the Texas death penalty sentencing scheme was changed to expressly allow juries to consider mitigation evidence.

In 1991 the Texas legislature amended Code of Criminal Procedure art. 37.071 to include a true "mitigation special issue." See 1991 Tex. Sess. Law Service Ch. 838 (S.B. 880). Related to Roberson's case, the two special issues in question became the following:

1)   Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

2)   Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating

circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentenced be imposed.

*Id*.; *See* TEX. CODE CRIM. PRO. art. 37.071 (Vernon Supp. 1993-present).

The jury could not answer special issue no. 2 "no" unless they agreed unanimously, and they could not answer special issue no. 2 "yes" unless ten or more of them agreed that mitigation called for a life sentence. *Id*. Jurors are not told that a single juror's belief that life is appropriate will result in a life sentence. *Id*.

The Fifth Circuit repeatedly held that Mills did not apply to the pre-1991 sentencing scheme because "Mills involve[d] statutory schemes different from the Texas sentencing statute and different legal standards." *See, e.g., Webb v. Collins*, 2 F.3d 93, 96 (5th Cir. 1993). This was true, as the pre-1991 sentencing scheme did not actually involve a mitigation special issue. However, the post-1991 sentencing scheme does include a mitigation special issue and is therefore much closer to the sentencing scheme discussed in Mills. The problem is that the Fifth Circuit, in its decisions related to the post-1991 sentencing scheme, has relied on decision based on Pre-1991 sentencing schemes. Roberson has not discovered cases that address whether or not the change in the sentencing scheme affects the analysis of this issue.

For example, the state cites *Druery v. Thaler*, for the propositions that *Teague* bars review of this claim and that *Mills* does not apply to Texas' sentencing scheme. 647 F.3d 535, 543 (5th Cir. 2011) *cert. denied*, 132 S. Ct. 1550 (U.S. 2012); Reply at 110. *Druery* cites *Miller v. Johnson* for the idea that "Mills is not applicable to the capital sentencing scheme in Texas." *Id*. (citing *Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir.2000)). *Miller* however is not applicable to the issue currently before this court for many reasons. First, "the jury at [Miller's] trial was instructed what to do if they did not reach agreement as set forth in the charge. The jury

26

instructions provided that if there was any special issue on which the vote of the jurors was not unanimously 'yes' or not at least ten in favor of an answer of 'no,' there should be no answer for that special issue and the presiding juror should not sign his or her name to any answer form for that special issue." *Miller*, at 288. Had this happened in Roberson's case, this claim would not have been presented.  Further, *Miller* concerned the pre-1991 jury capital sentencing scheme which was not used in Roberson's case. *Id*.  However, it is important that the *Miller* court did recognize that "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *Id*.  Roberson argues that the post-1991 sentencing scheme does not allow each juror to consider and give effect to mitigating evidence.

Druery also cited *Hughes v. Dretke*, 412 F.3d 582, 593–94 (5th Cir.2005) for the idea that the instant claim is *Teague* barred. *Druery*, 647 F.3d at 543.  Unexplainably, although *Hughes* involved a crime committed after 1991, the Fifth Circuit decision only discusses the application of the "future dangerousness" special issue.  No mention was made of the mitigation special issue.  Further, the Fifth Circuit in *Hughes* ruled only that the claim was *Teague* barred, relying on *Miller* (discussed above) and *Jacobs v. Scott*, 31 F.3d 1319, 1328–29 (5th Cir.1994).  *Jacobs* was decided based on the pre-1991 sentencing scheme. *Jacobs*, 31 F.3d at 1328-29. *Jacobs* decided that the 12-10 claim in that case was procedurally defaulted. *Id*.  It however went on to explain that the substantive argument was meritless because "[t]he [pre-1991] law in Texas is completely different from that in *Mills*." *Id*. at 1328.  This is true, because the pre-1991 law in Texas did not involve a mitigation special issue.  Also, much like the *Miller* case, the jurors in *Jacobs* were "instructed that each juror was to make his or her decision independently." *Id*. at 1329.  No such instruction was given in Roberson's case.  Finally, the Fifth Circuit once again

pointed out that *Mills* has been interpreted to mean "'each juror [must] be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death.'" *Id*. (citing *McKoy v. North Carolina*, 494 U.S. 433, 442–43 (1990)).

Roberson asserts that Texas' post-1991 capital sentencing scheme, as applied in his case, violates the Eighth and Fourteenth Amendments.  The distinction between the pre-1991 and post-1991 sentencing schemes has apparently not been addressed by the Fifth Circuit, which continues to rely upon the pre-1991 determination of this claim, for that reason Fifth Circuit precedent does not dictated the outcome to this claim.  As Roberson urged in his writ, the current sentencing scheme in Texas in violation of the well-recognized holding of *Mills* that "'each juror [must] be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death.'" *Id*. (citing *McKoy v. North Carolina*, 494 U.S. 433, 442–43 (1990)).

The Seventh Circuit also agrees that *Mills* requires individual jurors be permitted to consider mitigation and that individual jurors not be precluded from granting mercy because of the mistaken belief that their individual vote for life is meaningless:

> The same analysis applies in Kubat's case.  Kubat's jurors were never expressly informed in plain and simple language that if even one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death.  On the contrary, the instructions emphasized unanimity.  There is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

> *Kubat v. Thieret*, 867 F.2d 351, 372 (7th Cir. 1989).

As applied to the post-1991 sentencing statute, this claim is not Teague barred.  Under Teague, new rules of constitutional criminal procedure will not be announced on federal habeas review unless an exception applies. *Webb v. Collins*, 2 F.3d 93, 95 (5th Cir. 1993) (ci*ting Teague*

28

*v. Lane*, 489 U.S. 288, 316 (1989).  However, Roberson asserts that applying *Mills* as interpreted by *McKoy* to Texas' post-1991 sentencing scheme does not create a new rule. "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government.... To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301.

That jury instructions which mislead individual jurors about their ability to give effect to mitigating evidence are in violation of the Eight and Fourteenth Amendments does not break new ground. Indeed, the Supreme Court has long held that "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy*, 494 U.S. at 442–43 (1990)).  This well recognized Supreme Court rule dictates that the current Texas sentencing scheme is unconstitutional it requires jury instructions which mislead individual jurors to believe that their individual vote for life is meaningless unless more at least nine of their follow jurors agree.

Concerning the pre-1991 sentencing scheme, the Fifth Circuit ruled that "Mills may inform the analysis of his claim, but [it does] not dictate the constitutional rule urged by [the petitioner]." *Webb v. Collins*, 2 F.3d 93, 96 (5th Cir. 1993).  The basis of this ruling was that "Mills involve[d] statutory schemes different from the Texas sentencing statute and different legal standards." *Id*. At the time that this line of argument was adopted by the Fifth Circuit, Texas did not use the mitigation special issue.  By adopting a mitigation special, Texas law was brought much closer in line with the sentencing scheme found in *Mills*. Further, the Supreme Court has found that differences in underlying sentencing schemes do not necessarily provide a basis for denying relief under *Teague*. *Stringer v. Black*, 503 U.S. 222, 229 (1992) ("We

acknowledge there are differences in the use of aggravating factors under the Mississippi capital sentencing system and their use in the Georgia system in Godfrey. In our view, however, those differences could not have been considered a basis for denying relief in light of precedent existing at the time petitioner's sentence became final.").

As we have seen from our discussion of the Supreme Court's demands in *Smith I*, *Smith II*, and *Penry II* above, the Court requires that jurors be told accurate information in order to obtain accurate and constitutionally reliable decision making.  When a state manipulates jurors by giving them false information, or restrict their decision making so that jurors are bound by oath from rendering a decision that reflects their sincere beliefs, that state has introduces constitutionally intolerable capriciousness --- precisely what we have here.

In conclusion, because the Fifth Circuit has not addressed whether the 1991 change to Texas' sentencing scheme alters the analysis of this issue this Court should not be bound by prior precedent and should address this issue on the merits.  Not a single note was sent out asking what should be done in the event of a jury deadlock.  This no doubt was because the jury instructions made it clear that the jury could return no answer except for yes or no to the special issues. Although clear, this instruction was both an incorrect statement of Texas law and in violation of the United States Constitution.

### VIII.   THE RESPONDENT'S ARGUMENTS CONCERNING DIMINISHED CAPACITY ARE MISPLACED

After reciting the truism that "Texas law does not recognize a diminished capacity affirmative defense" the State volunteers that "Texas permits such evidence to be admitted as an attempt to negate mens rea, only if the evidence meets the requirements of Rule 403."  State's Br. at 162-163.  In fact, Texas law is far more nuanced.  In *Ruffin v. State*, the Texas Court of Criminal Appeals reversed the conviction of a mentally unstable man who fired at approaching

policemen when "the trial judge excluded testimony by appellant's psychologist about the existence and severity of his mental disease and delusions…".  270 S.W.3d 586, 587 (Tex. Crim. App. 2008).  "Relevant evidence may be presented which the jury may consider to negate the *means rea* element.  And this evidence may sometimes include evidence of a defendant's history of mental illness."  *Id*. at 596; *accord Broadnax v. State*, 2011 Tex. Crim. App. Unpub. LEXIS 920, *26-27 (Tex. Crim. App. 2011) ("Evidence of a mental disease or defect may be relevant and admissible to rebut or disprove the defendant's culpable *mens rea*."); *Lizcano v. State*, 2010 Tex. Crim. App. Unpub. LEXIS 270, *61 (Tex. Crim. App. 2010) ("As with other elements of an offense, relevant evidence may be presented that a jury may consider to negate any *mens rea* elements.  This evidence may include evidence of a defendant's history of mental illness, or evidence of a defendant's physical or mental diseases or defects.").

Respectfully submitted,

*/s/ Seth Kretzer*

_____
Seth Kretzer
Law Offices of Seth Kretzer
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (DIRECT)
seth@kretzerfirm.com (email)

*/s/ James W. Volberding*

_____
**JAMES W. VOLBERDING**
SBN: 00786313

Plaza Tower
110 North College Avenue

Suite 1850
Tyler, Texas 75702

(903) 597-6622 (Office)
(903) 597-5522 (fax)
*e-mail:* *jamesvolberding@gmail.com*

## **CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing document was forwarded to

all counsel of record on this 5th day of January 2013 through the ECF system.

*/s/ Seth Kretzer*

_____

Seth Kretzer