IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ROBERT LESLIE ROBERSON, III, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | No. 2:09-cv-327 |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Institutional Division, | § | |
| | § | |
| Respondent. | § | |

—————————————————————————

**ROBERSON'S OBJECTIONS TO
MAGISTRATE'S REPORT AND RECOMMENDATION**

—————————————————————————

TO THE UNITED STATES DISTRICT COURT:

Robert L. Roberson, III, a Texas death row inmate, respectfully objects to the Magistrate's Report and Recommendation as follows:

**Claims 1 – 3**:

A.    ***Discussion of procedural default issues.***

The procedural default doctrine is, by its very terms, limited to cases in which a "default" actually occurred --- meaning cases in which the prisoner actually violated the applicable state procedural rule. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Haynes v. Quarterman*, 561 F.3d 535, 538-39 (5th Cir. 2009) (state's argument of procedural default is rejected because claim that state court found to be defaulted was not claim that petitioner raised in federal habeas corpus but rather "related argument[]" arising out of same facts as federal habeas corpus claim).

The procedural default doctrine does not apply if the petitioner effectively complied

with the rule. *See e.g., Lee v. Kemma*, 534 U.S. 362, 366-67, 385 (2002) (state rules requiring that continuance motions be in writing and make certain showings "did not constitute a state ground adequate to bar federal habeas review" because "petitioner Lee . . . substantially, if imperfectly, made the basic showings [the state rule] prescribes . . . substantially, if to defend, should not depend on a formal 'ritual . . . [that] would further no perceivable state interest.'); *Trevino v. Texas*, 503 U.S. 562, 566-67 (1992) (applying *Ford v. Georgia*, to find that petitioner effectively presented his equal protection claim, even though his "assertion of his rights" may have been "inartful[]"); *Ford v. Georgia*, 498 U.S. 411, 418-19 (1991) (rejecting default defense to direct appeal consideration because petitioner adequately "presented the trial court with a cognizable *Batson* claim although he certainly failed to do it with the clarity that appropriate citations would have promoted"; petitioner's trial court pleadings "could reasonably have been intended and interpreted to raise a claim under the Equal Protection Clause" even though "pretrial motion made no mention of the Equal Protection Clause, and the later motion for a new trial cited the Sixth Amendment, not the Fourteenth."); *Kittelson v. Dretke*, 426 F.3d 306, 316-17 (5th Cir. 2005) (claim fairly presented; no procedural default); *Brown v. Collins*, 937 F.2d 175, 178-79 (5th Cir. 1991) (similar).[1]

Here, when they complained at the dismissal by the prosecutor, Doug Lowe, of the rape allegation at the close of the State's case, the substance of Roberson's trial attorneys' complaint was more than sufficiently clear to inform the trial judge of the nature of the constitutional violations:

---

[1] Throughout this pleading, Roberson has quoted and provided citations from Randy Hertz and James S. Liebman, *Federal Habeas Corpus Practice and Procedure* (2011 6th ed.). To ease reading, counsel has omitted quotation marks.

MR. EVANS [Defense counsel]:  Your Honor, based upon that we are exactly where, when I filed the motion for severance I represented to the Court we were going to be.  At this time based upon the inflammatory nature of the count that's been abandoned I would move for a mistrial by virtue of the fact that this jury has been intentionally voir dired on this issue.  They were promised that there was going to be presented evidence of sexual assault.  Now that's, in essence, an irrelevant aspect. It's not a predicate, it's not an element of the offense.  As the Court noted itself, this is a very serious and to the common individual or reasonable individual, an inflammatory aspect of any allegation.  Thus based upon that, your Honor, we would move for a mistrial.

THE COURT:  Mr. Evans, I'm going to deny your motion for a mistrial.

Trial Reporter's Record vol. 44, p. 4.

The substance of our federal constitutional claims are as follows:

- The sexual allegations were inflammatory to a reasonable person;
- Jurors were questioned thoroughly about them;
- Obviously a fair jury trial was impossible;
- All of this was the result of intentional State action;
- The lawyer referenced and referred the judge to his motion for severance, previously denied, Clerk's Record at page 290 (filed August 20, 2003), which argued federal grounds.

The strength of Roberson's  argument rests on his motion for severance, filed August 20, 2003, before his trial, and located in volume 3, page 290 of the state clerk's record. In this motion, as in *Ford v. Georgia*, 498 U.S. 411, 418-19 (1991), which had similar pre-trial motion circumstances, Roberson complained prospectively about precisely the same legal issue which is the focus of the claim at present: that the rape allegations are (and always were) baseless because the State had received evidence eliminating sexual assault (Dr. Squires' report, disclosed to the Defense, which traduced any legitimate fear by Nurse Sims of rape), would irretrievably compromise the jurors, and that including the rape allegations would violate Roberson's Sixth Amendment fair trial. The lawyer in fact presciently predicted precisely what occurred, "The State . . . if allowed to try the two capital counts together, could introduce evidence of extraneous conduct, and then elect

only to present the child victim under 6 count to the jury, yet . . . would have tainted the jury from due and fair consideration of such remaining count . . . ." Motion to Sever, p. 2, Clerk Record, vol. 3, p. 291.

It is our respectful position that no reasonable state jurist could fail to realize that Roberson's attorney was complaining about the compromise of his federal constitutional right to fair trial by jury. There has never been any default of Roberson's Sixth Amendment claim.

The State implicitly recognized this, which is why the state F&C's, written by prosecutors, went on to address the merits of Roberson's federal claims. Although the state district court wrote F&Cs that Roberson procedurally defaulted his federal constitutional claims in Claims 1- 3 here, the court did not stop there. Instead, the court went straight to their merits, correctly in our view, and rejected on the merits the same federal constitutional claims Roberson makes today. *See* F&Cs (nos. 11 - 28.) The CCA adopted these F&Cs, and therefore rejected these federal claims on their merits. *See Ex parte Roberson*, 2009 Tex. Crim. App. Unpub. LEXIS 571 (2009).

Under federal habeas rules, the violation of a procedural rule at trial, or on appeal, does not foreclose the petitioner under state law from raising the claim in a state postconviction petition. In Texas, just as occurred here, a petitioner is perfectly entitled to raise a federal constitutional claim for the first time in his state postconviction habeas petition, and the CCA entitled to grant relief on that claim, even if the claim could theoretically have been raised at trial. *See, e.g., Edwards v. Scroggy*, 849 F.2d at 209 n.4 (followed in *Smith v. Black*, 904 F.2d 950, 970, 976 n.8 (5th Cir. 1990), *vac'd & remanded on other grounds*, 503 U.S. 930 (1992) (petitioner's failure to raise claim on direct appeal

does not bar federal review "because the Mississippi Supreme Court had established a practice of addressing the merits of issues raised on postconviction petitions for writ of coram nobis in capital cases even if the issue had not been raised on appeal."); *Rice v. Hoke*, 846 F.2d 160, 163-64 (2nd Cir. 1988); *Armstrong v. Dugger*, 833 F.2d at 1435-36; *Wheat v. Thigpen*, 793 F.2d at 625-26; *Ross v. Kemp*, 785 F.2d 1467, 1470 n.4 (11th Cir. 1986).

The CCA, in a long line of cases, will reach a federal constitutional (or state claim) in state habeas when the inmate could not have developed the record in trial or direct appeal. *See Ex parte Rich*, 194 S.W.3d 508 (Tex. Crim. App. 2006); *Ex parte McClain*, 67 S.W.3d 204, 210 (Tex. Crim. App. 2002); *cf. Ex parte Smith,* 309 S.W.3d 63-64 (Tex. Crim. App. 2010) (egregious harm standard).

A perfect example is *Ex parte Hathorn*, 296 S.W.3d 570 (Tex. Crim. App. 2009), in which the CCA considered on the merits --- remarkably on its own motion in a successor writ --- a defaulted *Penry* claim and granted relief.

Further, under federal habeas rules, the federal court may reach the merits of a federal claim, even when the State argues it was denied under adequate and independent state grounds, when the state procedural "rule" is not mandatory but only a matter of discretion, regardless of how that discretion was exercised in the particular case. *See, e.g., Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 233-34 (1969) (direct review case); *Williams v. Georgia*, 349 U.S. 375, 389 (1955) (same); *Wells v. Maass*, 28 F.3d at 1010 (claim was not defaulted, even though state supreme court had previously refused to consider claims raised in manner employed by petitioner, because state court "always made clear that its actions were rooted in discretion and not jurisdiction").

In addition, even if a prisoner committed a procedural default that could have supplied an "adequate" and "independent" state ground for denying relief, the procedural default doctrine does not apply if "the last state court rendering a judgment in the case" reached the merits of the claim. *Harris v. Reed*, 489 U.S. 255, 262 (1989); *see, e.g., Victor v. Nebraska*, 511 U.S. 1, 19 (1994) ("Because the last state court . . . considered Victor's constitutional claim on the merits, it is properly presented for our review despite Victor's failure to object to the instruction at trial or raise the issue on direct appeal."); *Graham v. Collins*, 506 U.S. 461, 512 n.6 (1993) (Souter, J., dissenting) (issue is "properly before us" because "the Texas Court of Criminal Appeals appears to have addressed petitioner's challenge on the merits in a state postconviction proceeding"); *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) ("If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal court review that might otherwise be available").

Here, the state court F&Cs, while finding procedural default, nevertheless reached the merits. The CCA adopted the F&Cs, and therefore the denial on the merits. As a result, the highest Texas court denied Roberson's federal claims on their merits, allowing him to present them to this Court, unmolested by the state contemporaneous objection rule.

Consequently, Roberson respectfully asks the Court to set aside the R&R asserting procedural default and allow those points addressing the merits of the federal constitutional claims.

Alternatively, Roberson has asserted IAC as cause for any default:

### C. Failure to Object to Improper Prosecutor Argument.

Defense counsel did not object to improper arguments by prosecutors. Specifically, the prosecutors misled jurors by claiming that they were required by law to abandon the sexual allegation while assuring

jurors that Roberson raped the little girl. These improper arguments are discussed on page 49. Defense counsel did object to the sexual assault allegations in many other instances and the attorneys may have concluded that further objection was futile, which is true. However, in the event that any court holds that challenge to the prosecutor's improper argument was waived or procedurally defaulted, then it was the result of IAC.

In addition, there are other improper argument by prosecutors outside of permissible constitutional bounds to which trial counsel did not object. These include arguing in sentencing that Roberson sexually assaulted the child, sexually assaulted women, allusions that Roberson did not take the stand to refute allegations or bring forth rebuttal evidence, and attacks on Roberson over the shoulders of his trial counsel.

D. General Failure to Preserve Error.

Roberson also alleges that defense counsel failed to preserve error to all viable constitutional issues at trial. In the event that any court holds that an otherwise legitimate constitutional claim was waived or procedurally defaulted, then it was the result of IAC.

E. General Failure to Brief Direct Appeal Adequately.

Roberson also alleges that defense direct appeal counsel failed to brief adequately all viable constitutional issues before the Court of Criminal Appeals. In the event that any court holds that an otherwise legitimate constitutional claim was waived or procedurally defaulted, then it was the result of IAC.

Roberson section 2254 petition at 182-83.

A prisoner is entitled to excuse the default by demonstrating cause for the default and actual prejudice as a result of the alleged violation of federal law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Once such cause occurs when he receives ineffective trial representation. *Id.* at 752-53.

*Strickland* IAC of course requires Roberson to prove (1) deficient performance, (2) different outcome. The IAC analysis therefore is patent. No constitutionally effective capital defense lawyer can discern a trial strategy in leaving a viable defense or winning legal claim on the table. And if this federal court (or subsequently the Fifth Circuit) sustains any of claims 1 - 3 on the merits, Roberson is entitled to a new trial. Given what we documented as the pervasive questioning of *every juror* to provoke their obviously deep

and hostile feelings toward an accused child rapist, and the parading of child rape evidence in the prosecutor's opening statements and through his case-in-chief, and given what this trial would have looked like had it been handled without child rape allegations, Roberson was certainly harmed. He really had no chance at a fair trial.

> **B.** **_Discussion of the paucity of evidence --- at any point --- that Roberson raped the child._**

On pages 9 and 13 the R&R asserts that the testimony of Janet Squires constitutes some modicum of evidence that the child was sexually assaulted. Respectfully, it does not.

The issue is causation. Does medical science hold that minor tears on a child's anus can be caused by sexual assault or not? Merely because a witness asserts what she claims is a medical or scientific fact does not make it so.

Dr. Janet Squires testified that she saw a tiny laceration at the child's anus. (R.R. vol. 42 at 97, 100-01.) She did not observe major trauma of the anus. (R.R. vol. 42 at 97.) She did not see signs of bruising. (R.R. vol. 42 at 98.) She collected samples. (R.R. vol. 42 at 97.) She found insufficient evidence to conclude that Nikki had been sexually assaulted, nor could she rule it out. (R.R. vol. 42 at 99-100.)

Dr. Squires then addressed Nurse Sims's conjecture and explained why the State's rape theory was wrong. She explained the anal canal contraction which concerned Nurse Sims. She said that when a child is comatose the anal muscle commonly becomes lax. (R.R. vol. 42 at 99, 118.) This is because the nervous system is shutting down because of brain injury. (R.R. vol. 42 at 118.) Dr. Squires said that dilation of the anal canal, which led Mrs. Sims to believe Nikki had been sexually assaulted, did not indicate one way or the other whether sexual abuse had occurred. (R.R. vol. 42 at 99-100, 118, 119.) Her final report stated that child sexual assault could not be substantiated. (R.R. vol. 42 at 119.)

So with Dr. Squires's testimony alone could a reasonable jury infer what an experience physician would not: that a tiny laceration is in fact proof of rape? Not when there was no bruising, no large tears, no supporting evidence of any rape or sexual assault, and no suggestion of any kind that Robert was interested or inclined to harm a child. Not when an experience medical physician says the tear is not proof of rape. Jurors are entitled to make reasonable inferences, but they are not entitled to make their own science.

Consequently, following section 2254(d)(2), the state court's finding of fact that Dr. Squires's testimony is proof of child rape is unreasonable. The Court should so find.

What about Nurse Sims's testimony? Could a jury rely on it alone, even when contradicted and explained by Dr. Squires?

Sims found some fresh superficial tears to Nikki's anal area. (R.R. vol. 41 at 127, 133-34, 142.) She examined the rate of dilation of the anal canal and found that the dilation was faster than usual, suggesting to her sexual penetration. (R.R. vol. 41 at 129-30.)

Although she never saw it, Mrs. Sims reported that Nikki had a torn frenulum. (A frenulum of tongue is a fold of mucous membrane connecting the floor of the mouth to the underside of the tongue in midline.) Mosby's Medical Dictionary (6th ed. 2002); R.R. vol. 41 at 136- 37. Mrs. Sims could not inspect Nikki's mouth because it was obstructed by breathing tubes, but she found references in the medical examination of a torn frenulum. (R.R. vol. 41 at 136-38.) Mrs. Sims testified that in a child, a torn frenulum may be caused by insertion of a large penis, and is therefore a possible indicator of sexual assault. (R.R. vol. 41 at 137-38.)

Sims, therefore, offered two sexual assault theories: (1) that tiny tears could be the result of anal penetration, and (2) the child's frenulum was torn as a result of penile

penetration of her mouth. Dr. Squires, however, eliminated both theories. Dr. Squires explained that frenulum can tear as a result of accident, falling, the forcing of some object in the child's mouth causing trauma. R.R. vol. 42 at 111-12.) And we have discussed her rejection of Sims's anal penetration theory.

Consequently, no reasonable jury, and no state court, could possibly substitute its own medical science and decide that the child possessed a torn frenulum, which Sims said she did not observe, and therefore had been assaulted, and that the tears were proof of anal assault.

The R&R comments:

> In the present case, Nurse Andrea Sims provided testimony that there was evidence justifying her belief that Nikki had been subjected to a sexual assault. Roberson's claim that there was unequivocally no evidence to suggest that the victim was sexually assaulted is a misrepresentation of the record. Roberson has not shown that Nurse Sims' testimony was false, that the State knowingly presented false testimony or that the State failed to correct materially false testimony during the trial. He failed to satisfy his burden of showing that he is entitled to relief based on the standards set forth in *Giglio*.

R&R at 14.

Sims, however, did not provide "evidence justifying her belief." She provided her *supposition*, but not medically reliable evidence. And Squires, in fact, has proven that Sims' "testimony was false," or in the best light, unsupportable by any known medical knowledge. And that is the crux of the problem: based solely on Sims's supposition, based on incomplete knowledge of medicine, the prosecutor, who *did* have complete knowledge because he had spoken with Dr. Squires and had her report, deposed an entire jury panel for weeks on a rape theory he knew was unsupportable. Roberson did not stand a chance as he looked into the angry faces of men and women increasing hostile to him.

10

This leads to the reason why Roberson made this claim his first and foremost. It may be true that Roberson is not an attractive individual. The death penalty, however, should be reserved for the worst of the worst. Roberson is not in that category. Absent the trumped allegations of rape, the total sum of the remaining evidence is that while high on drugs he dropped or threw or shook a child causing traumatic brain injury. This is serious, justifying prison for life, but when courts execute such men, they undermine the credibility and legitimacy of the death penalty process.

**Claims 5 - 8**:

Roberson respectfully objects to the R&R's disposition of Claims 5 - 8.

The CCA, adopting the prosecutor-written F&Cs, while holding that Roberson's claims were defaulted, also addressed them on the merits. *See* State F&Cs nos. 37-48. Consequently, as discussed, they are subject to federal court review on the merits. *See supra; also Harris v. Reed*, 489 U.S. 255, 262 (1989); *see, e.g., Victor v. Nebraska*, 511 U.S. 1, 19 (1994). This is why it is unnecessary to engage the Director's assertions of default. Roberson respectfully objects to the Report's discussion of procedural default as unnecessary.

Further, Roberson has asserted IAC as cause and prejudice for default, just as in the previous claims:

> If there has been a default, the petitioner can demonstrate "cause" for and "prejudice" from the default. *Johnson v. Mississippi,* 486 U.S. 578, 587 (1988). This cause and prejudice includes, but is not limited to, concealment of evidence by the State, ineffective assistance of appointed counsel at trial or direct appeal, inaccurate application of a state procedural rule, or a miscarriage of justice.
>
> Roberson section 2254 Petition at 33.

And again:

D. *General Failure to Preserve Error.*

Roberson also alleges that defense counsel failed to preserve error to all viable constitutional issues at trial. In the event that any court holds that an otherwise legitimate constitutional claim was waived or procedurally defaulted, then it was the result of IAC.

E. *General Failure to Brief Direct Appeal Adequately.*

Roberson also alleges that defense direct appeal counsel failed to brief adequately all viable constitutional issues before the Court of Criminal Appeals. In the event that any court holds that an otherwise legitimate constitutional claim was waived or procedurally defaulted, then it was the result of IAC.

Roberson section 2254 petition at 182-83.

In addition, Roberson asserted IAC against his trial attorneys for any default on this very issue in claim 9.

The R&R criticizes Roberson's counsel for not walking the reader through an IAC analysis, but that is not necessary. *Strickland* IAC of course requires Roberson to prove (1) deficient performance, (2) different outcome. The IAC analysis therefore is patent. No constitutionally effective capital defense lawyer can discern a trial strategy in leaving a viable defense or winning legal claim on the table. And if this federal court (or subsequently the Fifth Circuit) sustains any of claims 5 - 8 on the merits, Roberson is entitled to a new trial. Given the dominance of the expert's future dangerousness prosecution, the misuse chronically of the PCL-R, and the redundant invocation by prosecutors of the experts and the testing in closing arguments, including pointing at him and shouting to jurors that he was a diagnosed "psychopath," Roberson was certainly harmed.

Roberson respectfully objects that the Report and Recommendation fails to address the myriad problems with misuse of the Hare Psychopathy Checklist (PCL-R). Roberson acknowledges that while one or two panels of the Fifth Circuit have accepted Hare Psychopathy testing, he contends nevertheless that the Circuit en banc or the Supreme

Court may decide differently. He respectfully objects to the Report's acquiescence of the misuse of Hare testing, and the Report's failure to address the misuse of the PCL-R:

- Repudiation of the use of the PCL-R in capital cases by Drs. Thomas Ryan, Scott Duncan, Stephen Hart, Donald Bersoff and Daniel Martell. A circumstance not addressed in *Martinez v. Dretke,* 99 F. App'x 538, 544 (5th Cir. 2004), *cert. denied,* 543 U.S. 1068 (2005);

- Rejection of the PCL-R by the forensic psychology community;

- The only experts who use the PCL-R in capital cases are unpublished (on this subject) experts who testify for prosecutors in capital cases;

- The opinions of the Fourth Circuit in *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000), and *United States v. Stitt,* 459 F.3d 483 (4th Cir. 2006), on this topic;

- The stack of peer reviewed empirical research articles Roberson provided directly on point. The Report complains that Roberson "failed to explain how the articles relate," R&R at 25, which is disappointing because the conclusions of the articles are well-stated and self-evident. Roberson discussed some of the articles and their authors' conclusions on pages 86-88, but the R&R comments on none of it.

Accepting the Director's sophistry, the Report pretermits objective scientific analysis and casts the misuse of the PCL-R under the gloss that "such arguments go to the weight of the evidence as opposed to the admissibility of the evidence." R&R at 27. Roberson respectfully disagrees. This is a clear misapplication of rules addressing scientific evidence. Admitting a dramatic test into a capital trial for purposes its author attests it was never designed, unsupported by any scientific testing that verifies its accuracy in such a case, runs afoul of the gatekeeping function of a trial judge faced with asserted scientific evidence, and prohibitions on inherently unsound scientific evidence in cases where it matters most.        *Whirlpool Corp v. Camacho,* 298 S.W.3d 631 (Tex. 2009);[2]

---

[2] Although the expert "had extensive experience in fire investigation and testified that he relied on that experience in reaching his opinions, much of the evidence offered by both

*Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572 (Tex. 2006) ) ("In determining whether expert testimony is reliable, a court should examine 'the principles, research, and methodology underlying an expert's conclusions.' When the testimony involves scientific knowledge, the expert's conclusions must be 'grounded 'in the methods and procedures of science.'' Otherwise, the testimony is 'no more than 'subjective belief or unsupported speculation.''); *cf. United States v. Sampson,* 335 F. Supp. 2d 217 (D. Mass. 2004); *United States v. Taylor,* 320 F. Supp. 2d 790 (N.D. Ind. 2004).

Although offering a lengthy discussion of the credentials of Drs. Allen and Self, the Report fails to address the meat of Roberson's challenge to forecasts of whether a man will be dangerous one day, which lasered precisely on the *methodology*, *connective reliability*, and *foundational reliability* one Texas judge has said are necessary conditions for admission of scientific evidence:[3]

- Rejection of future dangerousness prognostication by the overwhelming

---

parties centered on testing." Because that evidence "corresponds to the first reliability factor in *Robinson* – the extent to which a theory and its parts have been or could be subject to testing" – a proper appellate review requires evaluating the expert's testimony "considering both *Robinson-type* factors and examining for analytical gaps in his testimony."

Applying the *Daubert/Robinson* factors, the court held that the expert's testimony was unreliable because the expert failed to conduct his own relevant testing, instead relying on a Consumer Products Safety Commission report which tested a dryer with a significantly different design from the dryer in this case. Furthermore, the court noted that the expert's theory was developed for the instant litigation and had not been published or subjected to peer review. Similarly, here the state's experts have not published, and could not point to any publications, supporting use of the PLC-R in capital cases in which the prisoner would be incarcerated for life.

[3] A Texas judge has written that the reliability of an expert testimony can be broken down and examined with respect to three areas: (1) methodological reliability; (2) connective reliability; and (3) foundational reliability. Judge Harvey Brown, *Eight Gates for Expert Witnesses,* 36 Hous. L. Rev. 743 (Fall 1999). It appears that the R&R only addresses whether the state's experts were generally qualified in their field, leaving it to jurors to decide whether their assertions are scientifically valid.

majority of the forensic psychology field;

- The failure of such prognostication to consider the context of prison;

- Failure to consider the base rate data of actual violence in prison;

- Reckless misuse of the label of "psychopath";

- Failure to consider bona fide methods of future dangerous assessments by reliance on past behavior in a similar context, use of appropriate base rates, with adjustments for risk management and violence reduction techniques and procedures.

Another problem with the Report and Recommendation is that it does not address the constitutional aspects of Roberson's claims, such as any of the cases cited by Roberson, including *Taylor*, *Sampson*, *Stitt*, and *Barnette*. The State's experts may be experienced in their fields, but the PLC-R is a different matter, and it still remains that admission of pseudoscience in the guise of an expert, no matter how qualified, on something as critical and non-demonstrable as whether a man will probably be violent in the future, renders his trial fundamentally unsound.

It is for these reasons that Roberson urges the District Court to not adopt this aspect of the Report and Recommendation.

**<u>Claim 9</u>**:

Roberson respectfully objects to the R&R's disposition of Claim 9.

The Report errs by asking whether Self and Allen were *generally* qualified in the field of psychology, rather than asking whether they were actually *experts* in the matter(s) about which they were testifying: (1) the narrow subclass of forensic psychology of forecasting the rate of violence of men in prison who have been convicted of capital murder, and (2) use of the PCL-R. *See supra* discussion.

15

The Report cites *Coble*, but the issue there was the scope and nature of mitigating evidence introduced and omitted by Coble's defense counsel. Roberson's claims is completely different: the allegation is that his attorneys did not attack and object to the misuse of the largely discredited field of future dangerousness prognostication, and Self's and Allen's misuse of the psychological data and tools, and unfamiliarity with the concept of base rates.

A conceptual problem with the Report and Recommendation is its failure to operationalize the principle that Claim 9 is logically antecedent to Claims 5 - 8 for the specific purpose of asserting and challenging any procedural default concerns and establishing cause and prejudice. At the minimum, the Report should be modified to discuss Roberson's assertions of IAC cause and prejudice to claims 5 - 8.  Roberson's main argument, however, is that this is is unnecessary because the CCA addressed those claims on the merits.

The Report concludes that Roberson's IAC claim is procedurally defaulted. R&R at 33-34. Roberson respectfully submits that this is inaccurate. Under Texas law, no matter how the Director attempts to color it, IAC claims are mandated by the CCA to be raised in state habeas proceedings, not on direct appeal, for the reason that a record needs to be made of the trial lawyer's decisions, which is not usually possible on direct appeal. Indeed, the Report acknowledges one of the CCA's cases stating this precise proposition, *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997); *accord Ex parte Nailor,* 149 S.W.3d 125 (Tex. Crim. App. 2004).

The Report accepts the Director's claim that Roberson was required to present new evidence of IAC in habeas to justify failure to raise it on direct appeal. R&R at 32-33

(quoting F&C no. 52). The Report overlooks, however, that Roberson tried to do that very thing, demanding a hearing in state court so the attorneys could testify and explain their actions. The State, however, denied Roberson an evidentiary hearing for him to obtain the very evidence the Report chastises him for failing to present. Roberson objects, and asks the Court to order the evidentiary hearing he was denied so he can obtain and present his IAC evidence, as an independent claim and to establish cause and prejudice for any default of claims 5 - 8.

**<u>Claim 10</u>:**

Roberson respectfully objects to the R&R's disposition of Claim 10.

Roberson was denied an evidentiary hearing in state court to obtain the evidence to support his claims. Moreover, Claim 10 served an additional purpose, to establish cause and prejudice for any default of other claims. And as mentioned, the two-part IAC analysis is not difficult if the federal court sustains the merits of his other claims over default assertions by the Director. If the Court does not, then the IAC claims are moot, not defaulted.

The proper means of addressing claims 9 and 10 are for the Court to save them for last.

**<u>Claim 11</u>:**

The Report is correct. Roberson did not intend to bring Claim 11 from the state writ to the federal one. We kept the numbering to avoid confusion.

**<u>Claim 12</u>:**

Roberson respectfully objects to the R&R's disposition of Claim 12.

Whatever else, there would not be a *Teague* bar to this claim because it is grounded

on *Ring v. Arizona,* 122 S.Ct. 2428 (U.S. 2002), pp. 10-23, and *Apprendi v. New Jersey,* 530 U.S. 466, 494, n. 19 (U.S. 2000), which were decided prior to Roberson's trial, and before the CCA affirmed. The real question is whether the claim was defaulted by Roberson's trial lawyers.

The claim is not procedurally barred. First, Roberson's attorneys in fact challenged the misdefinition of "future dangerousness" to a low threshold of mere probability rather than the higher standard of beyond a reasonable doubt:

> 1. The Defendant objects to the failure of the Court to instruct the jury that the word "probability" as used in the first special issue, inquiring into future dangerousness, means a high probability, at least 95%, and to make a proper application of such law to the facts.
>
> 2. [Repeating the objection to 90%, 85%, 80%, 75%, 70%, 65%, 60%, 55% and 50% probabilities.]
>
> 10. The Defendant objects to the court's failure to instruct the jury that there is no presumption in favor of death, even if they find the defendant to be a "future danger" in answer to special issue number one, . . . ."
>
> Defendant respectfully prays that this . . . Court will sustain . . . pursuant to . . . the Fifth, Sixth, Eighth and Fourteenth Amendments . . . ."

Roberson Objections to Charge at Punishment, filed 13 Feb. 2003, at CR 628-29, and 634.

The point of these objections is clear: Roberson's attorney urged the state court to instruct jurors not to find that Roberson posed a future danger unless it did so by a measurably higher certainty than Texas currently requires. Expressly referencing the Sixth and Fourteenth Amendments, the objection was in substance an *Apprendi / Ring* objection, preserving the claim for this Court.

A second reason why there is no default is because the CCA addressed the claim

on its merits. *See* State F&Cs at 92 & 93. As discussed, under federal habeas rules, the violation of a procedural rule at trial or on appeal does not foreclose the petitioner under state law from raising the claim in a state postconviction petition. In Texas, just as occurred here, a petitioner is perfectly entitled to raise a federal constitutional claim for the first time in his state postconviction habeas petition, and the CCA is entitled to grant relief on that claim, even if the claim could theoretically have been raised at trial. *See, e.g., Edwards v. Scroggy*, 849 F.2d at 209 n.4 (followed in *Smith v. Black*, 904 F.2d 950, 970, 976 n.8 (5th Cir. 1990), *vac'd & remanded on other grounds*, 503 U.S. 930 (1992) (petitioner's failure to raise claim on direct appeal does not bar federal review "because the Mississippi Supreme Court had established a practice of addressing the merits of issues raised on postconviction petitions for writ of coram nobis in capital cases even if the issue had not been raised on appeal."); *Rice v. Hoke*, 846 F.2d 160, 163-64 (2nd Cir. 1988); *Armstrong v. Dugger*, 833 F.2d at 1435-36; *Wheat v. Thigpen*, 793 F.2d at 625-26; *Ross v. Kemp*, 785 F.2d 1467, 1470 n.4 (11th Cir. 1986).

As explained, the CCA, in a long line of cases, will reach a federal constitutional (or state claim) in state habeas when the inmate could not have developed the record in trial or direct appeal. *See Ex parte Rich*, 194 S.W.3d 508 (Tex. Crim. App. 2006); *Ex parte McClain*, 67 S.W.3d 204, 210 (Tex. Crim. App. 2002).

A perfect example is *Ex parte Hathorn*, 296 S.W.3d 570 (Tex. Crim. App. 2009), in which the CCA considered on the merits --- on its own motion in a successor writ of all things --- a defaulted *Penry* claim and granted relief.

Third, under federal habeas rules, the federal court may reach the merits of a federal claim, even when the State argues it was denied under adequate and independent state

grounds, when the state procedural "rule" is not mandatory but only a matter of discretion, regardless of how that discretion was exercised in the particular case. *See, e.g., Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 233-34 (1969) (direct review case); *Williams v. Georgia*, 349 U.S. 375, 389 (1955) (same); *Wells v. Maass*, 28 F.3d at 1010 (claim was not defaulted, even though state supreme court had previously refused to consider claims raised in manner employed by petitioner, because state court "always made clear that its actions were rooted in discretion and not jurisdiction").

Fourth, even if a prisoner committed a procedural default that could have supplied an "adequate" and "independent" state ground for denying relief, the procedural default doctrine does not apply if "the last state court rendering a judgment in the case" reached the merits of the claim. *Harris v. Reed*, 489 U.S. 255, 262 (1989); *see, e.g., Victor v. Nebraska*, 511 U.S. 1, 19 (1994) ("Because the last state court . . . considered Victor's constitutional claim on the merits, it is properly presented for our review despite Victor's failure to object to the instruction at trial or raise the issue on direct appeal."); *Graham v. Collins*, 506 U.S. 461, 512 n.6 (1993) (Souter, J., dissenting) (issue is "properly before us" because "the Texas Court of Criminal Appeals appears to have addressed petitioner's challenge on the merits in a state postconviction proceeding"); *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) ("If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal court review that might otherwise be available").

Here, the state court F&Cs, while finding procedural default, nevertheless reached the merits. The CCA adopted the F&Cs, and therefore the denial on the merits. As a result, the highest Texas court denied Roberson's federal claims on their merits, allowing him to

present them to this Court, unmolested by the state contemporaneous objection rule.

Consequently, Roberson respectfully asks the Court to set aside the R&R asserting procedural default and allow those points addressing the merits of the federal constitutional claim.

Alternatively, and fifth, Roberson has asserted IAC as cause for any default:

> *C. Failure to Object to Improper Prosecutor Argument.*
> Defense counsel did not object to improper arguments by prosecutors. Specifically, the prosecutors misled jurors by claiming that they were required by law to abandon the sexual allegation while assuring jurors that Roberson raped the little girl. These improper arguments are discussed on page 49. Defense counsel did object to the sexual assault allegations in many other instances and the attorneys may have concluded that further objection was futile, which is true. However, in the event that any court holds that challenge to the prosecutor's improper argument was waived or procedurally defaulted, then it was the result of IAC.
>
> In addition, there are other improper argument by prosecutors outside of permissible constitutional bounds to which trial counsel did not object. These include arguing in sentencing that Roberson sexually assaulted the child, sexually assaulted women, allusions that Roberson did not take the stand to refute allegations or bring forth rebuttal evidence, and attacks on Roberson over the shoulders of his trial counsel.
>
> *D. General Failure to Preserve Error.*
> Roberson also alleges that defense counsel failed to preserve error to all viable constitutional issues at trial. In the event that any court holds that an otherwise legitimate constitutional claim was waived or procedurally defaulted, then it was the result of IAC.
>
> *E. General Failure to Brief Direct Appeal Adequately.*
> Roberson also alleges that defense direct appeal counsel failed to brief adequately all viable constitutional issues before the Court of Criminal Appeals. In the event that any court holds that an otherwise legitimate constitutional claim was waived or procedurally defaulted, then it was the result of IAC.

Roberson section 2254 petition at 182-83.

A prisoner is entitled to excuse the default by demonstrating cause for the default and actual prejudice as a result of the alleged violation of federal law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Once such cause occurs when he receives ineffective

trial representation. *Id.* at 752-53.

As discussed, Roberson alleged IAC cause and effect for defaults such as the one alleged here. As explained, he was denied the state evidentiary hearing to prove his IAC cause and effect.

A lengthy IAC analysis is unnecessary. *Strickland* IAC of course requires Roberson to prove (1) deficient performance, (2) different outcome. The IAC analysis therefore is patent. No competent capital defense lawyer would discover a trial strategy in leaving a viable defense or winning legal claim on the table. And if a federal court sustains claims 12 or 13 on the merits, Roberson is entitled to a new sentencing trial. Given a death sentence on the defective jury charge, Roberson was certainly harmed.

Roberson stands by this claim, which is ripe for adjudication by the Supreme Court.

**<u>Claim 13</u>**:

Roberson respectfully objects to the Report's disposition of claim 13. His objections are nearly identical to those in claim 12, so Roberson re-incorporates them here.

First, as with claim 12, there is no *Teague* issue because *Apprendi* and *Ring* were decided before Roberson's trial.

Second, there is no procedural default. Roberson objected at trial to the question now at hand:

> 18.  The Defendant objects to the court's failure to instruct the jury that the burden of proof with respect to special issue two is on the state to prove beyond a reasonable doubt that there are no sufficient mitigating circumstances to warrant a life sentence, and to make proper application of such law to the facts. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000).

> 20.  The Defendant objects to the court's failure to provide a reasoned moral process for the consideration and giving of effect to mitigating circumstances. (i.e., no burden of proof, no standard of proof, no

> guidance as to the nature and strength of the presumption in favor of death that may arise, if at all, from the future dangerousness finding, etc.)

> Defendant respectfully prays that this . . . Court will sustain . . . pursuant to . . . the Fifth, Sixth, Eighth and Fourteenth Amendments . . . ."

Roberson Objections to Charge at Punishment, filed 13 Feb. 2003, at CR 632.

Roberson cited *Apprendi* and explained why the mitigation question's failure to assign the burden to the state government violated specified constitutional provisions, and how an unconstitutional presumption in favor of death would occur. The claim is unquestionably preserved.

The CCA, via the prosecution-written F&Cs, addressed claim 13 on the merits, which as discussed, allows reach by a federal court. *See* State F&Cs at paras. 97 - 112.

Roberson likewise stands by this claim, which is ripe for adjudication by the Supreme Court.

**<u>Claim 14</u>:**

Roberson respectfully objects to the Report's disposition of Claim 14.

The Report simply disagrees with Roberson's position and arguments, so there is no need to belabor. Roberson respectfully asks the Court to compare the Report with his petition's explanation of his claim and the weaknesses in evidence where it mattered.

Respectfully, the Report is in error in one vital respect. On page 47, it reproduced a paragraph asserting procedural default and other criticisms of Roberson's effort. This appears merely to be a typographical error; the Director and the state F&Cs do not assert procedural default on a sufficiency of evidence claim, which was addressed face on by the CCA on direct appeal.

**<u>Claims 15 and 31</u>:**

Roberson respectfully objects to the Report's disposition of claims 15 and 31.

Together, these claims challenge the sufficiency of evidence leading to his conviction, as distinct from his claim 14 challenge to the evidence supporting the future dangerousness special issue.

The CCA addressed and rejected Roberson's sufficiency challenge on appeal and in the state F&Cs (paras 130 - 135) and the state F&Cs do not assert procedural default (except incorrectly asserting, State F&Cs at para. 129, that a claim dispatched on its merits on direct appeal is defaulted if raised again in state habeas -- it is this misuse of the phrase "procedural default" that permeates the prosecution-written F&Cs). Consequently, the claims are appropriate for federal review, and the Report does not dispute this.

Although the Report asserts "Roberson once again made no real effort to show that the findings were unreasonable," we respectfully disagree. Roberson challenged evidence on page 209, preceded by a thorough discussion of misconduct by the District Attorney which allowed false evidence to roll into the liability phase (pages 7 - 11, 14 - 15, 37 - 40), which the Magistrate read but disagreed.

**Claim 27**:

The Report is correct. Roberson did not intend to bring Claim 27 from the state writ to the federal one. We kept the numbering to avoid confusion.

**Claim 39**:

Roberson respectfully objects to the R&R's disposition of claim 39. The claim is not *Teague* barred because it asserts a due process right to present a complete defense, recognized by the Supreme Court before Roberson's 2003 trial in *California v. Trombetta,* 467 U.S. 479, 485 (1984); *Washington v. Texas,* 388 U.S. 14 (1967);

*Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973). "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky,* 476 U.S. 683, 690 (1986). *Holmes v. South Carolina,* 547 U.S. 319 (2006), did not cut new ground; it follows long recognition of this fundamental right.

### Other Objections

Roberson respectfully objects to the R&R's disposition of claims 16 to 30 (not 27) and claims 34 to 38 and 40 to 45. He believes his petition and reply brief accurately state his claims on recognized constitutional bases existing before the CCA affirmed his conviction and sentence. He contends that the R&R inaccurately decided these claims. The Court possesses sufficient briefing to decide them.

### CONCLUSION

In *Miller-El*, the Circuit correctly, according to the Supreme Court, cited the *Slack v. McDaniel* COA threshold that that "[a] petitioner makes a 'substantial showing' when he demonstrates that his petition involves issues which are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 330 (2003) (*citing Miller-El v. Dretke*, 261 F.3d 445, 449 (5th Cir. 2001)). The Circuit, however, "interjected the requirements of 28 U.S.C. § 2254 into the COA determination," adding an impermissible state court findings presumption and a clear and convincing standard. *Miller-El*, 537 U.S. at 330.

The Supreme Court reaffirmed *Slack*, but discarded additional burdens on COAs, writing, "At this stage, however, we only ask whether the District Court's application of AEDPA deference, as stated in §§ 2254(d)(2) and (e)(1), to petitioner's *Batson* claim was

debatable amongst jurists of reason." *Miller-El*, 537 U.S. at 341.

Roberson's claims may or may not win the day in a full 2254(d) analysis, but they are far from frivolous, and are certainly debatable among reasonable jurists and therefore require COA under *Miller-El*. He respectfully objects to the R&R's recommendation that COA be denied.

WHEREFORE, PREMISES CONSIDERED, Robert Roberson respectfully objects to the Magistrate's Report and Recommendation.

Respectfully submitted this 28 day of September 2014,

/s/ James W. Volberding

_____

**JAMES W. VOLBERDING**
SBN: 00786313

First Place
100 E. Ferguson Street
Suite 500
Tyler, TX 75702

(903) 597-6622 (Office)
(866) 398-6883 (fax)
*e-mail: jamesvolberding@gmail.com*

Seth H. Kretzer
LAW OFFICES OF SETH KRETZER
The Lyric Center
440 Louisiana Street; Suite 200
Houston, Texas 77056
[Tel.] (713) 775-3050
 [Fax.] (713) 224-2815

Court-Appointed Attorneys for
Petitioner, Robert L. Roberson, III

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this pleading has been delivered this 28th day of September 2014 to:

Ms. Fredericka Sargent
Office of the Attorney General        *Counsel for the Respondent*
Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1600 (voice)
(512) 936-6388 (direct)
(512) 320-8132 (fax)

by the following means:

```
_____        By U.S. Postal Service Certified Mail, R.R.R.
_____        By First Class U.S. Mail
_____        By Special Courier
_____        By Hand Delivery
_____        By Fax before 5 p.m.,
_____        By Fax after 5 p.m.
_X___        By Email at Fredericka Sargent
```
<Fredericka.Sargent@texasattorneygeneral.gov>

/s/ James W. Volberding
_____
JAMES W. VOLBERDING